# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| Patricia J. Gibson, | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.: 3:06-CV-974-MEF** |
| | ) | |
| **v.** | ) | |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

James C. Pennington
(ASB-1287-N62J)
OGLTREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One Federal Place
1819 5th Avenue North, Suite 1000
Birmingham, Alabama  35203-2118
Telephone: (205) 328-1900
Facsimile:  (205) 328-6000
James.Penningtonatodnss.com

Fred W. Suggs, Jr.
(ASB-3587-G61F)
OGLTREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
300 North Main Street (29601)
Post Office Box 2757
Greenville, South Carolina 29602
Telephone: (864) 271-1300
Facsimile:  (864) 235-4754
Fred.Suggsatogletreedeakins.com

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ...........................................1

II.  STATEMENT OF FACTS...........................................................................2

    A.  *WestPoint Operations*...............................................................2

        1.  Gibson Was a Warper Operator ...................................................2
        2.  Gibson Was Knowledgeable About WestPoint Policies ...........................2
            a.  Orientation and Handbook .........................................2
            b.  Equal Employment Opportunity and Harassment Policies....................3
            c.  Reporting Procedures.................................................3
            d.  Quality Issues..........................................................4
            e.  Discipline and Termination..........................................4
        3.  Gibson's Duties as a Warper Operator ...........................................5
        4.  Conversion from Sheets to Towels at Lanier Plant .............................6

    B.  *Gibson's Deteriorating Performance* ...............................................6

        1.  Maintaining Quality was Emphasized ...........................................6
        2.  Counseling Report ................................................................7
        3.  First Written Warning..............................................................7
        4.  Continued Quality Issues on Gibson's Warpers ...............................8
        5.  Second Written Warning...........................................................8
        6.  Gibson Received a Final Notice ..................................................9
        7.  Gibson Had Opportunities to Retain Her Employment with WestPoint .......9
        8.  Gibson Avoided Termination Six Times Because of Leniency..................10
        9.  Third Written Warning and Termination.......................................11
        10.  WestPoint's Decision to Terminate Was Reluctant................................12

III.  ARGUMENT ...................................................................................12

    A.  *Summary Judgment Standard* ...................................................12

    B.  *Gibson's EEOC Charge Was Not Timely*........................................14

        1.  Gibson Failed to File Her Charge With the EEOC Within 180
            Days of Any Alleged Discriminatory Act ..................................14
        2.  Gibson's Initial Letter to the EEOC Was Not a Charge ...........................15
        3.  The EEOC Recognized Gibson's Letter Was Not a Charge....................15
        4.  The EEOC Ignored Both Its Own Advice to Gibson and the
            Law in Receiving Gibson's Charge Out of Time .....................16
        5.  When the Timeliness of The Charge Was Questioned, the EEOC
            Tried to Deceive WestPoint.....................................................17
        6.  Legal Standard For a Charge of Discrimination .......................18

C.  *Legal Framework for Analyzing Gibson's ADEA Claim* ..............................**21**

    1.  Gibson Has No Direct Evidence of Discrimination.....................................21
        a.  Alleged Question by Bill Anderson ........................................................22
        b.  Alleged Question by Tim Wilbanks ........................................................23
        c.  Alleged References by Greg Tilley.........................................................24
    2.  Gibson Cannot Establish a *Prima Facie* Case of Age Discrimination ........26
        a.  Gibson Was Not Qualified ...................................................................27
        b.  Gibson Cannot Show a Younger Person Replaced Her..........................28
    3.  Gibson Sets Forth No Evidence of Disparate Treatment.............................29
    4.  WestPoint Had a Legitimate, Non-Discriminatory Reason for Its Actions.30
    5.  Gibson Has No Evidence of Pretext  ..........................................................32

**IV.  CONCLUSION**.........................................................................................**37**

**DEFENDANTS WESTPOINT STEVENS, INC.'S AND WESTPOINT HOME, INC.'S
MEMORANDUM SUPPORTING MOTION FOR SUMMARY JUDGMENT[1]**

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

The Plaintiff, Patricia J. Gibson ("Gibson"),[2] asserts that WestPoint Stevens, Inc., and

WestPoint Home, Inc. ("WestPoint")[3] discriminated against her because of her age in violation

of the Age Discrimination in Employment Act ("ADEA").[4]   WestPoint will show that (1)

Gibson's claims are time barred because she did not timely file a charge with the EEOC; (2)

even if Gibson's EEOC charge were timely with regard to her termination, Gibson's claims for

disciplinary actions are time barred because they occurred more than 180 days before the filing

of her charge; (3) Gibson's employment was terminated for legitimate, non-discriminatory

reasons; and (4) there is no evidence that WestPoint was motivated to discipline Gibson or

terminate Gibson's employment because of Gibson's age.

Gibson received progressive discipline for performance deficiencies, in accordance with

the Company's well established policies, which eventually resulted in the termination of her

employment.   Gibson claims the discipline she received was undeserved and speculates that the

discipline must have been motivated by her age.   Gibson, however, offers no evidence to support

her subjective beliefs.   Gibson never complained about discrimination while employed at

---

[1] Citations to the Deposition Transcript of Patricia Gibson are as "Tr." followed by the page and line numbers.
Citations to the Deposition Exhibits of Patricia Gibson are as "Dx(s)," followed by the Deposition Exhibit
Number(s); Citations to Declarations of witnesses are by the last name of the witness, followed by the paragraph
number(s) where the testimony is found.

[2] During the course of her employment, Gibson has been known as Barrow and Varner, as well as Gibson (Tr.
14:10-15:9).

[3] To date, only WestPoint has engaged in discovery.   Plaintiff's counsel has neither taken nor noticed any
depositions and has served no written discovery.

[4] Counsel for Gibson attempted to frustrate the deposition by speaking objections where she attempted to tell Gibson
what she wanted Gibson to say (Tr. 99:6-100:14; 136:2-137:18) and repeated frivolous objections (Tr. 98:9-14;
106:3-11; 152:5-15; 154:5-11; 156:3-10; 157:12-15; 158:17-20; 159:4-160:4; 161:5-16; 171:10-17; 192:22-193:4;
197:14-19; 199:12-18; 207:6-11; 212:13-15).   Counsel for Gibson tried to prevent Gibson from testifying honestly
and completely by objecting to her witness' own testimony (Tr. 116:13-119:8) and implying that Gibson should not
be providing information by instructing "answer if you can" (Tr. 137:15-16).   This misconduct was effective.   At
one point, after trying to answer questions, despite her lawyer's objections to her answers, Gibson exclaimed that
her "hands [were] tied" (Tr. 118:15-20).

WestPoint, and WestPoint had legitimate, non-discriminatory reasons for disciplining and ultimately discharging Gibson.

## II.    STATEMENT OF FACTS

### A.    WESTPOINT'S OPERATIONS

### 1.    Gibson Was a Warper Operator

WestPoint[5] operates plants in the United States, including Alabama, manufacturing home furnishings, including sheets and towels.  Gibson briefly worked at WestPoint from 1973-1974, and was continuously employed from August 15, 1975,[6] until August 26, 2005 (Tr. 82:17-84:20; 215:3-11, Dxs. 11-13, 49-50).  Gibson worked as a Warper Operator at WestPoint's Lanier Plant (Dx. 11).

### 2.    Gibson Was Knowledgeable About WestPoint Policies

#### a.    Orientation and Handbook

Gibson attended orientation when she was hired (Tr. 90:5-17).  Gibson understood the rules and what WestPoint expected of her regarding production (Tr. 97:15-21).  At the time she was hired, Gibson was given an employee handbook and received multiple updates to the employee handbook during her employment (Tr. 92:1-94:17; 95:2-5; Dxs. 14-18).  Gibson recalls reading the handbook and having her supervisor explain various topics (Tr. 100:15-

---

[5] On June 1, 2003, WestPoint Stevens, and certain affiliates (collectively, the "Debtors"), commenced bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") pursuant to chapter 11 of Title 11 of the United States Code.  The chapter 11 cases are jointly administered under case number 03-13532 (RDD) and remain pending, although the Debtors' estates are administratively insolvent. Pursuant to an order of the Bankruptcy Court dated July 8, 2005 ("Sales Order"), substantially all of the assets of WestPoint Stevens were sold to WestPoint Home, and that sale closed on August 8, 2005.  On August 26, 2005, Gibson was terminated by WestPoint Home.  Gibson can assert no viable claims against WestPoint Stevens that arose after WestPoint Home's purchase of WestPoint Stevens' assets on August 8, 2005.  Gibson can assert no viable claims against WestPoint Home, that arose before WestPoint Home's purchase of WestPoint Stevens' assets on August 8, 2005.  Gibson's employment was terminated with WestPoint Stevens on August 8, 2005, and her employment with WestPoint Home began on August 8, 2005.

[6] Before being employed by WestPoint in 1975, Gibson had limited work experience.  In addition to Gibson's brief work at WestPoint's Lannett Mill as a spooler learner from 1973 to 1974, she had folded sheets at a commercial laundry, and had washed cars at a car wash (Tr. 34:15-36:16, Dx. 13).

101:13).   The most recent handbook was issued on July 1, 2004, and Gibson acknowledged receiving it on July 22, 2004 (Dxs. 18, 19).

### b.    Equal Employment Opportunity and Harassment Policies

WestPoint has comprehensive policies promoting a workplace free of discrimination and harassment.   WestPoint's Equal Employment Opportunity Policy, contained in the employee handbook, declares that WestPoint does not discriminate "because of race, color, religion, sex, national origin, age, disability or veteran's status."    The policy forbids "discrimination, harassment, retaliation, coercion, interference or intimidation of any associate" due to any of these characteristics, or against any associate who files a complaint or cooperates in the investigation of a complaint of discrimination or harassment (Dx. 19 at WPH 000335).   Gibson admitted being aware of WestPoint's policy, and recalls being instructed on the importance of the policy (Tr. 99:1-5; 100:5-101:2, 102:7-103:7).    Gibson admitted she was aware that employees who engage in discrimination and harassment are subject to immediate termination of employment under WestPoint's discipline policy (Tr. 109:8-110:8; Dx. 19 at WPH 000377; Gibson).

### c.    Reporting Procedures

Gibson admitted she was aware of the procedures for reporting problems, including discrimination or harassment, which were contained in the handbook and posted at the plant (Tr. 104:19-105:2; 107:1-6; Dx. 19 at WPH000355-357; Dx. 20;).   Gibson knew she could make complaints of discrimination to her supervisor, department manager, Human Resource Manager, Plant Manager, or the Division Director of Human Resources, and ultimately, the Vice President of Human Resources (Tr. 104:19-106:2; Dxs. 19, 20).   Gibson admitted that she never

complained about discrimination or harassment during the entire time she was employed with WestPoint (Tr. 106:3-11).

### d.    Quality Issues

Gibson admitted she understood WestPoint's policies for reducing waste, maintaining quality, and effective use of time and resources (Tr. 101:14-102:6; 103:8-14; Dx. 19). Gibson admitted she understood the importance of maintaining these policies by avoiding mistakes, paying attention to quality, correctly counting the number of ends, and watching the yardage clock (Tr. 103:21-104:14).

### e.    Discipline and Termination

Gibson admitted she understood WestPoint's disciplinary policy, which provides for a series of progressive warnings for "less than intolerable" offenses, and gives the option of immediate termination for "intolerable" offenses (Tr. 107:7-108:1, 108:10-109:7; Dx. 19 at WPH 000364-372;). Examples of each offense are set forth in the handbook (Tr. 107:7-17; Dx. 19 at WPH 000364, 372). Gibson admitted she understood that she could be disciplined for poor performance (Tr. 108:6-9).

A first offense for a less-than-intolerable violation results in a formal counseling documented by a Counseling Report. A second offense results in a verbal warning, with a written warning report to the associate's file. Each subsequent offense results in a verbal warning, with a written warning placed in the employee's file (Tr. 108:10-109:3; Dx. 19 at WPH 000369). Gibson admitted she understood that three written warnings in a twelve (12)-month period results in termination of employment (Tr. 109:4-7, 241:5-10; Dx. 19 at WPH 00369).

### 3. Gibson's Duties as a Warper Operator

A warper is a machine that makes beams of warp fabric for sheets or towels from individual strands of yarn. On the back of each warper are two frames called "creels", which have pegs (Tr. 110:13-21). The creels are numbered and employees called "creelers" have written instructions which tell them how many packages of yarn to put on the creel for a particular beam. The warper operator pulls the ends of the yarn, threads them through the rake, and wraps the yarn around the beam. The warper operator then sets a clock for the yardage to be run (Tr. 111:3-112:16). There were two warper operators, each with one warper of her own, and a third shared warper (Tr. 114:18-115:5). The warper operators were responsible for checking behind the creelers, and the work of the prior shift, to make sure everything was correct before a beam was run (Tr. 115:5-116:4). As the warper operators pull the yarn ends through, they count to ensure the correct number of ends are on each beam, depending on the style to be woven (Adcock ¶ 3). As Gibson admitted, the operator who lays the ends in the rake is responsible for the beam (Tr. 168:2-5; Adcock ¶ 3).

There are hundreds of ends on a towel beam (Tr. 112:19-21). Failure to count the correct number of ends can result in beams that are short of ends. Too few ends results in either excessive waste in scrapping the beam, or excessive labor in running a special match beam, both of which increases the costs of labor and materials. Missing one end can be repaired so that the yardage is not totally wasted, but a backup beam must be run (Tr. 113:2-114:9). Missing multiple ends cannot be repaired and results in total waste. Gibson has been instructed on the importance of setting warper switches correctly, turning on the yardage switch, and centering the beams on the warper (Tr. 159:4-10; 169:8-12; Dxs. 28, 34); making sure the correct amount of

yards run on every beam (Tr. 159:16-160:2; Dx. 29); laying the ends in correctly (Tr. 167:21-168:16; Dx. 33); and filling out tickets correctly (Tr. 170:6-18; Dx. 35).

### 4.    Conversion from Sheets to Towels at Lanier Plant

The Lanier Plant once manufactured sheets, but in late 2003 and early 2004, the Lanier Plant was converted to towel production (Tr. 44:14-16; Wilbanks ¶ 2).  Gibson, along with other Lanier employees, was temporarily transferred to the adjacent Carter Plant during the conversion from sheets to towels at Lanier (Tr. 44:14-18; 45:4-46:15; 152:5-13; Dx. 26; Wilbanks ¶ 2).  The Carter Plant had previously been converted from sheets to towels (Tr. 152:16-21).  On May 15, 2004, Gibson was returned  to the Lanier Plant, and began working as a Warper Operator in towel production (Tr. 45:4-46:15; 153:2-154:1; 170:19-23; Dx. 27).

Towel production is more complicated than sheet production, because there are more types of yarn, more styles, and the beams fill up quicker (Tr. 154:5-9; 155:18-156:2; Stewart ¶ 3; Warren ¶ 3; Tilley ¶ 3).  After returning to Lanier, Gibson's work performance deteriorated, because she was unable to adjust to the more demanding production of towels (Dx. 3; Stewart ¶ 4; Warren ¶ 4).[7]

### B.    GIBSON'S DETERIORATING PERFORMANCE

### 1.    Maintaining Quality Was Emphasized

On July 27, 2004, Gibson was counseled by her supervisor, Billy Stewart, for producing off-quality section beams (Tr. 171:21-173:1; Dx. 36).  This counseling was documented with a

---

[7] Although Gibson had been previously disciplined for some of the same performance problems when she was making sheets, the frequency and severity of her mistakes increased significantly after she began running towels at Lanier (Stewart ¶ 4; Warren ¶ 4).  Gibson had been disciplined previously for failing to check the yardage clock (Dx. 21, 1/11/95), running bad beams (Dx. 23, 7/18/96), and cutting beams short (Dx. 24, 10/7/96), and had other documentation of verbal communications from her supervisor regarding poor quality and performance (Dxs. 28-29, 31, 33-35).

Personnel Notice.[8]  Stewart stressed the importance of producing beams of yarn that would run properly in the next process, slashing.  Beams were to be produced with no defects.  Stewart reminded Gibson that she should notify him if a defect occurred so proper action could be taken (Dx. 36).

### 2.    Counseling Report

On August 11, 2004, Stewart gave Gibson a Counseling Report (the first step in the discipline procedure) for producing a poor quality beam (Tr. 173:8-174:3; Dx. 37).  Gibson had run 12,401 yards of cloth with six ends out on the right side.  Gibson admitted she understood this counseling was the first step in discipline (Tr. 173:8-16).  Even though Gibson admits she might have made this mistake, she claims, without any supporting information, that the discipline was discriminatory (Tr. 175:2-23).[9]

### 3.    First Written Warning

On September 30, 2004, Gibson received a First Written Warning (the second step in the disciplinary process) from her supervisor, Billy Stewart (Tr. 177:9-15; Dx. 39).  Gibson admits she had the incorrect number of ends on four (4) section beams because she did not count the ends when she took over from the prior shift, as she had been instructed to do (Tr. 178:1-15).  Yet, Gibson inconsistently claims the warning is discriminatory because the warper is always blamed instead of the creeler, and because the warning was given to her three days after the event (Tr. 178:16-18).  Gibson also believed that since she told Stewart about her mistake, she should not have received a warning (Tr. 180:5-21).  Gibson claims the only reason she thought

---

[8] A Personnel Notice is used to document complaints, problems, changes, commendations, or other actions affecting an employee's employment.  One of its main uses is to document verbal instructions or performance issues where discipline is not necessarily warranted.  If the conduct documented is not corrected, or instructions are not followed, discipline may be issued as a next step *(See, e.g.*, Dx. 27).  Gibson understood a Personnel Notice was not discipline (Tr. 165:20-23; 167:3-5; 170:10-14; 176:7-12; 199:5-7; 201:8-10).

[9] On September 24, 2004, Clifford McCants documented a reminder to Gibson to sign her Warper Tickets, because she had failed to sign five tickets (Tr. 176:7-177:5; Dx. 38).

the discipline was related to her age was because she was having so many problems that it had to be discrimination (Tr. 181:2-18).  Gibson admits she does not know what action Stewart may have taken with the creelers (Tr. 180:12-21; Stewart ¶ 6).

### 4. Continued Quality Issues On Gibson's Warpers

On October 5, 2004, Stewart documented that the slashing department had reported poor quality section beams from the warper run by Gibson and another employee, Shannon Johnson (Tr. 182:3-5; Dx. 40).  Stewart documented that he discussed with both Gibson and Johnson the importance of good quality.[10]  Gibson refused to sign the document (Tr. 183:6-8).  Gibson claims it was blamed on her, not Johnson.  Gibson admits that she does not know if Stewart also talked to Johnson, but "imagines" that he did (Tr. 183:9-12; 184:3-16).  Gibson's complaint about this incident was that the frames were outdated and there was poor quality yarn coming to her (Tr. 183:13-22; 184:17-21).   Gibson admits that she does not know why Stewart gave her warnings and Personnel Notices.  Gibson thought Stewart did not like her (Tr. 184:22-186:12).  Gibson does not claim Stewart gave her the Personnel Notice because of her age (Dx. 40).

### 5. Second Written Warning

Gibson received a Second Written Warning (the third step in the disciplinary process) on October 15, 2004, because she ran three (3) section beams that were each short six (6) ends (Tr. 187:11-22; Dx. 41).  This warning was for precisely the same reason that Gibson received her First Written Warning on September 20 (Dx. 39).  Gibson refused to sign this warning because she did not believe the missing ends were her fault.  Gibson contended that unspecified creelers

---

[10] When an error was made on the common warper, Stewart would talk to both Gibson and Johnson and give each a Personnel Notice (Stewart ¶ 10).  Johnson received the same Personnel Notice for this incident (WPH 000752).  Johnson believed she was being blamed for Gibson's errors (Johnson ¶ 5).

were at fault (Tr. 187:23-188:22).[11] Gibson claimed this warning was discrimination based on her age simply because she received the warning.  Gibson gave no cogent reason for her belief (Tr. 188:23-190:21).

### 6.    Gibson Received A Final Notice

Because Gibson received a second written warning, Gibson was issued a "Final Notice" on October 19, 2004, explaining that if she had received another warning before September 30, 2005, the date of her first written warning, she would be discharged (Tr. 191:7-193:15; Dx. 42). This Final Notice was in accordance with WestPoint's policy that three written warnings within a rolling twelve (12)-month period would result in termination of employment (Dx. 19 at WPH000369; Dx. 42).

### 7.    Gibson Had Opportunities to Retain Her Employment With WestPoint

At the time of Gibson's second written warning, it was recognized that Gibson was in trouble.  Other than her continuing performance problems, Gibson had been a good associate and was a long-term employee, so Human Resource Manager Calvin Ogletree told Gibson he would work with her to get her a more compatible job (Adcock ¶ 6).  Gibson bid for another job, but even though she was aware that she had two written warnings, she withdrew her bid the same day and told Calvin Ogletree she preferred to stay on her job as a warper operator (Tr. 226:5-227:20; 230:1-4; Adcock ¶ 6).  WestPoint had a rule prohibiting an employee with two written warnings from transferring to another job, but Bill Anderson offered to make an exception for Gibson by allowing her to bid for an open cleaner/sweeper position (Anderson ¶ 3).  Gibson admits that there were other opportunities for her to apply for an open position as a

---

[11] Employees were expected to report errors they found which had occurred in the previous steps of production.  If Gibson missed an error made by the creelers and ran an incorrect beam because she failed to detect the error, she was responsible for the bad beam (Tr. 115:5-116:4; 168:2-5; Adcock ¶¶ 3-4).

cleaner/sweeper, but she did not apply, despite the fact that one more warning would result in her discharge (230:7-231:5; Dx. 51).

**8.      Gibson Avoided Termination Six Times Because of Leniency**

After her second written warning, Gibson received six personnel notices related to poor performance, in lieu of the third written warning that would result in her termination (Anderson ¶ 7; Stewart ¶ 9).

On November 8, 2004, Jeff Black, who was supervising Gibson for the day, documented by personnel notice that Gibson had run five (5) beams with each one missing six (6) ends, creating significant waste (Tr. 194:2-195:9; Dx. 43).   Although she had two previous written warnings for precisely the same reason, Gibson was not given a third written warning for this serious incident (Tr. 196:14-19).   Therefore, Gibson avoided the termination of her employment. Gibson claims she does not recall this incident (Tr. 195:10-14).

On November 22, 2004, Stewart documented by personnel notice instructions on what to do if an end breaks and how to initial the card when a section beam is full (Dx. 44).   Gibson refused to sign that she had received these instructions, but admits she received them (Tr. 198:9-16).

On December 10, 2004, Stewart issued a personnel notice documenting that he reviewed with both warper operators complaints about poor quality and failure to fill out warp tags correctly (Tr. 199:5-200:19; Dx. 45).

On December 15, 2004, Stewart documented in a personnel notice that Gibson was not making an effort to run all three warpers while the other operator was on break.   This cooperation was expected of all operators (Tr. 201:8-202:2; Dx. 46).   Gibson was also instructed that she was not using her time productively because she was not starting her warpers before

doing paperwork and general housekeeping, which could be done while the warpers were running. Gibson admits she could have received a written warning for this violation (Tr. 202:15-23).

On February 8, 2005, Stewart issued a personnel notice documenting his discussion with Gibson about continued complaints of poor quality section beams and her low production (Tr. 203:7-22; Dx. 47). Gibson admits that this notice could have been given to her as a written warning, and that if it had, her employment would have been terminated (Tr. 203:23-204:6). The Personnel Notice noted Gibson had "No more chances!", indicating that Stewart had been avoiding issuing a third written warning, knowing that Gibson would be terminated (Dx. 47). This was Gibson's fourth personnel notice for poor quality while on final warning (Tr. 204:16-205:4).

Gibson received yet another chance to keep her job when Supervisor Ronny Warren[12] issued a personnel notice, instead of a written warning, on August 2, 2005, when Gibson ran a beam short (Tr. 207:2-19, Dx. 48). Warren noted that Gibson had two active warnings, and that any more problems would result in a third written warning and discharge. Warren was clearly aware that another warning would result in Gibson's termination, but he gave Gibson another chance by giving her a Personnel Notice, instead (Tr. 211:3-11).

9.    **Third Written Warning and Termination**

On August 26, 2005, Gibson received a third written warning for running three (3) beams with twelve (12) ends short (Tr. 211:15-212:3; Dx. 49). This was precisely the same reason that Gibson had received her first and second warnings and the Personnel Notice on November 8. Gibson does not claim that this warning which resulted in her termination was discriminatory

---

[12] After the conversion at Lanier, the warper operators worked an eight (8)-hour shift, while the supervisors worked a twelve (12)-hour shift. Therefore, Gibson was supervised by both Stewart and Warren (Stewart ¶ 2; Warren ¶ 2).

(Tr. 214:14-22). Gibson's employment was terminated because this was her third written warning in a rolling twelve (12)-month period (Tr. 215:3-23; Dx. 50).

### 10.    WestPoint's Decision To Terminate Was Reluctant

As evidenced by the six personnel notices between her second written warning and her third written warning, WestPoint was not anxious to terminate Gibson's employment (*See* II, B, 8; Stewart ¶ 9; Anderson ¶ 7). Gibson was given multiple opportunities to improve on her warper operator job or retain employment by transferring to other positions which were available to her (*See* II, B, 7; Adcock ¶ 6; Anderson ¶ 3). Calvin Ogletree reported to the Alabama Department of Industrial Relations ("ADIR") that "We hated to let her go" (Dx. 3). Shannon Johnson confirms that management did everything possible to help Gibson (Johnson ¶¶ 4, 5, 7). Ogletree's statements to the ADIR were helpful to Gibson in obtaining her unemployment benefits, because Ogletree made clear that there was no intentional misconduct on Gibson's part (Tr. 236:16-18; Dx. 3). Gibson simply could not adjust to the work standards required for towel production (Dx. 3). Gibson never complained that any of these warnings were discriminatory while at WestPoint (Tr. 106:3-11; Anderson ¶¶ 4, 5; Stewart ¶¶ 6, 7, 8; Warren ¶¶ 6, 7, 8).

### III.    ARGUMENT

### A.    SUMMARY JUDGMENT STANDARD

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986), *quoting*, Fed.R.Civ.P. 1. "Summary judgments for defendants are not rare in employment discrimination cases." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (citations omitted).

Summary judgment is proper under Federal Rule of Civil Procedure 56(c) where the movant shows there is no genuine issue of material fact and that, based upon the undisputed facts, it is entitled to judgment as a matter of law. *Earley*, 907 F.2d at 1080. For a question of fact to be *genuine*, the party opposing summary judgment "must do more than simply show that there is some *metaphysical doubt* as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-587 (1986). Instead, the evidence must be of such quality that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[I]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-250; *see also, Earley*, 907 F.2d at 1080.

In considering a motion for summary judgment, the trial court must, of course, consider the evidence in the light most favorable to the non-movant. *Earley*, 907 F.2d at 1080. During this process, however, the court is required to resolve only *reasonable* doubts in the non-movant's favor; it is not required to resolve <u>all</u> doubts in his favor. *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir. 1995); *Barnes v. Southwest Forest Industries, Inc.,* 814 F.2d 607, 609 (11th Cir. 1987). "A court is not obligated to find that there is no conflict in the evidence; the court must merely find that there is not <u>substantial</u> evidence opposed to the moving party's position." (emphasis in original). *Jones v. Miles Laboratories, Inc.,* 887 F.2d 1576, 1578 (11th Cir. 1989). A movant is entitled to summary judgment where, "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323. Where a movant has properly supported a motion for summary judgment, the burden shifts to the non-movant to demonstrate, through the evidentiary forms listed in Fed. R. Civ. P. 56(c), genuine issues of material fact necessitating a trial. *Id.* The

substantive law governing the plaintiff's claims determines which facts are material and which are irrelevant. *Anderson*, 477 U.S. at 248.

The first step in assessing a motion for summary judgment is to establish the substantive law governing the plaintiff's claims. After laying this foundation, WestPoint will demonstrate that the application of this law to the undisputed facts of this case leads inescapably to the conclusion that it is entitled to summary judgment.

### B.    GIBSON'S EEOC CHARGE WAS NOT TIMELY

### 1.    Gibson Failed to File Her Charge with the EEOC Within 180 Days of Any Alleged Discriminatory Act

Before exploring the merits of Gibson's ADEA claim under the Age Discrimination in Employment Act ("ADEA"), WestPoint will show that Gibson's claim should not be before the Court because her EEOC charge was untimely. It is well established under the ADEA that a plaintiff alleging age discrimination must exhaust administrative remedies by first filing a charge with the EEOC, in this case, within 180 days of the alleged discrimination. 29 U.S.C. §626(d)(1); 29 C.F.R. 1626.7(a); *Robinson v. Regions Fin. Corp.,* 242 F. Supp. 2d 1070 (M.D. Ala. 2003); *Riccard v. Prudential Ins. Co.,* 307 F.3d 1277, 1291 (11th Cir. 2002).

Gibson received a Formal Counseling Report on August 11, 2004 (Dx. 37). The time to file a charge of discrimination based on this report expired February 7, 2005. Gibson's First Written Warning was issued September 30, 2004 (Dx. 39). The time to file a charge based on this warning expired March 29, 2005. Gibson's Second Written Warning was given on October 15, 2004 (Dx. 41). The time to file a charge of discrimination based on this warning expired on April 13, 2005. Gibson's employment was terminated on August 26, 2005, as a result of her third written warning in twelve (12) months (Dx. 49 and 50), which is the last day she claims discrimination occurred (Tr. 249:12-250:18). After her third written warning that resulted in her

termination, Gibson had 180 days in which to file a charge of discrimination, or until February 22, 2006.

Gibson did not file a charge of discrimination until March 15, 2006 (Tr. 248:12-249:11; Dx. 58). Therefore, Gibson's charge of age discrimination based on her discipline and her termination is untimely.

### 2.    Gibson's Initial Letter to the EEOC Was Not a Charge

On December 30, 2005, Gibson sent to the EEOC a hand-written, one-page statement addressed "To Whom It May Concern," which was received at the EEOC on January 4, 2006 (Tr. 243:7-22; Dx. 53). Gibson asserted (1) she was terminated from WestPoint on August 26, 2005, after 30 years; (2) the reasons given for her termination were not true; (3) she was not given three warnings [before termination]; (4) the yarn was coming from other areas of the plant and she had no control over it; (5) her supervisor, Billy Joe Stewart, began harassing her as soon as she reported to Lanier; and (6) she [was harassed] for not running other people's jobs (Dx. 53). Since Gibson's hand-written letter said nothing about age discrimination, the EEOC had no basis for a charge on Gibson's behalf.

### 3.    The EEOC Recognized Gibson's Letter Was Not a Charge

On January 6, 2006, the EEOC sent a letter to Gibson at the return address listed on her hand-written correspondence (Dx. 54). The EEOC's letter states, "The information you gave us is not enough to determine how we should handle this case. More information is needed before we can continue." (Dx. 54). The EEOC warned Gibson, "IF WE HAVE NOT HEARD FROM ANYONE WITHIN 30 DAYS OF THIS LETTER, WE WILL ASSUME THAT THERE WAS NO INTENTION TO FILE A CHARGE OF DISCRIMINATION WITH US." (Dx. 54). Gibson admitted she received the EEOC's letter shortly after January 6, 2006 (Tr. 244:9-20).

It is clear from the EEOC's letter that it could not determine from the information in her letter if Gibson intended to file a claim. The EEOC case log confirms there was no basis for a charge: "12-30-05 Mail assigned to ISA – No Basis" and "01-06-05 ISA mailed contact to make certain that she had No Basis" (Dx. 55).

### 4. The EEOC Ignored Both Its Own Advice to Gibson and the Law in Receiving Gibson's Charge Out of Time

Rather than follow the advice in its own letter and assume Gibson did not intend to file a charge, the EEOC telephoned Gibson on March 6, 2006, <u>AFTER</u> Gibson's time to file a charge had expired, and left Gibson a message. When Gibson returned the EEOC's call, she lied to the EEOC by claiming that she had never received the EEOC's January 6 letter (Dx. 55). At her deposition, Gibson admitted that, on January 6, 2006, she lived at the address to which the EEOC sent its letter, and Gibson confessed that she did, in fact, receive it (Tr. 244:9-20), but took no action.[13]

---

[13] Gibson's deceit with the EEOC is not Gibson's only admission of mendacity.

Gibson told so many stories about her level of education that the whole truth is unlikely to be discovered. At her deposition, Gibson insisted that she completed the 10th grade at PS 271 in Brooklyn, New York (Tr. 33:2-13). It appears that Gibson actually completed only the 9th grade at Drew Junior High in Lanett. On her two WestPoint employment applications in 1973 and in 1975, respectively, Gibson wrote in her own hand that she completed the ninth grade at Drew (Tr. 31:14-32:19; 86:3-88:18, Dxs. 12-13). On the 1973 application, Gibson wrote she completed Drew in 1962, but on the 1975 application, she wrote 1961 (Dxs. 12-13). Either date is plausible for a person born in November 1947, and both are likely fairly accurate. In subsequent employment applications, Gibson inflated her education by claiming variously that she had graduated from high school or completed the 11th grade. Gibson recognized that listing more education than she had achieved would increase her chances of being hired (Tr. 86:3-87:7). AIC, "11[th] grade" (Tr. 39:5-19; Dx. 1 at 476); Troup County School System, "11[th] grade" (Tr. 40:3-18; Dx. 2 at 734); Alabama Department of Industrial Relations, "high school graduate" (Tr. 46:16-47:3; Dx. 3 at 636); A-1 Equipment, "completed high school" (Tr. 50:6-12; Dx. 4 at 541); First Choice Personnel, "11[th] grade" (Tr. 52:4-15; Dx. 5 at 519); Kelly Services, "high school, no diploma, 5/30/1965" (Tr. 53:11-21; Dx. 6 at 509)). Gibson admitted that she lied about her education on all five (5) applications (*Id.*).

Gibson confessed that she lied about the reason she left WestPoint because she believed if she told the truth about her employment being terminated for poor production, she would not be hired (Tr. 51:2-14; 304:1-6). Gibson consistently falsified her reason for leaving WestPoint as "laid off" (AIC, "laid off") (Tr. 304:1-19, Dx. 1 at 477); Troup County School System, "Layoff" (Tr. 42:2-19; Dx. 2at 735); A1 Employment, "layoff" (Tr. 50:13-51:14; Dx. 4 at 541); First Choice, "Laid off" (Tr. 52:16-21; Dx. 5at 519); Kelly Services, "Lay off" (Tr. 54:7-9; Dx. 6 at 510)).

**5.    When the Timeliness of the Charge Was Questioned, the EEOC Tried to Deceive WestPoint**

Not until March 7, 2006, did the EEOC send a Notice of Charge to WestPoint, declaring that, "No action is required by you at this time," and showing January 4, 2006, as the only date discrimination occurred.  January 4, 2006, was the date the EEOC received Gibson's letter. (Tr. 250:1-7; Dx. 56).  A second Notice of Charge was issued March 21, 2006, along with a Charge of Discrimination signed by Gibson on March 15, 2006 (Tr. 247:16-249:11; Dx. 57, 58).  The Charge stated that the earliest date of discrimination was August 26, 2005 (the date of Gibson's termination) and the latest January 4, 2006 (the date of Gibson's hand written letter to the EEOC) (Tr. 248:15-249:23; Dx. 58).  The charge was stamped received by the EEOC Birmingham District on March 16, 2006 (Tr. 249:5-8; Dx. 58).

WestPoint responded to the EEOC requesting that the charge be administratively dismissed because it was obviously untimely, having been filed on March 16, 2006, a full thirteen (13) days after the deadline of February 22, 2006 (Tr. 253:11-254:8; Dx. 62).  WestPoint also pointed out that Gibson was alleging discrimination on January 4, 2006, which was long after the date her employment was terminated, and that no particulars were given to explain the alleged discrimination that occurred after Gibson's discharge (Dx. 62).  The use of the January 6, date is a thinly veiled attempt by the EEOC to make Gibson's charge appear timely.  Gibson admitted WestPoint did nothing discriminatory to her in January 2006, and that the January 6, date simply coincided with the date her letter was received at the EEOC (Tr. 249:12-250:18).

In its letter of May 9, 2006, responding to WestPoint, the EEOC claimed that Gibson's original charge was filed on January 4, 2006, when a hand-written letter was received by the EEOC (WPH 000753).  This conclusion is contrary to law and contrary to the EEOC's original position that the information in that letter was insufficient to file a charge.  Nevertheless, the

EEOC had Gibson sign an amended charge dated May 6, 2006, stating that the original charge was filed on January 4, 2006 (Tr. 250:22-252:13; Dx. 59, 60). When responding to Gibson's request to issue a Notice of Right to Sue, the EEOC inadvertently, but accurately, noted in its internal "Recommendation For Closure" that, "The Charging Party filed the subjected [*sic*] charge **3/16/06**…" (emphasis added) (Dx. 61).

### 6. Legal Standard For A Charge of Discrimination

A charge filed with the EEOC must be "in writing under oath or affirmation and shall contain such information and be in such form as the Commission requires." 42 U.S.C.A. §2000e-5 (2005). Each charge must contain "A clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices," as well as the full name, address, and telephone number of the charging party, full name and address of the employer, and the approximate number of employees. 29 C.F.R. § 1626.8(a)(1)-(5). The purpose of a charge is to allow the EEOC to detect and remedy discriminatory employment practices through a process where prompt notice of the charge is conveyed by the EEOC to the employer and an investigation is conducted by the EEOC. *EEOC v. Shell Oil Co.,* 466 U.S. 54, 62-63, (1984). Upon receipt of a charge, the EEOC is responsible for "promptly notifying the respondent that a charge has been filed." 29 C.F.R. §1626.11.

The question of what constitutes a charge of discrimination in the Eleventh Circuit rests on whether (1) Gibson's December 30, 2005, letter satisfied the requirements of 29 C.F.R. § 1626.8; (2) Gibson manifested an intent for the letter to function as a charge, and; (3) the EEOC treated the letter as a charge. *Clark v. Coats & Clark, Inc.*, 865 F.2d 1237, 1240-41 (11th Cir. 1989) (intake questionnaire was deemed a charge because it sufficiently described the alleged discriminatory actions, the EEOC treated it as a charge, and the EEOC notified the defendant of

the alleged discrimination after receipt of the intake questionnaire, but before the completion of a formal charge). *Bost v. Fed. Express Corp.*, 372 F.3d 1233 (11th Cir. 2004) *cert. denied* 543 U.S. 1020 (2004) (an intake questionnaire is not a charge where there was no intent to file a charge, the questionnaire did not state it was a charge and plaintiff did not inquire with the EEOC or receive instruction from the EEOC regarding his alleged charge); *Pijnenburg v. W. Ga. Health Sys.*, 255 F.3d 1304, 1306-07 (11th Cir. 2001) (an intake questionnaire was not a charge because it neither notified the employer of a claim of discrimination, nor triggered an investigation by the EEOC). *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1320-21 (11th Cir. 2001) (intake form was a charge because the plaintiff received misleading information from the EEOC, the form stated it could function as a charge, and the EEOC treated it as a charge); *Malone v. K-Mart Corp.*, 51 F. Supp.2d 1287, 1299 (M.D. Ala. 1999) (letter to the EEOC constituted a charge only because the letter satisfied the requirements of 29 C.F.R. § 1601.12 (Title VII) [29 C.F.R. § 1626.11 (age)], conveyed the plaintiff's present intent to file an EEOC charge, and was treated as a charge by the EEOC).

Under the Eleventh Circuit's standards, Gibson's letter does not amount to a charge. The EEOC did not initiate an investigation, and did not notify WestPoint upon receipt of Gibson's letter. Unlike Wilkerson, Gibson received no misleading information inducing her to believe that the information she provided had initiated a charge. On the contrary, Gibson was specifically told the information in her letter was insufficient. Gibson never responded to the EEOC's request for additional information. There is no statement in her letter that Gibson intended to file a charge.

Gibson's letter contains much less information than would be in an intake questionnaire. Gibson's failure to state a claim of discrimination, or a basis for that discrimination, means her

letter could not function as a charge.  There is no reference to age, race, color, sex, or any other protected category, or basis of discrimination.  There is no reference to any discrimination at all. Gibson simply alleges that her warnings were undeserved.  Gibson's letter does not give any dates, other than the date of her termination.

In a case directly on point, the court found a letter to the EEOC which identified the defendant employer, identified the alleged harasser and included a description of the harassment, could have arguably contained sufficient information to be a charge.  However, the letter was found not to be a charge because the subsequent correspondence between the EEOC and the plaintiff showed that the EEOC did not consider the letter a charge and did not treat it as such. *Daniels v. Mobile Register, Inc.*, 2005 U.S. Dist. LEXIS 44875 (attached).

The EEOC's internal documentation shows it did not consider Gibson's letter to be a charge, and that it considered the date of the Charge to be March 16, 2006 (Dx. 54, 55, 61). Gibson herself admits that she did not intend to file a charge of age discrimination until she talked with the EEOC, which was after the time to file a charge had expired (Tr. 297:22-298:11; Dx. 55).[14]  Since Gibson did not express any intent to file a charge of age discrimination, and the EEOC did not treat the letter as a charge, Gibson did not file a timely charge on any of the claims in this action.  Accordingly, all Gibson's claims should be dismissed.

Even if Gibson's letter was a charge, the only incident which occurred within Gibson's time to file a charge was the August 26, 2005, Third Written Warning and Termination.  All of the other warnings were issued on or before October 15, 2005, which makes them untimely without regard to whether Gibson's March 16, 2006, charge was timely.  Therefore, any claims of discrimination based on the Counseling Report, First Written Warning and Second Written

---

[14] Gibson first spoke with the EEOC on March 7, after the time to file her charge expired on February 22 (Dx. 55).

Warning should be dismissed, as well as any other acts occurring earlier than 180 days before the January 4, 2006, letter.[15]

## C.    LEGAL FRAMEWORK FOR ANALYZING GIBSON'S ADEA CLAIM

Gibson's sole claim is for age discrimination.  29 U. S. C. § 621 *et seq.* (Complaint ¶¶ 4, 12; Tr. 116:5-9; 216:5-7).    A plaintiff may prove discrimination with either direct or circumstantial evidence. *Walker v. NationsBank N. A.,* 53 F.3d 1548, 1555 (11th Cir. 1995).[16]

### 1.    Gibson Has No Direct Evidence of Discrimination

Not every comment about an employee's race, gender, religion or age is direct evidence of discrimination.  *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277 (1989) (O'Connor, J. concurring).    Stray remarks, including "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" are not direct evidence. *Id.*    This reasoning has been followed by the Eleventh Circuit.  *Trotter v. Board of Trustees of Univ. of Ala.,* 91 F.3d 1449, 1453-54 (11th Cir. 1996) (holding that a statement by someone not involved in the allegedly discriminatory employment decision is not direct evidence), *overruled on other grounds*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90; *Allen v. City of Athens,* 937 F. Supp. 1531, 1542 (N.D. Ala. 1996) (noting that the Eleventh Circuit has adopted Justice O'Connor's definition of direct evidence); *see also Eskra v. Provident Life & Accident Ins. Co.,* 125 F.3d 1406, 1411 (11th Cir. 1997) ("A statement by a person who played no part in the adverse personnel decision is not direct evidence of discrimination.").

Not every comment concerning a person's age presents direct evidence of discrimination *Young v. General Foods Corp.*, 840 F.2d 825 (11th Cir. 1988).[17]  Young claimed that statements

---

[15] Gibson makes several claims that isolated statements or actions were discriminatory, but she cannot state a date of occurrence.  For brevity, these will be addressed in the argument on the validity of the ADEA claim itself (*See* III, C, 1, a-c).

[16] A third method of establishing a *prima facie* case is showing a statistical pattern of discrimination, but Gibson has made no claim or offered any such evidence in this case (*Carter v. Miami*, 870 F.2d 578, 581 (11th Cir. 1989).

by his superior that he lacked the "wherewithal" to perform his job, "moved in slow motion," was "not proactive," "not aggressive," and was about the same age as the superior's father were direct evidence of age discrimination, but the Court disagreed. *Id.* at 829. As in the *Young* case, the innocuous comments cited by Gibson as direct evidence of discrimination are not directly related to her age.[18] Gibson simply interprets them as related to her age because, in hindsight, it suits her purpose. As in *Young*, this is "a case where *the plaintiff has inferred* that certain facially neutral comments referred to [her] age in a discriminatory fashion." The inference Gibson seeks to make is certainly not required and, as a matter of law, is not even permitted. It is irrelevant. *Id.* at 829.

### a.    Alleged Question by Bill Anderson

Gibson complains that Bill Anderson once asked her if all of her children were grown. Gibson's strained interpretation is that Anderson meant it was time for her to leave WestPoint. A more likely explanation is that if Anderson questioned whether Gibson's children were grown, he did so as part of a conversation where he was making friendly, small talk with an employee. Gibson admits, however, that Anderson never said she should leave the company (Tr. 120: 1-121:12). Gibson does not know when the alleged comment occurred (Tr. 121:13-22). Gibson never complained to anyone about Anderson's alleged remark (Tr. 122:5-14).

Anderson's statement, even if made, is not evidence of direct discrimination. Although Anderson signed Gibson's warnings and her termination form, Anderson's alleged question about Gibson's children is completely unrelated to those actions. Gibson cannot even determine

---

[17] *See, e.g., Barnes v. Southwest Forest Industries, Inc.,* 814 F.2d 607, 610-611 (11th Cir. 1987) (remark by personnel manager that in order to transfer, "you would have to take another physical examination and at your age, I don't believe you could pass it" was not direct evidence of discrimination); *Carter v. City of Miami,* 870 F.2d 578 (11th Cir. 1989) (remark by City Attorney that he did not want his office run by "little old Jewish ladies," like his mother-in-law, was not direct evidence of age discrimination).

[18] Unlike *Young*, the alleged comments were not related in any way to Gibson's employment, or her ability to perform her job.

if the statement was made at a time that would be relevant to her warnings or her termination. (Tr. 121:13-22). Anderson's alleged question does not reference Gibson's work in any way, or how her work would be affected by having grown children. Gibson's illogical conclusion that Anderson was implying that she should leave her job is ridiculous. This was a stray remark, unrelated to age, and not related to the decisional process leading to Gibson's warnings or termination.[19] Therefore, it is not direct evidence of age discrimination.

### b. Alleged Question by Tim Wilbanks

Tim Wilbanks was the Employee Relation Manager for the Lanier and Carter Plants for twelve (12) years before being promoted to the position of Director of Labor Relations and Corporate Compliance and moving to the Corporate Offices (Tr. 124:16-125:12; Wilbanks ¶ 1). The transition of the Lanier Plant from sheeting to towels took place after Wilbanks had moved to the corporate offices. During the transition period, all Lanier Associates were placed on no-work-available leaves of absence. Around the same time, another plant that manufactured towels was closed. Wilbanks was aware that because towel manufacturing was more complicated than sheet manufacturing, the Company planned to transfer as many associates as possible from the closed towel plant to the Lanier Plant when it reopened producing towels. He was also aware that this meant most of the associates who were on leave from Lanier would not be recalled to work (Wilbanks ¶ 2).

When the Lanier Plant re-opened, Wilbanks was touring the plant to reconnect with the employees and making small talk (Tr. 124:2-15; Wilbanks ¶ 3). When Wilbanks saw Gibson, he

---

[19] The Courts have generally accepted that isolated remarks are not direct evidence of discrimination. *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1478 (10th Cir. 1996) (statements of personal opinion, unrelated to employment practices are not direct evidence); *Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 314 (6th Cir. 1989) (an isolated remark is not direct evidence) (overruled on other grounds by *Wright v. Murray Guard, Inc.*, 455 F.3d 702).

said, "Oh, hi, Pat, are you still here?" and walked on (Tr. 124:13-15; Wilbanks ¶ 3). Wilbanks had not seen Gibson in a while, since he had been transferred to the corporate headquarters (Tr. 125:8-17). Wilbanks was simply indicating his pleasant surprise that the associates had been recalled to work (Wilbanks ¶ 3).

Wilbanks' comments were not related to Gibson's age, or meant to imply anything relating to her age (Wilbanks ¶ 3). If anything, Wilbank's surprise that Gibson, and others, had been recalled to work was a positive exclamation, rather than a negative one. Gibson misinterpreted Wilbanks' comment, and there is nothing in the context of Wilbanks' alleged remark that would have led any reasonable person to believe that Wilbanks was referring to Gibson's age.

Gibson does not know when the conversation occurred, although it was after Lanier began manufacturing towels (Tr. 126:4-21). Gibson never complained about Wilbanks' alleged question during her employment with WestPoint (Tr. 126:22-127:10; Wilbanks ¶ 3). Gibson admits that Wilbanks was not involved in her discipline or her termination (Tr. 239:6-17). Since Wilbanks' statement was unrelated to Gibson's age but was a stray remark, not connected to any decisional process, and since Wilbanks was not a decision maker, Wilbanks' alleged question is not direct evidence of age discrimination.

c.    **Alleged References by Greg Tilley**

Gibson claims Greg Tilley, her former supervisor, would refer to employees as "old." Gibson gives as an alleged example Tilley asking, "have you seen that old Lela Mae?" Gibson

admits Tilley used "old" as an adjective for any person he inquired about.  Gibson admits she never heard Tilley use "old" in reference to herself (Tr. 123:1-124:1).[20]

Tilley was not a decision maker in Gibson's termination.  Tilley had not supervised Gibson since she was last at the Carter Plant in May 2004, and had not issued any discipline to her since July 17, 2003, much too long ago to be considered part of Gibson's claim (Tr. 220:18-23; Dx. 27, 35; Tilley ¶ 2).  Though Gibson believes that Tilley discriminated against her, she admits that she has only her "feelings" that the discipline from Greg Tilley was discriminatory (Tr. 133:6-134:17; 138:4-18; 143:5-14; 144:13-146:14; 149:7-151:12).  Finally, Gibson believes Tilley discriminated against her because of her race, not her age, and race was neither a basis for her EEOC charge, nor a claim in her lawsuit (Tr. 151:13-152:1; 220:6-17).

The evidence proffered by Gibson does not rise to the level of statements that have been found to be direct evidence in the Eleventh Circuit.  *Haynes v. W.C. Caye & Co.,* 52 F.3d 928, 930-931 (11th Cir. 1995) (holding that the statement, "women were simply not tough enough to do the job," is direct evidence of discrimination); *Caban-Wheeler v. Elsea,* 904 F.2d 1549, 1555 (11th Cir. 1990) (holding that the statement, "the…program needed a black director," is direct evidence of discrimination); *Sennello v. Reserve Life Ins. Co.,* 667 F. Supp. 1498, 1502 (S.D. Fla. 1987) (holding that the statement, "we can't have women in management," is direct evidence of gender discrimination), *aff'd* 872 F.2d 393 (11th Cir. 1989).

In *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390 (11th Cir. 1997), the Court ruled that while the statements in these cases showed a "close nexus" to the adverse employment action because they were directly related to the adverse employment action, statements which did not have a direct nexus, were not evidence of discrimination (*Id*. at 1394).

---

[20] *Philipp v. ANR Freight Sys.,* 61 F.3d 669, 674 (8th Cir. 1995) (holding that a supervisor's repeated references to the plaintiff as an "old man" were not direct evidence of discrimination because the statements did not relate to an employment decision).

The case also established that, not only must direct evidence be found, for the burden to shift to the defendant, the plaintiff must show the discrimination was a substantial motive for the employer's actions (*Id*. n.8, *citing Haynes*, 52 F.3d at 931).

For the foregoing reasons, Gibson has not shown direct evidence of age discrimination and can proceed with her claim only by relying on circumstantial evidence.

## 2.    Gibson Cannot Establish a *Prima Facie* Case of Age Discrimination

In establishing a *prima facie* case of age discrimination, a plaintiff may rely on the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) (*See Elrod v. Sears, Roebuck and Co*., 939 F.2d 1466, 1469 (11th Cir. 1991).  In a discharge case, this requires that plaintiff establish:  (1) membership in the protected class; (2) an adverse employment action; (3) that a substantially younger person filled the position from which she was discharged; and (4) she was qualified to do to the job.  *See Williams v. Vitro Servs. Corp.,* 144 F.3d 1438, 1441 (11th Cir. 1998) (recognizing extension of *McDonnell Douglas* test to circumstantial-evidence ADEA cases); *Tidwell v. Carter Prods.,* 135 F.3d 1422, 1426 (11th Cir. 1998) (applying burden-shifting analysis in circumstantial ADEA case); and *Turlington v. Atlanta Gas Light Co.,* 135 F.3d 1428, 1432 (11th Cir. 1998).

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of proving a *prima facie* case of age discrimination by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802-804.  If she meets that burden, she establishes a rebuttable of presumption of discrimination.  *Id.*

Gibson is a member of a protected class, because she is over forty (40) years of age (Tr. 15:22-16:1; 302:9-16).  Gibson suffered an adverse employment action by being terminated from her position on August 26, 2006, when she was issued her third written warning in twelve (12)

months (Tr. 211:12-215:23; Dxs. 49, 50).  Gibson cannot establish that she meets the third and fourth tests for proving a *prima facie* case of discrimination.

### a.     Gibson Was Not Qualified

Gibson has failed to demonstrate that she was qualified to perform the position she held, given her consistent inability to meet her employer's expectations.  *See Baker v. Sears, Roebuck & Co.,* 903 F.2d 1515, 1520-21 (11th Cir. 1990) (*per curiam*) (holding that terminated plaintiff failed to establish a *prima facie* case under the ADEA; ruling that she was not qualified because of her consistent failure to meet her employer's quota for sale of maintenance agreements, a requirement of the position).

Gibson does not deny that she made mistakes.  Rather, she insists her mistakes were not intentional and blames others for her mistakes and refuses to take responsibility (Tr. 145:21-23, 231:12-18; Dx. 3).  Gibson claims that all of the warnings she received for poor quality were the result of mistakes in an earlier part of the process and she was doing the best job she could (Tr. 216:8-4).  Gibson contends she was blamed, no matter whose fault it was (Tr. 217:4-18).  Gibson claims Bill Anderson told her that she would be blamed for any mistakes on the warpers, but this was true because, as warper operator, she *was* the one responsible for mistakes on her warper (Tr. 217:16-218:11).  Gibson admitted she was ultimately responsible for the beams that were run on her warper, because she was required to check and make sure everything was correct on the work before her in the process (Tr. 115:5-116:4).  Gibson admitted that "the person who lays the ends in the rake is the one responsible for the beam." (Tr. 168:2-5).

Gibson acknowledged that in view of these warnings, her termination was justified (Tr. 241:5-10).  Gibson can offer no evidence that the warnings are not factual.  She cannot dispute that she was 36 ends short, as stated on her third warning (Tr. 239:18-241:4).

Gibson offers only excuses for her poor quality, not a causal connection between her discipline and her age. Gibson asserts that her mistakes were the result of (1) bad quality throughout each phase of production (Tr. 278:9-279:16); (2) poor maintenance of the warpers which led to low production and breaking of ends during warping (Tr. 280:12-281:14; 183:16-22); or (3) creelers making mistakes in loading the packages of yarn (Tr. 178:21-179:1; 180:12-16; 188:12-22; 189:13-190:8). However, these explanations do not account for the fact that all four of Gibson's disciplinary actions, which resulted in her termination, were the result of Gibson's failure to properly <u>count</u> the ends (Dx. 37, 39, 41, 42). These mistakes are not related to the machinery, the quality of the yarn, or the work of the creelers. These mistakes are the direct result of Gibson's failure to count correctly the number of ends.

The facts are indisputable that Gibson's quality was poor, and her termination resulted from the application of well-established policies, of which Gibson was aware (*See* II, A, 2, a, d, e and II, A, 3). Gibson's excuses are lame. Gibson was terminated because she consistently failed to correctly count the number of ends, which cannot be blamed on other parts of the production process. Counting the ends correctly was Gibson's responsibility, and hers alone. Therefore, Gibson was not qualified for this position and her termination was justified.

### b.    Gibson cannot show a younger person replaced her

Gibson <u>thinks</u> that she was replaced by Sharon Jennings Heard, because Heard was being trained on the day Gibson was terminated (Tr. 241:11-17; 242:3-13). However, Gibson admits that she does not know who replaced her (Tr. 300:21-301:19). Gibson only knows that Heard was hired as a warper operator <u>before</u> Gibson was terminated (Tr. 301:10-22). Gibson does not even know Heard's age (Tr. 241:11-20). Gibson has failed to prove that a substantially younger person replaced her; therefore, she has failed to meet the fourth element of her *prima facie* case.

### 3.    Gibson Sets Forth No Evidence of Disparate Treatment

To establish that her warnings were discriminatory, Gibson could not offer any evidence that she was treated differently than similarly situated persons in her protected class. Though Gibson makes vague statements that she was unfairly given warnings, she falls short of even alleging a disparate treatment claim, much less proving one.[21]  Gibson simply asserts that she was being given discipline while others were not (Tr. 205:5-14).  Gibson offers no support for her belief.  To establish a *prima facie* case, she would have to show that the conduct of other employees who were not disciplined was "nearly identical" to her conduct.  *Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1259 (11th Cir. 2001).  Gibson has not presented substantial evidence that other warper operators continued to neglect counting in the correct number of ends after repeated warnings.

Gibson made a weak attempt to allege that Carolyn Johnson and Dorothy Boyd[22] were not given warnings for the same kinds of mistakes that she made (Tr. 237:11-238:1).  Gibson contends that, "I feel [Boyd] could make mistakes on beams as well, so, and the operators." *Id*.  Gibson does not claim that Johnson and Boyd actually made mistakes, but only that they were capable of making mistakes. "[T]o prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges," the Eleventh Circuit requires "the quantity and quality of the comparator's misconduct [to] be nearly identical" to that of the Plaintiff's. *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir. 1999).  Gibson has not presented evidence that Johnson or Boyd made errors with the same frequency or severity as Gibson's or that they did so after repeated warnings.  She has not shown that the quantity or quality of her co-workers' conduct was nearly identical to hers, and, therefore, she has not presented a *prima facie* case.

---

[21]  The legal framework for analyzing a disparate treatment claim is the same as a claim for termination.  Since Gibson's direct evidence has been shown to be insufficient regarding her termination, it is equally insufficient here.
[22]  Boyd was a creeler, but would run the warper while Gibson was on break (Tr. 237:11-22).

Gibson admits she did not know whether warnings were given to other associates (Tr. 205:5-206:13). Johnson had a different supervisor than Gibson, and Boyd held a different position (Tr. 238:5-6, 13-15). "[D]isciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis." *Jones v. Gerwens,* 874 F.2d 1534, 1541 (11th Cir. 1989). Differences in supervisors "alone probably precludes a showing of similarity because 'when different decision-makers are involved, two decisions are rarely similarly situated in all relevant respects.'" *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 618 (7th Cir. 2000). *See also Silvera,* 244 F.3d at 1261 n.5 ("differences in treatment by different supervisors…can seldom be the basis for a viable claim of discrimination"). Finally, Gibson admits she does not know the ages of Johnson and Boyd (Tr. 308:5-12; 237:11-22).

Gibson cannot show disparate treatment. Johnson and Boyd are not proper comparators, she does not know if they made the same mistakes she did, she does not know if they received warnings, and she does not know their ages. Their jobs were different, and Johnson had a different supervisor. Therefore, Gibson cannot base her claim of age discrimination on warnings on a disparate treatment analysis.

### 4.    WestPoint had a Legitimate, Non-Discriminatory Reason for Its Actions

Even if Gibson were to meet her burden of establishing a *prima facie* case, doing so "does not in itself entitle an employment discrimination plaintiff to survive a motion for summary judgment. . . ." *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 595 (11th Cir. 1987). The Eleventh Circuit has declared that "the defendant's evidence of a legitimate, non-discriminatory reason for its actions may be so strong as to rebut completely the inference raised by the plaintiff's *prima facie* case." *Id.; see also, Earley,* 907 F.2d at 1081.

30

If the plaintiff meets her burden of proving her *prima facie* case, the burden of *production* shifts to the defendant. The defendant may rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the alleged adverse employment action. *Eskra v. Provident Life Accident Ins. Co.,* 125 F.3d 1406, 1411 (11th Cir. 1997) (defendant bears the burden of articulating a non-discriminatory reason). If the defendant satisfies its burden of production, the plaintiff then has the burden of persuading the Court that the reason offered for the employment decision is a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802-04. The plaintiff satisfies this burden by establishing not only that the defendant's legitimate, non-discriminatory reason for its action was false, but also that a reasonable fact finder could conclude that the true reason for its action was an intent to discriminate on the basis of the plaintiff's age. *St. Mary's Honor Center v. Hicks*, 113 S.Ct. 2742, 2752 (1993); *Hawkins v. Ceco Corp.*, 883 F.2d 977, 981 n.3; *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184-85 (11th Cir. 1984). "It is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Center*, 113 S.Ct. at 2754. Mere conclusory allegations or assertions and subjective beliefs of discrimination do not prove pretext. *Earley*, 907 F.2d at 1081; *Young v. General Foods Corp.,* 840 F.2d 825, 830 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989). Instead, in order to show pretext, and thereby overcome a summary judgment motion, the plaintiff has the burden to produce substantial probative evidence on every element necessary to support a finding of discrimination in his favor by a rational trier of fact. *Grigsby*, 821 F.2d at 596-97.

If the plaintiff successfully carries her burden of establishing that defendant's legitimate, non-discriminatory reasons are pretextual and that the defendant was actually motivated by an intent to discriminate, she has satisfied the required ultimate burden of demonstrating by a

preponderance of the evidence that he or she has been the victim of intentional discrimination. *St. Mary's Honor Center,* 113 S.Ct. 2742. A plaintiff must successfully negotiate this entire burden-shifting process in order to prevail upon the "ultimate question" in a disparate treatment case of "'whether the defendant intentionally discriminated against the plaintiff.'" *Nix*, 738 F.2d at 1184, *quoting, United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 714-15 (1983). If the plaintiff is unable to prove the employer's justification to be pretextual, or if the record conclusively reveals some other non-discriminatory reason for the employer's decision, summary judgment must be granted for the employer. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

WestPoint has set forth its legitimate non-discriminatory reasons for issuing warnings to the Plaintiff for poor job performance, and for terminating her employment consistent with its well-established policies.

### 5.    Gibson Has No Evidence of Pretext

Once a reason for the adverse employment action has been proffered by the employer, the burden shifts back to Plaintiff to put forth sufficient evidence to permit a reasonable fact finder to conclude that WestPoint's reason for the decision was false and that the real reason was age discrimination. *See Sullivan v. AMTRAK*, 170 F.3d 1056, 1061 (11th Cir. 1999), *cert. denied*, 528 U.S. 1107 (2000).

A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute her business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason. *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*).

Gibson has failed to "meet [WestPoint's] reason head on and rebut it." Gibson has not come forward with any evidence whatsoever that WestPoint's reason for the termination of her employment was a mere pretext for an intent to discriminate. The evidence concerning the decision-making process leading up to the termination of Gibson's employment is clear and undisputed. Gibson's managers and supervisors followed WestPoint's established policies for discipline and termination.

Gibson has no credible contention for how her discharge is related to her age (Tr. 219:3-22). Gibson has not offered any evidence at all tending to show that WestPoint considered her age in any way in making its decisions. *See Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir. 1995) (rejecting plaintiff's discrimination claims which were found to be purely speculation).

Gibson opined that Greg Tilley just wanted someone else on her job (Tr. 134:2-20; 137:17-138:8; 143:5-14). In Gibson's opinion, Tilley was trying to get rid of her, but she did not know why, unless the reason was her race (Tr. 151:3-152:1). Gibson was emphatic that Tilley is a racist and discriminated against her because of her race (Tr. 220:6-17) ("Not my age, my race"). Gibson also admitted that she did not know why Billy Joe Stewart would give her "write-ups" (Tr. 185:16-186:12; 190:9-21). None of these claims supports Gibson's allegations of age discrimination.

Although Gibson vaguely claimed that her age motivated her warnings and eventual discharge, she could not articulate a reason (Tr. 181:2-18; 184:14-186:12; 189:1-11; 190:9-21; 216:1-219:22). The following claim is typical:

> Q.    And on what basis do you do you – what information do you have that Billy Joe Stewart gave this warning to you because of your age?
>
> A.    I don't know.  I was just having so many problems since I've been there, so I figured it's got something to do with discrimination.
>
> Q.    Anything else, any other information you can give me?
>
> A.    No.

Tr. 181:8-18.

Gibson linked her performance difficulties to poor quality yarn coming to the warper operators from earlier steps in the production process, not to her age (Tr. 216:8-218:2; 278:3-21). Obviously, if the quality was poor for Gibson, it was also poor for other warper operators. Importantly, the proper number of ends of even poor quality yarn can still be laid correctly in the rake so that poor quality does not excuse failure to lay in the correct number of ends.  If the warper operator can correctly lay in 394 ends, the operator can lay in the required 400 (Dx. 41). The following assertion by Gibson is typical:

> Q.    Do you have any other reasons that you claim age motivated your discharge, other than what you just told me?
>
> A.    And no more than the material they were sending down there to me to make the poor quality yarn, you know.
>
> * * * *
>
> Q.    You are saying that you were discharged for being unable to manage poor quality yarn that was coming to you from elsewhere in the plant and that therefore you believe that your – the real reason for your discharge was your age?
>
> A.    Age.

34

Q.     Anything else, any other reason other than what you've just
       told me?

A.     No.

Tr. 218:19-219:22.

Rather, than showing evidence of pretext, the record makes clear that WestPoint did not want to terminate Gibson's employment. Gibson's record of poor performance stretches back to 1993 (Tr. 156:15-21, Dx. 28). Even when Gibson was on the easier and less complex task of running the warper for sheets, she received notices, counselings, and discipline for poor performance (Tr. 156:18-171:15; Dxs. 28-35). After the Carter plant was converted from sheets to towels, Gibson's supervisors changed, but she continued to receive discipline for the same type of poor performance as she had previously received: (incorrect yardage/failure to set or correct yardage clocks) (Tr. 156:18-160:10; 163:11-165:16; 168:17-169:12; 206:14-211:11; Dxs. 28, 29, 31, 34, 48); short-ends (Tr. 177:6-181:18; 193:19-196:19; 211:12-214:22; Dxs. 39, 43, 49); poor quality (Tr. 167:6-168:16; 171:18-176:3; 181:19-191:3; 196:20-198:16; 203:1-206:13; 211:12-214:22; Dxs. 33, 36, 37, 40, 41, 44, 47); low production (Tr. 200:20-202:23; Dx. 46); safety violations (Tr. 160:5-163:10; 165:17-167:5; Dxs. 30, 32); incorrect or unsigned tickets (Tr. 169:13-171:15; 176:4-177:5; Dxs. 35, 38)).

The strongest evidence that WestPoint did not want to terminate Gibson's employment is the number of Personnel Notices she received <u>after</u> being placed on final notice. On September 30, 2004, Gibson received a First Written Warning for having the incorrect number of ends on four section beams (Tr. 177:6-181:18; Dx. 39). On October 15, 2004, Gibson received a Second Written Warning for the same thing: running three section beams, each with six ends short (Tr. 186:13-191:3; Dx. 41). Thereafter, instead of being issued warnings, which would have resulted

in the immediate termination of her employment, Gibson was given Personnel Notices, which did not count as discipline (Tr. 165:20-23; 167:3-5; 170:10-14; 176:7-12; 199:5-7; 201:8-10; Dxs. 43-48).  On November 8, 2004, Gibson ran five section beams, with each beam missing six ends.  This is the same careless, quality deficiency that resulted in Gibson's first two warnings.  Instead of being given a third warning, which, as Gibson admitted, would have resulted in the termination of her employment, Gibson was issued a Personnel Notice (Tr. 193:19-196:19; Dx. 43).  Gibson's supervisors went on to issue six more consecutive Personnel Notices, which were "get out of jail free cards" (Tr. 196:20-211:11, Dxs. 44-48).  Gibson admitted she could have been discharged instead of being given Personnel Notices (Tr. 202:6-204:6; 211:3-8).  When Gibson was given a Personnel Notice instead of a written notice on February 8, 2005, for poor quality and low production, her supervisor warned Gibson that she would get "no more chances!" (Tr. 203:7-205:4; Dx. 47).  Thereafter, on August 2, Gibson was given still another chance when she ran a beam short and was given a Personnel Notice instead of a written warning (Tr. 206:14-211:11, Dx. 48).  It was only when Gibson left three beams, each 12 ends short, for a total of 36 missing ends, just three weeks later, on August 23, that WestPoint was forced to give Gibson her third written warning, which required the termination of her employment (Tr. 211:12-215:23; Dxs. 49-50).

The foregoing facts belie any paranoid notion that any of Gibson's supervisors were out to get her (Tr. 134:2-20; 137:17-138:18; 143:5-14; 148:1-149:23; 151:1-152:1; 190:9-21), or that any of her supervisors were motivated to discipline or discharge her on account of her age (Tr. 189:1-6; 216:1-7).  To the contrary, the record proves that WestPoint exercised great restraint

and only reluctantly separated Gibson from employment.[23]  Human Resource Manager Calvin

Ogletree summed it up when he responded to the Alabama Department of Industrial Relations in

such a way as to ensure that Gibson would be awarded unemployment compensation:

> [W]hen the Company changed from sheeting to towels . . ., the work the claimant was performing became more fast paced.  It became more than the [claimant] could handle.  The fast-paced requirements for the [claimant] took away from the quality and attention needed to perform the job to standards.  We hated to let her go; she gave the Company a lot of good years, up until this change in work requirement occurred.

Dx. 3.

## IV.  CONCLUSION

For the foregoing reasons, WestPoint is entitled to summary judgment.  Defendant

therefore respectfully requests that this Court grant its Motion for Summary Judgment, and

dismiss this case with prejudice.

Dated this 3rd day of August, 2007.

Respectfully submitted,

**/s/ Fred W. Suggs, Jr.**
Fred W. Suggs, Jr.
(ASB-3587-G61F)

OGLTREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
300 North Main Street (29601)
Post Office Box 2757
Greenville, South Carolina 29602
Telephone:  (864) 271-1300
Facsimile:  (864) 235-4754
Fred.Suggs@odnss.com

---

[23]  One of Gibson's primary motivations in filing this lawsuit is an attempt to get money.  Gibson has been adjudicated a bankrupt and discharged under Chapter 7 in 2004 (Tr. 80:3-81:17; Dx. 10).  Thereafter, Gibson lost her home and has no significant assets (Tr. 74:13-23).  Gibson is in credit card debt, again (Tr. 76:6-77:3).

James C. Pennington
(ASB-1287-N62J)

OGLTREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One Federal Place
1819 5th Avenue North, Suite 1000
Birmingham, Alabama  35203-2118
Telephone: (205) 328-1900
Facsimile:  (205) 328-6000
James.Pennington@odnss.com


## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2007, I electronically filed the foregoing **Defendants'**

**Memorandum in Support of Motion for Summary Judgment** with the Clerk of the Court

using the CM/ECF system, which will send notification of such filing to the following:

### *Lateefah Muhammad*


Respectfully submitted,

**/s/ Fred W. Suggs, Jr.**
OF COUNSEL


5055805.6

38

# Personnel Notice of Shannon Johnson WPH 000752

**PERSONNEL NOTICE**

WESTPOINT STEVENS

☑ INITIATED BY COMPANY    ☐ AT REQUEST OF ASSOCIATE

| ASSOCIATE Shannon Johnson | ASSOCIATE NUMBER 4847 | TYPE OF NOTICE |
|---|---|---|
| FACILITY Lanier    DEPARTMENT Prep | SHIFT 6 | 1 - ASSOCIATE PROBLEM |
| SUPERVISOR Billy Stewart | NOTICE DATE 10-5-04 | 2 - ASSOCIATE COMPLAINT |
| EFFECTIVE DATE OF CHANGE | | 3 - NOTICE OF CHANGE |

TYPE OF NOTICE
1 - ASSOCIATE PROBLEM
2 - ASSOCIATE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - ASSOCIATE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

SITUATION IN BRIEF

Section beam quality

DETAILS

A complaint was written by the slashing department on 2 beams that were run on the No 2 warper 9-30-04. Shannon shares the responsibility with Patricia Gibson for beams run on the No 2 warper. So today I have again stressed the importance of running good quality

ACTION TAKEN

CEO ☑

WPH
000752                        refused to sign

(Attach additional sheets as necessary)

DISTRIBUTION
☐ COST DEPT.
☐ DEPT. FILES
   DIVISION HUMAN RESOURCES
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ HUMAN RESOURCES DEPT.

☐ VICE-PRESIDENT
☐ GENERAL MANAGER
☐ MANAGER
☐ ASST. MANAGER
☐ DEPT. MANAGER
☐ PRODUCTION DEPT.
☐ SUP   ROOM
☐

| RECOMMENDED BY Billy Stewart | 10-5-04 |
|---|---|
| DEPARTMENT MANAGER Bill Anderson | 10-5-04 |
| ASSOCIATE (if necessary) | |
| OTHER | |
| | SIGNATURE |    DATES |

WP 1157 CS REV 11/90

# EEOC Letter
# May 9, 2006
# WPH 000753



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Birmingham District Office

Ridge Park Place
1130 22nd Street, South, Suite 2000
Birmingham, AL 35205
(205) 731-0082
TTY (205) 731-0175
FAX (205) 731-0095

May 9, 2006

Tim Wilbanks
Director Labor Relations and Corporate Compliance
P. O. Box 71
West Point,   GA   31833

Re: Patricia Gibson EEOC #420-2006-01200

Dear Mr. Wilbanks:

The Birmingham District Office of the Equal Employment Opportunity Commission received your correspondence in reference to the above Charge of Discrimination.

To clear up the matter of timeliness, I have enclosed a copy of the original charge filed by Mrs. Gibson, reflecting a receipt date in the Birmingham District Office of January 4, 2006. Additionally, I have enclosed an amended charge of discrimination signed by Mrs. Gibson, reflecting the amendment statement on the bottom of the form 5. This statement was omitted on the first charge of discrimination mailed to you with a Notice of Charge which had a response date for your position statement being April 21, 2006.

Please be advised that no action was taken against Mrs. Gibson on January 4, 2006, only the date of the filing of her charge.

In view of the enclosed documents, I do not believe that there should be any questions of the timeliness of the charge. Therefore, as previously requested, please respond to the charge with your position statement by May 19, 2006, to the attention of Investigator, Sandra Figgers.

Sincerely,

*Linda Ross*

Linda S. Ross
Investigator Support Assistant

Enclosures: Original Charge
             Amended Charge

**WPH**
**000753**

# Declaration of Jason Adcock

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Patricia Gibson, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.:  3:06-CV-0974-MEF |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

---

### DECLARATION OF JASON ADCOCK

---

**COMES NOW**, Jason Adcock, who, pursuant to 28 U.S.C. § 1746, deposes and declares as follows based on his personal knowledge:

1.    I am currently employed by WestPoint in Quality Control at WestPoint's Fairfax Fabrication Plant.  In August 2005, I was the Superintendent for the Lanier Plant.

2.    Pat Gibson worked in WestPoint Home's Lanier Plant, which, at the time of the termination of Gibson's employment, manufactured towels.  Gibson produced consistently poor quality work and had difficulty producing beams with the correct number of ends.

3.    The warper operator has the duty of counting ends.  If the ends are wrong, the warper operator tells her supervisor.  If the warper operator runs a beam with the incorrect number of ends, the warper operator is responsible for the poor quality of that beam.

4.    If a warper operator makes an error, her error will be caught by the slasher operator, since slashing is the next process.  It is the slasher operator's duty to bring any errors from the warper

operators to the supervisor's attention. If the slasher operator receives a beam that is short ends and informs the supervisor, the supervisor confronts the warper operator. If the slasher operator creates a bad beam, that error will be caught by the tie-in operator, which is the next process.

5.    At the time Pat Gibson was employed, no warper operators got by with the incorrect number of ends.  Warper operators usually received a counseling or a written warning, but sometimes, a Personnel Notice.  This is true today.

6.    After consulting with me, Calvin Ogletree told Pat Gibson that other jobs were open at the Lanier Plant and that since she had two written warnings as a warper operator, Gibson should consider bidding for the open jobs.  Calvin Ogletree reported to me that Gibson said she would either "make it or break it as a warper operator."

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information contained in this Declaration is true and correct and that any additions, modifications, or deletions have been made and initialed by me.

Dated this 25ᵗʰ day of July, 2007.

Respectfully submitted,

_Jason Adcock_
Jason Adcock

5088195.1

2

# Declaration of Bill Anderson

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Patricia Gibson, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.:  3:06-CV-0974-MEF |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF BILL ANDERSON

**COMES NOW**, Bill Anderson, who, pursuant to 28 U.S.C. § 1746, deposes and declares as follows based on his personal knowledge:

1.        I manage the Preparation Department at WestPoint's Lanier Plant.  The manufacture of towels is very difficult, compared to the manufacture of sheets.  There are basically two styles of sheets and about a dozen styles of towels.  Running a beam for towels is much quicker than running a beam for sheets.  Sheet beams require about three and one-half hours, but towel beams run in 1.5 hours or less.

2.        I came to the Lanier Plant in 2003, while the Lanier Plant was manufacturing sheets.  The Lanier Plant converted to towels during the period from about January 2004, to May 2004.

3.        I told Pat Gibson that I had observed she was having much difficulty running the warper operator job on towels and that I was afraid she was not going to be able to produce good quality.  I explained to Pat Gibson that the Company policy was not to move someone from a job

after that person had two written warnings, but we would make an exception in her case and allow her to bid to a sweeper job, which was open. Pat Gibson said she would consider the offer. Gibson, in fact, signed for a job and then changed her mind and decided to remain on the warper operator job, even though she knew she had two warnings, and a third warning would result in the termination of her employment.

4.    When Pat Gibson was given warnings, I was present. Pat Gibson never claimed that a particular beam that had a defect was not hers. When the section beam leaves the warper operation, the beam has a card signed by the warper operator. I always had the cards.

5.    When given a warning or Personnel Notice, Pat Gibson was never huffy. Gibson did not complain that she was being warned and that others were not. Gibson did not complain that she was being given the warning because of her age. Gibson repeatedly said she was doing the best she could. I told Gibson she had to do better because she was producing beams that were causing problems in slashing and weaving.

6.    Shannon Johnson quit because Johnson said she could not work with Pat Gibson. Johnson claimed she was being blamed for Gibson's mistakes in the operation of Gibson's and Johnson's common warper.

7.    Billy Joe Stewart gave Gibson a string of Personnel Notices, instead of giving Gibson written warnings. These Personnel Notices were, in effect, "get out of jail free cards." With long-term employees, I do my best to save their jobs. This is the reason that we gave Pat Gibson so many chances, instead of giving her a written warning, which would have resulted in her discharge. When

2

we did give the third written warning, it was given very reluctantly.  The Company just could no longer tolerate the number of production mistakes that Gibson continuously made.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information contained in this Declaration is true and correct and that any additions, modifications, or deletions have been made and initialed by me.

Dated this _24_ day of July, 2007.

Respectfully submitted,

_Bill Anderson_

Bill Anderson

5088917.1

3

# Declaration of Shannon Johnson

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Patricia Gibson, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: 3:06-CV-0974-MEF |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF SHANNON JOHNSON

**COMES NOW**, Shannon Johnson, who, pursuant to 28 U.S.C. § 1746, deposes and declares as follows based on her personal knowledge:

1.      I worked as a warper operator at the Lanier Plant when Pat Gibson was also employed at Lanier. Pat Gibson also worked as a warper operator. I ran one warper. Pat Gibson ran one warper. Pat Gibson and I shared the running of a common warper.

2.      I had the opportunity to observe Pat Gibson during the entire shift. Gibson would not pay attention to her job.  Gibson frequently began working without checking how the warper operation was left by the previous shift.  A warper operator must always check her job at the beginning of the shift.

3.      Pat Gibson would not count the number of ends.  There is a book which tells the number of ends for each style.  I used the ~~book.~~ Paper S.J. Gibson would not use the ~~book.~~ Paper. Often she would glance @ the paper but not really pay attention and just work any way. S.J.

4.      In my opinion, Billy Joe Stewart was harder on me than he was on Pat Gibson, because Billy Joe Stewart appeared to be trying to save Pat Gibson's job.

5.      Billy Joe Stewart and other supervisors blamed me for Pat Gibson's mistakes. I was frequently counseled, given Personnel Notices and warnings for mistakes that Pat Gibson made. I became so frustrated with being blamed for Pat Gibson's errors, that I quit.

6.      I would not leave my warper running during breaks because I did not trust Pat Gibson to operate it. But, when Pat Gibson took breaks, she left her warper running, and I tended to it.

7.      I never saw any supervisor mistreat Pat Gibson. All of the supervisors appeared to be trying to help Pat Gibson.

8.      I am currently employed by Ambassador Personnel.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information contained in this Declaration is true and correct and that any additions, modifications, or deletions have been made and initialed by me.

Dated this _3_ day of ~~July~~ Aug., 2007.

Respectfully submitted,

*Shannon Johnson*
Shannon Johnson

5088969.1

2

# Declaration of Billy Joe Stewart

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Patricia Gibson, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.:   3:06-CV-0974-MEF |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF BILLY JOE STEWART

**COMES NOW**, Billy Joe Stewart, who, pursuant to 28 U.S.C. § 1746, deposes and declares as follows based on his personal knowledge:

1.      I am currently employed as a supervisor in Yarn Preparation at WestPoint's Lanier Plant.  I worked as a supervisor in Yarn Preparation at the Lanier Plant after the Lanier Plant converted from manufacturing sheets to manufacturing towels.  Toward the end of Pat Gibson's employment, Pat Gibson worked under my supervisor and under the supervision of Ronnie Warren.

2.      After the Lanier Plant converted from manufacturing sheets to manufacturing towels, the warpers went to a three-shift operation of eight (8) hours for each shift.  Carding and spinning stayed on twelve (12) hours, and the supervisors stayed on 12-hour shifts.  Consequently, the warper operators worked a fixed eight-hour shift, but the supervisors did not.  This meant that Billy Joe Stewart supervised Pat Gibson and the other warper operators and that some of the time, I supervised the warper operators.

3.     Manufacturing sheets was less complex than manufacturing towels. The sheets manufactured before Lanier converted to towels were basically two styles. In towel manufacturing, there are 12 or more styles. Most styles have different end counts and different packages of yarn. It was the warper operator's duty to verify both that the ends are the correct number and that the packages of yarn are correct. If the ends are incorrect or the packages of yarn incorrect, and the warper operator runs the beam, the warper operator is responsible for that beam.

4.     Pat Gibson performed adequately when Lanier manufactured sheets. After the Lanier Plant converted to towels, Gibson's performance was frequently deficient.

5.     When the Lanier Plant began the conversion from sheets to towels, the Lanier supervisors who had run sheets went to Carter, which has already converted to towels. When the Lanier Plant was started up running towels, the former Lanier supervisors stayed at Carter, but the former Carter supervisors went to Lanier. Accordingly, Pat Gibson not only had a new process, towels, but also new supervision.

6.     When Pat Gibson received a written warning or a Personnel Notice for poor quality, her usual statement was that she was doing the best she could. Despite warnings and Personnel Notices, Gibson kept doing what she had been doing and seemed indifferent to the prospects of having her employment terminated for poor quality. When confronted with a poor quality beam, Pat Gibson never claimed that the beam was not hers. In every case, the beam is identified by a card with the operator's signature so that there are few disputes about who produced the beam. When Pat Gibson was issued a written warning on September 30, 2004, and a second written warning on October 15, 2007, the creeler was not disciplined because it is the responsibility of the warper at that

2

point in the manufacturing process to make sure that the number of ends is correct, not the responsibility of the creeler.

7.      Pat Gibson never complained that she was being disciplined and that no one else who did the same things were not disciplined. Pat Gibson would not have known which other employees received warnings, because supervisors do not discuss discipline with other employees.

8.      Pat Gibson never complained that she was being treated differently because of her age.

9.      Pat Gibson had frequent quality deficiencies. After Pat Gibson received two written warnings, I gave Pat Gibson Personnel Notices, instead of written warnings, in an effort to save her job because a third written warning would have resulted in the termination of Pat Gibson's employment.

10.      Toward the end of Pat Gibson's employment, there were two warper operators under my supervision, Pat Gibson and Shannon Johnson. There were three warpers. Pat Gibson had responsibility for one warper and Shannon Johnson had responsibility for another warper. Pat Gibson and Shannon Johnson shared responsibility for the third warper. Sometimes, it was difficult to tell who made errors on the common warper. When there were errors, I would talk with both operators and give each a Personnel Notice. Shannon Johnson quit because she claimed she was being blamed for poor quality warp beams created by Pat Gibson.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information contained in this Declaration is true and correct and that any additions, modifications, or deletions have been made and initialed by me.

3

Dated this _30_ day of July, 2007.

Respectfully submitted,

Billy Joe Stewart

5088796.1

4

# Declaration of Greg Tilley

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Patricia Gibson, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.:   3:06-CV-0974-MEF |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

---

## DECLARATION OF GREG TILLEY

---

     **COMES NOW**, Greg Tilley, who, pursuant to 28 U.S.C. § 1746, deposes and declares as follows based on his personal knowledge:

     1.     I am currently employed as a supervisor in the Preparation Department at WestPoint's Carter Plant.

     2.     I supervised Pat Gibson when she worked at the Lanier Plant manufacturing sheets. When the Lanier Plant converted from sheets to towels, I transferred to Carter, which was already manufacturing towels.  After the Lanier Plant's conversion to towels was complete in about may 2004, Pat Gibson, who had been working on towel production at Carter, returned to the Lanier Plant, but I stayed at Carter as a supervisor in the Preparation Department.

     3.     A warper operator who is proficient in manufacturing towels can convert from towels to sheets much easier than a warper operator can become proficient at manufacturing towels after having worked only with sheets.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information contained in this Declaration is true and correct and that any additions, modifications, or deletions have been made and initialed by me.

Dated this _24_ day of July, 2007.

Respectfully submitted,

_Greg Tilley_

Greg Tilley

5088859.1

2

# Declaration of Ronnie Warren

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Patricia Gibson, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.:  3:06-CV-0974-MEF |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF RONNIE WARREN

**COMES NOW**, Ronnie Warren, who, pursuant to 28 U.S.C. § 1746, deposes and declares as follows based on his personal knowledge:

1.     I am currently employed as a supervisor in Yarn Preparation at WestPoint's Lanier Plant.

2.     After the Lanier Plant converted from manufacturing sheets to manufacturing towels, the warpers went to a three-shift operation of eight (8) hours for each shift. Carding and spinning stayed on twelve (12) hours, and the supervisors stayed on 12-hour shifts. Consequently, the warper operators worked a fixed eight-hour shift, but the supervisors did not. This meant that Billy Joe Stewart supervised Pat Gibson and the other warper operators and that some of the time, I supervised the warper operators.

3.     Manufacturing sheets was less complex than manufacturing towels. The sheets manufactured before Lanier converted to towels were basically two styles. In towel manufacturing,

there are 12 or more styles. Most styles have different end counts and different packages of yarn. It was the warper operator's duty to verify both that the ends are the correct number and that the packages of yarn are correct. If the ends are incorrect or the packages of yarn incorrect, and the warper operator runs the beam, the warper operator is responsible for that beam.

4.    Pat Gibson performed adequately when Lanier manufactured sheets. After the Lanier Plant converted to towels, Gibson's performance was frequently deficient.

5.    When the Lanier Plant began the conversion from sheets to towels, the Lanier supervisors who had run sheets went to Carter, which has already converted to towels. When the Lanier Plant was started up running towels, the former Lanier supervisors stayed at Carter, but the former Carter supervisors went to Lanier. Accordingly, Pat Gibson not only had a new process, towels, but also new supervision.

6.    When Pat Gibson received a written warning or a Personnel Notice for poor quality, her usual statement was that she was doing the best she could. Despite warnings and Personnel Notices, Gibson kept doing what she had been doing and seemed indifferent to the prospects of having her employment terminated for poor quality. When confronted with a poor quality beam, Pat Gibson never claimed that the beam was not hers. In every case, the beam is identified by a card with the operator's signature so that there are few disputes about who produced the beam.

7.    Pat Gibson never complained that she was being disciplined and that no one else who did the same things were not disciplined. Pat Gibson would not have known which other employees received warnings, because supervisors do not discuss discipline with other employees.

2

8.     Pat Gibson never complained that she was being treated differently because of her age.

9.     Dorothy Williams, a twister operator, worked until age 66.  Williams retired on or about Friday, March 16, 2007, after 42 years of service.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information contained in this Declaration is true and correct and that any additions, modifications, or deletions have been made and initialed by me.

Dated this _24th_ day of July, 2007.

Respectfully submitted,

_Ronny Warr_

Ronnie Warren

5088818.1

3

# Declaration of
# John T. Wilbanks

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Patricia Gibson, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.:  3:06-CV-0974-MEF |
| | ) | |
| WestPoint Stevens, Inc., and | ) | |
| WestPoint Home, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF JOHN T. WILBANKS

**COMES NOW**, John T. Wilbanks, who, pursuant to 28 U.S.C. § 1746, deposes and declares as follows based on his personal knowledge:

1.    I was the Employee Relations Manager for the Lanier and Carter Plants of WestPoint Stevens ("WestPoint") for twelve (12) years, before being promoted to the position of Director of Labor Relations and Corporate Compliance and moving from the Carter/Lanier Plants in Valley, Alabama, to the Corporate Offices in WestPoint, Georgia. As of the date of this Declaration, I am no longer employed by WestPoint.

2.    After I left the Carter/Lanier Plants, the Carter Plant converted from manufacturing sheets to manufacturing towels. Thereafter, between approximately January and May 2004, the Lanier Plant stopped manufacturing sheets and converted to manufacturing towels. During the transition period, all Lanier associates were placed on No Work Available Leaves or transferred to the Carter Plant, if there were vacancies. Around the same time, another WestPoint Stevens Plant

that manufactured towels was closed. The Company planned to transfer as many associates as possible from the closed towel plant to the Lanier Plant when it reopened producing towels so that the employees who were skilled in making towels would be retained. Many of the associates who were on leave from Lanier were not expected to be recalled to work.

3.      When the Lanier Plant reopened, I toured the plant as part of my routine duties to reconnect with the employees. As I saw familiar employees, I made small talk. I was pleasantly surprised to see that Pat Gibson had been recalled to work and said to Pat, "Oh, hi, Pat, are you still here?", or similar words to that effect. My comments were not related to Gibson's age or meant to imply anything relating to Gibson's age. Gibson and I had a friendly, but short, conversation. Gibson gave no indication that she was offended or upset by our brief conversation. No one ever reported to me that Gibson had complained about anything I said to her.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information contained in this Declaration is true and correct and that any additions, modifications, or deletions have been made and initialed by me.

Dated this _23_ day of July, 2007.

Respectfully submitted,

John T Wilbanks

John T. Wilbanks

5087730.1

2

# Daniels v. Mobile Register, Inc.

## 2005 U.S. Dist. LEXIS 44875

*2005 U.S. Dist. LEXIS 44875, **

SHERITA **DANIELS,** Plaintiff, vs. **MOBILE** REGISTER, INC., a/k/a **MOBILE** PRESS REGISTER, INC., Defendant.

<u>View the Full Docket from LexisNexis CourtLink for 1:04cv832</u>
CIVIL ACTION NO 04-0832-L

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

2005 U.S. Dist. LEXIS 44875

June 24, 2005, Decided

**CORE TERMS:** notice, summary judgment, sexual harassment, formal charge, female, correspondence, human resources, resignation, signature, sexual harassment, race discrimination, attachment, verified, drafted, administrative remedies, sexually harassed, discriminatory act, employment practice, box, relieved, file a charge, intake, reply, forwarded, sex, failed to exhaust, allegations contained, moving party, questionnaire, transpired

<u>**COUNSEL:**</u>  [*1]  For Sherita Daniels, Plaintiff: Larry C. Moorer, LEAD ATTORNEY, Mobile, AL.

For Mobile Register, Defendant: Thomas M. O'Hara, LEAD ATTORNEY, McDowell Knight Roedder & Sledge, L.L.C., Mobile, AL.

<u>**JUDGES:**</u> KRISTI D. LEE, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** KRISTI D. LEE

**OPINION**


**ORDER**

This matter is before the court on the following: defendant's motion for summary judgment and supporting brief (Docs. 5, 6); plaintiff's brief in opposition (Doc. 17), defendant's reply (Doc. 20) and plaintiff's response to motion for summary judgment and corrected affidavit (Docs. 22, 23) [1]

**FOOTNOTES**

[1] On May 25, 2005 the undersigned Magistrate Judge entered an order converting defendant's motion to dismiss to a motion for summary judgment and directing plaintiff to submit a corrected affidavit containing an original signature. (Doc. 21) See Griffith v. Wainwright, 772 F.2d 822, 825, n. 6 (11th Cir.1985), citing Barker v. Norman, 651 F.2d 1107, 1128-29 & n. 26 (5th Cir. Unit A 1981)(court has an obligation to allow the parties to remedy obvious defects in summary judgment materials)


[*2]  The parties have previously executed their written consent to the exercise of jurisdiction in this action by a United States Magistrate Judge, in accordance with 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, (Doc. 11) and the matter has been referred to the undersigned. (Doc. 12) The court having reviewed the briefs of the parties, along with the evidentiary submissions makes the following finding of facts and conclusions of law.

**I. Procedural History**

Plaintiff's complaint arises out of her employment with the Mobile Press Register. ("MPR"). On December 30, 2004 plaintiff filed the instant suit against defendants alleging, in sum, during the course of her employment by defendant she was sexually harassed by another employee of defendant on five occasions when the employee "rubbed her hands across Plaintiff's buttocks" (Doc. 1) [2] Plaintiff contends that she reported each incident to "supervisory personnel of the [defendant]" but that she was given no assistance in the matter. (Id.) Plaintiff further alleges that "[d]efendant has a policy of not assisting female employees when they complain of sexual harassment [*3] in the workplace" and seeks compensatory and punitive damages against defendant for its alleged actions. (Id.) Plaintiff further seeks reinstatement of her position "at full salary and benefits" along with a "a preliminary and permanent injunction enjoining the Defendant... from maintaining or continuing the policies, practices, customs, and usages of denying...or otherwise interfering with the Plaintiff's right to equal employment opportunities without discrimination." (Id.)

**FOOTNOTES**

2 Plaintiff's complaint includes a single count alleging sex discrimination/sexual harassment. (Doc. 1)

In response to plaintiff's complaint, defendant filed a motion to dismiss (which the court has now converted to a motion for summary judgment) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds, in sum, that (1) plaintiff failed to exhaust her administrative remedies, (2) that her complaint alleging sexual discrimination is not reasonably related to her EEOC [*4] charge alleging race discrimination and (3) that plaintiff's action is time barred because she failed to file her judicial complaint within ninety (90) days of her receipt of the EEOC's notice of right to sue letter. (Docs. 5, 6) On May 13, 2005 plaintiff filed a response in opposition to defendant's motion to dismiss along with an affidavit in support. (Doc. 17) On May 23, 2005, defendant submitted a reply brief with additional evidentiary submissions. (Doc. 20) On May 25, 2005 the court entered an order converting the defendant's motion to dismiss to a motion for summary judgment and allowing plaintiff ten days in which to submit any sur-reply along with a "cured" affidavit. (Doc. 21) On June 9, 2005 plaintiff submitted a response to defendant's reply brief, along with a corrected affidavit. (Docs. 22, 23) As set forth in detail below, upon consideration of all matters presented, and after reviewing the record in a light most favorable to the plaintiff, [3] the court determines that the defendant's motion for judgment as a matter of law is due to be **GRANTED.**

**FOOTNOTES**

3 The Court, when ruling on a motion for summary judgment, "must view all evidence and all factual inferences therefrom in the light most favorable to the non-moving party." Miller v. King, 384 F.3d 1248, 1258-59 (11th Cir.2004) (citations omitted).

## [*5] II. Factual Background

1. Plaintiff, Sherita Daniels was employed by the defendant from approximately April 25, 1977 until October 22, 2003. (Doc. 1)

2. Plaintiff alleges that on five occasions over a nine month period beginning in November 2002, Patricia Dougherty, an employee of defendant in the position of Accounts Payable Supervisor, "without plaintiff's consent rubbed her hands across plaintiff's buttocks." (Doc. 1, para. 8) Plaintiff states that after the incident she complained to both the Assistant Director and the Director of Human Resources but she was given "no assistance." (Id. at para. 9)

3. On October 8, 2003, plaintiff turned in her resignation and was relieved of her duties on October 10, 2003. [4] (Doc. 1) At the time of her resignation, plaintiff was employed as an Accounts Payable Bookkeeper. (Id.)

**FOOTNOTES**

4 Plaintiff asserts that she gave her two weeks notice on October 8, 2003 but was relieved of her duties

on October 10, 2003. (Doc. 1)

4. On January 16, 2004 plaintiff sent **[*6]** a letter to the EEOC wherein she outlined the nature of the harassment allegations and requested "assistance in an investigation into the situation because I feel like justice should be done." (Doc. 1, attachment)

5. On January 29, 2004 in response to plaintiff's January 16, 2004 letter, the EEOC, wrote plaintiff informing her that "[t]he office has competed [sic] its analysis of your letter...[and] have determined that the facts presented...do not describe a violation of any statute enforced by this commission." (Doc. 20, Exhibit A) Specifically, plaintiff was advised that the EEOC found that plaintiff's allegations "failed to state a prima facie claim" and that "the harassment [as outlined in her letter] was not so pervasive and severe as to compel the resignation." (Id.) Finally, the EEOC instructed plaintiff that "regardless of the EEOC's assessment of the merits of

> your claim, you, nevertheless *have a right to file a charge of discrimination with this agency.*"
> "*Should you elect to file a charge* the EEOC would exercise its statutory and regulatory authority to determine the scope of its investigation. Accordingly, we would elect not to investigate and would **[*7]** take no action other than immediate dismissal of such a charge for failure to describe a violation of Federal law." (Id.) (emphasis added)

6. Plaintiff responded to the EEOC's letter on February 21, 2004 as follows:

> In receipt of your letter explaining that the nature of my claim was not pervasive and severe, *I am filing a claim of discrimination claim [sic] because I am a African American female and Patricia Dougherty is a white female.* If it had been myself that had been reported for sexual harassment against a white person; I would have been terminated at that time.
>
> When I reported Patricia Dougherty to human resources for sexual harassment, it was not because she is white it was because she was wrong by touching me inappropriately in the workplace. I don't know if Patricia Dougherty is bisexual or not, all I know is that I am not bisexual or lesbian and do not choose to be and I do not find the touch of another female amusing.

(Doc. 20, Exhibit B) (emphasis added)

7. By letter dated March 15, 2004, the EEOC acknowledged receipt of plaintiff's February 21, 2004 letter as follows:

> We are in receipt of your correspondence received in this **[*8]** office whereby you have elected to file a complaint with the EEOC.
>
> In order for the Commission to complete action in this matter, it is necessary that we obtain a perfected charge executed by you under penalty of perjury. An appropriate charge has been drafted for your signature which satisfies the statutory and procedural requirements for the filing of a charge.
>
> Please date and sign each copy of the enclosed charge of discrimination in the lower left hand corner indicated by the X marks and return it the undersigned within 30 days of the date of this letter. If the executed charges are not returned within this time, the charge will be administratively closed for lack of a valid charge and no further action will be taken.

(Doc. 20, Exhibit C)

8. Based on plaintiff's allegations, the EEOC prepared a Charge of Discrimination and forwarded to plaintiff

for her signature. On the charge form under the section entitled "Discrimination Based On" the box labeled "race" has been marked with an "x". [5] The body of the charge of discrimination states, in full, as follows:

I was employed with the above named employer from April 25, 1977 to October 22, 2003. I was sexually [*9] harassed by Patricia Dougherty, Accounts Payable Supervisor. I reported the incidents to Tammy Hall, Assistant Human Resources Director, who in turn reported it to Leigh Stringfellow, Director of Human Resources. No disciplinary action was taken against Patricia Dougherty, so I turned in my two weeks notice on October 8, 2003, and was relieved of my duties on October 10, 2003.

I am filing a claim of discrimination because I am an African American female and Patricia Dougherty is a White female. When I reported Patricia Dougherty to human resources for sexual harassment, it was not because she is White, it was because she was wrong by touching me inappropriately in the work place. I began to look for employment elsewhere.

I believe that I have been discriminated against because of my race, Black, which is in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Doc. 1, attachment)

**FOOTNOTES**

5 The charge form identifies the following types of discrimination and directs complainants to "check appropriate box(es)": race, color, sex, religion, national origin, retaliation, age, disability, other. (Doc. 1, attachment)

[*10] 9. On April 8, 2004, plaintiff signed the charge of discrimination forwarded to her by the EEOC. (Doc. 1, attachment) The completed charge bearing plaintiff's signature was received by the EEOC on April 12, 2004. (Doc. 6, Exhibit E)

10. On April 20, 2004 the EEOC issued a Notice of Charge of Discrimination which it forwarded to the defendant. (Doc. 20, Exhibit E) The notice advises defendant that a "charge of discrimination has been filed against your organization under Title VII of the Civil Rights Act." (Id.) Under the heading "Circumstances of Alleged Discrimination" the box labeled "race" has been checked. (Id.)

11. The EEOC subsequently issued a Dismissal and Notice of Right to Sue. The notice is signed by an EEOC employee and dated April 21, 2004. (Doc. 6, Exhibit B)

12. Plaintiff received the Dismissal and Notice of Right to Sue from the EEOC on October 2, 2004. (Doc. 1, attachment) [6]

**FOOTNOTES**

6 No explanation has been given by either party for the nearly six (6) month time lapse between the signature date on the Dismissal and Notice of Right to Sue and the date plaintiff contends that she received the notice. In support of her claim that she received the Notice of Right to Sue on October 2, 2004 plaintiff has attached to her complaint a copy of an envelope from the EEOC addressed to plaintiff and date stamped September 29, 2004. (Doc. 1, attachment) Defendant has not offered any argument in opposition. For the purposes of defendant's motion for summary judgment, the court takes plaintiff's allegations as true and resolves all reasonable inferences in favor of plaintiff. The court further notes that while plaintiff's complaint states that she received the Notice of Right to Sue on October 2, 2004, in her affidavit submitted in support of her brief in opposition, plaintiff maintains that she received the notice on October 3, 2004. (Docs. 1, 22)

[*11] 13. On December 30, 2004 plaintiff filed the instant suit against defendants alleging, in sum, that

on five (5) separate occasions during the course of her employment she was subjected to sexual harassment by an employee of the defendant. (Doc. 1) Specifically, plaintiff alleges that "[o]n or about November 8, 2002, April 1, 2003, April 4, 2003, May 22, 2003 and August 5, 2003, Patricia Doughtery [an employee of defendant] ...without Plaintiff's consent, rubbed her hands across Plaintiff's buttocks." (Id.) Plaintiff contends after each of the alleged incidents she reported the conduct to "supervisory personnel of the [defendant]"..." [however] [n]o assistance was given to [her] by Defendant [] concerning [the] complaints against Patricia Doughterty." (Doc. 1) Plaintiff alleges that "[d]efendant has a policy of not assisting female employees when they complain of sexual harassment in the workplace." (Id.) Plaintiff voluntarily resigned her employment on October 8, 2003.

14. On December 30, 2004 plaintiff filed the instant complaint against defendants alleging claims of sexual harassment and sexual discrimination. (Doc. 1)

15. On April 4, 2005, in response **[*12]** to plaintiff's complaint, defendant filed the instant motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds, in sum, as follows: (1) plaintiff failed to file a formal charge with the EEOC within 180 days of the last allegedly discriminatory act; (2) plaintiff's complaint alleging sexual harassment is not reasonably related to the untimely charge of discrimination based on race; and (3) the action is time-barred for plaintiff's failure to file the complaint within ninety (90) days of receipt of notice to sue. (Doc. 6)

### III. Summary Judgment Standard

In support of their respective briefs on defendant's motion to dismiss the parties have relied on documents outside the pleadings. While some of the documents referred to by the parties may be considered central to plaintiff's claim such that they could be considered part of the pleadings, plaintiff has also submitted an affidavit in support of her opposition brief. Under Rule 12(b)(6), where the Parties have presented "matters outside the pleadings," the court in its discretion may treat a Rule 12(b)(6) motion as a motion for **[*13]** summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 12(b), 56; Jones v. Automobile Ins. Co. of Hartford, Conn., 917 F.2d 1528, 1532 (11th Cir.1990). Accordingly, the court has previously entered an order converting the motion to dismiss to a motion for summary judgment. (Doc. 21) See Fed.R.Civ.P. 12(b) [7]; Property Management & Investments, Inc. v. Lewis, 752 F.2d 599, 604 (11th Cir.1985) ("once the court decides to accept matters outside the pleading, it must convert the motion to dismiss into one for summary judgment").

**FOOTNOTES**

[7] Rule 12(b) contains a conversion clause which provides:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed. R. Civ. P. 12(b).

**[*14]** Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). [8] The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden then shifts to the nonmovant to show the existence of a genuine issue of material fact. Id. "If the nonmoving party fails to makes 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof, 'the moving party is entitled to summary judgment." Id. (quoting Celotex Corp., v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986))(footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determination of the truth of the matter. Instead, the evidence of the non-

movant is to [*15] be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 999 (11th Cir. 1992) cert denied, 507 U.S. 911, 113 S.Ct. 1259, 122 L.Ed. 2d 657 (1993) (internal citations and quotations omitted). However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Secretary of Dept. of Children and Family Services, 358 F.3d 804, 809 (11th Cir. 2004), cert denied, 543 U.S. 1081, 125 S.Ct. 869, 160 L.Ed.2d 825 (2005).

**FOOTNOTES**

8 Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

[*16] With this legal framework in mind, the court now turns to the specific grounds upon which defendant bases its motion for summary judgment.

## IV. Failure to Exhaust Administrative Remedies

*Plaintiff's Letters to EEOC*

Defendant argues that plaintiff has not exhausted her administrative remedies based on sex since she failed to file a formal charge with the EEOC within 180 days of the last allegedly discriminatory act. (Doc. 6) Specifically, defendant argues that despite plaintiff's characterization of her January 16, 2004 letter to the EEOC as a "charge", it is, in fact, not a charge since it "does not meet the procedural or statutory requirements of a formal charge of discrimination" since it was not "verified" nor was it accepted by the EEOC as a charge. (Id.)

Plaintiff's complaint identifies her January 16, 2004 letter to the EEOC as a charge and maintains that thereafter, on April 8, 2004 she "signed a formal charge." (Doc. 1) Specifically, plaintiff contends that on January 16, 2004, she "filed a charge of sexual harassment with the [EEOC] and on April 8, 2004 signed a formal charge." (Id.) In support of her brief in opposition, plaintiff has submitted [*17] her affidavit wherein she states, in pertinent part:

> On or about January 16, 2004, I filed charges with the EEOC in Birmingham, AL asserting that I had been sexually harassed by Patricia Doughtery, an employee of the Defendant....I was advised by the EEOC that the complaint was received in its Birmingham office on January 29, 2004. After reviewing my charges, the EEOC drafted a Charge of Discrimination complaint and forwarded it to me for my signature.

(Doc. 22, Affidavit of Sherita Daniels) However, plaintiff's affidavit fails to mention the correspondence that ensued between plaintiff and the EEOC *after* her January 16, 2004 letter and *before* the EEOC completed the formal charge for her to execute in March 2004. 9

**FOOTNOTES**

9 The evidence before the court reflects that plaintiff corresponded with the EEOC on two occasions - January 16, 2004 and February 21, 2004. (Doc. 6, Exhibit D; Doc. 20, Exhibit B)

As a threshold matter, the court must first determine whether plaintiff's correspondence to [*18] the EEOC constitutes a "charge". "Prior to filing a Title VII action ... a plaintiff first must file a charge of

discrimination with the EEOC." Gregory v. Georgia Dep't of Human Resources, 355 F.3d 1277, 1279 (11th Cir.2004). In order to obtain judicial consideration of a Title VII claim, the EEOC charge must be filed within 180 days after the last alleged unlawful employment practice occurred. 42 U.S.C. § 2000e-5(e)(1). The purpose of this requirement that a plaintiff exhaust his administrative remedies prior to filing a judicial complaint is twofold. First, is the belief that the EEOC "should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." Gregory, 355 F.3d at 1279. Secondly, and equally important, is that the charge requirement serves to notify the employer of the allegations made against it. Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1319 (11th Cir.2001). See also Bost v. Federal Express Corp., 372 F.3d 1233, 1238-39 (11th Cir. 2004) (ADEA)("The filing **[\*19]** of a charge of discrimination with the EEOC initiates 'an integrated, multi-step enforcement procedure' that enables the EEOC to detect and remedy various discriminatory employment practices" including the following steps: "(1) prompt notice from the EEOC to the employer that a charge has been filed; and (2) investigation of the charge by the EEOC.")

The EEOC regulations state that "[a] charge shall be in writing and signed and shall be verified" and should contain the following information: "(1) the full name, address, and telephone number of the person making the charge ...; (2) The full name and address of the person against whom the charge is made, if known ...; (3) A clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices ...; (4) If known, the approximate number of employees of the respondent employer ...; and (5) A statement disclosing whether proceedings involving the alleged unlawful employment practice have been commenced before a state or local agency charged with the enforcement of fair employment practice laws and, if so, the date of such commencement and the name of the agency." 29 C.F.R. § 1601.9 **[\*20]** ; 29 C.F.R. § 1601.12(a). "Notwithstanding [the general rule], a charge is sufficient when the [EEOC] receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." Id. at § 1601.12(b).

Courts have grappled with the issue of what constitutes a "charge" for purposes of the EEOC. The determination of whether a document, *other* than a verified charge form, constitutes a "charge" sufficient to satisfy the exhaustion requirement, focuses on a common theme- - the nature of the information provided in the document and whether the EEOC treated the document in question as a "charge" and acted accordingly. See Bost v. Federal Express Corp., 372 F. 3d at 1240-41 (intake questionnaire, which the EEOC did not treat as a charge of discrimination, did not constitute an EEOC charge); Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1319 (11th Cir.2001) (verified intake questionnaire *may* constitute a charge in limited instances); Moore v. Alabama State Univ., 945 F.Supp. 235, 239-240 (M.D.Ala. 1996) (letter **[\*21]** to EEOC constituted proper charge, court specifically noted that "the EEOC stated in its January 22, 1996 letter to Plaintiff that she 'filed [her] charge on March 29, 1994'"); Brook v. City of Montgomery, Ala., 916 F.Supp. 1193, 1202 (M.D.Ala., 1996) (ADEA) (Two-page, type-written letter to the EEOC which was treated as a charge by the EEOC fulfilled the requirements of 29 C.F.R. § 1626.8(b)).

In Malone v. K-Mart Corp., 51 F.Supp.2d 1287, 1299 (M.D.Ala., 1999), the district court for the Middle District of Alabama held that a plaintiff's letter to the EEOC, together with attachments, constituted an EEOC charge. The court reasoned that the letter satisfied the requirements of 29 C.F.R. § 1601.12, conveyed plaintiffs present intent to file an EEOC charge, and was treated as a charge by the EEOC. Id. Similarly, in Wilkerson v. Grinnell Corp., the Eleventh Circuit Court of Appeals held that a verified intake questionnaire that included the basic information suggested by the EEOC may constitute a charge for purposes of the statute of limitations "when the circumstances of the case would convince **[\*22]** a reasonable person that the charging party manifested her intent to activate the administrative process." 270 F.3d at 1321.

In the present case, plaintiff's January 16, 2004 letter to the EEOC identified defendant as her employer, identified the alleged harasser and included a description of the harassment. However, the letter was not verified. While the letter did not contain *all* of the information required under 29 C.F.R. § 1601.9; 29 C.F.R. § 1601.12, it was arguably sufficient. [10] However, the correspondence that transpired between the EEOC and plaintiff reveals that the EEOC did not consider plaintiff's January 16, 2004 letter to be a formal charge and it was not treated as such by the agency. (Doc. 20, Exhibit A) The EEOC did not draft a formal charge for plaintiff to execute based on the allegations contained in the January 2004 letter, nor is there any evidence that the EEOC notified plaintiff's employer of the allegations contained therein. See Bost v. Federal Express Corp., 372 F. 3d at 1240 (ADEA)("There is no evidence in the record that the EEOC did anything in response to Bost's intake **[\*23]** questionnaire and affidavit. The EEOC did not send a notice of

a charge … Instead, the EEOC sent notice of a charge of discrimination only after Bost filed his formal charge....") Rather, the EEOC informed plaintiff that it did not believe the allegations contained in the letter stated a claim and advised that if she chose to file a charge based on *those* allegations the agency would issue an immediate dismissal. (Doc. 20, Exhibit A) Plaintiff then submitted a *second* letter on February 21, 2004 wherein she acknowledges the EEOC's evaluation of her January letter indicating that the basis of her claim was, in fact, race discrimination. (Doc. 20, Exhibit B) After receiving this second letter from plaintiff, the EEOC drafted a formal charge based on plaintiff's claim of racial discrimination and returned it to plaintiff for her signature. (Doc. 20, Exhibit C)

---

**FOOTNOTES**

10 For example, plaintiff did not include her telephone number or the address of the defendant.

---

There is no evidence before the court that the EEOC **[*24]** considered plaintiff's January 2004 letter to be a charge. Rather, the record supports a contrary interpretation. After reviewing the January 2004 letter, the agency advised plaintiff that her allegations were insufficient and if she elected to file a charge based on *those* allegations the EEOC would issue an immediate dismissal. No other action was taken by the EEOC in response to plaintiff's January 2004 letter. Accordingly, the court finds that plaintiff's January 2004 letter to the EEOC does not constitute a formal charge. However, the court reaches the opposite conclusion with respect to plaintiff's February 2004 letter wherein plaintiff alleges, for the first time, that her complaints are based on race. (Doc. 20, Exhibit B) In response to plaintiff's second letter, the EEOC drafted a Charge of Discrimination which was forward to plaintiff for her signature. (Doc. 20, Exhibits C, D) Moreover, in the March 15, 2004 transmittal letter to plaintiff, the EEOC stated: "We are in receipt of your correspondence received in this office whereby *you have elected to file a complaint with EEOC.*" (Doc. 20, Exhibit C) (emphasis added). Plaintiff was advised that the enclosed charge "satisfies **[*25]** the statutory and procedural requirements for the filing of a charge" and plaintiff was instructed to sign and date the charge and "return it to the [EEOC] within 30 days of the date of this letter." (Id.) Upon receipt of the executed charge the EEOC then notified defendant of the charge and issued a Dismissal and Notice of Right to Sue. (Doc. 20, Exhibit E; Doc. 6, Exhibit B) Thus, in light of the correspondence that transpired between plaintiff and the EEOC, the court finds that plaintiff's February 2004 letter was treated as a complaint by the EEOC. 11 The defect in the letter - namely the lack of verification, was "cured" when plaintiff signed and returned the "perfected" charge to the EEOC pursuant to the agency's instructions. See Moore v. Alabama State University, 945 F.Supp. at 240. 12

---

**FOOTNOTES**

11 Plaintiff argues that her January 2004 letter was a "charge" and that any deficiencies were subsequently "cured" when she signed the formal charge of discrimination prepared by the EEOC. (Doc. 17) However, plaintiff does not make this argument with regard to her February 2004 letter. In fact, plaintiff first acknowledges the February 2004 letter in her sur-reply wherein she states: "In Plaintiff's 2/21/04 letter to the EEOC, Plaintiff informed EEOC that her charges against Patricia Dougherty were based on the fact that she had been sexually harassed by her, and not because she was white." (Doc. 22) While the court is mindful that its function is not to be an advocate on behalf of either *represented* party in this action, it would be remiss if it failed to consider all the evidence presently before it on defendant's motion for summary judgment.

The EEOC regulations provide that a charge may be amended to cure any technical defects or omissions. 29 C.F.R. § 1601.12(b) provides, in relevant part, that:

> A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received. A charge that has been so amended shall not be required to be redeferred.

29 C.F.R. § 1601.12(b). **[*26]**

**12** The Code of Federal Regulations provides that "'a charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of.'" Edelman, 535 U.S. at 110 n. 2, 122 S.Ct. at 1148 n. 2 (quoting 29 C.F.R. § 1601.12(b)(1997)). An unverified but otherwise valid charge may be verified after the time for filing a charge has expired. Id. at 1151-52.

*Timeliness of Charge*

Having determined that plaintiff's February 2004 letter constitutes a charge, the court now turns to the timeliness issue. It is undisputed that plaintiff tendered her resignation on October 8, 2003. Plaintiff maintains that she gave two weeks notice in her resignation but that she was "relieved" of her duties on October 10, 2003. (Doc. 1) Defendant argues that the date of the last discriminatory act would be the date plaintiff tendered her resignation and not her last day of employment. (Doc. 6, p. 5) Plaintiff's formal EEOC charge **[*27]** indicates that the last allegedly discriminatory act occurred on October 10, 2003. (Doc. 20, Exhibit D)

In order to be considered timely, plaintiff's discrimination charge needed to be filed within 180 days of the last allegedly discriminatory act. Assuming October 10, 2003 was the date of the last allegedly discriminatory act, plaintiff's charge would need to be filed on or before April 8, 2004 in order to be deemed timely. **13** The court finds that plaintiff's February 2004 letter constituted a Charge of Discrimination and the verified Charge received by the EEOC on April 12, 2004 relates back to the date of the February 2004 letter. See 29 C.F.R. § 1601.12(b). Montgomery v. Atlanta Family Restaurants, Inc., 752 F.Supp. 1575, 1580 (N.D. Ga. 1990)(holding that plaintiff's attorney's letter which manifested an intent to activate Title VII's machinery constituted a charge of discrimination which was timely filed and therefore, the charge subsequently signed by plaintiff relates back to the date of the original charge) Thus, the court need not reach the issue of whether the limitations period began to run on the date plaintiff tendered **[*28]** her resignation or on the last day of her employment. Accordingly, plaintiff's charge of discrimination filed on February 21, 2004 was filed well within the 180 day time period.

**FOOTNOTES**

**13** The court need not address defendant's argument that the 180 day period began running on the date plaintiff tendered her resignation since the court has concluded *infra* that a valid charge was filed in February 2004.

**V. Reasonably Related**

Having concluded that plaintiff's EEOC charge was timely filed, the court now addresses the issue of whether the EEOC charge signed by plaintiff on April 8, 2004 and received in the offices of the EEOC on April 12, 2004, is reasonably related to the claim of sexual harassment alleged in plaintiff's judicial complaint.

Defendant argues that plaintiff failed to exhaust her administrative remedies as to her sexual harassment claims since her EEOC charge identifies her claim as being based solely on race. Specifically, defendant argues that plaintiff's EEOC charge alleges a claim **[*29]** "solely [for] race discrimination" and "[plaintiff's] complaint makes claims of sex discrimination and sexual harassment that are not reasonably related to the allegations of race discrimination made in her April 12, 2004 EEOC charge." (Doc. 6, p. 8)

Plaintiff argues that "at all relevant time [she] was of the opinion she had filed a charge of sexual harassment." (Doc. 22) While plaintiff does not contest the fact that she read and signed the charge form prepared by the EEOC, she maintains that "she would have sought to amend the complaint form if she had know the information placed on it by the EEOC was not in support of a sexual harassment charge." (Doc. 17) Notwithstanding the correspondence between plaintiff and the EEOC she argues that she "has labored under the honest belief she had filed a sexual harassment claim, and that she had exhausted her

administrative remedies pertaining to same." (Doc. 22) [14]

**FOOTNOTES**

[14] It is unclear whether plaintiff was proceeding *pro se* at the time she was corresponding with the EEOC. Regardless of her status, plaintiff may not absolve herself of any responsibility regarding the content of the EEOC complaint. Plaintiff's correspondence with the EEOC in January and February indicates that she has an understanding of the process and of her rights under the discrimination statutes. See McNight v. Dormitory Auth., 995 F.Supp. 70, 77 n. 2 (N.D.N.Y.1998)(the court did not include as part of the charge allegations contained in a letter plaintiff presented to the state human rights agency intake officer, who allegedly used the letter to draft the charge signed by plaintiff. The court reasoned plaintiff presumably read the charge and concluded even an unrepresented person should have amended the charge to make it accurate before signing it.)

[*30] While a plaintiffs complaint is generally "limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination" the Eleventh Circuit has held that courts must be "extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII]." Gregory, 355 F.3d at 1280 (internal citation omitted). "Charges filed with the EEOC must be liberally construed because they are made by persons who are unfamiliar with the technicalities of formal pleadings and who usually do not have the assistance of an attorney." Tillman v. City of Boaz, 548 F.2d 592, 593 (5th Cir.1977) [15]

**FOOTNOTES**

[15] Decisions of the former Fifth Circuit rendered prior to October 1, 1981 constitute binding authority in the Eleventh Circuit. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

The Eleventh Circuit Court of Appeals has held that "[a] plaintiff's charge filed with the EEOC need not be identical [*31] to the subsequently filed judicial action." See Wu v. Thomas, 863 F.2d 1543, 1547 (11th Cir.1989); Liberti v. Walt Disney World Co., 912 F.Supp. 1494, 1502 (M.D.Fla.1995). "As long as the allegations in the judicial complaint and proof are "reasonably related" to charges in the administrative filing and "no material differences" between them exist, the court will entertain them....[j]udicial claims which serve to amplify, clarify, or more clearly focus earlier EEO complaints are appropriate. Allegations of new acts of discrimination, offered as the essential basis for the requested judicial review [are] not appropriate." Wu, 863 F.2d at 1547 (quoting Sanchez v. Standard Brands, Inc., 431 F.2d 455, 466 (5th Cir. 1970)). A claim is deemed to be reasonably related to an underlying EEOC charge of discrimination when the allegations fit within any of the following categories: (1) the claim was expressly raised in the pleadings before the EEOC's administrative law judge; (2) the claim might reasonably be expected to be considered in a diligent investigation of those issues expressly raised in the EEOC charge; or, (3) [*32] the claim was in fact considered during the EEOC investigation. Griffin v. Carlin, 755 F.2d 1516, 1522 (11th Cir.1985).

In her sur-reply, plaintiff acknowledges, for the first time, her additional correspondence with the EEOC. [16] Plaintiff contends that in her February 21, 2004 letter to the EEOC she "informed EEOC that her charges against Patricia Dougherty were based on the fact that she had been sexually harassed by her, and not because she was white." (Doc. 22) While plaintiff's February 2004 letter to the EEOC does discuss the sexual harassment allegations, plaintiff also acknowledges receiving the "letter [from the EEOC] explaining that the nature of my claim was not pervasive and severe" and states that she is "*filing a claim of discrimination claim [sic] because I am a African American female and Patricia Dougherty is a white female. If it had been myself that had been reported for sexual harassment against a white person; I would have been terminated at that time.*" (Doc. 20, Exhibit B) (emphasis added) A reasonable interpretation of plaintiff's letter is that, upon learning that the EEOC found no merit in her sexual harassment allegations, she resubmitted [*33] her allegations and changed her theory of discrimination to one based on race.

**FOOTNOTES**

**16** The February 21, 2004 letter from plaintiff to the EEOC was submitted by defendant in support of its reply brief filed with the court on May 23, 2005. (Doc. 20, Exhibit B)

After receiving plaintiff's February 21, 2004 letter, the EEOC drafted the following charge which was forwarded to plaintiff for her signature: **17**

> I was employed with the above named employer from April 25, 1977 to October 22, 2003. I was sexually harassed by Patricia Dougherty, Accounts Payable Supervisor. I reported the incidents to Tammy Hall, Assistant Human Resources Director, who in turn reported it to Leigh Stringfellow, Direct of Human Resources. No disciplinary action was taken against Patricia Dougherty, so I turned in my two weeks notice on October 8, 2003, and was relieved of my duties on October 10, 2003.

> I am filing a claim of discrimination because I am an African American female and Patricia Dougherty is a White female. When I reported **[*34]** Patricia Dougherty to human resources for sexual harassment, it was not because she is White, it was because she was wrong by touching me inappropriately in the work place. I began to look for employment elsewhere.

> I believe that I have been discriminated against because of my race, Black, which is a violation of Title VII of the Civil Rights Act of 1964, as amended.

(Doc. 1, attachment) On the charge form under the section entitled "Discrimination Based On" the box labeled "race" has been marked with an "x". (Id.) **18**

**FOOTNOTES**

**17** The charge drafted by the EEOC incorporates information contained in both of plaintiff's letters to the EEOC in January 2004 and February 2004.

**18** The court is mindful that "the failure to place a check mark in the correct box is [not] a fatal error [and] [i]n the context of Title VII, no one--not even the unschooled-- should be boxed out." Sanchez v. Standard Brands, Inc., 431 F.2d 455 at 463. Accordingly, the court's conclusion regarding the scope of plaintiff's EEOC complaint does not hinge on this technicality, but, rather, is based on the context of the correspondence that transpired between plaintiff and the EEOC, the Charge of Discrimination, the Notice of Discrimination and the Dismissal and Notice of Right to Sue.

**[*35]** Plaintiff signed the charge as drafted and returned it to the EEOC. Upon receiving plaintiff's perfected charge, the EEOC issued a Notice of Charge of Discrimination to defendant and issued a Dismissal and Notice of Right to Sue to plaintiff. (Doc. 20, Exhibit E; Doc. 6, Exhibit B) After receiving a Notice of Right to Sue, plaintiff filed a judicial complaint against defendants alleging a claims of sexual harassment. The complaint alleges, in pertinent part, as follows:

> 8. On or about November 8, 2002, April 1, 2003, April 4, 2003, May 22, 2003 and August 5, 2003, Patricia Dougherty, at all relevant times employed by Defendant Mobile Register as an Accounts Payable Supervisor, without Plaintiff's consent, rubbed her hands across Plaintiff's buttocks.

> 9. After each said unconsented to touching by Patricia Dougherty, Plaintiff complained to supervisory personnel of the Defendant Mobile Register, in particular to Tami Hall, Assistant Human Resources Director for the Defendant Mobile Register and to Leigh Stringfellow, Director of Human Resources for the Defendant Mobile Register. No assistance was given to Plaintiff by Defendant Mobile Register concerning Plaintiff's complaints **[*36]** against Patricia Doughtery.

> 10. As a direct an proximate result of being sexually harassed by Patricia Dougherty, and the

Defendant Mobile Register having provided no assistance to Plaintiff concerning her complaints, on or about October 8, 2003 Plaintiff turned in her resignation and was relieved of her duties at Defendant Mobile Register October 10, 2003.

(Doc. 1)

Defendant argues that plaintiff's EEOC charge "would not have prompted the EEOC to investigate claims that MPR allegedly engaged in sex discrimination and sexual harassment of all of its female employees." (Doc. 6, p. 10) While the EEOC charge does include some information relating to the alleged sexual harassment, it states *unequivocally* that it is based on race. (Doc. 20, Exhibit D) Moreover, the Notice of Charge of Discrimination issued by the EEOC advises defendant that a "charge of discrimination has been filed against your organization under Title VII of the Civil Rights Act." (Doc. 20, Exhibit E) Under the heading "Circumstances of Alleged Discrimination" the box labeled "race" has been checked. (Id.) [19]

## FOOTNOTES

[19] See ftnt. 17.

**[*37]** In the present case, there is no reason to believe that conduct constituting sexual harassment would have fallen within the scope of the investigation of plaintiffs charge of race discrimination. Thus, the court finds that plaintiff's sexual harassment allegations are not reasonably related to the EEOC charge alleging race discrimination. See Terrell v. McGuire, 2003 U.S. Dist. LEXIS 16751, 2003 WL 22213132 (D.Kan., August 27, 2003)(unexhausted sexual harassment claim is not reasonably related to plaintiff's claim of race discrimination); Crawford v. Bank of America, 986 F.Supp. 506, 508 (N.D.Ill., 1997) (finding allegation of race discrimination not like or reasonably related to sexual harassment); Lee v. Junior College Dist., 1995 WL 363723 (E.D. Mo. Mar 08, 1995), aff'd 91 F.3d 148 (8th Cir. 1996)(Table) (same). The court's finding is bolstered by the correspondence that transpired between plaintiff and the EEOC. The EEOC had previously addressed plaintiff's sexual harassment allegations advising that the agency had read her allegations and concluded that she failed to present a prima facie case. While the EEOC advised plaintiff of her right **[*38]** to file a complaint based on those claims, she was told that if she chose to do so, the agency would issue and immediate dismissal. (Doc. 6, Exhibit A) Plaintiff then submitted a second letter to the EEOC wherein she predicated her allegations on race. After receiving this second letter, the EEOC then drafted a charge based on plaintiff's allegations of racial discrimination.

Because of the significant discrepancy in theory between plaintiff's EEOC charge and her complaint in district court, the Court concludes that the claim in plaintiff's district court complaint is not "like or related" to the claim alleged in her EEOC charge. Plaintiff's claim of sexual harassment is beyond the scope of her EEOC charge. Since plaintiff failed to exhaust the required administrative procedures for a sexual harassment claim, and as her time for filing an EEOC charge for that claim has expired, the Court finds that summary judgment is due to be granted in favor of the defendant.

## CONCLUSION

In the final analysis, the court finds that plaintiff has failed to exhaust her administrative remedies relating to the sexual harassment claim contained in her complaint and therefore, the court lacks **[*39]** subject matter jurisdiction over her claim of sexual harassment. Accordingly, defendant's motion for summary judgment is **GRANTED.**

**DONE and ORDERED** this the 24<th> of June 2005.

/s/ Kristi D. Lee

## UNITED STATES MAGISTRATE JUDGE

## JUDGMENT

In accordance with the Order entered on this date on Defendant's motion for summary judgment and

supporting brief (Docs. 5, 6); Plaintiff's brief in opposition (Doc. 17), Defendant's reply (Doc. 20) and Plaintiff's response to motion for summary judgment and corrected affidavit (Docs. 22, 23), in which the court entered judgment in favor of Defendant as to all claims alleged against in Plaintiff's complaint; it is hereby **ORDERED, ADJUDGED** and **DECREED** that Plaintiff's action be and is hereby **DISMISSED** with prejudice.

**DONE** and **ORDERED** this the 24<th> day of June 2005.

/s/ Kristi D. Lee

## UNITED STATES MAGISTRATE JUDGE

Source:  Legal > / . . . / > **Federal & State Cases, Combined** 
Terms:  **name(daniels and mobile)**  (Edit Search | Suggest Terms for My Search)
View:  Full
Date/Time:  Wednesday, August 1, 2007 - 2:19 PM EDT

* Signal Legend:
⬤ - Warning: Negative treatment is indicated
🅠 - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
🅐 - Citing Refs. With Analysis Available
🅘 - Citation information available
* Click on any *Shepard's* signal to *Shepardize*® that case.

**LexisNexis**®   About LexisNexis  | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# Deposition Transcript of Patricia Gibson, Part One
# Pages 1-108

In The Matter Of:

**PATRICIA J. GIBSON**
v.
**WESTPOINT STEVENS, INC., ET AL.**

**NO. 3:06-CV-0974-MEF**

---

**PATRICIA J. GIBSON**
**July 12, 2007**

---



TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

THE HIGHEST QUALITY IN COURT REPORTING

(Pages 1 to 4)

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CIVIL ACTION NO. 3:06-CV-0974-MEF

PATRICIA J. GIBSON,
    Plaintiff,
vs.
WESTPOINT STEVENS, INC. and WESTPOINT
HOME, INC.,
    Defendants.

DEPOSITION
OF
PATRICIA J. GIBSON
July 12, 2007

REPORTED BY:  Susan B. Treadaway
    Certified Shorthand Reporter
    and Notary Public

---

**Page 3**

1        A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4      Ms. Lateefah Muhammad
5      Attorney at Law
6      Post Office Box 1096
7      Tuskegee, Alabama 36087
8
9  FOR THE DEFENDANT:
10     Mr. Fred W. Suggs, Jr.
11     Attorney at Law
12     Ogletree, Deakins, Nash,
13     Smoak & Stewart, P.C.
14     The Ogletree Building
15     300 North Main Street
16     Post Office Box 2757
17     Greenville, South Carolina 29602
18
19 OTHERS PRESENT:
20     Mr. Lawrence Williams
21
22
23

---

**Page 2**

1        S T I P U L A T I O N
2
3      IT IS STIPULATED AND AGREED,
4  by and between the parties, through their
5  respective counsel, that the deposition of
6  PATRICIA J. GIBSON may be taken before
7  Susan B. Treadaway, Commissioner,
8  Certified Shorthand Reporter and Notary
9  Public;
10     That it shall not be necessary
11 for any objections to be made by counsel
12 to any questions, except as to form or
13 leading questions, and that counsel for
14 the parties may make objections and assign
15 grounds at the time of trial, or at the
16 time said deposition is offered in
17 evidence, or prior thereto.
18
19
20
21
22
23

---

**Page 4**

1      INDEX OF EXAMINATION
2
3          PAGE:
4  EXAMINATION BY MR. SUGGS     9
5  EXAMINATION BY MS. MUHAMMAN     268
6
7
8      INDEX OF EXHIBITS
9
10         PAGE:
11 Plaintiff's Exhibit 67     295
12
13
14 Defendant's Exhibit 1     37
15 Defendant's Exhibit 2     39
16 Defendant's Exhibit 3     42
17 Defendant's Exhibit 4     49
18 Defendant's Exhibit 5     51
19 Defendant's Exhibit 6     53
20 Defendant's Exhibit 7     61
21 Defendant's Exhibit 8     77
22 Defendant's Exhibit 9     78
23 Defendant's Exhibit 10     79

---

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 5 to 8)

Page 5

INDEX OF EXHIBITS (Continuing)

PAGE:

| | |
|---|---|
| Defendant's Exhibit 11 | 82 |
| Defendant's Exhibit 12 | 84 |
| Defendant's Exhibit 13 | 87 |
| Defendant's Exhibit 14 | 91 |
| Defendant's Exhibit 15 | 92 |
| Defendant's Exhibit 16 | 92 |
| Defendant's Exhibit 17 | 93 |
| Defendant's Exhibit 18 | 94 |
| Defendant's Exhibit 19 | 98 |
| Defendant's Exhibit 20 | 106 |
| Defendant's Exhibit 21 | 130 |
| Defendant's Exhibit 22 | 134 |
| Defendant's Exhibit 23 | 140 |
| Defendant's Exhibit 24 | 143 |
| Defendant's Exhibit 25 | 146 |
| Defendant's Exhibit 26 | 152 |
| Defendant's Exhibit 27 | 152 |
| Defendant's Exhibit 28 | 156 |
| Defendant's Exhibit 29 | 159 |
| Defendant's Exhibit 30 | 160 |

Page 7

INDEX OF EXHIBITS (Continuing)

PAGE:

| | |
|---|---|
| Defendant's Exhibit 51 | 226 |
| Defendant's Exhibit 52 | 237 |
| Defendant's Exhibit 53 | 243 |
| Defendant's Exhibit 54 | 243 |
| Defendant's Exhibit 55 | 245 |
| Defendant's Exhibit 56 | 246 |
| Defendant's Exhibit 57 | 247 |
| Defendant's Exhibit 58 | 248 |
| Defendant's Exhibit 59 | 250 |
| Defendant's Exhibit 60 | 251 |
| Defendant's Exhibit 61 | 252 |
| Defendant's Exhibit 62 | 253 |
| Defendant's Exhibit 63 | 261 |
| Defendant's Exhibit 64 | 261 |
| Defendant's Exhibit 65 | 262 |
| Defendant's Exhibit 66 | 263 |

Page 6

INDEX OF EXHIBITS (Continuing)

PAGE:

| | |
|---|---|
| Defendant's Exhibit 31 | 163 |
| Defendant's Exhibit 32 | 165 |
| Defendant's Exhibit 33 | 167 |
| Defendant's Exhibit 34 | 168 |
| Defendant's Exhibit 35 | 169 |
| Defendant's Exhibit 36 | 171 |
| Defendant's Exhibit 37 | 173 |
| Defendant's Exhibit 38 | 176 |
| Defendant's Exhibit 39 | 177 |
| Defendant's Exhibit 40 | 181 |
| Defendant's Exhibit 41 | 186 |
| Defendant's Exhibit 42 | 191 |
| Defendant's Exhibit 43 | 193 |
| Defendant's Exhibit 44 | 196 |
| Defendant's Exhibit 45 | 198 |
| Defendant's Exhibit 46 | 200 |
| Defendant's Exhibit 47 | 203 |
| Defendant's Exhibit 48 | 206 |
| Defendant's Exhibit 49 | 211 |
| Defendant's Exhibit 50 | 214 |

Page 8

1  I, Susan B. Treadaway, a
2  Shorthand Reporter of Birmingham, Alabama,
3  and a Notary Public for the State of
4  Alabama at Large, acting as Commissioner,
5  certify that on this date, as provided by
6  the Federal Rules of Civil Procedure of
7  the United States District Court, and the
8  foregoing stipulation of counsel, there
9  came before me at 2401 C First Avenue,
10 Opelika, Alabama, on the 12th day of July,
11 2007, commencing at 9:15 A.M., PATRICIA J.
12 GIBSON, witness in the above cause, for
13 oral examination, whereupon the following
14 proceedings were had:

16     PATRICIA J. GIBSON,
17 being first duly sworn, was examined and
18 testified as follows:

20     MR. SUGGS:  Do you want to
21 read and sign, do you want your witness to
22 read and sign?
23     MS. MUHAMMAD:  Well, I think

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 9 to 12)

Page 9

1  we may need to.
2  MR. SUGGS: Do you want to wait
3  until the end?
4  MS. MUHAMMAD: Yes, let's just
5  do that.
6  MR. SUGGS: All right. You
7  will decide at the end whether read and
8  sign. Okay.
9  MS. MUHAMMAD: All of the
10 other ones I agree to.
11 MR. SUGGS: I'm going to make
12 a note at the end of my notes.
13
14 EXAMINATION BY MR. SUGGS:
15 Q. Okay. This deposition is
16 being taken pursuant to the Federal Rules
17 of Civil Procedure, all objections are
18 reserved except those which would be
19 waived if not made at the deposition and
20 those necessary to assert a privilege.
21 Ms. Gibson, as you know from our brief
22 introduction, my name is Fred Suggs, I'm
23 an attorney with Ogletree, Deakins, Nash,

Page 10

1  Smoak & Stewart. My firm and I represent
2  WestPoint in this lawsuit that you've
3  brought against the company. The Federal
4  Rules of Civil Procedure give me the right
5  to ask you questions under oath and
6  require that you respond with full,
7  complete, truthful answers. Your
8  testimony here today is just as important
9  as if we were in court before a judge and
10 a jury. I'm sure Ms. Muhammad has already
11 told you that. Do you understand that you
12 are under oath and that what you say here
13 today may be used as evidence in a later
14 trial?
15 A. Yes.
16 Q. Okay. Now, my question is
17 going to be pretty easy, but it's your
18 answers that the court wants and nobody
19 else's. So, when I ask you a question,
20 you need to answer it and not confer with
21 your lawyer. If I give you a document to
22 ask you questions of the document, you
23 need to ask me any questions if you have

Page 11

1  questions about my questions. And during
2  the course of the deposition, Ms. Muhammad
3  is required to refrain from any activities
4  that would suggest or appear to suggest an
5  answer to you, and I'm sure she will do
6  that. Now, you should wait until I finish
7  asking my question before you start
8  answering. And normally if we were just
9  in a conversation, it would be all right
10 for us to talk over one another. But this
11 lady here, the court reporter, has to take
12 down my questions and she has to take down
13 your answers verbatim and if we're talking
14 over each other, she can't do that. So,
15 can I have your agreement that you'll wait
16 until I finish asking a question before
17 you start answering it?
18 A. Yes.
19 Q. All right. And you can have
20 my agreement that I will let you
21 completely finish your answer before I ask
22 another question, okay?
23 A. Okay.

Page 12

1  Q. Now, if Ms. Muhammad has
2  objections, she'll say I object. And if
3  she says I object, then you stop answering
4  until she and I can resolve it. And she
5  shouldn't direct you to refuse to answer a
6  question unless she does so on the grounds
7  of privilege and immediately moves for a
8  protective order. And if there aren't any
9  objections, you ought to give full,
10 complete and truthful answers. And you
11 can take as much time as you want to to
12 think about your answer before you begin
13 to answer, okay?
14 A. Okay.
15 Q. Are you on any medication
16 right now that would affect your ability
17 to answer questions?
18 A. No, I don't think so. Blood
19 pressure only.
20 Q. Okay. That doesn't affect
21 your memory or anything like that?
22 A. No.
23 Q. Okay. You don't drink

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 13 to 16)

| Page 13 | Page 15 |
|---|---|
| 1 alcohol, do you? | 1    Q.    And that was from the time you |
| 2    A.    No. | 2 were hired at about -- the first time |
| 3    Q.    Now, I saw that you have some | 3 about 1974 until about 1986 or 1987? |
| 4 papers in your lap? | 4    A.    Yes. |
| 5    A.    Yes. | 5    Q.    Okay.  You were once known as |
| 6    Q.    What are they? | 6 Patricia J. Varner? |
| 7    A.    Just files, copies of my | 7    A.    Yes. |
| 8 questions -- | 8    Q.    Okay.  Any other names? |
| 9    Q.    May I see them? | 9    A.    Gibson. |
| 10    A.    -- from my lawyer.  My | 10    Q.    All right.  Anything else? |
| 11 answers. | 11    A.    No. |
| 12    Q.    Are these the things that you | 12    Q.    Okay.  You're a female? |
| 13 studied to get ready for your deposition? | 13    A.    Yes. |
| 14    A.    Yes. | 14    Q.    You're African-American? |
| 15    Q.    (Reviewing documents.)  Okay. | 15    A.    Yes. |
| 16 Ms. Gibson, you gave me defendant's first | 16    Q.    Your Alabama driver's license |
| 17 request for production of documents to the | 17 number is |
| 18 plaintiff, plaintiff's amended initial | 18    A.    Yes. |
| 19 disclosures, plaintiff's response to | 19    Q.    Your Social Security number is |
| 20 defendant's first request for admissions, | 20 |
| 21 defendant's first request for admissions | 21    A.    Yes. |
| 22 to the plaintiff, plaintiff's amended | 22    Q.    Your date of birth is |
| 23 responses to defendant's request for | 23 |

| Page 14 | Page 16 |
|---|---|
| 1 production, defendant's first | 1    A.    Yes. |
| 2 interrogatories to the plaintiff and | 2    Q.    Where were you born? |
| 3 plaintiff's response to defendant's first | 3    A.    Chambers County, Alabama. |
| 4 interrogatories and I'm going to give all | 4    Q.    In the country? |
| 5 of that back to you and you can put it | 5    A.    Lanett, Alabama. |
| 6 back in your folder.  Okay.  This | 6    Q.    And your present address is |
| 7 deposition is going to be in several | 7 403 Fairwood Drive, Valley, Alabama 36854? |
| 8 parts.  The first part is just background, | 8    A.    It used to be, but I had to |
| 9 okay, case -- questions that you can | 9 move. |
| 10 answer just like that.  Your full name is | 10    Q.    Okay.  How long did you live |
| 11 Patricia Jones Gibson? | 11 at 403 Fairwood Drive? |
| 12    A.    Yes. | 12    A.    For about twenty-six years |
| 13    Q.    Now, you've been known by | 13 alone. |
| 14 other names, aliases and nicknames, | 14    Q.    When did you move? |
| 15 haven't you? | 15    A.    February the 19th, it was |
| 16    A.    One. | 16 2005. |
| 17    Q.    What's that? | 17    Q.    Now, are you sure about 2005? |
| 18    A.    Sissy. | 18    A.    February 2006. |
| 19    Q.    I'm sorry? | 19    Q.    Say again. |
| 20    A.    Sissy. | 20    A.    2006. |
| 21    Q.    Sissy.  Okay.  And you were | 21    Q.    2006.  Okay. |
| 22 once known as Patricia Jones Barrow? | 22    A.    Okay.  Get that right. |
| 23    A.    Yes. | 23    Q.    You moved from 403 Fairwood |

4

Page 17

1    Drive, Valley, Alabama to somewhere else
2    on February 19th, 2006?
3        A.    '6.
4        Q.    Where did you move to?
5        A.    Newnan, Georgia.
6        Q.    That's in Coweta County?
7        A.    Yes.
8        Q.    What's your address in Newnan?
9        A.    4 Peachtree Street, Newnan,
10   Georgia.  Zip code, let's see, I thought I
11   had -- oh.  Let's see.  Zip code is 30263.
12       Q.    Okay.
13             MS. MUHAMMAD:  Excuse me, can
14   we go off the record for just a moment?
15             (Off-the-record discussion.)
16             MR. SUGGS:  We will go back on
17   the record.
18       Q.    Now, Ms. Gibson, we just had
19   an off-the-record discussion initiated by
20   your lawyer, Ms. Muhammad, to try to
21   clarify the date that you moved from 403
22   Fairwood Drive in Valley.
23       A.    Yes.

Page 18

1        Q.    And you first told me 2005.
2    And then you said no, it was February of
3    2006.  What do you say now?
4        A.    It was 2007.  I just had to
5    get it right because I've been so confused
6    here lately, you know, not with my work,
7    but --
8        Q.    Okay.
9        A.    No.
10       Q.    So, you moved this year?
11       A.    Year.
12       Q.    So, it's been --
13       A.    2007, February 19th.
14       Q.    It's July now.  So, you moved
15   about five months ago?
16       A.    Yes.
17       Q.    All right.  And now you live
18   in Newnan?
19       A.    Newnan, Georgia.
20       Q.    Have you lived anywhere else
21   since you moved from 403 Fairwood Drive?
22       A.    No, I haven't.
23       Q.    Who lives with you there at

Page 19

1    Newnan?
2        A.    Ms. Mattie Ogletree.
3        Q.    O-g-l-e-t-r-e-e?
4        A.    Yes.
5        Q.    Is she a relative of yours?
6        A.    Yes, my cousin.
7        Q.    Cousin?
8        A.    First cousin.
9        Q.    Anybody else live there with
10   you?
11       A.    My husband, Jerry Gibson.
12       Q.    Anybody else?
13       A.    Her grandchildren be there
14   with her every so often.
15       Q.    Who?
16       A.    Ms. Mattie Ogletree.  That's
17   her home.
18       Q.    That's her home?
19       A.    Yes.
20       Q.    So, you moved in with her?
21       A.    Yes.
22       Q.    You don't have any interest in
23   that house?

Page 20

1        A.    No, I don't have any, that's
2    her house.
3        Q.    Do you rent?
4        A.    Yes, I pay rent.
5        Q.    How much do you pay?
6        A.    I pay a hundred and fifty a
7    month.
8        Q.    Now, is Ms. Ogletree there the
9    whole time?
10       A.    Yes.
11       Q.    Did you live at 403 Fairwood
12   Drive for almost the whole time that you
13   worked for WestPoint?
14       A.    WestPoint Stevens, yes.
15       Q.    Do you have a telephone number
16   in Newnan?
17       A.    In Newnan, the only thing I
18   have is a cell number, but I could get her
19   phone.
20       Q.    What's that cell phone?
21       A.    It's 706-585-3890.
22       Q.    Okay.  And there is a landline
23   to the house?

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 21 to 24)

| Page 21 |
|---|
| 1    A.   Yes. |
| 2    Q.   You don't know that number? |
| 3    A.   I don't know that. |
| 4    Q.   Whose name is it in? |
| 5    A.   Ms. Mattie Ogletree. |
| 6    Q.   Okay. Do you have an E-mail |
| 7   address? |
| 8    A.   No, I don't have an E-mail. |
| 9    Q.   Now, your mother's name is |
| 10   Ollie Goodman Jones? |
| 11    A.   Yes. |
| 12    Q.   And your father's name is |
| 13   Robert Jones? |
| 14    A.   Yes. |
| 15    Q.   Your mama still living? |
| 16    A.   No, my mama is deceased. |
| 17    Q.   When did she pass away? |
| 18    A.   I can't say exactly, it's been |
| 19   so many years. Probably about -- it's |
| 20   been about fifteen years. |
| 21    Q.   Is your father still living? |
| 22    A.   No. |
| 23    Q.   Did either of them work for |

| Page 22 |
|---|
| 1   WestPoint? |
| 2    A.   No, he never worked for |
| 3   WestPoint. |
| 4    Q.   What did your father do? |
| 5    A.   He used to work for the |
| 6   railroad and Mr. Darden, Darden Shoes in |
| 7   WestPoint. |
| 8    Q.   And your mama worked as a |
| 9   domestic? |
| 10    A.   Yes, for Mr. Herbert Hunt. |
| 11    Q.   And your current husband is |
| 12   Jerry Gibson? |
| 13    A.   Jerry Gibson. |
| 14    Q.   When did y'all get married? |
| 15    A.   October -- October the 26th, I |
| 16   believe that's what it was, but I'm not |
| 17   sure, not right offhand my date, but I do |
| 18   have it. |
| 19    Q.   You don't know the year? |
| 20    A.   1997, I believe it was. |
| 21    Q.   1997? |
| 22    A.   Yes. |
| 23    Q.   Where did y'all get married? |

| Page 23 |
|---|
| 1    A.   In Lafayette. |
| 2    Q.   Lafayette, Alabama? |
| 3    A.   Yes. |
| 4    Q.   And before that, were you |
| 5   married to a gentleman named Varner? |
| 6    A.   Yes. |
| 7    Q.   What was his name? |
| 8    A.   Robert Varner. |
| 9    Q.   How do you spell it? |
| 10    A.   R-o-b-e-r-t, V-a-r-n-e-r. |
| 11    Q.   Is he still living? |
| 12    A.   No, he's deceased. |
| 13    Q.   When were you married to him? |
| 14    A.   I can't say. It was about |
| 15   '80 -- it was probably in the '80s, around |
| 16   '89. We were divorced. |
| 17    Q.   You were divorced before he |
| 18   died? |
| 19    A.   Yes. |
| 20    Q.   And you got divorced when? |
| 21    A.   I don't have my records, but |
| 22   it's Lawyer Phillips. I can't think back |
| 23   that far. |

| Page 24 |
|---|
| 1    Q.   Where did you get divorced? |
| 2    A.   Through Lawyer Phillips. |
| 3    Q.   What city were you in, what |
| 4   town were you in? |
| 5    A.   Fairfax, Alabama. |
| 6    Q.   Okay. And when did Mr. Varner |
| 7   pass away? |
| 8    A.   I'm not sure. |
| 9    Q.   All right. So, you were |
| 10   married to him in the '80s? |
| 11    A.   In the '80s. |
| 12    Q.   Okay. And then you were |
| 13   previously married to Eddie Lawrence |
| 14   Barrow? |
| 15    A.   Barrow. |
| 16    Q.   Uh-huh. And Mr. Barrow died |
| 17   before you started working with WestPoint? |
| 18    A.   Yes -- no. We started working |
| 19   at the same time. He was working in |
| 20   Fairfax and I was working in Lanett. |
| 21    Q.   Okay. |
| 22    A.   And my husband got sick, so we |
| 23   had to get a leave from his job to go to |

6

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 25 to 28)

Page 25

1 New York. That's where his mother wanted
2 him, his family there. And he died in
3 Kings County Hospital.
4       Q.   Is that in New York?
5       A.   Yes.
6       Q.   And this was about when?
7       A.   '70, I figure around the early
8 '70s.
9       Q.   Is Mr. Gibson working now?
10      A.   No.
11      Q.   Now, he did work for
12 WestPoint?
13      A.   WestPoint Stevens.
14      Q.   When did he stop working for
15 WestPoint?
16      A.   I think they separated him
17 around the -- let's see, around August the
18 20th. The exact date, I don't remember.
19 Around the 26th, I think, they separated
20 him from WestPoint Stevens.
21      Q.   What year?
22      A.   2005.
23      Q.   Was that before or after you

Page 26

1 were separated?
2       A.   That was after.
3       Q.   How long after?
4       A.   About a week or two.
5       Q.   Now, do you have any children?
6       A.   No. No. I've got some
7 stepchildren.
8       Q.   Are your stepchildren Janice
9 Jones and Miles Jones?
10      A.   Miles, yes.
11      Q.   Both of them?
12      A.   Yes.
13      Q.   Where does Janice Jones work?
14      A.   Janice, she passed.
15      Q.   Oh, she's deceased?
16      A.   Uh-huh.
17      Q.   How about Miles?
18      A.   Miles is in Detroit.
19      Q.   And they are not your natural
20 children?
21      A.   No.
22      Q.   Now, in the Valley, Opelika,
23 Montgomery area, the area that this court

Page 27

1 district covers, tell me who your -- the
2 last names of the people that you're kin
3 to, for example, Gibson, we know that.
4 Barrow, we know that.
5       A.   My relatives, Didalls.
6       Q.   How do you spell that?
7       A.   D-i-d-a-l-l.
8       Q.   All right.
9       A.   The Goodmans.
10      Q.   How do you spell that?
11      A.   G-o-o-d-m-a-n.
12      Q.   All right.
13      A.   The Budgers.
14      Q.   How do you spell that?
15      A.   B-u-d-g-e-r.
16      Q.   Okay.
17      A.   And the Jones, J-o-n-e-s.
18      Q.   All right. Do you have a
19 niece named Cora Hicks?
20      A.   Yes.
21      Q.   So, you are kin to the Hicks?
22      A.   Yes, related to Cora. My
23 niece.

Page 28

1       Q.   Do you have a cousin named
2 Marie Trammel?
3       A.   She's just a friend.
4       Q.   She's just a friend?
5       A.   Yes.
6       Q.   So, she is not kin to you?
7       A.   No.
8       Q.   Do you got a brother?
9       A.   Tommy Lee.
10      Q.   Tommy Lee?
11      A.   Jones.
12      Q.   Are you kin to anybody named
13 Allen, last name Allen?
14      A.   Tommy Lee Allen, yes, I'm
15 related to the Allens.
16      Q.   Are Tommy Lee Allen and Tommy
17 Lee Jones different people?
18      A.   Same person.
19      Q.   What's his last name?
20      A.   Well, he always went by Tommy
21 Lee Allen, A-l-l-e-n.
22      Q.   Okay. Did he have a different
23 father than you?

7

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 29 to 32)

| Page 29 | Page 31 |
|---|---|
| 1    A.   No.<br>2    Q.   Did you ever go by Allen?<br>3    A.   No.<br>4    Q.   How does it happen that he<br>5  goes by Allen?<br>6    A.   Somewhere or another, the<br>7  birth certificate got -- I really don't<br>8  know.<br>9    Q.   Okay.  Now, when you were<br>10  growing up, did you ever have any serious<br>11  illnesses?<br>12    A.   No.<br>13    Q.   Did you ever have any serious<br>14  injuries?<br>15    A.   No.<br>16    Q.   Did you ever get in trouble<br>17  with the juvenile authorities?<br>18    A.   No.<br>19    Q.   Now, when you were in school<br>20  coming along, did you do okay in school?<br>21    A.   Yes.<br>22    Q.   And I don't mean any<br>23  disrespect by these questions, but were | 1    Q.   Any kind of individual<br>2  education program?<br>3    A.   No.<br>4    Q.   Have you ever taken a drug<br>5  called Ritalin?<br>6    A.   No.<br>7    Q.   Cylert?<br>8    A.   No.<br>9    Q.   Dexedrine?<br>10    A.   No.<br>11    Q.   Were you ever suspended or<br>12  expelled from school?<br>13    A.   No.<br>14    Q.   Tell me your educational<br>15  background.<br>16    A.   Well, I went as far as going<br>17  no further than the eleventh grade.<br>18    Q.   All right.  Where did you go<br>19  to grammar school?<br>20    A.   I went to Drew.<br>21    Q.   And Drew was grades what<br>22  through what?<br>23    A.   Through the ninth. |

| Page 30 | Page 32 |
|---|---|
| 1  you ever told that you had attention<br>2  deficit disorder?<br>3    A.   No.<br>4    Q.   Were you ever told that you<br>5  were hyperactive?<br>6    A.   No.<br>7    Q.   That you were dyslexic?<br>8    A.   No.<br>9    Q.   That you had a learning<br>10  disability?<br>11    A.   No.<br>12    Q.   None of that.  Were you ever<br>13  placed in a self-contained class?<br>14    A.   No.<br>15    Q.   A class for the educationally<br>16  handicapped?<br>17    A.   No.<br>18    Q.   A class for the emotionally<br>19  handicapped?<br>20    A.   No.<br>21    Q.   Any kind of special education<br>22  program?<br>23    A.   No. | 1    Q.   One through nine?<br>2    A.   Yes.<br>3    Q.   And where is Drew?<br>4    A.   It used to be in Shawmut,<br>5  Alabama, but a tornado blew it away.<br>6    Q.   Okay.  But that was after you<br>7  finished the ninth grade?<br>8    A.   Yes.<br>9    Q.   All right.  Did you have any<br>10  education after the ninth grade at Drew?<br>11    A.   No.  I was in New York then<br>12  with my father.<br>13    Q.   All right.  Did you complete<br>14  the ninth grade at Drew?<br>15    A.   Yes.<br>16    Q.   That's as far as you went?<br>17    A.   Over at Drew.<br>18    Q.   I'm sorry?<br>19    A.   At Drew.<br>20    Q.   Did you go anywhere else?<br>21    A.   Yes, I went to school in New<br>22  York then for --<br>23    Q.   Where did you go to school in |

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 33 to 36)

Page 33

1  New York?
2      A.   PS 271, and a little private
3  school, I can't think of the name.
4      Q.   What's the last school you
5  went to?
6      A.   271.
7      Q.   What's the last grade you
8  finished?
9      A.   The tenth there.
10      Q.   You finished the tenth?
11      A.   Uh-huh.
12      Q.   Did you start the eleventh?
13      A.   Yes.
14      Q.   What bureau is PS 271 in?
15      A.   It was out in east New York.
16      Q.   Does it have a name like --
17      A.   Brooklyn.
18      Q.   Brooklyn?
19      A.   New York.
20      Q.   What years did you live in New
21  York City?
22      A.   I stayed in New York about
23  fifteen -- about fifteen to twenty years.

Page 34

1      Q.   When did you come back to
2  Alabama?
3      A.   In 19, let me see, 73.  I
4  think it was 1973.
5      Q.   Didn't go to college?
6      A.   No.
7      Q.   Did you get any awards or any
8  citations for significant educational
9  accomplishments?
10      A.   No.
11      Q.   None?
12      A.   None.
13      Q.   All right.  After you stopped
14  going to PS 271, did you have any jobs?
15      A.   Yes, I had a job, I worked at
16  this place called Sunshine Laundry in
17  Brooklyn, New York.  The address, I don't
18  know the address, but it was on Lexington
19  Avenue between Patrick and Broadway.
20      Q.   Okay.  What did you do there?
21      A.   Well, they did like sheets,
22  towels, mostly like big companies, motels,
23  you know, just something like they get

Page 35

1  shipping out, they laundry, it was a big
2  company, and they did a lot of motels and
3  big business stuff like that.
4      Q.   What did you do?
5      A.   Well, I used to fold the
6  sheets.
7      Q.   Okay.  What happened to that
8  job?
9      A.   It went out of business.
10      Q.   Do you know what year that
11  was?
12      A.   No.  No, I don't.
13      Q.   All right.  Where else did you
14  work?
15      A.   Well, I came here, that's when
16  I got a job at Lanett mill, me and my
17  husband, Eddie Barrow.  I worked in Lanett
18  for about -- I guess about three months, I
19  guess before he got sick.
20      Q.   Then you went back to New
21  York?
22      A.   And I had to go back with him.
23      Q.   And then you returned?

Page 36

1      A.   And I returned back, I think
2  it was in 1975, I worked at -- what's the
3  name of the car wash.  Valley Fast Car
4  Wash in Valley and Lanett with Henderson
5  and Henderson.  And I left from there, I
6  went back to the mill to get my
7  application and I was hired at Lanett
8  mill.
9      Q.   Okay.  About how long did you
10  work for Valley Fast Car Wash?
11      A.   I guess maybe six months --
12      Q.   What was --
13      A.   -- because I was -- well, we
14  was washing cars.
15      Q.   Okay.
16      A.   Detailing cars.
17      Q.   Detailing cars.  Ms. Gibson, I
18  have passed to your lawyer who will hand
19  it on to you what's been marked as
20  Exhibit 1.  And when she gives that to
21  you, I would like to ask you some
22  questions about it.
23          Now, Ms. Gibson, do you see the

9

Page 37

1  first page is numbered 439?
2        (Whereupon, Defendant's
3        Exhibit 1 was marked
4        for identification.)
5      A.    Yes.
6      Q.    All right.  And see up at the
7  top it says AIC Operations, Inc.?
8      A.    Yes.
9      Q.    That's Auburn Investment
10 Casting, isn't it?
11     A.    Yes.
12     Q.    And you worked there after you
13 worked at WestPoint, correct?
14     A.    Yes.
15     Q.    And if you will look over at
16 the page that's numbered 457, at the
17 bottom.
18     A.    Yes.
19     Q.    When you were hired at Auburn
20 Investment Casting, you made eight dollars
21 and ninety-four cents an hour?
22     A.    Yes.
23     Q.    And if you will look at page

Page 38

1  449, which is the next page up, it looks
2  like this.  449.  Do you see that?
3      A.    Yes, sir.
4      Q.    It looks like that on June the
5  9th, 2006, you got a raise to nine dollars
6  and fifty-eight cents an hour, do you see
7  that?
8      A.    Yes.
9      Q.    And if you look at page 442,
10 which is the second page down, it appears
11 to me that you got laid off for lack of
12 work on July the 3rd, 2006; is that
13 correct?
14     A.    Yes.
15     Q.    And that was what you were
16 told, lack of work, right?
17     A.    Yes, lack of work.
18     Q.    All right.  And then if you
19 look at the top page, it says lack of
20 work, last day worked, July 28th, 2006, do
21 you see that?
22     A.    July 12th --
23     Q.    Let me show you.  Lack of

Page 39

1  work, last day worked, July 28th, 2006.
2      A.    (Witness nods head.)
3      Q.    Is that information correct?
4      A.    Yes.
5      Q.    Now, look down at page 476.
6  Got it?
7      A.    Yes.
8      Q.    It shows you went to high
9  school PS 271, Brooklyn, New York.  Do you
10 see that?
11     A.    Yes.
12     Q.    And then up above that, it
13 says circle highest grade completed in
14 each category.  Well, you have circled the
15 three, but you actually didn't complete
16 the eleventh grade, did you?
17     A.    Correct.  No, I didn't.
18     Q.    So, that's incorrect?
19     A.    That's incorrect.
20        (Whereupon, Defendant's
21        Exhibit 2 was marked
22        for identification.)
23     Q.    When you finish, you can just

Page 40

1  stack it up right there and we will just
2  turn it face down.
3            Now, Ms. Gibson, I am giving
4  Ms. Muhammad Exhibit 2, which is from the
5  Troup County school system.
6            Okay.  You have the Exhibit 2
7  in front of you now?
8      A.    Yes.
9      Q.    All right.  It's numbered in
10 the same way.  Let's turn to page 734.
11 And if you will see at that square down at
12 the bottom for educational background, it
13 says PS 271, Brooklyn, New York.
14     A.    Uh-huh.
15     Q.    Grade completed, eleven and
16 you've already told me that should have
17 been ten, correct?
18     A.    Yes.
19     Q.    And look, if you will, at page
20 728.  Now, that shows that Troup County
21 schools hired you as a temporary employee
22 on September the 12th, 2006 at an hourly
23 wage of seven dollars and fourteen cents

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 41 to 44)

Page 41

1 an hour; is that correct?
2     A.    Yes.
3     Q.    All right.  And then it looks
4 like that you continued -- if you look at
5 727, that you continued as a temporary for
6 an additional thirty days.  Do you see
7 that?
8     A.    Yes.
9     Q.    Is that right, too?
10    A.    Yes.
11    Q.    All right.  And then if you
12 look at the first page, it's page 725,
13 down at the bottom, it appears that Troup
14 County hired you as a regular employee on
15 November the 17th, 2006 at eight
16 eighty-nine an hour; is that correct?
17    A.    Yes.
18    Q.    All right.  Now, let's look at
19 page 735.  Do you see the block that says
20 work history?
21    A.    Yes.
22    Q.    All right.  Is that your
23 handwriting?

Page 42

1     A.    Yes.
2     Q.    And look at 735.  Keep your
3 place on -- I mean 737.  Is that your
4 signature?
5     A.    Uh-huh.
6     Q.    That's your signature?
7     A.    Yes.
8     Q.    Okay.  Now, let's look back at
9 735.  Now, Auburn Investment, it says the
10 reason for leaving is layoff.
11    A.    (Witness nods head.)
12    Q.    Right?
13    A.    Yes.
14    Q.    That's true, isn't it?
15    A.    Yes.
16    Q.    Now, WestPoint Stevens, it
17 also says reason for leaving, layoff.
18 That's not true, is it?
19    A.    That's not true.
20          (Whereupon, Defendant's
21          Exhibit 3 was marked
22          for identification.)
23    Q.    Now, I don't want to assume

Page 43

1 too much.  We've got a lot of documents to
2 look at.  Do you read okay?
3     A.    Yes, sir.  I read pretty good.
4     Q.    Okay.  I've given your lawyer
5 Exhibit 3, which is an Alabama Department
6 of Industrial Relations document beginning
7 with Bates stamp 604.  And she'll hand you
8 that in just a minute.  Okay.  On
9 Exhibit 3, Bates number 604 at the bottom
10 of the page, it appears that the Alabama
11 Department of Industrial Relations is
12 talking with Mr. Ogletree.  Do you know
13 Calvin Ogletree?
14    A.    Yes, I know Calvin.
15    Q.    All right.  And he is asked if
16 there was negligence or misconduct on your
17 part.  And he says no misconduct, nothing
18 intentional on your part.  And then he
19 goes on to say this, when the company
20 changed from sheeting to towels in the
21 textile industry, the work the claimant,
22 that's you, was performing became more
23 fast paced.  It became more than the

Page 44

1 claimant could handle.  The fast pace
2 requirement for the claimant took away
3 from the quality and attention needed to
4 perform the job to standards.  We hated to
5 let her go, she gave the company a lot of
6 good years up until this change in work
7 requirement occurred.  Do you disagree
8 with anything Mr. Ogletree said?
9     A.    Yes, I do.
10    Q.    What?
11    A.    Now, when he said the pace,
12 they sent me to Carter mill before they
13 ever -- the layoff they were going to
14 have -- not a layoff, they were going to
15 close the plant to remodel it for the
16 towels.  I went to Carter mill and worked
17 up until the time they reopened the new
18 plant.
19    Q.    And Carter was on towels?
20    A.    On towels.  And once I went
21 back to Lanier, that's when all of the --
22 now, with what Calvin is saying, I wasn't
23 slow at my work.  I was always up to pace.

11

Page 45

1　I didn't have no problem in Carter mill
2　with my work. So, with what they are
3　saying, I don't understand it.
4　　Q.　All right. When you left
5　Lanier for Carter, Lanier had been on
6　sheets, right?
7　　A.　Yes.
8　　Q.　When you went to Carter,
9　Carter had once been on sheets, but at the
10　time you went down there, they had
11　converted to towels?
12　　A.　Towels.
13　　Q.　So, when you were at Carter,
14　you learned something about how to run
15　towels?
16　　A.　Run towels, yes.
17　　Q.　Then you transferred back to
18　Lanier?
19　　A.　Well, they sent me back to
20　Lanier. I didn't transfer back.
21　　Q.　All right. So, you went back
22　to Lanier and when you got back, Lanier
23　was on towels?

Page 46

1　　A.　Not quite because it really
2　wasn't up-to-date with the -- wasn't
3　nothing running right.
4　　Q.　All right. But they weren't
5　running sheets anymore?
6　　A.　No sheets anymore.
7　　Q.　All right. They were trying
8　to run towels?
9　　A.　Yes.
10　　Q.　And that's the job that you
11　eventually got discharged from was running
12　towels --
13　　A.　Towels.
14　　Q.　-- at Lanier?
15　　A.　Yes.
16　　Q.　Now, let's look at the second
17　page, 636, education status. Over in the
18　right-hand column, it says high school
19　graduate. Do you see that?
20　　A.　Right.
21　　Q.　You do see it?
22　　A.　Yes.
23　　Q.　That's not right, is it?

Page 47

1　　A.　No, I didn't write this, so --
2　　Q.　No, it's printed, isn't it?
3　　A.　Uh-huh.
4　　Q.　You told the Alabama
5　Department of Industrial Relations that
6　you were a high school graduate?
7　　A.　No, I haven't told them. No.
8　No.
9　　Q.　Do you recall talking to a
10　representative of the Alabama Department
11　of Industrial Relations on the telephone?
12　　A.　2007.
13　　Q.　Ma'am?
14　　A.　I'm just reading this. I'm
15　going to be honest, no, I don't remember.
16　　Q.　All right. Well, they got
17　your Social Security number right, didn't
18　they?
19　　A.　Yes.
20　　Q.　And they got your date of
21　birth right?
22　　A.　11/8, yes.
23　　Q.　And they got your race right?

Page 48

1　　A.　Yes.
2　　Q.　And they got your gender
3　right?
4　　A.　Yes.
5　　Q.　All right. Look over at 641.
6　Did the Alabama Department of Industrial
7　Relations refer you to Briggs & Stratton
8　Corporation for a job interview?
9　　A.　No, not that I know of.
10　　Q.　You didn't go to an interview
11　with Briggs & Stratton?
12　　A.　No. I wish --
13　　Q.　All right. See down there
14　where it says Master Brand Cabinets, it
15　says referred outcome status not hired.
16　Did you interview with them?
17　　A.　I'm going to be honest, I went
18　to the unemployment office, if they called
19　me, I don't remember because if they had
20　of, I would have been on this job. I
21　don't remember. I didn't get a call. I
22　signed -- filled out an application.
23　　Q.　You filled out an application

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 49 to 52)

Page 49

1  with the Alabama Department of Industrial
2  Relations?
3      A.   Unemployment office, yes.
4      Q.   All right.  Do you know
5  whether the Alabama Department of
6  Industrial Relations sent an application
7  for you to Briggs & Stratton?
8      A.   No, I don't.
9      Q.   Don't know.  Okay.  Do you
10  know whether they sent one for you to
11  Master Brand Cabinets?
12      A.   No, I don't.
13          (Whereupon, Defendant's
14          Exhibit 4 was marked
15          for identification.)
16      Q.   Ms. Gibson, your lawyer has
17  just handed you Exhibit 4, which appears
18  to be an application you submitted to
19  A1 Employment.  Did you apply for a job
20  with A1?
21      A.   A1, yes.
22      Q.   All right.  And is that your
23  signature in three places at the bottom of

Page 50

1  this document?
2      A.   Yes.
3      Q.   Okay.  And is the handwriting
4  on the document yours?
5      A.   Yes.
6      Q.   Do you see where it says under
7  your name in the left-hand corner, did you
8  complete high school?
9      A.   Yes.
10      Q.   And you checked that box for
11  yes, do you see that?
12      A.   Oh, yes.
13      Q.   All right.  Now, do you see
14  where it says -- where you're listing the
15  places you've worked and you say WestPoint
16  Home and it says over in the far right,
17  why did you leave, layoff?
18      A.   Layoff.
19      Q.   Did you write that?
20      A.   No, I didn't write layoff in
21  there.
22      Q.   Who wrote that?
23      A.   One of the ladies in A1.

Page 51

1      Q.   Is that what you told her?
2      A.   Yes, she was asking me why was
3  I laid off, she said why didn't you put in
4  the box layoff if you were laid off
5  because I didn't put anything in the box.
6      Q.   You left it blank?
7      A.   I left it blank.
8      Q.   But you told her you had been
9  laid off?
10      A.   And, so, I just mentioned the
11  layoff.  The reason why I mentioned
12  layoff, I felt that I wouldn't be able to
13  get a job if I told them they separated
14  me.
15          (Whereupon, Defendant's
16          Exhibit 5 was marked
17          for identification.)
18      Q.   Okay.  Ms. Gibson, I'm handing
19  your lawyer Exhibit 5 and when she gives
20  it to you, I'll ask you some questions
21  about it.  Ready?
22      A.   Yes.
23      Q.   Okay.  Do you see at the top,

Page 52

1  Exhibit 5, it says First Choice Personnel,
2  Inc.?
3      A.   Yes.
4      Q.   See on page 520, you signed
5  this application three times?
6      A.   Yes.
7      Q.   Those are your signatures?
8      A.   Yes.
9      Q.   All right.  And if you look
10  back at the first page where it says
11  circle highest grade completed, you wrote
12  in eleventh grade.  Do you see that?
13      A.   Yes.
14      Q.   Is that your handwriting?
15      A.   Yes.
16      Q.   All right.  And if you look at
17  employment history, it says reason for
18  leaving, laid off?
19      A.   Laid off.
20      Q.   Is that your handwriting?
21      A.   Yes.
22      Q.   Now, look at the last page.
23  Did you get the job that we already talked

Page 53

1  about at Auburn Investment Casting through
2  First Choice?
3      A.   Yes.
4          (Whereupon, Defendant's
5          Exhibit 6 was marked
6          for identification.)
7      Q.   I'm handing your lawyer
8  Exhibit 6. Ms. Gibson, you have in front
9  of you now Exhibit 6?
10     A.   Yes.
11     Q.   Now, you see under education,
12  it's checked high school, no diploma. Did
13  you check that?
14     A.   Yes.
15     Q.   And did you write in 5/30,
16  1965 down below that?
17     A.   (Witness nods head.)
18     Q.   Is that the last year that you
19  were in the eleventh grade and didn't
20  complete it?
21     A.   Yes.
22     Q.   Okay. And let's look over at
23  the next page, which is 510. Now, down at

Page 54

1  the bottom under work experience, it shows
2  Auburn Investment Casting and it says
3  temporary layoff. Did you write that?
4      A.   Yes.
5      Q.   Was that correct?
6      A.   Yes.
7      Q.   And under WestPoint Stevens,
8  it's written layoff. Did you write that?
9      A.   Yes.
10     Q.   Did you receive any work
11  through Kelly?
12     A.   No, I didn't.
13     Q.   Now, when you worked at Auburn
14  Investment Casting, what did you do?
15     A.   I was on the line, assembly
16  line.
17     Q.   What kind of line?
18     A.   On the line doing parts.
19     Q.   Assembly?
20     A.   Yes, assembly.
21     Q.   What did AIC make?
22     A.   Mostly contains parts for, I
23  think the airplanes, like -- well, I just

Page 55

1  can't describe them, but they -- all kind
2  of parts, but they need cleaning, they
3  even made auto -- let me see. What do
4  they call them? They never did say, but
5  they was certain parts that go on certain
6  air conditions. Let me see what else.
7      Q.   Well, let me ask you this, did
8  you put things together with your hands?
9      A.   Yes.
10     Q.   Did you inspect at all?
11     A.   Yes, I inspect, I was an
12  inspector.
13     Q.   You were an inspector?
14     A.   (Witness nods head.)
15     Q.   But you assembled, too?
16     A.   No, we didn't have to assemble
17  them.
18     Q.   You looked at parts that had
19  already been assembled?
20     A.   Well, we just cleans them, you
21  see, they come out -- well, when they come
22  to us, we had to clean them up and I guess
23  they're what they call, you know, an

Page 56

1  assembly line and more than one lady, and
2  we cleans them up, we sent them out to
3  be -- we inspect them, they box them up
4  and sent them out.
5      Q.   All right. And then at Troup
6  County, what did you do?
7      A.   I'm a custodian.
8      Q.   Sweep and clean and so forth,
9  mop?
10     A.   Sweep and clean, help with the
11  kids if we have to, you know.
12     Q.   Clean up classrooms?
13     A.   Yes, classrooms, cafeteria.
14     Q.   What happened to that job?
15     A.   I still have it.
16     Q.   You still have it. You are
17  full-time there?
18     A.   Yes.
19     Q.   After WestPoint, did you have
20  any other jobs besides Auburn Investment
21  Casting and Troup County?
22     A.   No.
23     Q.   Those are the only two?

14

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 57 to 60)

Page 57

1    A.   The only two.
2    Q.   Did you get any kind of
3 commendations at either one?
4    A.   Yes.
5    Q.   Where?
6    A.   I got a recommendation from
7 Troup County schools.
8    Q.   What did you get?
9    A.   She wrote us a sheet, a
10 commendation for the work we done.
11    Q.   Okay. Have you gotten any
12 discipline or negative evaluations at
13 Troup County?
14    A.   No.
15    Q.   Did you receive any discipline
16 or negative evaluations at Auburn
17 Investment Casting?
18    A.   No.
19    Q.   Who was your supervisor there?
20    A.   Steve Holly.
21    Q.   H-o-l-l-y?
22    A.   Yes.
23    Q.   Do you get along okay with

Page 58

1 him?
2    A.   Yes, fine.
3    Q.   Have you ever been in the
4 military?
5    A.   No.
6    Q.   Have you ever sued anybody
7 before?
8    A.   No.
9    Q.   Have you ever been sued?
10    A.   No.
11    Q.   Have you ever been a witness
12 in a lawsuit?
13    A.   No.
14    Q.   Ever given a deposition like
15 this before?
16    A.   No.
17    Q.   Ever filed any claim or charge
18 against any company except WestPoint?
19    A.   No.
20    Q.   Did you ever have an injury at
21 work?
22    A.   Well, I hurt my hand once, but
23 maybe from lifting. I had a cyst to come

Page 59

1 up on me.
2    Q.   A ganglion cyst?
3    A.   A cyst.
4    Q.   Was that covered by worker's
5 comp?
6    A.   Yes.
7    Q.   And did you get some money
8 through comp for your wrist injury?
9    A.   From the time I was out, I
10 think I got a check.
11    Q.   Now, you didn't have any
12 permanent disability from your wrist, did
13 you?
14    A.   No.
15    Q.   No impairment award or
16 anything like that?
17    A.   No.
18    Q.   Now, have you ever been
19 arrested?
20    A.   Yes.
21    Q.   For what?
22    A.   Possession of marijuana.
23    Q.   Were you convicted?

Page 60

1    A.   No.
2    Q.   What happened that you got
3 arrested?
4    A.   Well, I had some pot,
5 marijuana cigarette.
6    Q.   Where were you?
7    A.   Well, I was in the store,
8 Dillard's.
9    Q.   Tell me about it.
10    A.   And I just got arrested and I
11 had some shades in my hand, I guess they
12 thought I was fixing to take them, but I
13 didn't, so I got arrested for overnight
14 and after that --
15    Q.   Were you smoking the joint?
16    A.   No.
17    Q.   But it was marijuana?
18    A.   Yes.
19    Q.   And where did you get it?
20    A.   From a lady friend.
21    Q.   Do you use marijuana?
22    A.   No.
23    Q.   Ever?

15

Page 61

1    A.    That was twenty-five years
2  ago.
3    Q.    Where were you?
4    A.    In Auburn.
5        MS. MUHAMMAD:  We are going to
6  object to this line of questioning, I
7  think it's too remote.
8        MR. SUGGS:  Well, now that I
9  know it's twenty-five years ago, I've
10  asked her all of the questions I want.
11        (Whereupon, Defendant's
12        Exhibit 7 was marked
13        for identification.)
14    Q.    Now, Ms. Gibson, Exhibit 7
15  shows a violation for speeding on November
16  the 21st, 2005.  Do you remember that?
17    A.    Yes, I was coming from church.
18    Q.    Gave you a ticket anyway?
19    A.    Yes.
20    Q.    Even though you were in your
21  Sunday clothes?
22    A.    Yes.  It was more than -- if I
23  was speeding, there was a lot of others

Page 62

1  speeding, but I don't think I was
2  speeding.  I just don't like to argue.
3    Q.    Is this the only traffic
4  violation you've had?
5    A.    No, this is the second one.
6    Q.    When was the first one?
7    A.    Oh, it's been a long time, a
8  long, long time.
9    Q.    Okay.  Have you ever been
10  convicted of any crime?
11    A.    No.
12    Q.    In the last decade, last ten
13  years, other than your ganglion cyst that
14  you told me about, have you had any
15  serious illnesses or surgeries?
16    A.    No.
17    Q.    Did you ever have a dislocated
18  shoulder?
19    A.    Oh, yes, I had a dislocated --
20  let me get it right now.  This shoulder
21  here, I fell during the Christmas putting
22  lights up off a ladder and dislocated, I
23  can't pronounce it, my shoulder.

Page 63

1    Q.    Dislocated your shoulder?
2    A.    Shoulder.
3    Q.    Not work related?
4    A.    No.  It was not work related.
5    Q.    And for the ganglion cyst, you
6  took some time off and you got paid for
7  it?
8    A.    Yes, a couple of days for
9  that.
10    Q.    Now, was that ganglion cyst
11  work related?
12    A.    Yes.
13    Q.    Who are your doctors?
14    A.    Dr. Fagan, Dr. Cameron, and I
15  can't think of this bone doctor, he's down
16  here.  I can't think of his name, the one
17  that did my shoulder.
18    Q.    Could it have been
19  Dr. Whatley?
20    A.    Dr. Whatley.
21    Q.    Anybody else?
22    A.    No.
23    Q.    What do you see Dr. Fagan for?

Page 64

1    A.    I was going to him for my
2  blood pressure.  And Dr. Cameron also for
3  my pressure.
4    Q.    Do they work together?
5    A.    Well, they all in the same
6  building.  It's a family physician.
7    Q.    All right.  Do you see
8  Dr. Fagan and Dr. Cameron for your blood
9  pressure?
10    A.    Uh-huh.
11    Q.    Do you see anybody else for
12  any other ailments?
13    A.    No, no more than my yearly
14  checkup.
15    Q.    And who do you see for that?
16    A.    Dr. Cameron.
17    Q.    Okay.  How about a
18  Dr. Hemberg?
19    A.    Oh, Dr. Hemberg, that was long
20  years ago.
21    Q.    You don't use him anymore?
22    A.    No.
23    Q.    What did you see him for?

16

Page 65

| | | |
|---|---|---|
| 1 | A. | I disremember. |
| 2 | Q. | You disremember? |
| 3 | A. | Uh-huh. |
| 4 | Q. | How about Dr. Shiver? |
| 5 | A. | Dr. Shiver. Well, I guess |

there for a yearly exam also.
7  Q.  Is he in with somebody?
8  A.  No, he's got his own office,
9  private.
10  Q.  Dr. Duprat?
11  A.  Oh, for mammogram and biopsy.
12  He did the surgery, Dr. Duprat.
13  Q.  Did he do your wrist?
14  A.  Yes.
15  Q.  In the last decade, have you
16  seen any therapist or counselor for any
17  mental or emotional condition?
18  A.  No.
19  Q.  Been in any rehab facility?
20  A.  No.
21  Q.  Have you ever been diagnosed
22  with any mental or emotional condition?
23  A.  No.

Page 66

1  Q.  You already told me you don't
2  drink?
3  A.  No.
4  Q.  Have you ever been a member of
5  narcotics anonymous?
6  A.  No.
7  Q.  Do you use any street drugs at
8  this time?
9  A.  No.
10  Q.  Have you ever complained to
11  any of these doctors that we just talked
12  about about stress?
13  A.  Yes, I have.
14  Q.  Who?
15  A.  Dr. Cameron, Dr. Fagan.
16  That's about -- them are the only two, I
17  think.
18  Q.  All right. Anxiety?
19  A.  Sometimes I feel, but I
20  haven't complained to anyone about it.
21  Q.  All right. Nervousness?
22  A.  Yes, I be nervous sometimes.
23  Q.  Did you complain to any

Page 67

1  doctors about being nervous?
2  A.  Yes, I have.
3  Q.  Who?
4  A.  I have spoke to Dr. Fagan
5  about being nervous.
6  Q.  All right. Irritability, did
7  you complain to any of these doctors about
8  being irritable?
9  A.  No. No.
10  Q.  Okay. About being unable to
11  sleep?
12  A.  Yes, I have, to Dr. Cameron
13  and Dr. Fagan.
14  Q.  Being unable to concentrate?
15  A.  No, I haven't spoken to
16  anyone.
17  Q.  Being depressed?
18  A.  Yes, I have, but I didn't get
19  medication.
20  Q.  Who did you speak to, which
21  doctor did you complain to?
22  A.  Both of them, Dr. Fagan and --
23  Q.  Have you ever complained to

Page 68

1  them about having a serious disease?
2  A.  No.
3  Q.  Now, you do take high blood
4  pressure medicine?
5  A.  Yes.
6  Q.  What do you take?
7  A.  I don't even know the name of
8  it, but I can get the name of it. I'll
9  call them.
10  Q.  Where do you get your
11  prescriptions filled?
12  A.  This one was filled at Hoods
13  Drugstore.
14  Q.  How do you spell that?
15  A.  H-o-o-d, Hoods Pharmacy.
16  Q.  H-o-o-z?
17  A.  D.
18  Q.  T?
19  A.  D.
20  MS. MUHAMMAD: I think she
21  said H-o-o-d.
22  Q.  Spell it one more time.
23  A.  H-o-o-d. Hoods.

17

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 69 to 72)

Page 69

1    Q.    And where is Hoods?
2    A.    In Lanett -- no, it's Fairfax.
3  It's near the hospital, Lanier Memorial
4  Hospital at the corner.
5    Q.    Now, do you get it filled at
6  Hoods even though you live now in Newnan?
7    A.    Yes, because I was at the
8  doctors here, I don't have a doctor in
9  Newnan, true.  Kroger's --
10    Q.    Which Kroger's?
11    A.    -- pharmacies in Lanett.
12    Q.    Is it just one Kroger's in
13  Lanett?
14    A.    Yes.
15    Q.    All right.  Any other places
16  you used to get prescriptions filled other
17  than Hoods and Kroger's?
18    A.    No.
19    Q.    All right.  Do you take any
20  hormone replacement therapy?
21    A.    No.
22    Q.    Muscle relaxers?
23    A.    Yes.

Page 70

1    Q.    What do you take?
2    A.    I don't know.  They just give
3  me one.
4    Q.    Valium?
5    A.    I think did they say Valium.
6  She just said a muscle relaxer and
7  Ibuprofen.
8    Q.    Okay.
9    A.    She didn't say no Valium.
10    Q.    So, you don't take Valium?
11    A.    No, not that I know of.
12    Q.    Librium?
13    A.    No.
14    Q.    Prozac?
15    A.    No.
16    Q.    Desyrel?
17    A.    No.
18    Q.    Zoloft?
19    A.    No.
20    Q.    Any sedatives or sleeping
21  pills?
22    A.    Yes, I take a sleeping pill,
23  but I don't know the name of it, but I

Page 71

1  don't have any right now.  I'm not taking
2  any now.
3    Q.    Are you a member of any
4  church?
5    A.    Yes, I go to church.
6  Friendship since I've been in Newnan.  I'm
7  a member of New Marcello Baptist church in
8  Lafayette, Alabama.
9    Q.    All right.  What's the one in
10  Newnan, Friendship?
11    A.    Friendship.
12    Q.    Is it Methodist, Baptist,
13  what?
14    A.    Methodist.
15    Q.    AME?
16    A.    I would have to get that
17  information for you.  I have it outside.
18    Q.    But it's in Newnan?
19    A.    Yes.
20    Q.    And you are a member of what?
21    A.    New Marcello Baptist church.
22    Q.    Where is it?
23    A.    It's on Highway 50 in

Page 72

1  Lafayette.
2    Q.    In Lafayette?
3    A.    Yes.
4    Q.    Who's the preacher over there?
5    A.    Reverend Terry Magby.
6    Q.    Last name?
7    A.    Magby.
8    Q.    M-a-g?
9    A.    B-y.
10    Q.    B-y.  Are you a member of any
11  clubs?
12    A.    No.
13    Q.    Any professional
14  organizations?
15    A.    No.
16    Q.    Any special interest groups,
17  like ladies get together to read books or
18  quilts, anything like that?
19    A.    No.
20    Q.    Do you have any hobbies?
21    A.    Excuse me?
22    Q.    Hobbies.
23    A.    Well, most of my hobbies, I

18

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 73 to 76)

Page 73

1  like to watch TV or maybe go out to
2  movies, something like that.
3      Q.    And you do that from time to
4  time?
5      A.    From time to time, yes, to the
6  park or something.
7      Q.    Now, do you own a car?
8      A.    Yes.  I'm buying it.
9      Q.    You are buying it?
10     A.    Yes.
11     Q.    What is that?
12     A.    A 19 -- 2004 Galant.
13     Q.    Do you have some equity in it,
14  I mean, if you sold it and paid off the
15  bank, could you put some money in your
16  pocket?
17     A.    No, the only thing right now I
18  could do is make a payment.  I've got, I
19  guess, about two more years before I'm
20  able to pay for it.
21     Q.    At how much a month?
22     A.    Four hundred and nineteen a
23  month.

Page 74

1      Q.    Okay.  You just own that one
2  car?
3      A.    Yes.
4      Q.    Is that the car you go back
5  and forth?
6      A.    Back and forth to work.
7      Q.    Okay.  Now, you told me about
8  living with Ms. Ogletree?
9      A.    Yes.
10     Q.    Do you have any other real
11  property that you are buying?
12     A.    No.
13     Q.    Did you lose the home that you
14  lived in for twenty-five years?
15     A.    Yes.
16     Q.    And who got that?
17     A.    Wells Fargo.
18     Q.    Did you get anything out of
19  it?
20     A.    No.
21     Q.    Do you have any other
22  significant assets besides your car?
23     A.    No.

Page 75

1      Q.    Have you got a bank account?
2      A.    No bank account.  The only
3  thing I do is deposit and use as the
4  bills, the money I make to pay the bills,
5  some of them that I can afford to pay.
6      Q.    Well, have you got a checking
7  account?
8      A.    No, it's savings.  I just put
9  it in a savings account.
10     Q.    Do you pay your bills by cash?
11     A.    Yes.  Most of the time if I
12  don't send a money gram or a Western
13  Union.
14     Q.    How much have you got in the
15  bank?
16     A.    About fifty dollars.
17     Q.    Have you got any money buried
18  in the backyard?
19     A.    No.
20     Q.    Have you got any bank
21  certificates of deposit?
22     A.    No.
23     Q.    Are you a member of a credit

Page 76

1  union, like where you work?
2      A.    Right now, I don't think so.
3  I think we have to be there a year before
4  we are able to get any of the 4 -- I think
5  it's 2 -- 402.
6      Q.    Have you got any credit cards?
7      A.    Yes, I have credit cards, but
8  they need paid, not no cash on them, no
9  cash credit cards.
10     Q.    Now, explain that to me.
11     A.    Okay.  That means the credit
12  cards that I have are little three hundred
13  dollar maybe credit card.
14     Q.    How much money do you owe on
15  your credit cards?
16     A.    All of it.
17     Q.    I'm sorry?
18     A.    Three hundred.  It's
19  probably -- from the time I was
20  unemployed, it's probably up in about a
21  thousand dollars.
22     Q.    On each card?
23     A.    Yes.

19

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

Page 77

1   Q.   And how many cards have you
2   got?
3   A.   Two.
4   Q.   And how much are you making a
5   month?
6   A.   I make a thousand four hundred
7   and twenty-two dollars a month.
8   Q.   Every month of the year?
9   A.   Yes.
10   Q.   You've got a full-time job,
11   even though it's a school, you work
12   twelve months?
13   A.   I work twelve, but we have
14   holidays, but we still get --
15        (Whereupon, Defendant's
16        Exhibit 8 was marked
17        for identification.)
18   MS. MUHAMMAD:  I can't read
19   this page here, 134, it's not legible.
20   MR. SUGGS:  Okay.
21   MS. MUHAMMAD:  Do you have the
22   original, one that's more legible?
23   Q.   Ms. Gibson, I will show you

Page 78

1   Exhibit 8.  Now, your lawyer has pointed
2   out that the first page is hard to read.
3   But if you would look at the second page,
4   135, do you see where it says dislocated
5   shoulder?
6   A.   Yes.
7   Q.   And it appears that you were
8   out with that from January 1, 1998 to
9   February 17, 1998, doesn't it?  You can
10   see that from page 136.  1/1/98, 2/17/98.
11   A.   Yes.
12   Q.   That's correct, isn't it?
13   A.   Yes.
14   Q.   And you say that injury
15   occurred when you were doing something
16   with Christmas tree lights?
17   A.   Christmas.  (Witness nods
18   head.)
19        (Whereupon, Defendant's
20        Exhibit 9 was marked
21        for identification.)
22   Q.   I am going to hand your lawyer
23   Exhibit 9.

Page 79

1   MS. MUHAMMAD:  Now, the
2   previous one was 8?
3   MR. SUGGS:  8.
4   MS. MUHAMMAD:  We have 7.
5   MR. SUGGS:  Why don't we go
6   ahead and do this, we'll take a break and
7   I'll get it straight with you.  7 was the
8   driving record.
9   MS. MUHAMMAD:  That was the
10   speeding ticket.  Part of 198 is not
11   legible.
12   Q.   Okay.  Ms. Gibson, you have in
13   front of you Exhibit 9 and this one has to
14   do with the time that you were out for
15   your ganglion cyst, and it shows that you
16   were out from December the 12th, 2003 to
17   January the 5th, 2004.  That's on the
18   first page.
19   A.   Okay.
20   Q.   Let's see.  Now, those dates
21   appear to be correct?
22   A.   (Witness nods head.)  Yes.
23        (Whereupon, Defendant's

Page 80

1        Exhibit 10 was marked
2        for identification.)
3   Q.   Now, Ms. Gibson, did you file
4   for bankruptcy?
5   A.   Yes.
6   Q.   Were you represented by an
7   attorney named W. Gregory Ward?
8   A.   Ward, yes.
9   Q.   And was it a result of this
10   bankruptcy that you had to give up your
11   home?
12   A.   No.  This was just to help
13   keep the house and all, to keep the
14   payments up on the house.
15   Q.   So, the bankruptcy was before
16   you lost your house?
17   A.   Yes.
18   Q.   All right.  It says date
19   discharged up at the top, 2/10/2004; is
20   that correct?
21   A.   Yes.
22   Q.   So, you reaffirmed your debt
23   for your mortgage, your car loan and your

Tyler Eaton Morgan Nichols & Pritchett, Inc.

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 81 to 84)

Page 81

1   TV?
2       A.   Yes.
3       Q.   And as a result of this
4   bankruptcy, you can still get credit
5   cards?
6       A.   Yes, they will send you a
7   credit card, three hundred dollars, yes.
8       Q.   Well, did you file another
9   petition for bankruptcy after this one?
10      A.   Well, I tried.  That was in
11  order to -- I tried to file Chapter 13.  I
12  thought maybe that would help save my
13  house.  But I didn't -- wasn't enough
14  income just for me because I was the only
15  person doing it.
16      Q.   Mr. Gibson doesn't work?
17      A.   Doesn't work.
18      MR. SUGGS:  All right.  Do you
19  want to take a little break?
20      THE WITNESS:  Yes.  Yes.
21      (Whereupon, a break was had
22      from 10:45 A.M. until 10:53
23      A.M.)

Page 82

1       (Whereupon, Defendant's
2       Exhibit 11 was marked
3       for identification.)
4       Q.   (BY MR. SUGGS:)  Ms. Gibson,
5   do you recall who hired you?
6       A.   Talking about WestPoint
7   Stevens, right?
8       Q.   (Nods head.)
9       A.   (Witness shakes head.)
10      Q.   Don't recall?
11      A.   I don't recall what -- let's
12  see.  I can't recall who was -- who hired
13  me at that time.
14      MS. MUHAMMAD:  If you don't
15  recall -- if you do later, we can always
16  tell him later.  You can move on.
17      Q.   Now, Exhibit 11 shows that you
18  were hired September the 4th, 1973 and
19  that you worked until January the 7th,
20  1974 when you stopped reporting to work.
21  I think that's consistent with what you
22  told me earlier was that in January of
23  1974 that your husband, Mr. Barrow, got

Page 83

1   sick and y'all went to New York?
2       A.   Now, this supposed -- this is
3   not Lanett mill.  This is Lanier mill?
4       Q.   It says Lanett, L-a-n't.
5       A.   Yes.
6       Q.   So, that's where you worked,
7   Lanett?
8       A.   Lanett, yes.
9       Q.   And that was from '73 until
10  January of '74?
11      A.   '74.
12      Q.   And that's when your husband
13  got sick?
14      A.   Sick.
15      Q.   And then you came back and in
16  August of 1975, you started working at
17  Lanier?
18      A.   Lanier.
19      Q.   And this doesn't show you
20  going back and forth between Lanier and
21  Carter at the end, but you worked until
22  August the 26th, 2005 at Lanier, correct?
23      A.   Lanier, yes.

Page 84

1       (Whereupon, Defendant's
2       Exhibit 12 was marked
3       for identification.)
4       MS. MUHAMMAD:  Personnel
5   director's name is not legible on page
6   five.  Are the originals of these
7   documents available, do you have those
8   with you?
9       MR. SUGGS:  I don't have them,
10  no.  I just have a copy.
11      Q.   Ms. Gibson, you have
12  Exhibit 12, which is part of your
13  personnel file and it shows that you were
14  hired at Lanett mill as a spooler learner
15  on the third shift on September the 4th,
16  1973.
17      A.   Yes.
18      Q.   Is that consistent with your
19  recollection?
20      A.   Yes.
21      Q.   All right.  Look over at page
22  seven.  Do you see where it's signed
23  Patricia Barrow?

21

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 85 to 88)

Page 85

1    A.    Yes.
2    Q.    That's you?
3    A.    Yes.
4    Q.    That's your signature?
5    A.    Yes.
6    Q.    And do you see where it says
7    spooler learner?
8    A.    Yes.
9    Q.    And 9/4/73?
10    A.    (Witness nods head.)  Yes.
11    Q.    Do you see that?
12    A.    Yes.
13    Q.    And then before you came back
14    to the mill in '75, did Mr. Barrow pass
15    away?
16    A.    Yes, he did.
17    Q.    Okay.  And if you will look
18    over on page nine, you see that's an
19    application for employment, it's got in
20    the corner down here, 8/25/73, do you see
21    that?
22    A.    Yes.
23    Q.    All right.  And look over on

Page 86

1    page eleven.  Is that your signature?
2    A.    Eleven.  Yes.
3    Q.    Okay.  And look right in the
4    middle of page nine.  Do you see where it
5    says education and training, do you see
6    that?
7    A.    Yes.
8    Q.    It says Drew Junior High,
9    Lanett, Alabama.
10    A.    Yes.
11    Q.    Number of years completed,
12    nine.
13    A.    (Witness nods head.)
14    Q.    Now, in 1973, is that true
15    that you had nine years of school?
16    A.    I went through, yes, nine
17    years at Drew, but I didn't put in New
18    York on there.  I didn't put that in
19    there.
20    Q.    Now, did you actually go to
21    school in New York?
22    A.    Yes.  Yes.
23    Q.    Why didn't you put your New

Page 87

1    York education at the public school?
2    A.    Well, at the time, I just
3    wanted a job, me and my husband.
4    Q.    Well, do you think putting
5    more education down might have helped your
6    chance to get a job?
7    A.    Yes.
8    Q.    Now, if I get records from
9    this high school in New York, you are
10    going to be on it?
11    A.    I should, I should.
12        (Whereupon, Defendant's
13        Exhibit 13 was marked
14        for identification.)
15    Q.    Okay.  Ms. Gibson, do you see
16    in the corner down here, the application
17    is dated 7/17, 1975?
18    A.    Yes.
19    Q.    Now, that's when you reapplied
20    after your husband passed away, isn't it?
21    A.    Yes.
22    Q.    Look over at the last page,
23    which is page four.  Is that your

Page 88

1    signature at the bottom of the page where
2    it says Patricia J. Barrow?
3    A.    Yes.
4    Q.    The man's name is there, John
5    Boone.  Do you know him?
6    A.    No, I take it he was the one
7    that hired me, but I didn't know him.
8    Q.    And then there's another name,
9    it's Max, maybe Cleland.  Do you know who
10    that is?
11    A.    No.
12    Q.    And then if you look on the
13    first page, which is page two, education
14    and training, it says Drew Junior, do you
15    see that?
16    A.    Yes.
17    Q.    Year completed, 1961, correct?
18    A.    Yes.
19    Q.    How did you find out about the
20    job at WestPoint at that time, back in
21    1975?
22    A.    My brother.
23    Q.    Mr. Allen?

22

Page 89

1   A.   Ocie Lee Jones.
2   Q.   Who?
3   A.   My brother, Ocie Lee Jones.
4   Q.   I thought you told me your
5   brother was like Tommy Allen?
6   A.   I had two brothers.
7   Q.   Oh, you do, who is the other
8   one?
9   A.   Ocie Lee Jones.
10  Q.   Okay.  Did he ever work for
11  the company?
12  A.   No.  He just told me they was
13  hiring.  I was in New York at the time.
14  Q.   When you got hired, you went
15  through an orientation process, didn't
16  you?
17  A.   Orientation.  I think it was,
18  where it showed me --
19  Q.   Where they showed you the job
20  and told you what the rules were and gave
21  you a handbook, things like that?
22  A.   Yes, sir, we got a handbook,
23  see, but we was -- it was at Shawmut

Page 90

1   unemployment for WestPoint.
2   Q.   The employment office was at
3   Shawmut?
4   A.   Yes.
5   Q.   And they gave you the
6   orientation and then sent you down to the
7   mill?
8   A.   Yes.
9   Q.   And they showed you the job
10  and put you on training down at the mill?
11  A.   Well, when I got hired -- let
12  me -- at Lanier, when they hired me, they
13  brought -- took me -- they showed me a
14  movie about safety, they gave us a
15  handbook to read about safety and the
16  rules and regulations, and then they put
17  me with a lady to train me.
18  Q.   Okay.
19  A.   Told me when to come in.  And
20  it was on third shift.
21  Q.   All right.  And this was in
22  '75?
23  A.   Yes, at Lanier.

Page 91

1   Q.   Okay.  And you trained for a
2   while and then you begun to run the
3   machine yourself?
4   A.   Yes.
5   Q.   Did you start out on warpers?
6   A.   Spooling.
7   Q.   Started out on spooling and
8   then moved to warping?
9   A.   Well, I guess little odds and
10  ends until the job came open.  People was
11  out, I imagine that hired, they just put
12  you to a job if ever a person is out
13  until -- they asked me did I want to train
14  for warpers, so there was probably an
15  opening for a job for me and I told them
16  yes.  And that was not Bobby Green,
17  Mr. Crowder, Bobby Crowder.
18  Q.   And about when was that?
19  A.   I would say probably around
20  '70, late '70s or the early '80s.
21       (Whereupon, Defendant's
22       Exhibit 14 was marked
23       for identification.)

Page 92

1   Q.   Okay.  Ms. Gibson, you've got
2   Exhibit 14 in front of you?
3   A.   Yes.
4   Q.   Is that signature and date
5   acknowledging receipt of the guide book
6   for employees in your hand?
7   A.   Yes.
8       (Whereupon, Defendant's
9       Exhibit 15 was marked
10      for identification.)
11  Q.   Ms. Gibson, I show you
12  Exhibit 15, is the signature and date on
13  Exhibit 15 in your hand acknowledging
14  receipt of the guide book for associates?
15  A.   Yes.
16      (Whereupon, Defendant's
17      Exhibit 16 was marked
18      for identification.)
19  Q.   Ms. Gibson, I show you
20  Exhibit 16.  Is the signature and date
21  acknowledging receipt of the guide book
22  for associates in your hand?
23  A.   Yes.

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 93 to 96)

Page 93

1      (Whereupon, Defendant's
2      Exhibit 17 was marked
3      for identification.)
4      Q.    Ms. Gibson, I show you
5  Exhibit 17.  Is the signature and date in
6  the bottom right-hand corner acknowledging
7  receipt of the guide book for associates
8  in your hand?
9      A.    Yes.
10      MS. MUHAMMAD:  I will object
11  to Exhibit 17.  It appears that there's
12  other than what she's acknowledging on
13  that page and I don't want the record to
14  show that she's acknowledging the entire
15  sheet, all she's entitled.
16      Q.    All right.  Ms. Gibson, does
17  it look like to you that the bottom part
18  that talks about build your job security
19  booklet is a different document from the
20  upper part, which is a personnel notice?
21      A.    Yes, it is different.
22      Q.    All right.  And I'm just
23  asking you about the bottom part.  I don't

Page 94

1  know why it was copied that way.
2      A.    Okay.
3      (Whereupon, Defendant's
4      Exhibit 18 was marked
5      for identification.)
6      Q.    Ms. Gibson, are both
7  signatures and both dates acknowledging
8  receipt of the guide book and separately
9  the human resources policy manual on
10  Exhibit 18 in your hand?
11      A.    Yes.
12      Q.    Those are your signatures?
13      A.    These are -- yes, they are my
14  signatures.
15      Q.    And the dates look like you
16  wrote them?
17      A.    Yes.
18      Q.    Now, did you read the employee
19  handbook?
20      A.    When they first give them to
21  me, yes.
22      Q.    Did you read parts of the
23  handbook after it was given to you with

Page 95

1  updates in it?
2      A.    I don't remember getting no
3  more books after -- I remember reading out
4  of a book and he be done explained to us
5  concerning our rights about the job, let's
6  see, it's a talk, he'll talk to you and
7  then he give you a book to read and you
8  sign a paper saying that you done read
9  this book.
10      Q.    Okay.  And that happens every
11  time --
12      A.    He called you to the office on
13  a certain maybe months out of the year
14  concerning the guide book, or maybe if you
15  have any problem with medical or either
16  what that MSDS, that medical book where
17  you could find that or any other --
18  something concerning your job or something
19  like that, and that's about it.
20      Q.    Okay.  So, when the handbook
21  changed, your supervisor would call you
22  into the office and go over the changes
23  with you?

Page 96

1      A.    With you in the office, yes.
2      Q.    And then you would sign the
3  paper?
4      A.    And then we would sign the
5  paper.
6      Q.    And the papers are like the
7  ones we just went through; is that
8  correct?
9      A.    This don't seem like nothing I
10  signed, I signed it, but it don't look
11  like nothing that I read in the office.
12      Q.    All right.  And when you say
13  "this," you're talking about Exhibit 18,
14  correct?
15      A.    Yes, with the --
16      Q.    But if you look at Exhibit 17,
17  that looks like something you signed?
18      A.    That one don't no more than
19  something that -- the head part look like
20  a write-up sheet, you know.
21      Q.    Right.
22      A.    Now, maybe that would seem
23  more like it.

24

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Page 97

1    Q.    Exhibit 16 --
2    A.    Yes.
3    Q.    -- looks like what you signed?
4    A.    Signed.
5    Q.    But you admit that all of
6    those are your signature?
7    A.    All of those are my signature.
8    Q.    Do you recall anything about
9    the handbook or the explanations that your
10   supervisors gave you about the handbook
11   that you didn't understand?
12   A.    Well, I mostly understood
13   about safety and regulations about my job
14   and all.
15   Q.    You understood what the rules
16   were?
17   A.    Yes.
18   Q.    And you understood what was
19   required of you from a production
20   standpoint?
21   A.    Yes.
22   Q.    Do you remember asking your
23   supervisors any questions about the

Page 98

1    handbook?
2    A.    No. No, I don't.
3            (Whereupon, Defendant's
4            Exhibit 19 was marked
5            for identification.)
6    Q.    All right. You are looking
7    now at Exhibit 19, aren't you?
8    A.    Yes.
9    Q.    Okay. And can you identify
10   this handbook that's marked revised 7/1/04
11   as the handbook you received on July 22nd,
12   2004?
13           MS. MUHAMMAD: Object to the
14   form.
15   A.    No.
16   Q.    You can't?
17   A.    I can't.
18   Q.    Do you recall receiving this
19   handbook that's marked Exhibit 19?
20   A.    When I first got -- when I
21   first was hired, I got a little handbook
22   about as wide as my hand and you always
23   read it, maybe two, they give you one

Page 99

1    inside the plant. I remember two
2    handbooks concerning the policy inside the
3    plant, your job, you know, is important,
4    our policy on equal employment
5    opportunity.
6    Q.    You remember that?
7    A.    Yes, out of the handbook.
8            MS. MUHAMMAD: I think the
9    question was, Ms. Gibson --
10   A.    Yes.
11           MR. SUGGS: Now, wait a minute
12   now. I'm going to ask the questions.
13   This is my deposition, you can take her
14   on -- I'm going to give you plenty of time
15   to answer questions. If she has a
16   question about my question, she asks me.
17   I don't want the record cluttered up.
18           MS. MUHAMMAD: Well, I object
19   that she's answering other than what you
20   have asked.
21           MR. SUGGS: I don't want you
22   to have any speaking objections. If you
23   object, say leading, compound question or

Page 100

1    whatever, no speaking objections. If you
2    want to talk to me off the record outside
3    the presence of the witness, that's fine.
4    I do not want you telling the witness what
5    you want her to say.
6            MS. MUHAMMAD: Well, I don't
7    want her answering questions that you
8    haven't asked.
9            MR. SUGGS: Well, she was --
10           MS. MUHAMMAD: So, unless you
11   have asked a question, I'm going to
12   object.
13           MR. SUGGS: She was answering
14   my question. Thank you, Ms. Gibson.
15   Q.    Now, look at the table of
16   contents that you were just looking at.
17   There you go. And tell me what you
18   remember on that table of contents being
19   gone over with you and being in the
20   handbook.
21   A.    Your job is important, and our
22   policy, equal opportunity. Our policy on
23   sexual harassment, zero tolerance for

25

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 101 to 104)

Page 101

1  violence, positive, associate relation,
2  you and your supervisor, being regular in
3  your attendance, starting your job on
4  time, always put your safety first, reduce
5  waste wherever possible, striving for the
6  best in quality.
7      Q.   You remember all of that?
8      A.   Yes.
9      Q.   From reading the handbook?
10     A.   Yes.
11     Q.   And your supervisor is talking
12 to you about it in addition?
13     A.   Yes.
14     Q.   Now, let's use these numbers
15 that are in the three hundred series for
16 reference.  Turn, please, to 351.  All
17 right.  And you're familiar with the
18 policy on reducing waste, correct?
19     A.   Yes.
20     Q.   All right.  Now, look at 352.
21 And you're familiar with the policy that
22 says we want to get the best quality we
23 can, right?

Page 102

1      A.   Yes.
2      Q.   All right.  Look at 353.  And
3  you're familiar with the policy on using
4  your time appropriately and not wasting
5  supplies or damaging equipment, right?
6      A.   Yes.
7      Q.   Now, let's turn back to 335,
8  which is more toward the front.  Okay.
9  This is the policy on equal employment
10 opportunity and harassment that you told
11 me about earlier that you remembered?
12     A.   Yes.
13     Q.   All right.  Do you see where
14 it says, and this is sort of in the middle
15 here, WestPoint Stevens' policy not to
16 discriminate against any individual
17 because of race, color, religion, sex,
18 national origin, age, disability or
19 veteran status, do you see that?
20     A.   Yes.
21     Q.   And do you see down here,
22 discrimination, harassment, retaliation,
23 coercion, interference or intimidation of

Page 103

1  any associate due to his or her race,
2  religion, color, national origin, sex,
3  age, disability or veteran status is
4  strictly forbidden.  Do you see that?
5      A.   Yes.
6      Q.   And that's what you remember?
7      A.   Yes.
8      Q.   And that waste policy that we
9  looked at, that was to encourage reduction
10 of waste, mistakes and errors, wasn't it?
11     A.   Yes.
12     Q.   And the quality policy was to
13 encourage better quality, right?
14     A.   Yes.
15     Q.   And these policies were
16 essential to encourage employees to be
17 careful, to take care of equipment and
18 supplies, avoid waste and to not hurt
19 themselves, right?
20     A.   Yes.
21     Q.   And in your job as a warper
22 operator, you could comply with these
23 policies by avoiding mistakes in how that

Page 104

1  warper was operated, right?
2      A.   Yes.
3      Q.   And paying attention to
4  quality?
5      A.   Yes.
6      Q.   Paying attention to the number
7  of ends?
8      A.   Yes.
9      Q.   Paying attention to your
10 yardage clock?
11     A.   Yes.
12     Q.   What else?
13     A.   Well, making sure we don't
14 make any mistakes.
15     Q.   Okay.  Because if you make a
16 mistake, the slasher operator is going to
17 find it, right?
18     A.   Going to find it.  I've --
19     Q.   Now, let's look at 355.  Do
20 you see in big letters, it says at the
21 top, tell us when things go wrong?
22     A.   Yes.
23     Q.   And then if you look on over,

26

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 105 to 108)

Page 105

1  look at 357, the first step is to see your
2  supervisor. Do you see that?
3      A.   Yes.
4      Q.   Were you aware of this step by
5  step procedure?
6      A.   Yes.
7      Q.   You knew you could go to
8  the --
9      A.   356 and 357.
10     Q.   You knew you could go to your
11 supervisor?
12     A.   Yes.
13     Q.   And you knew you could go to
14 your department manager?
15     A.   Yes.
16     Q.   And you knew you could go to
17 the human resource manager?
18     A.   Yes.
19     Q.   And then you could go on to
20 the assistant?
21     A.   Yes.
22     Q.   And you could go on up to the
23 division director of human resources,

Page 106

1  right?
2      A.   Yes.
3      Q.   You never did complain by
4  using this procedure to --
5          MS. MUHAMMAD:  Objection,
6  leading.
7      Q.   -- anyone at the plant about
8  age discrimination, did you?
9          MS. MUHAMMAD:  Objection,
10 leading.
11     A.   No.
12         MR. SUGGS:  Now, what we did
13 is fine for me to ask a question and your
14 attorney to object and you go ahead and
15 answer. And if it gets you off and you
16 want me to repeat it, I will, but, I mean,
17 she's got every right in the world to
18 object.
19         (Whereupon, Defendant's
20         Exhibit 20 was marked
21         for identification.)
22     Q.   All right. Exhibit 20 is a
23 poster. Now, I'll represent to you that

Page 107

1  it's normally bigger than this, and we
2  reduced it down so it would be the same
3  size as all of these other pages, but have
4  you seen this poster marked Exhibit 20
5  posted in the plant at Lanier?
6      A.   Yes.
7      Q.   Let's go back and look some
8  more at Exhibit 19, which is the handbook
9  and turn, if you will, here, I'll help you
10 here, to 364. Do you see at the top of
11 364 it says violation considered less than
12 tolerable?
13     A.   Yes.
14     Q.   And look at 372. And you see
15 it says violations considered to be
16 intolerable?
17     A.   Yes.
18     Q.   So, if it's less than
19 tolerable, you get a series of warnings,
20 correct?
21     A.   Yes.
22     Q.   If it was intolerable, they
23 could fire you on the spot, right?

Page 108

1      A.   Yes.
2      Q.   Now, let's look back at page
3  365. Do you see there number seven, poor
4  job performance, do you see that?
5      A.   Yes.
6      Q.   And one of the things that you
7  could be disciplined for is poor job
8  performance, isn't it?
9      A.   Yes.
10     Q.   And if you look at 369. It
11 shows A through D, first offense, second
12 offense, subsequent offenses and then what
13 happens if you get three warnings within a
14 twelve-month period, right?
15     A.   Yes, I see.
16     Q.   So, for a first offense, you
17 get a formal counseling, correct?
18     A.   Yes.
19     Q.   And for a second offense, you
20 get a verbal warning with a written report
21 going in your file, right?
22     A.   Yes.
23     Q.   And then for each offense

27

# Deposition Transcript of Patricia Gibson, Part Two
# Pages 109-216

Page 109

1  after that, you get a verbal warning and a
2  written warning put in your file, right?
3      A.   Yes.
4      Q.   And if you get three warnings
5  within twelve months, your employment is
6  terminated, right?
7      A.   Yes.
8      Q.   And if you look at 377, number
9  twenty-three.  Now, these are intolerable
10  offenses, and it says retaliating against,
11  harassing or intimidating a fellow
12  associate for opposing discrimination,
13  harassment or filing a complaint of
14  discrimination or harassment, or for
15  cooperating in an investigation of
16  discrimination, harassment.  Do you see
17  that?
18      A.   Yes, sir.
19      Q.   Did you read that to yourself?
20      A.   Twenty-three?
21      Q.   Right.  You read it to
22  yourself?
23      A.   Yes.

Page 110

1      Q.   All right.  So, if somebody
2  harasses another employee, they get fired
3  for it on the spot, right?
4      A.   Yes.
5      Q.   Or if they engage in
6  discrimination, they can get fired for it
7  on the spot, right?
8      A.   Yes.
9      Q.   Tell me what it was like to
10  operate a warper from the time that you
11  walked in the plant to begin the shift
12  until you went home, what would you do?
13      A.   Okay.  Each time -- okay, we
14  have two creels on the back of the
15  warpers.
16      Q.   All right.  Now, treat me like
17  I've never been in a textile mill before.
18  What's a creel?
19      A.   A creel is a frame which you
20  have pegs on the back, look like long
21  nails to put packages on.
22      Q.   All right.  Are we saying
23  c-r-e-e-l, creel?

Page 111

1      A.   C-r-e-e-l, yes.
2      Q.   All right.
3      A.   And we also have a sheet like
4  we have here to tell us about safety and
5  all of this with how long they want this
6  creel, how many ends they want in the
7  creel, they write up you a long sheet of
8  paper with each -- if you are running a
9  beam, two beams off of a creel, which the
10  package is about this big (indicating)
11  with the yarn on it, maybe it run three
12  beams, it might run two.  And we have
13  creelers in the back, they go look at the
14  sheet to see how many packages they need
15  to put up on this creel because they're
16  numbered across the top one through ten,
17  twelve, on both sides.  And once this
18  creel turns, because the creel is not
19  going to turn, it's what's pulling the
20  package around to the front in order for
21  you to thread it up.  So, when they set it
22  up, you turn it and you go and pull your
23  ends if your beams -- if you completed

Page 112

1  your first set of beams and pull the end,
2  bring them up, you've got a rake, you
3  thread it up.
4      Q.   Through the rake?
5      A.   Through the rake.  And it's
6  just like threading up an eye through like
7  a needle like, but they're a little
8  larger, so you wrap it on the beam, you
9  check it to make sure your size is
10  correct.  And then you bring the press
11  roller up, set in the amount of yardage
12  you're supposed to run.
13      Q.   In the yardage clock?
14      A.   In the yardage clock and
15  whenever it finishes, it knocks off, you
16  cut it out, tie it up and doff it off.
17      Q.   And how many ends are you
18  talking about for a towel?
19      A.   It could be two or a set of
20  four fifteen.  It could be four hundred
21  and fifteen ends.
22      Q.   Four hundred and fifteen ends?
23      A.   And that's on both sides of

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 113 to 116)

Page 113

1 the creel.
2     Q.   And if you are an end short,
3 then you've got a defective towel?
4     A.   You'll have a defect, but you
5 can also with the slasher, they could
6 replace one pane and put that in and let
7 it run and set it in and you won't have no
8 loss.
9     Q.   So, one end, the slasher
10 tender can repair?
11     A.   Yes, he can repair it. And
12 sometimes we might have to cut that job
13 out short if it break down and the
14 electrician or either the breakdown fixer
15 can't fix it, and they done be tangled the
16 ends up so bad that we can't jog it up on
17 the beam if the frame is down, so we will
18 have to cut it out sometimes. Once we cut
19 it out, we can run a backup beam, they
20 call it, that's to finish them yards out
21 to make that beam completed. And they
22 will put -- either they will run the first
23 first -- most yards you run the first

Page 114

1 time, they'll put it on the slasher if
2 they're getting ready to run that set,
3 then when that run out, see, they come
4 back and lay them ends in when we run the
5 backup beam. So, we really don't have,
6 say, a total waste unless the job break
7 down and most of the time, the job stays
8 down when it wasn't up and running. It's
9 just a problem with the job a lot of days.
10     Q.   All right.
11     A.   The electrician said they
12 couldn't find parts to make this job run
13 like it should because the frames were
14 old, it wasn't a new frame and something
15 was, I guess, donated and it was three
16 jobs we had a lot of problems with. The
17 chain break.
18     Q.   Three warpers?
19     A.   Three warpers.
20     Q.   Two warper tenders?
21     A.   And the two warper tenders.
22     Q.   So, you had -- then toward the
23 end there, you had one warper and another

Page 115

1 warper operator had the other warper?
2     A.   Warper.
3     Q.   And then y'all split the
4 middle one?
5     A.   Yes. And like I said, we had
6 creelers in the back, they're supposed to
7 have been pretty much -- when they go back
8 there to creel their job, they're supposed
9 to know exactly where everything goes just
10 like I did, you know, I was supposed to
11 check my job behind these people when they
12 creel. And we had just -- like I said, we
13 had a sheet saying you put it on row five
14 and work your way up, maybe two packages,
15 maybe one or five, how many ever it takes
16 to make that row to finish it out. That
17 was the main thing. You set them in on
18 the correct row, when the frame turned,
19 it's in the right place. So, you know,
20 with night shift, I'm working behind third
21 shift, so we always have to check to make
22 sure everything was correct.
23     Q.   You would check and make sure

Page 116

1 that the shift ahead of you had done
2 everything they were supposed to do?
3     A.   Everything they were supposed
4 to do.
5     Q.   Okay. Now, in your complaint
6 that was filed with the court, you claim
7 that you were discriminated against by
8 WestPoint on account of your age, correct?
9     A.   Yes.
10     Q.   And that's the only kind of
11 discrimination you're complaining about,
12 correct?
13     A.   Yes, and no, let me think of
14 the name now. Bill Anderson said some
15 things about my children is grown now and
16 I felt like that was discriminating, maybe
17 it was time for me to go, I just felt like
18 for him to ask me that question. Let me
19 see, what is his name. Ronny Warren used
20 to come up, instead of saying Pat, I need
21 you to go over there --
22     MS. MUHAMMAD: I'm going to
23 object to this answer. He hasn't asked

Case 3:06-cv-00974-MEF-TFM    Document 45-13    Filed 08/03/2007    Page 4 of 28

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 117 to 120)

Page 117

1    those questions, so you answer only the
2    question asked.
3         A.    Okay.
4         MR. SUGGS:  I asked the
5    question and I didn't cut the witness off
6    because I told the witness when we started
7    that I wouldn't cut her off.  And I object
8    to you interfering with my deposition.
9    Now, go on, continue.
10        MS. MUHAMMAD:  You had asked a
11   question, she was answering --
12        MR. SUGGS:  The record will
13   show what the question was, I'm interested
14   in the witness' answer.
15        MS. MUHAMMAD:  I'm putting my
16   objection on the record.
17        MR. SUGGS:  Well, are you
18   going to object to what your own witness
19   says?
20        MS. MUHAMMAD:  I'm objecting
21   that she's answering questions that you
22   have not asked.
23        MR. SUGGS:  Well, you can

Page 118

1    object to my questions.  I don't think you
2    can object to her answers.  Go on.
3         A.    Where was I?
4         Q.    You were talking about Ronny
5    Warren.
6         A.    Oh, Ron Warren.
7         MS. MUHAMMAD:  I object.  Ask
8    the question about what you want to know
9    about Ron Warren.  You haven't asked a
10   question about Ron Warren.
11        Q.    Go ahead, tell me what you're
12   trying to tell me.
13        MS. MUHAMMAD:  Let him ask the
14   question and you answer it.
15        Q.    What was it that you wanted to
16   say about Ronny Warren?  I want to give
17   you every chance that you want to tell me
18   what your claims are.
19        A.    With my hands tied.  Let me
20   see now.  Do I need to go to --
21        MS. MUHAMMAD:  What do you
22   want to know is what you need to ask her.
23        MR. SUGGS:  I don't need to

Page 119

1    know anything from you.
2         MS. MUHAMMAD:  Well, ask her
3    what you want to know.
4         Q.    What did you want to tell me
5    about Ronny Warren?
6         A.    That's what you want to
7    know --
8         Q.    Yes, ma'am.
9         A.    -- about Ron Warren?  Okay.
10   If something needed to be done anywhere
11   inside the plant or something concerning
12   the job, instead of him asking me or
13   calling me by name, Pat, he would go up
14   and just poke me like that, you don't even
15   know he's there or he'll push you like
16   that (indicating).
17        Q.    Touch you?
18        A.    Yes.  Or not touch, well, he
19   poked, sometimes it hurt, you know, and
20   you just turn around and look and say yes
21   or whatever the question he wants you to
22   do, you know, you go on and do it, you
23   know.

Page 120

1         Q.    Okay.  Now, tell me again what
2    Bill Anderson said to you.
3         A.    He come up, sit down and asked
4    me all of my -- was all of my children
5    grown now, said maybe it's -- he didn't
6    say it was time for me to go, but that's
7    how I felt.
8         Q.    He did not say it was time for
9    you to go?
10        A.    No.  I said but my children is
11   grown now.  It was a conversation, he just
12   come in and started talking.
13        Q.    Does he know your children?
14        A.    No, he don't know any of my
15   kids.
16        Q.    But he knew you had
17   stepchildren?
18        A.    Yes -- no.  Not really.
19        Q.    He knew they were your
20   children?
21        A.    Yes.
22        Q.    He didn't know they were your
23   stepchildren?

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 121 to 124)

Page 121

1    A.   No.
2    Q.   He just thought they were your
3    children?
4    A.   Yes.
5    Q.   And he asked you about your
6    children, whether they were grown?
7    A.   Not --
8    Q.   Correct?
9    A.   Yes.
10   Q.   And you said yes, they're
11   grown?
12   A.   Yes.
13   Q.   Do you know when that comment
14   was made by Mr. Anderson?
15   A.   No.  It's been a while now.
16   And, you know, I was out -- my mind then
17   was thinking about my job and, you know,
18   at that time, I wasn't -- whatever
19   happened.
20   Q.   Okay.  Do you have any idea
21   when it was?
22   A.   No, I don't.
23   Q.   All right.  Was anybody else

Page 122

1    present?
2    A.   No.  Just him.
3    Q.   Where were you?
4    A.   Sitting in the lunchroom.
5    Q.   Okay.  Did you complain to
6    anybody about Mr. Anderson's comment?
7    A.   Not inside the plant, no.
8    Q.   Did you complain to anybody
9    outside the plant?
10   A.   No, no more than my lawyer.
11   Q.   Okay.  So, you brought it up
12   to your lawyer after this lawsuit was
13   filed?
14   A.   Yes.
15   Q.   Okay.
16        MS. MUHAMMAD:  I object to
17   characterization of when she said what she
18   said.
19   Q.   Did anybody besides
20   Mr. Anderson and Mr. Warren say anything
21   to you that you felt was inappropriate?
22   A.   Greg Tilley.
23   Q.   I'm sorry?

Page 123

1    A.   Greg Tilley.
2    Q.   What did he say?
3    A.   He used to come up and say
4    is -- have you seen that old Lela Mae.
5    It's just old in everything for anybody,
6    any person he would ask for.
7    Q.   So, he would ask you about
8    Lela Mae.  He didn't say anything
9    inappropriate about you, did he?
10   A.   I imagine -- I'm taking it he
11   would have if -- but he probably wouldn't
12   say it to me direct.
13   Q.   You didn't hear him?
14   A.   No.
15   Q.   And nobody reported that he
16   said anything inappropriate about you, did
17   they?
18   A.   He probably mentioned it to a
19   few, but they just didn't say anything to
20   me.
21   Q.   Nobody told you that he said
22   anything bad about you?
23   A.   No, it's just how he said

Page 124

1    things to me.
2    Q.   Okay.  Tim Wilbanks never said
3    anything to you that you thought was
4    because of your age, did he?
5    A.   Well, one day he come inside
6    the plant, he was with some more
7    gentlemans.
8    Q.   He was what?
9    A.   He was walking inside the
10   plant, I guess with some more gentleman --
11   people.  I can't say who they was, but
12   they wasn't there at all times, I can say
13   that much, you know, he came by me, he
14   said oh, hi, Pat, are you still here and
15   walked on, you know.
16   Q.   Now, how long have you known
17   Tim Wilbanks?
18   A.   Well, he used to be our
19   assistant safety director.
20   Q.   And how long ago was that?
21   A.   That was around about -- I
22   guess around 2000, 2001.
23   Q.   And how long before that did

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 125 to 128)

Page 125

1  you know him?
2      A.    That's the only time, I
3  reckon, when he first came out there.
4      Q.    And then he left and went to
5  some other job?
6      A.    I think he went to the
7  corporate office.
8      Q.    Went to the corporate office.
9  So, it had been a while since you had seen
10 him?
11     A.    Yes, no more than when he
12 would come inside the plant.
13     Q.    And he saw you on this day and
14 he said hey, Pat, you're still here?
15     A.    Still here.
16     Q.    That's all?
17     A.    That's all.
18     Q.    Anybody else present?
19     A.    They was walking by.  No, I
20 imagine they couldn't hear over the noise.
21     Q.    So, you don't know anybody
22 else who heard the comment?
23     A.    No.

Page 126

1      Q.    Was anything else said in that
2  conversation?
3      A.    No.
4      Q.    Do you know when that was?
5      A.    No, I can't pinpoint the date.
6      Q.    Any idea when it was?
7      A.    The only thing I know, they
8  was coming in, they said we was going to
9  have company.
10     Q.    Said what?
11     A.    See, whenever they get ready
12 to have company inside the plant, we would
13 either have to clean up around the job,
14 you know, make it presentable.  At that
15 time, I was -- I think I was probably
16 getting the end up to get my job started
17 up when he walked past me.
18     Q.    So, that was the entire
19 conversation?
20     A.    Yes, that was when they had
21 started the towel, running the towels.
22     Q.    Did you complain to anybody
23 within the plant about what Mr. Wilbanks

Page 127

1  said?
2      A.    No.
3      Q.    Did you complain to anybody
4  outside the plant?
5      A.    No, no more than the person
6  I -- Ms. Muhammad is the only person I
7  have talked to.
8      Q.    So, you talked to your lawyer
9  about it?
10     A.    Yes.
11     Q.    Did you complain about any
12 other incidents that you assert were
13 connected to your age other than what you
14 just told me?
15     A.    Well, they was getting -- they
16 was training this lady, this Denise
17 Fulghum was training -- I can't think of
18 her name, young, for a warper job, but I
19 didn't know -- then on her job, which
20 would be job three, which they changed the
21 name, I guess it would be one, and out of
22 her training, one morning she came to me,
23 I just had walked in, she asked me, said

Page 128

1  Ron said would you run my job, which would
2  be Denise's job, while I train -- I can't
3  think of what the lady's name is, but I
4  think her last name is Heard, I think her
5  last name was a Heard, while I train her
6  on your job.  So, I said -- well, I
7  couldn't refuse because the supervisor
8  told her to tell me this, so I went on
9  break and I come back, and when I walked
10 in the cafeteria, the girl said huh, Pat,
11 where are you going, I said what you mean.
12 Well, you going somewhere, somebody going
13 to be running your job.  So, I didn't have
14 no idea if nobody was going to be running
15 my job because I wasn't planning on
16 quitting.
17     Q.    And what's the lady's name?
18     A.    The lady on -- what's on my
19 job, was running my job now, I can't think
20 of her -- let's see.  Sharon Jennings.
21     Q.    Sharon?
22     A.    Jennings.
23     Q.    Jennings.  And tell me when

32

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 129 to 132)

Page 129

1   this was.
2       A.   I don't know the month.
3       Q.   About when, what year?
4       A.   That was in the same month I
5   got fired in.
6       Q.   All right.
7       A.   The same year, 2005.
8       Q.   All right.  The same year,
9   2005 that you lost your job?
10      A.   Yes.
11      Q.   And what is it that you allege
12  was discriminatory about this woman
13  training on your job?
14      A.   Age.
15      Q.   How?
16      A.   I feel like they was
17  discriminating me on my age when they say
18  I had been doing a poor job performance.
19      Q.   Uh-huh.
20      A.   I don't think so.
21      Q.   Well, now, after this lady
22  worked on your job, did you work on your
23  job after that?

Page 130

1       A.   Yes.
2       Q.   So, she just trained on it one
3   shift?
4       A.   Well, no, that's the day they
5   fired me on.
6       Q.   Oh, I --
7       A.   Yes, it was.
8       Q.   I see.  That was the last day
9   you worked?
10      A.   Uh-huh.  Uh-huh.
11      Q.   Okay.  Anything else you
12  complain about?
13      A.   No more than how my job be
14  left, sometimes I would come in, how my
15  job be, it may be in a bad condition or --
16      Q.   You don't claim that was on
17  account of your age, do you?
18      A.   No.  But I wasn't, you know,
19  complaining about that.
20          (Whereupon, Defendant's
21      Exhibit 21 was marked
22      for identification.)
23      Q.   Now, Ms. Gibson, this is

Page 131

1   Exhibit 21 that you have in front of you,
2   isn't it?
3       A.   Yes.
4       Q.   And it shows the counseling
5   date of 1/11/95 in the upper right-hand
6   corner.  Do you see that?
7       A.   Yes.
8       Q.   And the employee name is Pat
9   Barrow.  Do you see that?
10      A.   Yes.
11      Q.   Now, that's you, isn't it?
12      A.   Yes.
13      Q.   And you were using Patricia
14  Barrow in 1995?
15      A.   Yes, I was still -- I never
16  did take my husband's -- you know, I never
17  did go back to Patricia Jones.  That was
18  my husband's name.
19      Q.   Okay.  And you received this
20  counseling for failing to check the
21  yardage clock and running too much yarn on
22  the beam, right?  Correct?
23      A.   That's it right here.  Do you

Page 132

1   see right here where it says on 1/11/95,
2   Pat ran eighty-two thousand yards on the
3   cotton beam that was supposed to only have
4   seventy-eight thousand yards, Pat has been
5   talked to about this early and knowing she
6   is supposed to check the yards clock.
7       Q.   Okay.  So, it's correct to say
8   that you got the counseling report for
9   failing to check the yardage clock and
10  running too much yarn on the beam,
11  correct?
12      A.   Yes.
13          MS. MUHAMMAD:  I object to
14  that.  That's not what that form says.
15      A.   Because it's supposed to have
16  been seventy-eight thousand yards.
17  Somebody -- it's got switches on this
18  beam -- on this clock, two, and each one
19  of them you can set the yards and two
20  clocks.  And see what happened, somebody
21  come along, switched -- we always set up
22  the amount of yard that we've got to run
23  during that day, we'll put eighty-two in

33

PATRICIA J. GIBSON                                                    PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.                                           July 12, 2007

(Pages 133 to 136)

Page 133

1   one clock, seventy-eight in the other.
2   What somebody did, went and switched that
3   clock off and put the eighty-two thousand
4   yards on that beam. And I went to Greg
5   about this, but I still got wrote up.
6        Q.   All right. You got the
7   warning from Greg Tilley, correct?
8        A.   Yes.
9        Q.   And you don't claim that this
10  counseling was discriminatory in any way,
11  do you?
12       A.   Well, I felt like if he wanted
13  to -- now, at the time with this, it was
14  only one operator per shift. It wasn't
15  two operators, just one with three jobs.
16       Q.   Okay. Now, let me repeat my
17  question. You don't claim that this
18  warning, Exhibit 21, was discriminatory in
19  any way, do you?
20       A.   Well, yes, in a way because if
21  I explained to Greg about my job and then
22  he turn around and write me up, see, we
23  don't just do things and don't tell the

Page 134

1   supervisor.
2        Q.   Okay. On what basis do you
3   claim it was discriminatory?
4        A.   I just felt like he was doing
5   it probably against -- just doing
6   something.
7        Q.   Why?
8        A.   I just couldn't talk to him.
9        Q.   Do you not know why?
10       A.   No, I never know why.
11       Q.   Well, do you have any
12  information that you can tell me that
13  would support your contention that
14  Exhibit 21 was given to you for a
15  discriminatory reason? Is your answer no?
16       A.   My answer is no, no, I said
17  no, I don't know why.
18       Q.   Okay.
19       A.   He probably just didn't like
20  me.
21            (Whereupon, Defendant's
22            Exhibit 22 was marked
23            for identification.)

Page 135

1        Q.   Ms. Gibson, you have in front
2   of you Exhibit 22, which was given to you
3   under the name of Pat Barrow on
4   February 8, 1995. Can you identify your
5   signature at the bottom of Exhibit 22?
6        A.   Yes.
7        Q.   And you received this first
8   warning because you failed to wear your
9   dust mask and said that you weren't going
10  to wear one that day?
11       A.   No, I didn't tell them that,
12  no.
13       Q.   All right. Okay. The last
14  line of the handwritten paragraph, read
15  along with me, she told me she was not
16  going to wear one today. Do you see that?
17       A.   Yes.
18       Q.   All right. That's what the
19  warning says, right?
20       A.   That's what he says, yes.
21       Q.   All right. You say that's not
22  correct?
23       A.   That's not correct. I didn't

Page 136

1   say that.
2        Q.   Do you claim that this first
3   written warning was discriminatory in any
4   way?
5        A.   (Witness nods head.) I do.
6        Q.   All right. What information
7   do you have to support your contention
8   that Exhibit 22 was given to you for
9   discriminatory reasons?
10       A.   I just felt --
11            MS. MUHAMMAD: I'm going to
12  object to that question. You can answer,
13  if you can, but I think you're asking
14  her --
15            MR. SUGGS: I object, again to
16  you --
17            MS. MUHAMMAD: -- a legal
18  question, that she's not a lawyer and
19  can't answer.
20            MR. SUGGS: -- instructing the
21  witness through your objections. If you
22  want to object to my question, say object,
23  compound, object, leading, whatever, but

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 137 to 140)

Page 137

1 don't instruct the witness.
2 MS. MUHAMMAD: She's not a
3 lawyer.
4 MR. SUGGS: I'm not asking
5 questions that would require a lawyer to
6 answer it. All I'm asking is what
7 reason -- what information does she have
8 that would support her contention that
9 that warning was given for discriminatory
10 reasons. She can tell me what she knows.
11 A. Could I say one thing to my
12 lawyer?
13 Q. I just want your answer.
14 A. I'm looking at --
15 MS. MUHAMMAD: Just answer the
16 question, if you can.
17 A. I'm just saying he wanted
18 somebody else on the job.
19 Q. All right. Now, this is back
20 in 1995?
21 A. Yes, that's what I'm
22 looking -- and, see, there's two write-ups
23 and two different in the month.

Page 138

1 Q. You're talking about --
2 A. I've been looking at that,
3 too.
4 Q. Talking about Greg Tilley?
5 A. Yes, Greg Tilley.
6 Q. All right. And you think that
7 Exhibit 22 was given to you because Greg
8 Tilley wanted somebody else on the job?
9 A. The same day.
10 Q. Any other reason to support
11 your contention besides what you just told
12 me?
13 A. I feel like he was
14 discriminating me, something. That's what
15 I felt like.
16 Q. Any other reason you feel that
17 way?
18 A. No.
19 Q. Okay. Now, looking back at
20 Exhibit 19, number eight, gross
21 insubordination, that's an intolerable
22 offense, isn't it?
23 A. Yes.

Page 139

1 Q. And see on three seventy-four,
2 twelve, and then we will turn over to
3 three seventy-five, for G, failure to use
4 proper protective equipment.
5 A. Oh, but I didn't. I -- we
6 have a sign up saying when we're supposed
7 to wear them dust masks. I wasn't -- I
8 didn't walk up and just tell him I wasn't
9 going to wear no dust mask. I just had
10 walked in probably to my job.
11 Q. When he saw you?
12 A. And you have to go to -- we've
13 got a locker to get our dust masks. But I
14 didn't tell him I wasn't -- you know, I
15 wouldn't go up and say I'm not going to do
16 this.
17 Q. When he saw you, you weren't
18 wearing your dust mask?
19 A. I wasn't wearing my dust mask
20 and he assumed, because I didn't even say
21 a word when he told me that, but the next
22 thing I know, I was called to the office
23 on a write-up. So, I didn't say it --

Page 140

1 tell him that.
2 Q. Well, if you had said you
3 weren't going to wear one today --
4 A. He probably would have fired
5 me.
6 Q. -- you could have been fired
7 for that, right?
8 A. Yes.
9 Q. And Greg Tilley was your
10 supervisor at the time that this first
11 warning was given?
12 A. Yes.
13 (Whereupon, Defendant's
14 Exhibit 23 was marked
15 for identification.)
16 Q. Now, Ms. Gibson, Exhibit 23 is
17 a counseling report that was given to you
18 on July 18, 1996 when you went under the
19 name of Pat Barrow, correct?
20 A. Yes.
21 Q. And that's your signature in
22 the bottom right-hand corner of
23 Exhibit 23?

35

Page 141

1       A.    Yes.
2       Q.    And you got this counseling
3   for poor job performance, running two
4   beams with high selvages; is that correct?
5       A.    Yes.
6       Q.    And it was given to you by
7   Greg Tilley?
8       A.    (Witness nods head.)
9       Q.    Can you explain to me what a
10  selvage is?
11      A.    Okay, it's the size of a beam,
12  they're supposed to be smooth on both
13  sides.  And when it runs, it's supposed to
14  stay that way until the beam get full.
15  Sometimes the rake will slip.  It throw --
16  the yarn will pile up on one side.
17      Q.    You don't dispute this
18  warning, Exhibit 23, for any reason, do
19  you?
20      A.    No, but I didn't see the beam
21  with the high selvage.
22      Q.    You don't claim that this
23  counseling report was discriminatory in

Page 142

1   any way, do you?
2       A.    Well, say if we running bad
3   yarn or something happens, don't nothing
4   go by the supervisor without knowing.  If
5   I had a high selvage and I caught it in
6   time, I will go get the supervisor.
7       Q.    You don't claim that
8   Exhibit 23 is a counseling report that was
9   given to you for discriminatory reasons,
10  do you?
11      A.    Yes, I believe that was, too.
12      Q.    And what information do you
13  have that supports your contention that
14  Exhibit 23 was given to you for
15  discriminatory reasons?
16      A.    Because we had been talked to
17  about our job performance and to make sure
18  not to run waste.  See, once I get a job,
19  I, you know, want to make sure everything
20  is right.  I'm not in there to try to do
21  nothing intentionally to mess up nothing
22  because I need a job, too.  And I'm sure
23  what they sells, they want to make their

Page 143

1   sales and nothing out of there to try to
2   mess up.
3       Q.    All right.
4       A.    So --
5       Q.    Well, what information or what
6   reasons do you have that would support
7   your claim that Greg Tilley gave you this
8   counseling report for discriminatory
9   reasons?
10      A.    As I say, I still stick with
11  my word, he just didn't want me on the
12  warpers.
13      Q.    All right.  Anything else?
14      A.    No.
15          (Whereupon, Defendant's
16          Exhibit 24 was marked
17          for identification.)
18      Q.    Okay.  Now, Ms. Gibson,
19  Exhibit 24 is a first warning dated
20  October 7, 1996 when you were going under
21  the name of Pat Barrow.  Do you recognize
22  your signature in the bottom right-hand
23  corner?

Page 144

1       A.    Yes.
2       Q.    And the reason you got this
3   first warning report was that you cut a
4   beam out short --
5       A.    Uh-huh.
6       Q.    -- when the doff light wasn't
7   on and the clock wasn't cleared off,
8   correct?
9       A.    Yes.
10      Q.    And this was given by Greg
11  Tilley, correct?
12      A.    Yes.
13      Q.    And you don't claim that
14  Exhibit 24 was given to you for
15  discriminatory reasons, do you?
16      A.    Yes, I felt like it was.
17  After I had told him about it, I go and
18  get him, wherever he be, bring him back,
19  let him see where I made my mistake.  I
20  felt like -- then later on, maybe, the
21  only thing he said was the day, maybe two
22  days later, he'll call me to the office
23  and write me up about it.

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 145 to 148)

Page 145

1    Q.    So, you recall bringing this
2  mistake to Mr. Tilley's attention?
3    A.    Yes.
4    Q.    And because you brought it to
5  his attention, you didn't think you ought
6  to get a warning for it?
7    A.    Well, they always say if we
8  make any -- have a mistake or have any
9  problem about the job, come and get them.
10   Q.    All right.
11   A.    Maybe they could correct it.
12 See, if I cut it out short, I could have
13 ran two thousand yards of backup beam and
14 that would have been the yardage.
15   Q.    Do you have any information to
16 support your contention other than what
17 you just told me that you believe that
18 this warning was given to you for
19 discriminatory purposes?
20   A.    Uh-huh.
21   Q.    What?
22   A.    I made a mistake on that job,
23 but it wasn't intentional.

Page 146

1    Q.    Okay.  Well, do you have any
2  other reason besides what you just told me
3  now to support your contention that
4  Exhibit 24 was given to you for
5  discriminatory reasons?
6    A.    I felt like when he called me,
7  he wrote me up and I had already told him
8  because they had already told us if we had
9  any problems concerning these jobs, let
10 them know.  Maybe he's supposed to have
11 wrote me up, but he knew about it.
12   Q.    Yes, ma'am.  That's the same
13 reason.  I got that one.  Anything else?
14   A.    No.
15        (Whereupon, Defendant's
16        Exhibit 25 was marked
17        for identification.)
18        (Off-the-record discussion.)
19        (Whereupon, a break was had
20        from 12:16 P.M. until 12:22
21        P.M.)
22   Q.    (BY MR. SUGGS:)  Have you got
23 Exhibit 25 in front of you?

Page 147

1    A.    Yes.
2    Q.    All right.  You see that
3  there's the name Pat Gibson --
4    A.    Yes.
5    Q.    -- in the upper left-hand
6  corner?
7    A.    Yes.
8    Q.    And the counseling date of
9  10/14/02 in the right-hand corner of
10 Exhibit 25?
11   A.    Yes.
12   Q.    And it says down at the
13 bottom, Greg Tilley, 10/14/02, do you see
14 that?
15   A.    Yes.
16   Q.    Is that his signature as far
17 as you can tell?
18   A.    Yes.
19   Q.    All right.  Now, you didn't
20 sign this, did you?
21   A.    No.
22   Q.    Do you recall the event that
23 led to this counseling report where Greg

Page 148

1  Tilley talked to you about a bad beam and
2  he said that you got smart and talked
3  hateful to him?
4    A.    Yes.
5    Q.    You do recall that?
6    A.    I remember the day, not the
7  exact month or whatever, but I remember
8  him saying I was talking smart to him and
9  I don't remember saying anything, just
10 listened to him talk because at the time,
11 I was working on another -- I was working
12 on the warpers at the time, he called me
13 and said something about I ran a bad beam.
14   Q.    Did you refuse to sign the
15 warning?
16   A.    Yes, I refused to sign it
17 because I felt like he had been on my back
18 so much until I just stopped signing them,
19 when he said I'll be saying stuff to him
20 when I knew I wasn't.  I wasn't -- all of
21 that was happening, it wasn't me.  It was
22 just something -- I felt like it was just
23 Greg.

37

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 149 to 152)

Page 149

1    Q.   Just what?
2    A.   Something Mr. Tilley just
3  wanted to do, have something to do, it was
4  always Pat.  I never did hear him say
5  nothing about nobody else.  It was always
6  Pat.
7    Q.   Do you claim that Mr. Tilley
8  gave you the warning that's marked
9  Exhibit 25 for discriminatory reasons?
10   A.   Yes, I feel like he was
11  discriminating me.
12   Q.   And on what do you base that
13  belief?  I believe where we are is that
14  you said that your belief was that Greg
15  Tilley gave you Exhibit 25, which is a
16  counseling report, for discriminatory
17  reasons and I asked you why you believe
18  that?
19   A.   Because it's the way he wrote
20  this.  Now, okay, he said he tried to talk
21  to me about a bad beam.  Now, if he come
22  down and said Pat, you ran this, but see,
23  he don't -- they don't show you these

Page 150

1  beams.  These beams be already run up if
2  they can run them.  If not, they have to
3  take them down and then they can show you,
4  say this is where you made your mistake
5  on, but none of this never happened.  All
6  of this work was already run when you come
7  in.  The only thing he can show me was a
8  ticket saying that I did this.  This was
9  during the time where Ms. Huguley said --
10  no, it couldn't have been this.  It just
11  said my name was on the ticket.
12   Q.   So, Greg Tilley tried to show
13  you the ticket?
14   A.   He showed me the ticket.
15   Q.   Okay.
16   A.   I told him that I don't think
17  that was mine.  He said, well, your name
18  on it.  Well, I said okay.  I said but
19  right now I'm trying to get my job started
20  up.  And he said I was doing bad conduct
21  because I was trying to get my job up and
22  running.  No.
23   Q.   Any other reasons you believe

Page 151

1  that this counseling report was given to
2  you for discriminatory reasons?
3    A.   Yes, I do, when he wrote it up
4  as hateful.
5    Q.   Okay.  Any other reasons?
6    A.   No.  He was just trying to get
7  rid of me, I say, that's what I say.
8    Q.   Okay.  And why do you think he
9  was trying to get rid of you?
10   A.   Just how he wrote this up, put
11  down hateful and I never spoke or said a
12  bad thing to him.
13   Q.   No, that wasn't my question.
14  My question was:  Why do you think he was
15  trying to get rid of you?
16   A.   I just know it.  I'm saying he
17  was discriminating me maybe because of my
18  color.
19   Q.   Okay.  Do you know any other
20  reasons why he would have been trying to
21  get rid of you?
22   A.   I couldn't think of nothing
23  else because I hadn't said or did anything

Page 152

1  to anybody.
2        (Whereupon, Defendant's
3        Exhibit 26 was marked
4        for identification.)
5    Q.   Okay.  This is a separation
6  notice dated in the upper right-hand
7  corner 1/28/04 signed at the bottom by
8  Calvin Ogletree, and it appears to me that
9  this is when you went from Lanier to
10  Carter, when they were converting Lanier
11  from sheets to towels and you went down to
12  Carter to work on towels; is that correct?
13   A.   Yes.
14        MS. MUHAMMAD:  I object as
15  leading.
16   Q.   And you started making towels
17  at Carter?
18   A.   Yes.
19   Q.   And you had been making sheets
20  at Lanier?
21   A.   Yes.
22        (Whereupon, Defendant's
23        Exhibit 27 was marked

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Page 153

1          for identification.)
2      Q.    Exhibit 27 down at the bottom
3   shows Calvin Ogletree, 5/15/04, do you see
4   that?
5      A.    Yes.
6      Q.    And this shows that you were
7   being transferred back to Lanier from
8   Carter in May, 2004, doesn't it?
9      A.    Yes.
10     Q.    And when you went back to
11  Carter, Carter was beginning to run
12  towels, correct?
13     A.    Yes.
14     Q.    So, you had been a warper
15  operator at Carter working on towels?
16     A.    Yes.
17     Q.    And before you went to Carter,
18  you had been a warper operator at Lanier
19  working on sheets?
20     A.    Yes.
21     Q.    And when you returned to
22  Lanier, you were a warper operator working
23  on towels?

Page 154

1      A.    Towels, yes.
2      Q.    Okay.  So, the information on
3   Exhibit 27 appears to be correct?
4      A.    Yes.
5      Q.    Now, making towels is more
6   complex than making sheets because you
7   have so many more different types of
8   yarn with the towels, correct?
9      A.    Yes.
10         MS. MUHAMMAD:  Object to
11  leading.
12     Q.    And different styles of
13  towels?
14     A.    Well, we wasn't printing --
15  putting a style on, we was just running
16  the cotton.
17     Q.    But if you have different
18  styles means different number of ends,
19  doesn't it?
20     A.    Yes, they change ends.
21     Q.    Okay.  And on sheets, weren't
22  there just one or two styles?
23     A.    No, there were more than one

Page 155

1   or two.  We had several styles making
2   sheeting four fifteen, five hundred end,
3   what I'm talking about ends, maybe two
4   seventy-one or three or three seventy-one,
5   something like that, there was small
6   sheets, large sheets, and then again, we
7   might make table cloths, but they never
8   said, but, you know, they got real small
9   and then it could have been for a baby bed
10  or something, but we running real small.
11  We had to rake to make these small beams
12  because, see, we had to set a rake end at
13  the front to make these beams and half of
14  the time, we would send -- when we started
15  making towels, them rakes didn't fit
16  because they didn't have the rakes for
17  them.
18     Q.    Would it be generally true
19  that there were more styles of towels than
20  there were styles of sheets?
21     A.    Yes.
22     Q.    And would it be generally true
23  that the beams for towels filled up

Page 156

1   quicker than --
2      A.    Yes.
3      Q.    Now, a personnel notice is not
4   discipline, is it?
5          MS. MUHAMMAD:  If you can
6   answer that, answer.  I object to the
7   form.
8          MR. SUGGS:  How about just
9   limit it to I object to the form.  I can
10  live with that.
11     Q.    A personnel notice is not
12  discipline, is it?
13     A.    I don't understand the
14  question.
15     Q.    All right.  Let me show you
16  one.  Do you see at the top it says
17  personnel notice?
18         (Whereupon, Defendant's
19         Exhibit 28 was marked
20         for identification.)
21     A.    Yes.
22     Q.    And do you see over on the
23  right side, it says type of notice,

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 157 to 160)

Page 157

1  employee problem, employee complaint,
2  notice of change, request for change,
3  employee request, commendation,
4  miscellaneous notice, do you see that?
5  Are you with me?
6      A.   Okay, on 10/1.
7      Q.   Right over here (indicating).
8      A.   Oh, okay.
9      Q.   None of those say warning, do
10 they?
11     A.   No.
12     Q.   So, a personnel notice is not
13 discipline, is it?
14         MS. MUHAMMAD:  Object to the
15 form.
16     A.   I just don't know.
17     Q.   You don't know?
18     A.   No.
19     Q.   Okay.  Now, Exhibit 28, do you
20 recognize the signature at the bottom of
21 Ray Scott?
22     A.   Well, Mike McGill.
23     Q.   No, it looks like Ray Scott.

Page 158

1      A.   Ray Scott.
2      Q.   Uh-huh.  Do you see that?
3      A.   Yes.
4      Q.   And do you see the signature
5  of Joel Motley?
6      A.   Oh, yes.
7      Q.   All right.  Now, where did you
8  think you saw Mike McGill's?
9      A.   I thought Mike McGill.
10     Q.   All right.  But it's not, is
11 it?
12     A.   No.
13     Q.   Okay.  And this personnel
14 notice is reminding you to see that warper
15 switches are set correctly?
16     A.   Yes.
17     Q.   And that the yardage switch is
18 on?
19         MS. MUHAMMAD:  Objection,
20 leading.
21     A.   Repeat yourself.
22     Q.   And that the yardage switch is
23 on?

Page 159

1      A.   Now, let me read this here.
2  On 10/21 -- (Reviewing document.)  I do.
3  I did.
4      Q.   Okay.  Now, here's my
5  question.  This personnel notice is
6  reminding you to see that all warper
7  switches are set correctly, that the
8  yardage switch is on, and that the beams
9  are centered on the warper, correct?
10     A.   That's right.
11         MS. MUHAMMAD:  Objection,
12 leading.
13         (Whereupon, Defendant's
14         Exhibit 29 was marked
15         for identification.)
16     Q.   Now, Ms. Gibson, Exhibit 29 is
17 written by Greg Tilley and Ray Scott on
18 January 2nd, 1995, correct?
19     A.   Yes.
20         MS. MUHAMMAD:  Leading.
21     Q.   And it's reminding you to set
22 the yardage clock and to make sure that
23 the right amount of yards is on every

Page 160

1  beam, correct?
2      A.   Yes.
3         MS. MUHAMMAD:  Leading,
4  objection.
5         (Whereupon, Defendant's
6         Exhibit 30 was marked
7         for identification.)
8      A.   That was mine.
9      Q.   What did you want to point
10 out, Ms. Gibson, are we talking about
11 Exhibit 29?
12     A.   Yes.  They just put that in my
13 file for a reminder.
14     Q.   Well, you remember being
15 talked to about the yardage clock needing
16 to be set correctly, don't you?
17     A.   Yes, and I know how to set it,
18 so that's why I, you know --
19     Q.   And you remember being talked
20 to about being sure that the amount of
21 yardage was correct on each beam, don't
22 you?
23     A.   Yes.  See, that's what the

Page 161

1  whole book was about.
2      Q.   All right.  You have before
3  you Exhibit 30?
4      A.   Yes.
5      Q.   All right.  And it's a
6  personnel notice dated March the 10th,
7  1996 by Greg Tilley and Ray Scott, right?
8      A.   Yes.
9      Q.   And --
10         MS. MUHAMMAD:  Objection,
11  leading.
12      Q.   -- it's reminding you of an
13  unsafe act of wearing headphones and
14  listening to the radio, right?
15         MS. MUHAMMAD:  Objection,
16  leading.
17      A.   I will say no to that.
18      Q.   I'm sorry?
19      A.   I'm going to say no to that.
20      Q.   I mean, but that's what it
21  says, isn't it?
22      A.   Yes.
23      Q.   Are you saying you didn't do

Page 162

1  that?
2      A.   No.
3      Q.   You never wore headphones?
4      A.   Yes, I have.
5      Q.   All right.  You weren't
6  supposed to, were you?
7      A.   No.  But it wasn't no Hyster
8  going in that area at that time.
9      Q.   Wasn't any what going on?
10      A.   A Hyster, you know, where you
11  drive back and forth.
12      Q.   Uh-huh.
13      A.   That wasn't happening at that
14  time.  So, I was sitting in the smoking
15  booth.  I was sitting down in a smoker.
16      Q.   You were sitting in a smoking
17  booth wearing head phones and listening to
18  the radio?
19      A.   Uh-huh.
20      Q.   All right.  Now, you didn't
21  understand that this was discipline, did
22  you?
23      A.   Oh, yes, I know, they talked

Page 163

1  to me about it.
2      Q.   Okay.  Well, you remember it?
3      A.   Yes.
4      Q.   But it says over in the
5  right-hand side, number seven,
6  miscellaneous notice, correct?
7      A.   Yes.
8      Q.   And that was from Greg Tilley,
9  right?
10      A.   Yes.
11         (Whereupon, Defendant's
12         Exhibit 31 was marked
13         for identification.)
14      Q.   Ms. Gibson, do you know of a
15  supervisor named Lynn Sorrow?
16      A.   Yes.
17      Q.   On July 26th, 1996, the date
18  of this personnel notice that's marked
19  Exhibit 31, was Mr. Sorrow your
20  supervisor?
21      A.   Let's see.  No, I never worked
22  under -- I worked under him, but not as
23  him being my supervisor.

Page 164

1      Q.   You mean he might have been
2  your supervisor temporarily?
3      A.   Yes.
4      Q.   And this employee name Pat
5  Barrow, that's you, isn't it?
6      A.   Yes.
7      Q.   All right.  And this is just a
8  miscellaneous notice, isn't it?
9      A.   Yes, but I don't even remember
10  this.
11      Q.   Okay.  And it says --
12         MS. MUHAMMAD:  Did you read
13  it?  I'm sorry.
14      Q.   Okay.  Have you read it to
15  yourself?
16      A.   No.
17      Q.   Well, just read it quietly to
18  yourself.
19      A.   (Reviewing document.)
20      Q.   Have you read it now?
21      A.   Yes, I've read it.
22      Q.   Okay.  Now, the personnel
23  notice says that you need to work faster

41

Page 165

1 and pay more attention, that you had cut a
2 beam out eight thousand yards short,
3 correct?
4     A.   That's what this says.
5     Q.   All right.  Do you remember
6 it?
7     A.   No, I don't even remember Lynn
8 writing me up about nothing.  I wasn't in
9 the office.
10     Q.   Okay.  Now, this is not a
11 write-up in the sense that it's not a
12 warning, correct?
13     A.   No, it's not a warning.  It's
14 just something he wrote up.
15     Q.   And put it in your file?
16     A.   File.
17         (Whereupon, Defendant's
18         Exhibit 32 was marked
19         for identification.)
20     Q.   These personnel notices are
21 like get out of jail free cards, aren't
22 they?
23     A.   They're something.  I don't

Page 166

1 know what they --
2     Q.   Now, Ms. Gibson, this
3 personnel notice is given to you when you
4 were going under the name of Pat Barrow on
5 October the 10th, 1996 by Greg Tilley and
6 Ray Scott for an unsafe act by not wearing
7 goggles while blowing off a warper,
8 correct?
9     A.   That's what it says.
10     Q.   All right.  Do you remember
11 that?
12     A.   No.
13     Q.   But that's not --
14     A.   Dust mask and safety glasses
15 are required.
16     Q.   All right.  You know that?
17     A.   Yes.
18     Q.   Every time you blow off, you
19 have got to have on a dust mask and safety
20 glasses?
21     A.   And safety glasses.
22     Q.   And this personnel notice was
23 to remind you to have your safety goggles

Page 167

1 on over your regular glasses, right?
2     A.   Yes.
3     Q.   Not discipline, though, right,
4 it was just a reminder?
5     A.   Just a reminder.
6         (Whereupon, Defendant's
7         Exhibit 33 was marked
8         for identification.)
9     Q.   Okay.  Ms. Gibson, Exhibit 33
10 is another personnel notice given to you
11 under the name of Pat Barrow.  It's signed
12 by Greg Tilley and Ray Scott on August 23,
13 1997, isn't it?
14     A.   Yes.
15     Q.   And have you had a chance to
16 read it?
17     A.   No.
18     Q.   Just read this part right
19 there (indicating).
20     A.   Okay.  (Reviewing document.)
21     Q.   This is just a reminder to
22 make sure that the ends are laid correctly
23 in the rake, right?

Page 168

1     A.   Yes.
2     Q.   And it says that the person
3 who lays the ends in the rake is the one
4 responsible for the beam?
5     A.   Yes.
6     Q.   That's what it says, right?
7     A.   That's what it says.
8     Q.   Is that true in practice?
9     A.   Yes, the one that lay them
10 ends in the rake -- well, we've been in
11 training, we're supposed to know how to
12 lay ends.
13     Q.   All right.  And if you were
14 the one that did that, then you were
15 responsible for that beam?
16     A.   Yes.
17         (Whereupon, Defendant's
18         Exhibit 34 was marked
19         for identification.)
20     Q.   Okay.  Ms. Gibson, Exhibit 34
21 is a personnel notice dated May 11, 1999
22 given by Greg Tilley to you, correct?
23     A.   Yes.

42

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 169 to 172)

Page 169

1   Q.   Have you read it yet?
2   A.   No.
3   Q.   All right.  Take a minute and
4   read it.
5   A.   (Reviewing document.)
6   Q.   Have you read it?
7   A.   Yes.
8   Q.   And Greg Tilley is reminding
9   you to check the yardage clocks at the
10  start of the shift and every day before
11  the start and throughout the day, right?
12  A.   Yes.
13       (Whereupon, Defendant's
14       Exhibit 35 was marked
15       for identification.)
16  Q.   Ms. Gibson, Exhibit 36 is a
17  personnel notice given to you on July 17,
18  2003 by Greg Tilley and Bill Anderson,
19  isn't it?
20  A.   Yes.
21  Q.   All right.  Take a moment to
22  read the handwritten portion in the middle
23  of the page, please.

Page 170

1   A.   (Reviewing document.)
2   Q.   Have you finished reading it?
3   A.   Yes.
4   Q.   That's Exhibit, what, 35?
5   A.   Yes.
6   Q.   And it's stating that you need
7   to be careful because you had filled out
8   the wrong ticket for a beam, right?
9   A.   Yes.
10  Q.   But, again, that's not
11  discipline, it's just a reminder, right?
12  A.   Just a reminder, but it was --
13  I didn't sign it -- oh, yes, I did, I take
14  that back.  I signed it.
15  Q.   You signed it in the middle,
16  you just didn't sign it at the bottom,
17  right?
18  A.   At the bottom.
19  Q.   Okay.  Now, we said that the
20  changeover when you went back to Lanier
21  and started working on towels was in May,
22  2004, right?
23  A.   Yes.

Page 171

1   Q.   And if you think about the
2   ones that we just went through, these
3   personnel notices were for 1993 up until
4   about 2003, over a period of ten years,
5   right?
6   A.   (Witness nods head.)
7   Q.   That was all before the
8   changeover?
9   A.   Yes.
10  Q.   And all of these had to do
11  with either performance issues or safety
12  issues like the goggles or listening to
13  the radio, right?
14  A.   (Witness nods head.)  Well,
15  yes.
16       MS. MUHAMMAD:  Object to
17  leading.
18       (Whereupon, Defendant's
19       Exhibit 36 was marked
20       for identification.)
21  Q.   Now, this personnel notice
22  marked Exhibit 36 is dated July 27, 2004,
23  right?

Page 172

1   A.   Yes.
2   Q.   And you can see that's back
3   when you were in Lanier, right?
4   A.   Yes.
5   Q.   And it's given by Billy
6   Stewart, right?
7   A.   Yes.
8   Q.   All right.  Take a moment to
9   read the details.
10  A.   (Reviewing document.)
11  Q.   Have you read it?
12  A.   Yes.
13  Q.   And this is not a warning, but
14  just a notice from Billy Stewart that he
15  discussed with you the importance of
16  making beams that would run in the next
17  process which was slashing, right?
18  A.   Yes.
19  Q.   And if defects occurred, you
20  were supposed to tell him?
21  A.   Yes.
22  Q.   And Billy Joe Stewart was your
23  supervisor at the time?

43

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 173 to 176)

Page 173

1    A.   Yes.
2        (Whereupon, Defendant's
3        Exhibit 37 was marked
4        for identification.)
5    Q.   Can you tell me if that's your
6   signature on Exhibit 36?
7    A.   Yes.
8    Q.   All right.  Exhibit 37 is a
9   counseling report, correct?
10    A.   Yes.
11    Q.   And that is discipline, right?
12    A.   Yes.
13    Q.   That's the first step in the
14  progressive discipline that we looked at
15  in the handbook earlier today, isn't it?
16    A.   Yes.
17    Q.   All right.  Now, this was
18  given on August 11, 2004, right?
19    A.   Yes.
20    Q.   Now, I don't see your
21  signature on it, do you?
22    A.   No.
23    Q.   But it says under action

Page 174

1  taken, this report has been reviewed with
2  Pat.  Do you see that?
3    A.   Yes.
4    Q.   All right.  Now, read the
5  details, please, and tell me when you have
6  read them.
7    A.   Oh, read them out loud?
8    Q.   No, just read them to
9  yourself.
10    A.   (Reviewing document.)
11    Q.   Okay.  And this counseling
12  report -- have you finished?
13    A.   Yes.
14    Q.   All right.  The counseling
15  report says that you left six ends out of
16  the right side of your first beam and ran
17  twelve thousand four hundred and one yards
18  before the missing ends were discovered,
19  correct?
20    A.   Yes.
21    Q.   Do you remember that?
22    A.   Not right offhand, but I
23  remember going and getting Billy Joe about

Page 175

1  this.
2    Q.   You don't claim that this
3  counseling report was given to you for
4  discriminatory reasons, do you?
5    A.   Yes, I do, because one, even
6  though they talk, I've tried checking my
7  job, but it be two people pulling ends.
8  Now, we all pulled ends on this creel from
9  one to fifteen, maybe eighteen rows and in
10  looking over a row, now, I might have made
11  a mistake on it, but I don't understand
12  this still.
13    Q.   I'm sorry?
14    A.   I just said I don't understand
15  this paper still.
16    Q.   All right.  Do you have any
17  other reasons that you claim that that was
18  discriminatory other than what you just
19  told me?
20    A.   Yes, I feel like it is.
21    Q.   No, do you have any other
22  reasons other than what you just told me?
23    A.   No.  No.

Page 176

1    Q.   And Billy Stewart was your
2  supervisor on August the 11th, 2004?
3    A.   Yes.
4        (Whereupon, Defendant's
5        Exhibit 38 was marked
6        for identification.)
7    Q.   Okay.  This paper got
8  photocopied crinkled up, but you can see
9  it's a personnel notice, right?
10    A.   Yes.
11    Q.   Not discipline, right?
12    A.   Yes.
13    Q.   Who's Clifford McCants?
14    A.   Carter mills side.  He was
15  with Carter mills.
16    Q.   So, this was in
17  September 2004, correct?
18    A.   Yes.
19    Q.   And the reminder is that
20  you've got to sign your warper tickets,
21  right?
22    A.   Yes.
23    Q.   Do you remember that?

44

Page 177

1    A.    Yes.  Mostly I signed my
2  tickets, but he said I didn't.
3    Q.    And he was just reminding you
4  to sign them, right?
5    A.    Yes.
6         (Whereupon, Defendant's
7         Exhibit 39 was marked
8         for identification.)
9    Q.    All right.  Ms. Gibson, this
10  document, which is Exhibit 39, is marked a
11  first warning report, right?
12    A.    Yes.
13    Q.    And it was dated 9/30/04,
14  right?
15    A.    Yes.
16    Q.    And you received this report
17  because of an incorrect number of ends on
18  four section beams, right?
19    MS. MUHAMMAD:  I object.
20    A.    Let me read this.
21    Q.    Have you now had a chance to
22  read the details?
23    A.    Yes.

Page 178

1    Q.    And you received this
2  counseling report because of an incorrect
3  number of ends on four beams?
4    A.    Yes.
5    Q.    And it says that you assumed
6  one side had the correct number of ends,
7  but that you're supposed to count the ends
8  when taking over at the start of a shift,
9  right?
10    A.    Yes.
11    Q.    And is that the right process?
12    A.    Yes.
13    Q.    Okay.  And Billy Joe Stewart
14  gave you this warning?
15    A.    Yes.
16    Q.    And you don't claim that this
17  warning, Exhibit 39, was discriminatory,
18  do you?
19    A.    Yes, I do.
20    Q.    Why?
21    A.    Because how the job was set up
22  with the ends and all, the creel, they
23  never speak about the creel, always the

Page 179

1  operator.
2    Q.    Any other reason that you
3  claim it was discriminatory?
4    A.    Because he waited two or three
5  or four days before he come with this
6  write-up.
7    Q.    Well, now, it says that the
8  event happened on Monday, September 27,
9  2004.  Do you see that?
10    A.    Yes.
11    Q.    And then --
12    A.    He's coming in on the 30th.
13    Q.    And the warning is the 30th,
14  correct?
15    A.    (Witness nods head.)
16    Q.    And you say the passage of
17  time shows it was discriminatory?
18    A.    Yes.
19    Q.    Any other reason that you
20  would say this is discriminatory?
21    A.    Well, I feel like it is
22  because once you tell a supervisor, that
23  was all our conversation was about, make

Page 180

1  sure the supervisor know what goes on.
2    Q.    You didn't think you --
3    A.    And we let him know before
4  sometimes we even pull an end on the job.
5    Q.    Are you claiming that you told
6  Billy Joe Stewart about the incorrect
7  number of ends?
8    A.    Yes.  Yes.
9    Q.    And you thought because you
10  had told him, that you shouldn't have got
11  a warning?
12    A.    Well, maybe if I didn't get
13  them maybe to talk to the people that was
14  creeling in the back, maybe that will help
15  out with the job, it would have been less
16  problems.
17    Q.    Do you know whether he did or
18  not?
19    A.    No, I doubt it.
20    Q.    Do you know?
21    A.    No, I don't.
22    Q.    All right.
23    A.    I felt that kept happening,

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 181 to 184)

Page 181

1  so --
2      Q.   Any other reason that you can
3  give me to support your belief that
4  Exhibit 39 was given to you for
5  discriminatory reasons other than what
6  you've already told me?
7      A.   Age, probably.
8      Q.   And on what basis do you --
9  what information do you have that Billy
10  Joe Stewart gave this warning to you
11  because of your age?
12     A.   I don't know.  I was just
13  having so many problems since I've been
14  there, so I figured it's got something to
15  do with discrimination.
16     Q.   Anything else, any other
17  information you can give me?
18     A.   No.
19         (Whereupon, Defendant's
20          Exhibit 40 was marked
21          for identification.)
22     Q.   Billy Joe Stewart was your
23  supervisor at the time that Exhibit 39 was

Page 182

1  given?
2      A.   Yes.
3      Q.   Exhibit 40 is just a personnel
4  notice, isn't it?
5      A.   Yes.
6      Q.   Correct?
7      A.   Yes.
8      Q.   And it was given by Billy Joe
9  Stewart to you on October the 5th, 2004,
10  right?
11     A.   Yes.
12     Q.   And it's a reminder to you by
13  Billy Stewart -- well, wait a minute.
14  Have you had a chance to read the details?
15     A.   No, I have not.
16     Q.   All right.  Please read the
17  details.
18     A.   (Reviewing document.)
19     Q.   Have you had a chance to read
20  them?
21     A.   Yes.
22     Q.   All right.  And this is -- the
23  personnel notice is just a reminder to you

Page 183

1  from Billy Joe Stewart that poor quality
2  section beams had been reported to the
3  slashing department and that you and
4  Shannon Johnson were responsible, right?
5      A.   Yes.
6      Q.   You refused to sign it,
7  correct?
8      A.   Yes.
9      Q.   You don't know if Billy Joe
10  Stewart also talked to Shannon Johnson
11  about quality, do you?
12     A.   No, I don't.
13     Q.   You don't claim that this
14  personnel notice was discriminatory, do
15  you?
16     A.   Well, in a way, yes, I feel
17  like the jobs --
18     Q.   I'm sorry?
19     A.   Them frames, outdated frames,
20  poor quality yarn coming from the coils,
21  spinning all the way to the warpers, bad
22  quality.
23     Q.   Well, how did Billy Stewart

Page 184

1  discriminate against you by giving you
2  this personnel notice?
3      A.   Well, he got it all on me, he
4  said showing that I was responsible, but
5  me and her both was the operator.
6      Q.   All right.  Well, now this is
7  just a personnel notice, right?
8      A.   Uh-huh.
9      Q.   It's not a warning, is it?
10     A.   No.
11     Q.   Well, how is it discriminatory
12  for Mr. Stewart to give you this personnel
13  notice?
14     A.   Well, he talked to us about
15  it, I imagine he talked to Shannon, too,
16  but she never did say anything.
17     Q.   You don't claim it's
18  discriminatory, do you?
19     A.   If we mess up, I think he's
20  discriminating on us when it's the frame
21  was the one causing a lot of problems.
22     Q.   And he was discriminating
23  against you on account of what?

46

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

Page 185

1     A.    Writing up -- write-ups.
2     Q.    On what basis?
3     A.    Well, everything here, there's
4  nothing look good on the paper.
5     Q.    Do you think he just didn't
6  like you?
7     A.    I don't know.
8     Q.    You don't know why he --
9     A.    I can't say -- well, we ain't
10  there for the person to like us anyway,
11  we're there to get along with the job, you
12  know, have our job qualifications,
13  whatever, but we're supposed to be there
14  to be able to get along with the people
15  that we work with.
16     Q.    So, you can't say why Billy
17  Joe Stewart was discriminating against
18  you?
19     A.    Writing me up, no, I can't say
20  because there had been write-ups, that's
21  all I've been seeing, write-ups, write-ups
22  about something.
23     Q.    And you don't know any reason

Page 186

1  Billy Joe Stewart would have to
2  discriminate against you?
3     A.    Not unless somebody just said
4  hey, just write her up, everything will be
5  all right, you know.  That's what it
6  seemed like to me.
7     Q.    Repeat that, please.
8     A.    Just write her up, look like
9  everything will be all right, that's what
10  it seems like to me, the only thing, I
11  ain't seen no recommendation that they
12  appreciate nothing I did.
13          (Whereupon, Defendant's
14          Exhibit 41 was marked
15          for identification.)
16          MS. MUHAMMAD:  I would prefer
17  if you would pass these to me and not
18  throw them to me.
19          MR. SUGGS:  I'm sorry, but my
20  arms are not that long.  I have been doing
21  my best to put them in your hand.  If you
22  want to come closer, you're welcome to.
23          MS. MUHAMMAD:  Perhaps if

Page 187

1  Mr. Lawrence won't mind passing them to
2  me, you can pass them to him.
3          MR. WILLIAMS:  No problem.  No
4  problem.
5     Q.    Ms. Gibson, you have got
6  Exhibit 41 in front of you.  Please take a
7  moment to read the details.
8     A.    (Reviewing document.)
9     Q.    Have you read them?
10     A.    Yes, I have.
11     Q.    All right.  Now, this is a
12  second warning, correct?
13     A.    Yes.
14     Q.    And it's dated October 15,
15  2004, correct?
16     A.    Yes.
17     Q.    And the stated reason is off
18  quality section beams, correct?
19     A.    Yes.
20     Q.    And they were off quality
21  because they were six ends short, correct?
22     A.    Yes.
23     Q.    Now, you didn't sign it,

Page 188

1  right?
2     A.    No.
3     Q.    And it was given by Billy Joe
4  Stewart, right?
5     A.    Yes.
6     Q.    And he was your supervisor at
7  the time?
8     A.    Yes.
9     Q.    Do you recall getting this
10  second warning?
11     A.    Yes.
12     Q.    Do you recall that the ends
13  were short?
14     A.    Yes, but I don't feel it was
15  my fault.
16     Q.    Whose fault was it?
17     A.    The creelers.
18     Q.    Okay.  Specifically who?
19     A.    The people that work the back
20  of the job, I don't know their names.
21  Third shift warper creelers or either
22  first shift.
23     Q.    Do you claim that Billy Joe

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 189 to 192)

Page 189

1 Stewart gave you this second warning,
2 which is marked Exhibit 41, for
3 discriminatory reasons?
4     A.    Yes, age --
5     Q.    Age.
6     A.    -- discrimination.
7     Q.    What --
8     A.    Because he wrote -- say I done
9 poor quality work, my job qualification
10 was poor, so I figure he did it concerning
11 age.
12    Q.    All right.
13    A.    But with this, I feel like
14 Billy Joe and the operators, the creelers,
15 all of us should have been together
16 with -- if they're going to have a talk
17 concerning these jobs, all of us should
18 have been together.  And the creelers
19 supposed to have been working with the
20 operator or they can just go back there
21 and throw up everything, anything, and the
22 only thing I do is, okay, I don't mind,
23 which I used to check, I still check, if I

Page 190

1 was there, but I'm not there, the sheet
2 that's showing how many ends, how far they
3 go back to make this job the four hundred
4 that he was looking for.  But, see, this
5 is not my fault.  That means I would have
6 had to creel this job from the outside
7 because this frame is already turning and
8 up and ready to run.
9     Q.    What information do you have
10 that Billy Joe Stewart gave you this
11 second warning report because of your age
12 that you haven't already told me?
13    A.    I don't know about Billy Joe.
14    Q.    I'm sorry?
15    A.    I really don't know about
16 Billy Joe, what was the reason for these
17 write-ups.
18    Q.    You don't have any other
19 information than what you've already told
20 me?
21    A.    No, I don't.
22    Q.    And Billy Joe was your --
23    A.    Supervisor.

Page 191

1     Q.    -- supervisor at the time this
2 warning was given to you?
3     A.    Yes.
4           (Whereupon, Defendant's
5           Exhibit 42 was marked
6           for identification.)
7     Q.    Ms. Gibson, you have before
8 you Exhibit 42?
9     A.    Yes.
10    Q.    And you see your signature
11 down at the bottom?
12    A.    Yes.
13    Q.    And the date by your signature
14 is 10/19/04?
15    A.    Yes.
16    Q.    That signature and date are
17 both in your hand?
18    A.    Yes.
19    Q.    And this is called a final
20 notice, right?
21    A.    Yes.
22    Q.    Okay.  Now, do you see where
23 it's checked less than intolerable

Page 192

1 offenses?
2     A.    Yes.
3     Q.    And do you see where it says
4 this is to inform you that another
5 violation of an offense considered less
6 than intolerable under the discipline and
7 discharge policy before 9/30/05 will
8 result in your discharge, do you see that?
9     A.    Yes, I see it.
10    Q.    All right.  So, 9/30/05 was
11 the anniversary date of your first
12 warning, right?
13    A.    Yes, but I -- yes, I see.
14    Q.    And this is signed at the
15 bottom by Billy Joe Stewart, correct?
16    A.    Yes.
17    Q.    He was your supervisor at the
18 time?
19    A.    Yes.
20    Q.    And Calvin Ogletree?
21    A.    Yes.
22    Q.    And they are saying Patricia,
23 if you get another warning, you'll lose

48

Page 193

1  your job.
2      A.   (Witness nods head.)
3          MS. MUHAMMAD:  I object to the
4  form.
5      Q.   Correct?
6      A.   No, they didn't tell me that.
7      Q.   That's what the form tells
8  you, right?
9      A.   That's what the form is
10 telling me?
11     Q.   Well, you understood that if
12 you got another warning before
13 September 30th, 2005, you were going to
14 get fired, didn't you?
15     A.   Yes, but, you know, I'm
16 looking at Carter mill, I didn't make no
17 mistakes, but the mistakes I made was once
18 I got back over there on that side.
19         (Whereupon, Defendant's
20         Exhibit 43 was marked
21         for identification.)
22     Q.   Ms. Gibson, you have got
23 Exhibit 43 in front of you?

Page 194

1      A.   Yes.
2      Q.   All right.  You see at the
3  bottom it's signed by Jeff Black on
4  November 8th, 2004, do you see that?
5      A.   Yes.
6      Q.   Was he your supervisor at the
7  time?
8      A.   Just for that day, temporary
9  supervisor.
10     Q.   He was temporarily supervising
11 you?
12     A.   Yes.  Assisting.
13     Q.   All right.  And it's also
14 signed by Bill Anderson, right?
15     A.   Yes.
16     Q.   And Anderson was the
17 department manager, right?
18     A.   Yes.
19     Q.   Take a minute to read the
20 details.
21     A.   (Reviewing document.)
22     Q.   Have you read it?
23     A.   Yes.

Page 195

1      Q.   Now, this is just a personnel
2  notice, right?
3      A.   Yes.
4      Q.   Not a warning?
5      A.   No.
6      Q.   All right.  And it says Pat
7  ran five beams, each one missing six ends,
8  correct?
9      A.   That's what it says.
10     Q.   All right.  Is that, in fact,
11 what happened?
12     A.   I don't know nothing about it.
13     Q.   You don't recall that?
14     A.   No, I don't.
15     Q.   All right.  Do you see at the
16 bottom where it says action taken?
17     A.   Uh-huh.
18     Q.   It says Pat was talked to
19 about this problem.  She was told if it
20 happens again, disciplinary action will be
21 taken up to and including discharge if
22 necessary.  A copy of this notice will be
23 placed in personnel file.  Did you have

Page 196

1  that conversation with Jeff Black and Bill
2  Anderson?
3      A.   No, I didn't.
4      Q.   Do you see up in the details
5  it says the only way this could be
6  corrected at the slasher was to run an
7  extra beam in this set creating two
8  hundred and ninety ends of waste?
9      A.   Yes.
10     Q.   Nobody ever talked to you
11 about this?
12     A.   No.  I didn't even know Jeff
13 Black wrote me up about nothing.
14     Q.   You could have been
15 disciplined and given a third written
16 warning for running five beams each with a
17 missing end, couldn't you?
18     A.   Yes, but I don't even remember
19 that.
20         (Whereupon, Defendant's
21         Exhibit 44 was marked
22         for identification.)
23     Q.   All right.  Ms. Gibson, you

49

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 197 to 200)

Page 197

1    have Exhibit 44 in front of you?
2        A.    Yes.
3        Q.    All right.  Please take a
4    minute to read the details.
5        A.    (Reviewing document.)
6        Q.    Have you read them?
7        A.    Yes.
8        Q.    All right.  These were just
9    instructions in this personnel notice on
10   what to do when an end breaks and on
11   initialing cards for full section beams,
12   right?
13       A.    Yes.
14       Q.    Why did you refuse to sign
15   these instructions?
16       A.    Well, one reason I didn't sign
17   because they wouldn't --
18           MS. MUHAMMAD:  Object to the
19   form.
20       A.    Excuse me.
21       Q.    Go ahead.
22       A.    They didn't fix the creel.
23   They wasn't trying to fix the creels for

Page 198

1    this.  Now, a lot of lost ends, they said
2    preventing waste, they couldn't even get
3    the breakdown fixed, electrician, none of
4    them could fix these frames to stop some
5    of this.  They didn't talk to the creelers
6    on the back about creeling these warpers,
7    only the operators, they were going to put
8    the load on the operator.
9        Q.    You admit you were told these
10   things?
11       A.    Yes.
12       Q.    By Billy Joe Stewart?
13       A.    Yes.  I talked to him.
14       Q.    And he was your supervisor on
15   November the 22nd, 2004?
16       A.    Yes.
17           (Whereupon, Defendant's
18           Exhibit 45 was marked
19           for identification.)
20       Q.    Okay.  You have in front of
21   you Exhibit 45?
22       A.    Yes.
23       Q.    Would you read the details,

Page 199

1    please?
2        A.    (Reviewing document.)
3        Q.    Finished?
4        A.    Yes.
5        Q.    All right.  Exhibit 45 is just
6    a personnel notice, right?
7        A.    Yes.
8        Q.    And it was given by Billy Joe
9    Stewart to you on December the 10th, 2004,
10   correct?
11       A.    Yes.
12       Q.    And what's happening is Billy
13   Joe Stewart is telling you that there has
14   been a complaint about poor quality and he
15   reviewed that with you and the other
16   operator; is that correct?
17           MS. MUHAMMAD:  Objection to
18   form, leading.
19       A.    We wasn't together.
20       Q.    You and the other operator
21   weren't together?
22       A.    No.
23       Q.    Was the other operator Shannon

Page 200

1    Johnson?
2        A.    Let me see what month is this.
3        Q.    December of 2004.
4        A.    Denise Turner.
5        Q.    Denise Turner?
6        A.    I imagine it was Denise Turner
7    Fulghum.
8        Q.    Denise Turner Fulghum?
9        A.    Yes.
10       Q.    But you remember Billy Joe
11   Stewart reviewing the section beam quality
12   complaints with you?
13       A.    Yes.
14       Q.    And talking to you about the
15   warp tags not being filled out correctly?
16       A.    Yes.  But we mostly put the
17   tags on the beam frame that we running,
18   that way we won't make the mistake of
19   putting the wrong tag on.
20           (Whereupon, Defendant's
21           Exhibit 46 was marked
22           for identification.)
23       Q.    Okay.  Do you have Exhibit 46

50

Page 201

1  in front of you?
2      A.   Yes.
3      Q.   All right.  Just take a minute
4  to read the details.
5      A.   (Reviewing document.)  Okay.
6      Q.   Have you read them?
7      A.   Yes.
8      Q.   Okay.  Now, Exhibit 46 is just
9  a personnel notice, right?
10     A.   Yes.
11     Q.   And it was given by Billy Joe
12  Stewart on 12/15/2004, correct?
13     A.   Yes.
14     Q.   And it's for you not
15  cooperating and running all three warpers
16  when the other warper tender was on break,
17  correct?
18     A.   Yes.
19     Q.   Was that other warper tender
20  Shannon Johnson?
21     A.   12/15 of '04.  It's between
22  Shannon Johnson and Denise Turner.  I
23  disremember which one.

Page 202

1      Q.   You don't remember which one?
2      A.   No.
3      Q.   All right.  And it says here
4  you wouldn't sign it?
5      A.   No, I didn't sign it.
6      Q.   You could have gotten
7  disciplined for that, right?
8      A.   Yes, but, you know, my reason
9  for not signing was because a lot of times
10  things go on, like I said, concerning my
11  work and I put my heart and soul into my
12  work and it was always a write-up and I am
13  at fault, so, I stopped writing up,
14  signing my name on paper.
15     Q.   What was given to you as
16  Exhibit 46 --
17     A.   Yes.
18     Q.   -- could have been given to
19  you as a written warning?
20     A.   Yes.
21     Q.   Billy Joe Stewart was your
22  supervisor at the time?
23     A.   Yes.

Page 203

1           (Whereupon, Defendant's
2           Exhibit 47 was marked
3           for identification.)
4      Q.   Ms. Gibson, you have
5  Exhibit 47 in front of you?
6      A.   Yes.
7      Q.   It's a personnel notice dated
8  February 8, 2005, isn't it?
9      A.   Yes.
10     Q.   Given to you by Billy Joe
11  Stewart?
12     A.   Yes.
13     Q.   Would you take a minute and
14  read the details?
15     A.   (Reviewing document.)
16     Q.   Have you read it?
17     A.   Yes.
18     Q.   Billy Joe Stewart was telling
19  you that there were continuing complaints
20  about off quality section beams and low
21  production, right?
22     A.   Yes.
23     Q.   And this Exhibit 47 which is a

Page 204

1  personnel notice could have been a
2  warning, right?
3      A.   Yes.
4      Q.   And if it was a warning, you
5  would have lost your job, right?
6      A.   Yes.
7      Q.   See at the bottom where it
8  says action taken?
9      A.   Yes.
10     Q.   It says no more chances.  Do
11  you see that?
12     A.   (Witness nods head.)
13     Q.   Do you know whose initials
14  those are under no more chances?
15     A.   No.
16     Q.   Now, while you were on final
17  notice, this was your fourth personnel
18  notice regarding quality issues, wasn't
19  it?
20     A.   Yes.
21     Q.   So you had been given four
22  chances while you were on final notice,
23  right?

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 205 to 208)

Page 205

1    A.    Yes.
2    Q.    And this one states it's your
3  last chance?
4    A.    Yes.
5    Q.    And tell me again why you
6  refused to sign, you all of a sudden
7  stopped signing them?
8    A.    I just stopped signing them
9  because it was always something looked
10  like I did.  And if supervisors seen where
11  it was a lot of mistakes, why wasn't the
12  other operator, all of us were together at
13  the time they did the talking to help with
14  some of these mistakes.
15    Q.    But, when you got a warning,
16  the supervisor didn't go out and say,
17  well, I just gave Pat a warning, did he?
18    A.    No, he didn't.
19    Q.    And if he gave Shannon or
20  somebody else a warning, he wouldn't go
21  talk about giving them a warning either,
22  would he?
23    A.    No, because he had us

Page 206

1  separated, always something different in
2  the running of the beam but it looked like
3  to me mine was an everyday thing here.
4    Q.    So it's hard for one employee
5  to know when another employee gets a
6  write-up, isn't it?
7    A.    Well, when we are running
8  these jobs together, we both supposed to
9  know.
10    Q.    Okay.  But it's hard for you
11  to know when somebody else gets a
12  write-up, isn't it?
13    A.    Yes, it is.
14        (Whereupon, Defendant's
15        Exhibit 48 was marked
16        for identification.)
17    Q.    Okay.  Ms. Gibson, you have in
18  front of you a personnel notice marked
19  Exhibit 48.  Would you take a moment and
20  read the details?
21    A.    Yes.  (Reviewing document.)
22    Q.    Have you read them?
23    A.    Yes, sir.  Yes, I have read

Page 207

1  them.
2    Q.    Okay.  All right.  And this
3  personnel notice was issued by Ronny
4  Warren, right?
5    A.    Yes.
6    Q.    And the personnel notice is
7  documenting that you ran a beam three
8  thousand four hundred and forty yards
9  short?
10        MS. MUHAMMAD:  I object to the
11  form.
12    A.    Let me think about this.  No,
13  the beam wasn't short.
14    Q.    All right.  Well, let me --
15  I'm going to get to that point.  The
16  notice says that the beam was three
17  thousand four hundred and forty yards
18  short at the slasher, right?
19    A.    Yes, at the slasher.
20    Q.    All right.  And you say it
21  wasn't short?
22    A.    No.
23    Q.    Now, tell me about that.

Page 208

1    A.    Okay.  It says right here,
2  poor quality.  They don't say what job it
3  came off of, what frame.  They all just
4  got write-ups about a job but they don't
5  say what frame.
6    Q.    All right.  Read that sentence
7  after the slasher.  It was thirteen --
8    A.    Okay.  Short at slasher, it
9  was a hundred and thirty --
10    Q.    It gives a beam number,
11  doesn't it?
12    A.    It was a hundred and thirty --
13  the beam number, yes.  It's just too
14  many --
15    Q.    I'm sorry?
16    A.    -- fake write-ups.  This
17  write-up, this is the last write-up I was
18  supposed to have gotten.
19    Q.    Now, this is just a personnel
20  notice.
21    A.    No.  You know, the slasher can
22  make mistakes.
23    Q.    All right.  Now, this is a

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 209 to 212)

Page 209

1  personnel notice dated August 2, 2005,
2  right?
3      A.   Yes, but I don't know nothing
4  about this.
5      Q.   All right.  And you can see
6  what it says, it says you ran a beam three
7  thousand four hundred and forty yards
8  short?
9      A.   Short, yes.
10     Q.   And it goes on to say that you
11 have two active warnings, right?
12     A.   Yes.
13     Q.   And it says if there are
14 anymore problems of this nature, she will
15 receive a third written warning and will
16 be subject to discharge.  Do you see that?
17 Excuse me?
18     A.   I didn't see that.  I never
19 did read this.
20     Q.   I'm sorry?
21     A.   I never did see this, you
22 know.
23     Q.   You claim you never saw

Page 210

1  Exhibit 48 before?
2      A.   No.
3      Q.   Were you told you had run a
4  beam three thousand four hundred and
5  forty yards short?
6      A.   No.
7      Q.   Were you reminded that you had
8  two active written warnings, and if you
9  got another one, you'd be discharged?
10     A.   No.
11     Q.   Did you talk to Ronny Warren
12 and Bill Anderson about poor quality
13 around the end of August, I'm sorry, end
14 of July, first of August, 2005?
15     A.   No more than when I went and
16 got one about this job, this was, this
17 warper one, I believe, where Denise Turner
18 told me that I needed to run her job while
19 she trained the other operator.
20     Q.   That was the last day you
21 worked, right?
22     A.   Yes.
23     Q.   Okay.  We've already talked

Page 211

1  about that?
2      A.   Uh-huh.
3      Q.   Now, if you had received a
4  written warning instead of this personnel
5  notice on August the 2nd, 2005, that would
6  have resulted in the termination of your
7  employment, wouldn't it?
8      A.   Yes.
9      Q.   And Ronny Warren was your
10 supervisor at the time?
11     A.   At the time.
12          (Whereupon, Defendant's
13          Exhibit 49 was marked
14          for identification.)
15     Q.   Okay.  Ms. Gibson, you have in
16 front of you Exhibit 49?
17     A.   Yes.
18     Q.   And that's called a warning
19 report, isn't it?
20     A.   Yes.
21     Q.   And it's marked third warning,
22 right?
23     A.   Yes.

Page 212

1      Q.   And it says poor quality,
2  twelve ends short on three beams, correct?
3      A.   (Witness nods head.)
4      Q.   Take a moment and read the
5  details.
6      A.   (Reviewing document.)
7      Q.   Have you read it?
8      A.   Yes.
9      Q.   Okay.  And this warning report
10 was written by Ronny Warren on
11 August 26th, 2005, right?
12     A.   Yes.
13     Q.   And Mr. Warren was your
14 supervisor at the time?
15          MS. MUHAMMAD:  Objection.
16     A.   When is that, 8/26?  I wasn't
17 present.
18     Q.   I'm sorry?
19     A.   At the time this was wrote, I
20 wasn't present.
21     Q.   Well, was Mr. Warren your
22 supervisor on August 26th, 2005?
23     A.   Yes, he was.

53

Page 213

1     Q.   All right.  Now, this says on
2   August 23, 2004, Pat ran a set on number
3   three warper.  The three beams on this set
4   were run twelve ends short making a total
5   of thirty-six ends short on the set.  The
6   three beams were verified by the style and
7   the beam numbers as being correct by Pat.
8   Is that true?
9     A.   If this -- I don't know
10  nothing about this.
11    Q.   All right.  Do you recall
12  Ronny Warren showing you the beams and you
13  verifying that that was correct, that you
14  ran them?
15    A.   No.
16    Q.   All right.  Now, the event
17  that you told me about when somebody was
18  already on your job, was that at the
19  beginning of the shift?
20    A.   Yes, the first thing that
21  morning.
22    Q.   And that was on the 26th?
23    A.   Yes.

Page 214

1     Q.   So you didn't go on your job
2   that day?
3     A.   No, I was on Denise Turner's
4   supposed-to-have-been job.
5     Q.   And you were referred to
6   personnel that day?
7     A.   Yes.
8     Q.   And that was the day they told
9   you --
10    A.   That was the next day I was
11  referred to personnel.  If I worked on the
12  28th day, the next day, I didn't go
13  inside, I was sent to the front.
14    Q.   All right.  Now, you don't
15  claim that Exhibit 49, which is your third
16  warning, was given to you for
17  discriminatory reasons, do you?
18    A.   I wasn't there.  I don't know
19  anything about that letter, this report.
20    Q.   You don't claim it was written
21  for discriminatory reasons, do you?
22    A.   I don't know.  I wasn't there.
23         (Whereupon, Defendant's

Page 215

1         Exhibit 50 was marked
2         for identification.)
3     Q.   Now, Exhibit 50 is your
4   separation notice, right?
5     A.   Yes.
6     Q.   And it's dated --
7         MS. MUHAMMAD:  I object to the
8   form.
9     Q.   -- August 26th, 2005, isn't
10  it?
11    A.   Yes.
12    Q.   And it's marked involuntary,
13  isn't it?
14    A.   Yes.
15    Q.   Three warnings within a
16  twelve-month period, correct?
17    A.   That's what it says.
18    Q.   And it's signed by Ronny
19  Warren and Bill Anderson?
20    A.   Yes.
21    Q.   And at the bottom by Calvin
22  Ogletree?
23    A.   Yes.

Page 216

1     Q.   You don't claim that you were
2   separated from employment for
3   discriminatory reasons, do you?
4     A.   Yes, sir, I do.
5     Q.   And on what do you base your
6   claim?
7     A.   On age.  On age.
8     Q.   All right.  And why do you
9   claim that your age was the reason for
10  your termination?
11    A.   The poor quality, everything I
12  see in them write-ups, that they have got
13  there said poor quality.  I can't make
14  nothing happen that I didn't process.  It
15  came through cords, drawing, spinning,
16  warping, which I was the warper operator.
17  Now, poor quality had to start in the back
18  of -- from the beginning, they had to
19  process it correctly or either the cotton
20  was bad when they processed it.  And a lot
21  of it they brung in there from other
22  plants were bad.  We just tried to make
23  the best of it, try to run whatever they

# Deposition Transcript of Patricia Gibson, Part Three Pages 217-315

Page 217

1 put on that job and tried to make it the
2 best, but you just can't make the thing
3 the best if it's not good, we can only do
4 what we could. And a lot of lost ends, I
5 don't understand with the write-ups and
6 all of them mine. I ain't heard no other,
7 from no other operator, it was all mine.
8 Looked like they were just writing up the
9 operator, putting their slip in mine and I
10 was supposed to sign it. But I don't
11 think that was fair. You know, I'm the
12 operator, true, and I was supposed to have
13 been one of the oldest head operators in
14 Lanier plant, I was the only one besides
15 Lela Mae Dennis. And I was supposed to
16 have been the number one. But I have been
17 told I was going to be the one to blame
18 for whatever went down on them warpers.
19     Q.    Who told you that?
20     A.    Bill Anderson.
21     Q.    What did he tell you?
22     A.    I was going to be the one to
23 blame for everything no matter what

Page 218

1 mistake that went on on those warpers, I
2 was going to be the one that they blamed.
3     Q.    Who was present when that was
4 said?
5     A.    Nobody but me and him at the
6 time. And see if it's a lot of noise, you
7 couldn't hear what the other person was
8 saying to you unless they speak up kind of
9 loud but it was said.
10     Q.    Where were you?
11     A.    On the warpers.
12     Q.    Do you know when it was?
13     A.    I can't say the exact date but
14 I know I worked third shift and he was
15 down there one morning, they usually check
16 the job out every morning.
17     Q.    Do you know about when it was?
18     A.    No.
19     Q.    Do you have any other reasons
20 that you claim age motivated your
21 discharge other than what you just told
22 me?
23     A.    And no more than the material

Page 219

1 they were sending down there to me to make
2 the poor quality yarn, you know.
3     Q.    All right. You're saying you
4 got discharged for being unable to manage
5 poor quality yarn and that --
6     A.    I was unable to -- they said I
7 couldn't even run a job.
8     Q.    Okay.
9     A.    Out of twenty,
10 twenty-five years, I couldn't run a
11 warper.
12     Q.    You are saying that you were
13 discharged for being unable to manage poor
14 quality yarn that was coming to you from
15 elsewhere in the plant and that therefore
16 you believe that your -- the real reason
17 for your discharge was your age?
18     A.    Age.
19     Q.    Anything else, any other
20 reason other than what you've just told
21 me?
22     A.    No.
23     Q.    Now, in your complaint, you

Page 220

1 don't claim that Greg Tilley harassed you
2 or discriminated against you, you don't
3 have any harassment claims on the basis of
4 your age against Greg Tilley, do you?
5     A.    Yes, I do.
6     Q.    What do you claim, how do you
7 claim that Tilley discriminated against
8 you?
9     A.    I just say he's racist, that's
10 what I say.
11     Q.    Oh, that Tilley is a racist?
12     A.    Yes.
13     Q.    You think he discriminated
14 against you on the basis of your race?
15     A.    Of my race.
16     Q.    Not your age?
17     A.    Not my age, my race.
18     Q.    Do you know when the last time
19 was that you were supervised by Greg
20 Tilley?
21     A.    Yes, I worked Carter mill and
22 all of the supervisors, the supervisor
23 Greg Tilley, Lyn Sorrell, Ray Scott.

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 221 to 224)

Page 221

1    Q.    They supervised you at Carter?
2    A.    They switched -- yes.  They
3  had switched them around some.
4    Q.    So when you went back to
5  Lanier, Tilley stayed at Carter?
6    A.    Yes, he was already over in
7  the Carter.
8    Q.    And you never complained about
9  discrimination or harassment to anybody at
10  WestPoint Home when you were still working
11  there?
12    A.    No, because they know how they
13  were treated.  They just probably afraid
14  to speak, speak up.
15    Q.    All right.  Now, you claim you
16  signed some kind of petition?
17    A.    Yes, what they had, it was a
18  meeting inside about discriminating, maybe
19  just wanted you to sign it or somewhat.
20  So we just signed it, discriminating
21  sheet, we didn't put no names on it,
22  concerning who or what.
23    Q.    Who was asking you to sign it?

Page 222

1    A.    No, they just had a meeting
2  inside the plant.
3    Q.    The company held a meeting?
4    A.    Uh-huh.  Concerning that, yes.
5    Q.    Concerning discrimination?
6    A.    Discrimination or if -- but I
7  don't think all of that was just that, I
8  think it had something to do with
9  insurance.
10    Q.    Oh, was this just a sign-in
11  sheet where you signed in to show you were
12  there?
13    A.    No.  It was something saying
14  how you like your supervisor, you know,
15  something they have every year, I think.
16    Q.    A survey?
17    A.    Yes.
18    Q.    So you participated in the
19  survey?
20    A.    Yes.
21    Q.    You didn't write your name
22  on --
23    A.    Every year.

Page 223

1    Q.    You didn't write your name on
2  it, did you?
3    A.    Yes, we did.
4    Q.    You did write your name on it?
5    A.    I think we had to sign it.
6    Q.    You're sure about that?
7    A.    Yes, I think so.  I'm not
8  sure.
9    Q.    Well, you don't recall ever
10  signing any kind of petition, do you?
11    A.    No.
12    Q.    Now, let me just read you this
13  answer, and I want you to clarify it.  It
14  says -- this is your answer to request to
15  admit number twenty-eight.  The plaintiff
16  participated in the confidential signing
17  of a petition that charged the company
18  with harassment in or about 2003?
19    A.    Oh, it was a separate
20  petition?  Were they separate?
21    Q.    I'm sorry?
22    A.    This petition that I supposed
23  to have signed, now, everybody didn't sign

Page 224

1  this petition.  They had their own
2  separate sheets.
3    Q.    Well, who asked you to sign
4  this petition?
5    A.    I don't think -- no, they just
6  give us out papers to read with --
7    Q.    So something the company gave
8  you?
9    A.    Yes, saying if anything come
10  about with harassing, so I signed the
11  sheet.
12    Q.    So you weren't accusing
13  anybody of discriminating against you?
14    A.    No, not at that time.
15    Q.    Okay.  All right.  I just
16  wanted to clarify that.  Now, before your
17  employment was terminated, did Calvin
18  Ogletree come to you and say that he
19  wanted to give you the opportunity to
20  transfer to another job?
21    A.    No.
22    Q.    Were you aware that there were
23  postings for other jobs in the plant that

56

Page 225

1  you could have bid for?
2      A.    Yes.
3      Q.    Did you ever tell Calvin that
4  you weren't interested in posting or
5  signing up for another job, that you were
6  going to make it or break it as a warper?
7      A.    No, I didn't tell him that.
8      Q.    Did you tell anybody that?
9      A.    No.
10     Q.    Did you tell anybody anything
11  like that?
12     A.    No.
13     Q.    Were you ever offered the
14  position of a cleaner/sweeper, sort of a
15  custodial position like you have now at
16  Troup County?
17     A.    Repeat that.
18     Q.    Were you ever offered the
19  opportunity to become a cleaner/sweeper, a
20  position sort of like you have at Troup
21  County?
22     A.    No.
23     Q.    And to get off the warper job?

Page 226

1      A.    No.
2          (Whereupon, Defendant's
3          Exhibit 51 was marked
4          for identification.)
5      Q.    Now, Ms. Gibson, I'm not
6  trying to trick you. Your request to
7  admit indicates that you were offered a
8  night shift position. Do you recall that?
9      A.    I signed a bid sheet for a job
10  but I don't think it was cleaning and
11  sweeping.
12     Q.    Do you know what it was?
13     A.    No, not at this time. And I
14  changed my mind. I went back to the front
15  and talked to Calvin Ogletree so I got the
16  warper job back.
17     Q.    Okay.
18     A.    Because I didn't hold the job
19  sheet up that long.
20     Q.    Okay. Did you ever -- did you
21  actually go to the other job?
22     A.    No.
23     Q.    Never went to it?

Page 227

1      A.    No.
2      Q.    You just signed for it?
3      A.    I just signed for it.
4      Q.    And you came off the warper
5  job but you never did go to the new job?
6      A.    I never did go off the warper
7  job.
8      Q.    Okay. So you stayed on the
9  warper job and you went to Calvin and said
10  I signed for it but I don't want it?
11     A.    Yes, that's what I did. I
12  signed like say about lunchtime that
13  morning, I thought about it, they said you
14  have got to drop back to a lower paying
15  job, and when I could have stayed, and I
16  just thought about it and I just stayed on
17  the warpers.
18     Q.    Okay. But you don't remember
19  what that other job was?
20     A.    No.
21     Q.    Do you remember what it paid?
22     A.    It didn't pay what the warper
23  paid.

Page 228

1      Q.    Paid less than the warper job?
2      A.    Yes. It was spinning and --
3  basic pay or spinning job, that's what the
4  warper paid.
5      Q.    All right.
6      A.    So, no.
7      Q.    Did Calvin say well, you
8  didn't have to take it?
9      A.    He said it was all right since
10  they hadn't processed no papers or nothing
11  or moving me around.
12     Q.    So you could stay where you
13  were?
14     A.    Were.
15     Q.    Did he remind you you had two
16  warnings?
17     A.    No, he didn't.
18     Q.    But you knew it?
19     A.    Not really, because I thought,
20  you know, as I say, being an operator,
21  maybe everybody change their thing on the
22  meeting when it's more than one operator.
23  I feel the creelers, the operators, all of

57

Page 229

1    us should have been in a meeting since it
2    was so many mistakes or lost ends or
3    either the job, creel wasn't right, didn't
4    have enough ends, and I got to creel this
5    job from the outside or either I go on the
6    back and be a creeler hand and let the
7    ladies in the back run the warpers.  It
8    was one of the two.
9        Q.    Now, at the time you signed up
10   for this job that was somewhat of a lower
11   paying job, you knew you were on a final
12   notice, right?
13       A.    Repeat that, now.
14       Q.    When you signed up for this
15   job that was a lesser paying job, you knew
16   you were on the final notice, right?
17       A.    No, not at that time.  No, not
18   at that time.  I know I had two warnings.
19       Q.    Okay.
20       A.    But the warnings that I had, I
21   figured, I said well, this -- which I
22   wasn't trying to make no mistake anyway to
23   get these warnings.

Page 230

1        Q.    When you signed up for that
2    job that you could have taken, you already
3    had two warnings?
4        A.    Yes.
5        Q.    Okay.
6        A.    I guess.
7        Q.    All right.  Let's look at this
8    job bid sheet that's Exhibit 51.  Have you
9    got that in front of you?
10       A.    Yes.
11       Q.    And you see up at the top it
12   says 3/23/05, cleaner/sweeper?
13       A.    Uh-huh.
14       Q.    First shift, do you see that?
15       A.    Uh-huh.  Yes.
16       Q.    I don't see your name on
17   there, do you?
18       A.    No.
19       Q.    But you could have signed for
20   it?
21       A.    I could have signed for it.
22       Q.    All right.  Now look at the
23   bottom sheet.  9/8/05, do you see that?

Page 231

1        A.    Yes.
2        Q.    So, that cleaner/sweeper job
3    was still open in September of 2005 on the
4    first shift, right?
5        A.    It says first shift.
6        Q.    Okay.
7        A.    Barbara Love was
8    cleaner/sweeper.
9             MR. SUGGS:  I'm just trying to
10   make sure I don't put this in the record
11   twice.  There it is.
12       Q.    We looked at Exhibit 3 earlier
13   where Calvin Ogletree said that there
14   wasn't any misconduct on your part, that
15   the company hated to let you go, that
16   there was nothing intentional by you; do
17   you remember that?
18       A.    Yes.
19       Q.    So, the information that
20   WestPoint gave the Alabama Department of
21   Industrial Relations was helpful to your
22   claim to get unemployment, wasn't it?
23       A.    No.

Page 232

1        Q.    Well, how could that be
2    anything but helpful?  Let me read it and
3    read it with me.  We hated to let her go.
4    She gave the company a lot of good years
5    up until this change in work requirement
6    occurred.  There was no misconduct on the
7    claimant's part, nothing intentional on
8    her part.  Do you see that?
9        A.    But they wrote me up saying
10   that I was doing poor job, my job
11   qualifications were poor on work.  Like
12   some of them write-ups, Billy Joe Stewart
13   wrote up about me and Greg Tilley, so,
14   that, it took me a while to get
15   unemployment.  My unemployment wasn't on
16   time.
17       Q.    You got it, didn't you?
18       A.    Yes, I did.
19       Q.    All right.
20       A.    But it took some phone calls.
21   And I called Ogletree and asked him what
22   were they -- what have they done the
23   reason why I wasn't getting unemployment.

58

Page 233

1    Q.   And Calvin told you he was
2  going to help you get it?
3    A.   He said he'll check into it to
4  see what Billy Joe wrote up or whatever.
5    Q.   And you don't know if Billy
6  Joe wrote up anything, do you?
7    A.   Yes, I got it through
8  unemployment that he wrote --
9    Q.   Do you have a copy of anything
10  that he wrote?
11    A.   Let's see.  I don't have it on
12  me but I have a copy.
13    Q.   Have you produced that during
14  discovery?
15    A.   Yes.
16    Q.   Have you given it to your
17  lawyer?
18    A.   Yes.
19    MS. MUHAMMAD:  You have a
20  copy.  I sent it to you.
21    MR. SUGGS:  Have you got a
22  copy there?
23    MS. MUHAMMAD:  Production.  I

Page 234

1  don't have a copy.  Do we have access to a
2  copier here?
3    MR. SUGGS:  Yes, we will find
4  a copier.  Have you got something Billy
5  Joe Stewart signed?
6    MS. MUHAMMAD:  Well, it
7  doesn't show his name but it shows your
8  agency, the company response.
9    MR. SUGGS:  May I see it?  I
10  will give it right back.  Well, this is
11  something the claimant wrote.
12    A.   At the bottom in between, but
13  at the top.
14    MS. MUHAMMAD:  At the top
15  portion, do you see the typed written
16  part?
17    MR. SUGGS:  Three warnings in
18  a twelve-month period, final incidence,
19  poor job quality and leaving ends
20  resulting in waste.  Do you agree that's
21  what it says?
22    MS. MUHAMMAD:  If that's what
23  it says.

Page 235

1    MR. SUGGS:  It doesn't say who
2  said it, does it?
3    MS. MUHAMMAD:  This particular
4  document doesn't.
5    Q.   So you don't have any evidence
6  that Mr. Stewart had any role in talking
7  with the Alabama Department of Industrial
8  Relations about your unemployment, do you?
9    A.   By -- yes, I talked to one of
10  the -- I don't know the lady's name at
11  this time, maybe I should have wrote it
12  down, but she told me that it was Billy
13  Joe Stewart wrote up in order for me to
14  get my unemployment, but why it took me so
15  long --
16    Q.   You don't know the lady's
17  name?
18    A.   No.
19    Q.   You don't know when the
20  conversation was?
21    A.   No, but it was back in 2005.
22  No, I don't.
23    Q.   And you got your unemployment?

Page 236

1    A.   Yes, after I kept trying,
2  calling.
3    Q.   And what Calvin Ogletree said
4  was helpful, wasn't it?
5    A.   They said they couldn't get in
6  touch with Mr. Stewart so they had to
7  throw it out, whatever he said concerning
8  that.
9    Q.   And what Mr. Ogletree said was
10  helpful, wasn't it?  Correct?
11    A.   It still took a while.  May
12  the 26th.  May 26th.
13    MS. MUHAMMAD:  Look at this
14  statement.
15    A.   9/21.
16    Q.   My question was what Mr.
17  Ogletree said was helpful, wasn't it?
18    A.   Yes.
19    MS. MUHAMMAD:  Can we take a
20  break now?  I need to make a call.
21    MR. SUGGS:  Sure.
22    (Whereupon, a break was had
23  from 2:32 P.M. until 2:39 P.M.)

59

Page 237

1      (Whereupon, Defendant's
2      Exhibit 52 was marked
3      for identification.)
4      Q.    (BY MR. SUGGS:)  Now, Ms.
5  Gibson, Exhibit 52 shows that you were
6  eligible for unemployment benefits, right?
7      A.    Yes.
8      Q.    And you did draw your
9  unemployment, didn't you?
10     A.    Yes.
11     Q.    On what do you base your
12 contention that Carolyn Johnson and
13 Dorothy Boyd were not written up for the
14 same mistakes you were written up for?
15     A.    Because, now, before they
16 changed around the operator have to run --
17 they was having the operator, whenever she
18 break, I was supposed to be taking over,
19 whichever one go on break, that's
20 including me.  Dorothy Boyd used to come
21 to the front from the creel and run the
22 warpers, so I feel she could make mistakes
23 on beams as well, so, and the operators,

Page 238

1  but they wasn't counting it.
2      Q.    Is Carolyn Johnson a warper
3  operator?
4      A.    She's a warper operator.
5      Q.    And Dorothy Boyd, too?
6      A.    No, she creels.
7      Q.    You don't know how old Carolyn
8  Johnson is, do you?
9      A.    No.
10     Q.    You don't know how old Dorothy
11 Boyd is either, do you?
12     A.    No.
13     Q.    Who was Carolyn Johnson's
14 supervisor?
15     A.    Jimmy Waites.
16     Q.    Do you know who Dorothy Boyd's
17 supervisor was?
18     A.    Ronny Warren and Billy Joe
19 Stewart.
20     Q.    Last name?
21     A.    Ronny Warren and Billy Joe
22 Stewart.  But we was on twelve-hour shifts
23 so we had two supervisors.

Page 239

1      Q.    Have you given me all of the
2  information that you have that any of your
3  disciplinary warnings or your discharge
4  were on account of your age?
5      A.    Yes, as far as I know.
6      Q.    Do you have any information
7  whatsoever that Tim Wilbanks was involved
8  in any of the discipline you received at
9  WestPoint?
10     A.    He was just a visitor.
11     Q.    He was not involved in any
12 discipline you got?
13     A.    No.
14     Q.    Tim Wilbanks wasn't involved
15 in the decision to terminate your
16 employment, was he?
17     A.    No.
18     Q.    What do you base your
19 contention on that the reasons given for
20 your termination, that is, three warnings
21 in a twelve-month period, were not true?
22     A.    The write-up, the last
23 write-up I wasn't even present.  I wasn't

Page 240

1  present when that write-up on that sheet,
2  the last sheet you showed, I didn't know
3  anything about it.  And when the next day
4  I come in, I was met at the end of the
5  warper, before I went into the gate by
6  Ronny Warren for me to go around front.
7  So that meant I could get back in my car
8  and drive around front.
9      Q.    All right.
10     A.    That's what happened.
11     Q.    And that's when you were
12 thirty-six ends short?
13     A.    Thirty-six?
14     Q.    Three beams on this set with
15 twelve ends short making a total of
16 thirty-six ends short on the set?
17     A.    I don't know nothing about
18 that.  And once I got around there, I had
19 to sit and wait on Bill Anderson and Jason
20 Adcock.
21     Q.    Well, if that thirty-six ends
22 short were true, that would justify a
23 written warning?

60

Page 241

1    A.    I don't know nothing about
2  that because as far as I know it wasn't no
3  thirty-six ends short on a three
4  thirty-three.
5    Q.    But you would agree with me,
6  if you were thirty-six ends short, that
7  would justify a warning, right?
8    A.    Yes.  That would have
9  justified termination, because I had
10  already had these write-ups.
11    Q.    Who is it that you claim
12  replaced you on the warper?
13    A.    Sharon Jennings Heard.
14    Q.    Sharon?
15    A.    Jennings.
16    Q.    Heard?
17    A.    Heard.
18    Q.    You don't know how old she is,
19  do you?
20    A.    No, I don't.
21    Q.    How do you know she replaced
22  you?
23    A.    Because they were training

Page 242

1  her.
2    Q.    I'm sorry?
3    A.    They was training her.
4    Q.    They were training her?
5    A.    (Witness nods head.)
6    Q.    You don't know --
7    A.    They started training her that
8  day before I made -- the day I made the
9  mistake on the warpers, which would be
10  Denise Turner's job, since they was
11  training her to run my job, so, that's
12  where the mistakes were made on her,
13  Denise Turner's job.
14    Q.    Did you ever hear Shannon
15  Johnson complain to you or to anybody else
16  that Shannon was blamed for the poor
17  quality beams that you created?
18    A.    Excuse me now?
19    Q.    Did you ever hear Shannon
20  Johnson complain to you or to anybody else
21  that Shannon was being blamed for the poor
22  quality beams that you created?
23    A.    No.

Page 243

1    Q.    Do you know why Shannon
2  Johnson left WestPoint?
3    A.    No.
4       (Whereupon, Defendant's
5       Exhibit 53 was marked
6       for identification.)
7    Q.    Ms. Gibson, you have
8  Exhibit 53 in front of you?
9    A.    Yes.
10    Q.    Is that your signature at the
11  bottom of the page?
12    A.    Yes.
13    Q.    Is 403 Fairwood Drive, Valley,
14  Alabama 36854 where you were living on
15  December the 30th, 2005?
16    A.    Yes.
17    Q.    Is December 30th, 2005 the
18  date you sent this letter to the EEOC?
19    A.    Yes.
20    Q.    And you addressed it to whom
21  it may concern?
22    A.    Yes.
23       (Whereupon, Defendant's

Page 244

1       Exhibit 54 was marked
2       for identification.)
3    Q.    Take Exhibit 54, please.
4  Would you take a moment and read over
5  Exhibit 54?
6    A.    (Reviewing document.)
7    Q.    Ready?
8    A.    Yes.
9    Q.    All right.  On January 6th,
10  2006, you were living at 403 Fairwood
11  Drive, Valley, Alabama?
12    A.    Yes.
13    Q    And that's the same address
14  that was on your handwritten letter that's
15  Exhibit 53, isn't it?
16    A.    Yes.
17    Q.    So you got this letter which
18  is Exhibit 54 from the EEOC sometime
19  shortly after January 6th, 2006?
20    A.    Yes.
21    Q.    All right.  And it says, if
22  you look in the second sentence, the
23  information you gave us is not enough to

61

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 245 to 248)

| Page 245 |
|---|
| 1   determine how we should handle this case. |
| 2   Do you see that? |
| 3      A.   Yes. |
| 4      Q.   And at the bottom in all caps, |
| 5   it says if we have not heard from anyone |
| 6   within thirty days of this letter, we will |
| 7   assume that there was no intention to file |
| 8   a charge of discrimination with us. Do |
| 9   you see that? |
| 10      A.   Yes. |
| 11      (Whereupon, Defendant's |
| 12      Exhibit 55 was marked |
| 13      for identification.) |
| 14      Q.   Do you have before you |
| 15   Exhibit 55? |
| 16      A.   Yes. |
| 17      Q.   You see the first entry on |
| 18   this case log, 12/30/05? |
| 19      A.   Yes. |
| 20      Q.   Mail assigned to ISA-no basis, |
| 21   do you see that? |
| 22      A.   Yes. |
| 23      Q.   And you see 1/6/05, ISA mailed |

| Page 246 |
|---|
| 1   CP a contact to make certain that she had |
| 2   no basis. Do you see that? |
| 3      A.   Yes. |
| 4      (Whereupon, Defendant's |
| 5      Exhibit 56 was marked |
| 6      for identification.) |
| 7      Q.   You have before you Exhibit |
| 8   56? |
| 9      A.   Yes. |
| 10      Q.   And it's called a notice of |
| 11   charge of discrimination, right? |
| 12      A.   Yes. |
| 13      Q.   And the box checked is for |
| 14   age, right? |
| 15      A.   Yes. |
| 16      Q.   And you see it's directed to |
| 17   Tim Wilbanks at WestPoint, do you see |
| 18   that? |
| 19      A.   Yes. |
| 20      Q.   And it says, in box number |
| 21   one, no action is required at this time, |
| 22   do you see that? |
| 23      A.   Yes. |

| Page 247 |
|---|
| 1      Q.   And do you see down at the |
| 2   very bottom, down here, it says dates, |
| 3   earliest 1/4/2006, latest 1/4/2006. Do |
| 4   you see that? |
| 5      A.   Yes. |
| 6      Q.   And you quit working for |
| 7   WestPoint in August 25th, 2005, right? |
| 8      A.   But I had a hundred and eighty |
| 9   days. |
| 10      Q.   All right. You quit work for |
| 11   WestPoint August 2005, right? |
| 12      A.   I was separated August 2005. |
| 13      Q.   Do you agree with me your last |
| 14   day worked was August 25, 2005? |
| 15      A.   2005. |
| 16      (Whereupon, Defendant's |
| 17      Exhibit 57 was marked |
| 18      for identification.) |
| 19      Q.   Now, Ms. Gibson, you have in |
| 20   front of you Exhibit 57? |
| 21      A.   Yes. |
| 22      Q.   That's another notice of |
| 23   charge of discrimination, isn't it? |

| Page 248 |
|---|
| 1      A.   Yes. |
| 2      Q.   And it's directed to Tim |
| 3   Wilbanks at WestPoint, correct? |
| 4      A.   Yes. |
| 5      Q.   And this time it, the box |
| 6   checked is number three, asking WestPoint |
| 7   to present a position statement, right? |
| 8      A.   Yes. |
| 9      Q.   And it's dated March 21, 2006, |
| 10   correct? |
| 11      A.   Yes. |
| 12      (Whereupon, Defendant's |
| 13      Exhibit 58 was marked |
| 14      for identification.) |
| 15      Q.   Ms. Gibson, you have in front |
| 16   of you Exhibit 58? |
| 17      A.   Yes. |
| 18      Q.   Do you see in the bottom |
| 19   left-hand corner there's a date of 3/15/06 |
| 20   and a signature. Is that your signature? |
| 21      A.   Yes. |
| 22      Q.   Is the date 3/15/06 the date |
| 23   you signed it? |

62

Page 249

1     A.    Yes.
2     Q.    Is that date written in your
3  hand?
4     A.    Yes.
5     Q.    And you can see it was
6  received by the EEOC on March the 16th,
7  which is the next day?
8     A.    Yes.
9     Q.    Do you see that stamp
10 received?
11    A.    Yes.
12    Q.    And in this block right here,
13 it says the earliest date of
14 discrimination was August 26th, 2005. Do
15 you see that?
16    A.    Yes.
17    Q.    Now, that was about the time
18 you were discharged, wasn't it, or maybe
19 the day after?
20    A.    Yes.
21    Q.    And it says latest, 1/4/2006.
22 Do you see that?
23    A.    Yes.

Page 250

1     Q.    Now, that's the date of your
2  handwritten letter, right? I'm sorry,
3  that may be the date your handwritten
4  letter was received. January 4, 2006 is
5  the date your handwritten letter was
6  received by the EEOC, right?
7     A.    Yes.
8     Q.    WestPoint Stevens didn't do
9  anything to you on January 4, 2006, right?
10    A.    Excuse me? Repeat that.
11    Q.    WestPoint Stevens didn't do
12 anything to you on January 4, 2006, did
13 they?
14    A.    No, I wasn't in the plant at
15 that time.
16    Q.    Yes, you had left the plant in
17 August of 2005, right?
18    A.    Yes.
19          (Whereupon, Defendant's
20          Exhibit 59 was marked
21          for identification.)
22    Q.    Ms. Gibson, you have in front
23 of you Exhibit 59?

Page 251

1     A.    Yes.
2     Q.    And is 5/6/06 the date you
3  signed it?
4     A.    Yes.
5     Q.    Is that your signature in the
6  bottom left-hand corner?
7     A.    Yes.
8     Q.    And did the EEOC receive it on
9  May 8, 2006?
10    A.    Yes.
11    Q.    And it has the same dates as
12 the last charge, right, August 26th, 2005,
13 and the latest 1/4/2006?
14    A.    Yes.
15    Q.    All right. So you are
16 verifying that by looking at Exhibit 58
17 and comparing it to Exhibit 59, right?
18    A.    Yes.
19          (Whereupon, Defendant's
20          Exhibit 60 was marked
21          for identification.)
22    Q.    Now, Ms. Gibson, you can see
23 that you signed Exhibit 59, which is an

Page 252

1  EEOC charge on May the 6th, and this
2  letter dated May 3rd asks you to sign the
3  charge and send it back. Was Exhibit 59
4  sent to you by way of this March 3rd, 2006
5  letter, which is marked Exhibit 60?
6     A.    Yes.
7     Q.    And in May of 2006, were you
8  getting mail at 403 Fairwood Drive?
9     A.    Yes.
10    Q.    So, the letter says sign the
11 charge and send it back and you did
12 exactly as instructed, correct?
13    A.    Yes.
14          (Whereupon, Defendant's
15          Exhibit 61 was marked
16          for identification.)
17    Q.    Ms. Gibson, you have in front
18 of you Exhibit 61?
19    A.    Yes.
20    Q.    This is an internal EEOC
21 memorandum entitled recommendation for
22 closure, isn't it?
23    A.    Yes.

Page 253

1    Q.   And you see the last sentence
2  starting with the charging party, are you
3  with me?
4    A.   Yes.
5    Q.   The charging party filed the
6  subjected charge 3/16/2006 and more than
7  one hundred and eighty days have expired
8  since the filing of the charge.  Did I
9  read that correctly?
10   A.   Yes.
11        (Whereupon, Defendant's
12        Exhibit 62 was marked
13        for identification.)
14   Q.   Ms. Gibson, just take a look
15  at Exhibit 62 and let me know when you
16  have read it?
17   A.   Yes.
18   Q.   You've read it?
19   A.   No, I will read it.
20  (Reviewing document.)  All right.
21   Q.   You've read it?
22   A.   Yes.
23   Q.   Okay.  So, this is a letter

Page 254

1  from Mr. Wilbanks to the EEOC, correct?
2    A.   Yes.
3    Q.   And look at the third
4  paragraph.  He points out that on January
5  the 4th, 2006, you were no longer an
6  employee of the company.  And that was
7  correct, right?
8    A.   Yes.
9    Q.   Now, Ms. Gibson, if we get to
10  a trial of this case, who do you know
11  right now who would have information about
12  your claims who might be called as a
13  witness?
14   A.   The EEOC have information.
15   Q.   Okay.  Who else?  Anybody?
16   A.   My cousin, I talk to her.
17   Q.   And who is that?
18   A.   Cora Carr.
19   Q.   Who?
20   A.   Cora car.
21   Q.   Does Cora Carr know anything
22  other than what you've told her?
23   A.   No, she don't.

Page 255

1    Q.   She just knows what you have
2  told her?
3    A.   What I have told her.
4    Q.   Has she ever worked for the
5  company?
6    A.   No.
7    Q.   Okay.  Anybody else?
8    A.   Well, my husband, Jerry
9  Gibson.
10   Q.   Does Jerry Gibson know
11  anything other than what you've told him?
12   A.   No.  He wasn't in that area
13  but he worked there.
14   Q.   Okay.  Anybody else?
15   A.   Mattie Gibson Gregory.
16   Q.   Mattie Gibson Gregory?
17   A.   She used to be a creeler.
18   Q.   Does she know anything other
19  than what you've told her?
20   A.   No, not what they ever said
21  anything to me.
22   Q.   Okay.  Anybody else?
23   A.   Lela Mae Dennis.

Page 256

1    Q.   Does she know anything other
2  than what you've told her?
3    A.   No.  No.
4    Q.   How about Bennie Carr?
5    A.   What I told her.
6    Q.   That's a female?
7    A.   Yes.
8    Q.   Bennie Carr just knows what
9  you've told her?
10   A.   Yes.
11   Q.   How about Margaret Phillips?
12   A.   Just what I told her.
13   Q.   How about Mattie Ogletree?
14   A.   No more than what I told her.
15   Q.   And she's your cousin?
16   A.   Yes.
17   Q.   And the lady you live with?
18   A.   Yes.
19   Q.   Marie Scribling?
20   A.   Well, she knows something, she
21  says she knows, but I can't get in touch
22  with her.
23   Q.   What is it she knows?

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 257 to 260)

Page 257

1    A.    Well, she was in the open end
2 spinning, so --
3    Q.    Does she still work for the
4 company?
5    A.    I don't know.  I imagine so.
6    Q.    Do you know where she lives?
7    A.    No.
8    Q.    All right.  Linda Acres?
9    A.    Well, what I told her.  And
10 she still work for the company.
11    Q.    Dorothy Finley?
12    A.    She work for the company.
13    Q.    Does Dorothy Finley know
14 anymore than what you've told her?
15    A.    No, she don't work in that
16 area.
17    Q.    How about Sharon -- I'm sorry,
18 Shannon?
19    A.    Johnson.
20    Q.    Is it Shannon Jennings' line
21 or is it Sharon?
22    A.    Sharon.
23    Q.    Sharon.  What does she know?

Page 258

1    A.    I wouldn't -- I don't know.
2 The only thing I know, she is the one that
3 is running my job.
4    Q.    How about Carrie Little
5 McLemore?
6    A.    Well, she run back winding.
7 She don't know no more than what I talked
8 to her about concerning the job.
9    Q.    So she just knows what you've
10 told her?
11    A.    That's it.
12    Q.    How about Troy Leveridge?
13    A.    Well, he is the breakdown
14 fixer.  Maybe he can explain the job, the
15 reason why the job performance is poor.
16    Q.    Okay.  James King?
17    A.    The same.
18    Q.    He's a fixer, too?
19    A.    Yes.
20    Q.    How about Denise Turner
21 Fulghum?
22    A.    Fulghum.  She's a warper
23 operator.  But I never just talked to her

Page 259

1 concerning nothing they ever said to me.
2    Q.    So she doesn't know anything
3 about your case?
4    A.    No more than working with her.
5    Q.    No more than what?
6    A.    Working with her together,
7 working together.
8    Q.    Y'all worked on the same
9 warper?
10    A.    Shift.
11    Q.    The same shift?
12    A.    Yes.
13    Q.    Did you sometimes run one and
14 a half warpers and she ran one and a half?
15    A.    Ran the other, yes.
16    Q.    Vennie Carr?
17    A.    Well, she was overhauler.  But
18 she's no longer there.  She don't know no
19 more than I've told her.
20    Q.    Okay.  Denise Fulghum, is she
21 still working?
22    A.    I guess.  I don't know.
23    Q.    Do you have any involvement

Page 260

1 with any of these people I just named
2 outside of work except Mattie Ogletree?
3    A.    No, no more than working with
4 them.
5    Q.    If you won your case, what
6 would you want the Court to do for you?
7    A.    My home, I need my home, I
8 need a place to live.  With my insurance.
9    Q.    What kind of insurance, health
10 insurance?
11    A.    Health.
12    Q.    Have you got insurance where
13 you work now?
14    A.    Life insurance.  I don't have
15 any life, no more than my job.  Maybe just
16 get my life back together.
17    Q.    Now, is Ms. Muhammad
18 representing you on a contingency basis?
19    A.    Yes.
20    Q.    Have you incurred any expenses
21 to date in this lawsuit?
22    A.    I don't think so.
23    Q.    I mean, have you had to pay

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 261 to 264)

Page 261

1  for anything yet?
2      A.   No.  No.
3      Q.   Have you taken any statements
4  from any witnesses?
5      A.   No.
6           (Whereupon, Defendant's
7           Exhibit 63 was marked
8           for identification.)
9      Q.   Now, Ms. Gibson, Exhibit 63
10  shows right up there at the top that you
11  made eight thousand two hundred and five
12  dollars and one cent from March through
13  August 2006 working at AIC.  Does that
14  seem correct to you?
15      A.   Yes.
16           (Whereupon, Defendant's
17           Exhibit 64 was marked
18           for identification.)
19      Q.   Exhibit 64 shows when you
20  worked at AIC through First Choice?
21      A.   Yes.
22      Q.   So these are your First Choice
23  earnings, and you'll see in that first

Page 262

1  column total gross pay, three thousand
2  nine hundred and eleven dollars and
3  seventy-six cents.  Does that seem correct
4  to you?
5      A.   Yes.
6           (Whereupon, Defendant's
7           Exhibit 65 was marked
8           for identification.)
9      Q.   Do you have in front of you
10  Exhibit 65?
11      A.   Yes.
12      Q.   All right.  Do you see up in
13  the upper right-hand corner it shows that
14  your annual earnings at Troup County Board
15  of Education were seventeen thousand
16  sixty-eight dollars and eighty cents?
17      A.   Yes.
18      Q.   And this says that you got
19  your health insurance, group dental,
20  dependent life and LTD at a total cost of
21  two twenty-six twenty per month.  Does
22  that seem right?
23      A.   Yes.

Page 263

1      Q.   And if you would look over on
2  the page marked 725, it's actually up at
3  the top instead of at the bottom, it's the
4  second page down, showing that you were
5  making eight eighty-nine an hour, expected
6  to work eight hours a day, two hundred and
7  forty days a year for twelve months?
8      A.   Yes.
9      Q.   And your date of hire as a
10  permanent employee is shown 11/17/06; is
11  that right?
12      A.   Yes.
13      Q.   So, as a temporary, you earned
14  seven dollars and fourteen cents an hour?
15      A.   Yes.
16      Q.   Now, you haven't been treated
17  for any mental anguish or emotional
18  distress, have you?
19      A.   No.  Okay.
20           (Whereupon, Defendant's
21           Exhibit 66 was marked
22           for identification.)
23      Q.   And you don't have any

Page 264

1  physical limitations or mental
2  limitations, do you?
3      A.   No.
4      Q.   Now, have you got Exhibit 66
5  in front of you?
6      A.   Yes.
7      Q.   And this is a document that
8  you filled out at First Choice?
9      A.   Yes.
10      Q.   Is that your signature on the
11  document by 1/4/06?
12      A.   Yes.
13      Q.   And this shows that you could
14  perform a variety of physical tasks and
15  you don't have any limitation on your
16  ability to perform physical or mental
17  duties?
18      A.   No, I don't.
19      Q.   Is that what it shows?
20      A.   Yes, that's what it shows.
21      Q.   All right.  Is that still true
22  today?
23      A.   Yes.

66

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 265 to 268)

| Page 265 |
|---|

1  Q.   Do you have any documents that
2  you know of that haven't been given to me?
3  A.   No.
4  Q.   Now, at Troup County, who is
5  your supervisor?
6  A.   Let's see.  Let me think.  Pat
7  Hill is my supervisor and Regina Bass.
8  Q.   Bass, B-a-s-s?
9  A.   Yes.
10  Q.   Where does Pat Hill work?
11  A.   She works for Troup County
12  custodial -- she work in the main
13  building.  It's on -- let me see.  Davis
14  Road.
15  Q.   In Newnan?
16  A.   In Le Grange.
17  Q.   In Le Grange.  And it's what
18  road?
19  A.   Davis.
20  Q.   Do you work at a school?
21  A.   Yes.
22  Q.   And who is the principal?
23  A.   Ms. Johnson.

| Page 266 |
|---|

1  Q.   And who is Regina Bass?
2  A.   Supervisor over with the
3  school, she work with -- she's a
4  custodian, but she supervised, she the
5  lead, they call her lead custodian.
6  Q.   And she works at the same
7  school where you work?
8  A.   Yes.
9  Q.   What school do you work?
10  A.   Franklin Forest Elementary.
11  Q.   All right.  And that's where
12  Ms. Johnson is?
13  A.   Yes.
14  Q.   Now, do you actually report to
15  Ms. Johnson or Ms. Hill?
16  A.   Well, I have to report to,
17  really to all three of them, say if I'm,
18  if I have to be off or something, for some
19  reason, I have to report to all of them,
20  Pat Hill, Ms. Johnson, and Regina Bass.
21  Q.   Okay.  Now, other than the
22  other companies that we have been talking
23  about like AIC, First Choice, Troup

| Page 267 |
|---|

1  County, have you made any other efforts to
2  find a job?
3  A.   I had tried but they wasn't
4  calling me back, so I took the first
5  opening of a job.
6  Q.   And since you got a job at
7  Troup County, have you continued to look
8  or --
9  A.   No.  I just, I just like my
10  work.
11  Q.   Are you going to be there
12  until you retire?
13  A.   Yes.
14  Q.   All right.  You are aware,
15  aren't you, that the Court has said you
16  and your lawyer owe WestPoint two thousand
17  five hundred dollars?
18  A.   Yes, I'm aware of it.
19  Q.   What efforts are you making to
20  pay that debt?
21  A.   I couldn't pay anything.  I
22  don't have anything.  I don't have any
23  money.  I don't even have a home to live

| Page 268 |
|---|

1  in.
2  MR. SUGGS:  All right.  I
3  appreciate your patience.
4  Answer any questions that your
5  lawyer wants to ask you.
6  MS. MUHAMMAD:  I do have a few
7  questions just for clarification purposes.
8
9  EXAMINATION BY MS. MUHAMMAD:
10  Q.   Mr. Suggs asked you some
11  questions regarding some of the witnesses
12  that you had mentioned would testify or
13  could possibly testify in this case.  I'm
14  going to go down the list and ask you if
15  any of these persons can testify as to
16  your performance.
17  A.   Okay.
18  Q.   On the job at WestPoint when
19  you worked there.  Lela Mae Dennis?
20  A.   Well, she can probably verify,
21  that's if the job was running sufficient
22  yarn, I mean, good, you have to run good
23  in order to for us to make this

67

Page 269

1   efficiency.
2        Q.   All right.  But she can speak
3   to your performance on the job?
4        MR. SUGGS:  Objection,
5   leading.
6        Q.   That's my question, each of
7   these persons, can they speak to your
8   performance on the job?
9        MR. SUGGS:  Objection,
10  leading.
11       A.   No.
12       Q.   Did you work with Ms. Lela Mae
13  Dennis?
14       A.   Yes.
15       Q.   Okay.  Did she ever see you
16  performing any jobs?
17       A.   Yes.
18       Q.   Okay.  But she couldn't say
19  anything about how you performed them?
20       A.   No.
21       Q.   How about Carrie Little
22  McLemore?
23       A.   No.  She was a winder operator

Page 270

1   on a different machine but she worked on
2   the back of the warpers, couldn't, you
3   know, see how the performance was.
4        Q.   And you said Dennis, I mean
5   Denise --
6        A.   Fulghum.
7        Q.   -- Fulghum.  Was she a warper
8   also?
9        A.   Warper operator also.
10       Q.   Could she speak to your
11  performance on the job?
12       A.   Well, I don't know, but we did
13  work, run them together with the job
14  performance, with the -- they said they
15  was on computer like showing how your job
16  performance is, how it worked, but the
17  only thing they didn't have was show when
18  ends are out, something like that, but --
19       Q.   What about Mattie Gibson, did
20  you work with her?
21       A.   Well, I worked with her.  She
22  was a creeler and she also used to help
23  running the front whenever I would take a

Page 271

1   break.
2        Q.   Could she testify about your
3   performance on the job?
4        A.   Well, I don't know.  Then
5   again she might.  Now, she creels, she was
6   creeler, warpers, and was also trying to
7   help run them whenever I would, you know,
8   go on break.
9        Q.   Could Mr. Troy Leveridge speak
10  to your performance on the job?
11       A.   Yes, he could speak.
12       Q.   Mr. James King?
13       A.   King, he could speak.
14       Q.   Mr. Terrell Goldston?
15       A.   Terrell Goldston.
16       Q.   Terrell Goldston?
17       A.   All of them, you know,
18  breakdown fixers.  I can't just say that
19  they could say how good of a worker I --
20  they could say I was there every day.
21  They couldn't say how many beams I run
22  that day.  But they know I was there and
23  know I worked.

Page 272

1        Q.   What about Reverend Frazier?
2        A.   Yes, he was the same, he was a
3   breakdown fixer also.  He used to doff the
4   beams whenever it was time for them to
5   doff.  I believe he could speak for that.
6   James King, Troy Leveridge.
7        Q.   Okay.  Dorothy Finley?
8        A.   No, she couldn't, she
9   couldn't.
10       Q.   Linda Acres?
11       A.   No, she was a cord operator.
12  She wasn't drawing.
13       Q.   Cora Carr?
14       A.   No, she wasn't a -- she didn't
15  work for WestPoint Stevens.
16       Q.   But these are people that you
17  have talked to about your --
18       A.   Job.
19       Q.   -- job situation?
20       A.   Yes.
21       Q.   Mr. Suggs asked you if you
22  were successful in this lawsuit what would
23  you want the Court would have WestPoint to

68

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 273 to 276)

Page 273

1  do for you in this lawsuit. In your
2  amended disclosures to the defendants in
3  this case, did you not indicate some
4  specific things that you wanted?
5      A.   Talking about my home, I would
6  like to have my home back, a place to live
7  and maybe I could get my life back
8  together.
9      Q.   Do you have your copy of the
10 plaintiff's amended initial disclosures
11 with you?
12     A.   Me?
13     Q.   Yes, in those documents that
14 you have.
15     A.   This is -- I don't know.
16     Q.   If not, I can show you a copy
17 that I have here.
18     A.   Okay.
19     Q.   I think you have it, but just
20 for the sake of time, if you will take a
21 look at that document. Does that document
22 help you to refresh your memory as to what
23 you had submitted to the defendants

Page 274

1  regarding your disclosures to them and
2  what you were seeking to have the
3  defendants pay to you or give to you if
4  you were successful in this case?
5      A.   Now, the amount --
6      Q.   Wait. If you were successful
7  in this case, does that document tell the
8  defendants what you want to have done,
9  have happen?
10     A.   Yes.
11     Q.   Okay. Can you tell us what
12 those things are? Do you say anything
13 about your back pay?
14     A.   Oh, back pay based upon my
15 earnings?
16     Q.   What were you earning?
17     A.   At the time of ten fifty-eight
18 per hour.
19     Q.   Okay.
20     A.   My claim would have been
21 forty-four thousand plus interest of
22 twelve percent.
23     Q.   Okay. Was there any other

Page 275

1  amount that you would claim against the
2  defendants?
3      A.   Compensatory damage,
4  liquidated damage, plaintiff claims of
5  eighty-eight thousand dollars. Salary and
6  benefit and other necessary means -- I
7  can't pronounce it.
8      Q.   Noneconomic?
9      A.   Okay. Noneconomic loss plus
10 interest of twelve percent.
11     Q.   Did you ask for any punitive
12 damages?
13     A.   Punitive damage, plaintiff
14 claim five hundred thousand.
15     Q.   Is that five hundred thousand
16 or five million?
17     A.   Five million.
18     Q.   Dollars?
19     A.   Yes. Punitive damage.
20     Q.   For punitive damage?
21     A.   For damage. I can't pronounce
22 it.
23     Q.   And just a few more questions

Page 276

1  I want to ask you to clarify. When Mr.
2  Suggs showed you Exhibit Number 52, I
3  believe that's the employer notice of
4  determination that you received that
5  showed that Mr. Wilbanks -- let me just
6  flip through those -- had written a letter
7  or made some notation there, and I believe
8  you testified about this exhibit saying
9  that this was sent and came from WestPoint
10 Stevens. You testified that Mr.
11 Wilbanks -- strike that, please.
12         You were asked the question --
13 I'm sorry, I had it. You were asked the
14 question about Mr. Wilbanks not having
15 anything to do with your termination and
16 you said no, he didn't. Had you had a
17 conversation with him about whether or not
18 he was involved?
19     A.   No, I haven't.
20     Q.   Had you read anything, sworn
21 statement that had been signed by him that
22 said he had nothing to do with your
23 termination?

Page 277

1    A.   No, I don't know.
2    Q.   Okay.  Do you have any proof
3  at all that Mr. Wilbanks had nothing to do
4  with your termination?
5    A.   No, I don't.
6    Q.   Exhibit Number 50 was shown to
7  you as your separation notice, I believe
8  it was called your separation notice.  Had
9  you seen this document before, and
10  particularly on that date, August 26th,
11  2005?
12    A.   No.
13    Q.   And so, when Mr. Suggs
14  referred to that as your notice, that was
15  not a notice that you had received --
16    A.   No, I did --
17    Q.   -- at that time?
18    A.   I didn't receive this.  This
19  is the first time seeing it, the
20  separation notice.
21    Q.   Okay.  And he had asked you --
22    A.   I didn't receive one.
23    Q.   So, this was your first time

Page 278

1  seeing this notice?
2    A.   Seeing that, yes.
3    Q.   I believe you testified that
4  you were told that you were being
5  terminated because of poor quality --
6    A.   Quality.
7    Q.   -- on the job?
8    A.   Yes.
9    Q.   And I believe you testified
10  that you disagreed with that because the
11  quality had, the poor quality had to start
12  before it got to you?
13    A.   That's right.
14    Q.   What did you mean by that?
15    A.   I mean started like in the
16  cord room, from the cord through drawing,
17  if the drawing run bad, it got to run bad
18  in the spinning.  Once it get to me on the
19  warper, on the creel, it got to also run
20  bad, but they never could get no good
21  quality yarn.
22    Q.   So, would it be fair to say
23  that if the job before you, those areas of

Page 279

1  the assembly before you started bad, that
2  it would end bad?
3    A.   Yes.
4        MR. SUGGS:  Objection,
5  leading.
6    Q.   At the point where you were,
7  was that the end of the line, or did it go
8  to another location after you?
9    A.   Well, that was the end of the
10  line.  And once it go on to sloshing, and
11  once I run, it wasn't nothing else could
12  be done about it.  I just, we just have to
13  sort of work with it on the warpings.
14  Once we worked with it on the warpers, if
15  we couldn't get it to run good, it wasn't
16  going to run good at all on the sloshing.
17    Q.   Did you know your beams by
18  numbers?
19    A.   Yes, we had it wrote down on a
20  sheet saying that that was your beam.
21  Whenever you write up a ticket, you have
22  got to put your beam and your number down
23  on your slip that you write it up on.

Page 280

1    Q.   How many beams did you
2  operate?
3    A.   Well, with beams, I normally
4  doff about maybe three, four, sometimes
5  five.  It all depends on how good the yarn
6  runs.  And with the middle frame, we
7  always produced more beams on that job
8  than any other because it was -- it run a
9  little better.  And it all depend on what
10  style they were running or what material
11  they are running.
12    Q.   Was there ever a time that you
13  operated the beams and there were problems
14  with the frame?
15    A.   Yes.  A lot of mornings I come
16  in either the job is already down, need
17  work did, we don't know what the
18  conditions are, why the job wouldn't run.
19  Sometimes it could be the frame, sometimes
20  it could be the front end of the job.
21  Sometimes it could be the tension on the
22  frame.
23    Q.   And in those instances, were

70

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 281 to 284)

Page 281

1  those times that you had problems with the
2  beams or with the frames or with the
3  tension, were those times when you would
4  more than likely have low production?
5      A.   Yes.  And sometimes what make
6  a beam bad, if it's on the sides is the
7  beam is bad itself, it need -- maybe it
8  have a little catches in where it be done
9  cut a lot of yarn off and they would maybe
10  scratch the beam, make them ends snag,
11  break.
12      Q.   Was that something that you
13  could have prevented as a warper operator?
14      A.   No, I couldn't prevent it.
15      Q.   In your opinion, what would
16  have remedied that kind of problem?
17      A.   Maybe they could fix the,
18  maybe they could take the beams and have
19  them fixed, maybe bring them and set them
20  back, get all of the rough edges off and
21  the rakes, maybe if they had of bought the
22  rakes instead of trying to homemade make
23  the rakes with some, maybe that would have

Page 282

1  been better.  Maybe that would have helped
2  not had a high and low sides.
3      Q.   I believe you testified
4  earlier that when you went to -- and all
5  of this was happening on the Lanier side,
6  as you call it, the Lanier mill side?
7      A.   Yes.  With the rakes slipping,
8  that mean if the fixer put the rake on and
9  if he didn't clamp it, whatever way they
10  had to hook it on to make it hold, if that
11  come a loose during that process of
12  running that beam, that going to throw
13  that rake to slide over and you will have
14  a high side and a low side on your beams.
15  But, see, we couldn't control that.
16      Q.   Did you ever complain to
17  anyone about those type problems?
18      A.   Yes, we always would tell Bill
19  Anderson or Billy Joe Stewart, but going
20  through that conversation, they probably,
21  if they didn't write it down, they would
22  probably forget it.
23      Q.   When you went to the Carter

Page 283

1  mill side, did you have those type
2  problems?
3      A.   No, all of their beams were
4  practically up-to-date because they
5  took -- see, when they took our old, and
6  they said old frames out, which they were
7  a little more modern than the ones we
8  received --
9      Q.   Now, when you say they took
10  them out, where were they taking them out
11  to?
12      A.   They were taking them out to
13  take them to Carter mill.
14      Q.   Okay.  So the Lanier mill shut
15  down?
16      A.   Yes.
17      Q.   And they took those frames out
18  of there?
19      A.   Out of there and took them --
20      Q.   And they took them where?
21      A.   To Carter side.
22      Q.   Okay.  So, did you -- you
23  finally, I mean, did you get -- before you

Page 284

1  went back to the Lanier mill side, did you
2  get new frames?
3      A.   No.  The frames that we
4  received is out of another plant, I don't
5  know whether it was up here or -- but
6  Opelika or Le Grange or some place that we
7  received frames that, well, they wasn't --
8  they was outdated?  They wasn't -- you
9  couldn't even find parts to fix the frame.
10      Q.   So --
11      A.   But they told us they was
12  better jobs, that's what we was told.
13      Q.   But, with your experience as
14  having worked as a warper operator for the
15  number of years that you did before going
16  to the Carter side, when you came back to
17  the Lanier side, were those frames of a
18  quality that would have produced the level
19  of production that the company wanted?
20      A.   No.  No.  They stayed down too
21  regular.
22      Q.   When you were on the Carter
23  side, what type of textiles did you assist

71

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 285 to 288)

Page 285

1    in making as a warper operator?
2        A.    We were running towel.
3        Q.    So you were running towels on
4    the Carter mill side, and when you came
5    back to the Lanier mill side you were
6    running towels?
7        A.    Yes.
8        Q.    During the six months that you
9    were on the Carter mill side, how many
10   times were you written up as you recall it
11   or you received --
12       A.    Only notice.
13       Q.    -- notices?
14       A.    Only notices I received --
15       Q.    Personnel notice?
16       A.    -- notice from what's the
17   guy's name, Clifford.  He talked to all of
18   the operators at the same time in his
19   office, but I didn't receive a notice.
20   That was my first notice of first seeing a
21   notice was today, but he talked to all of
22   us, all of the operators in his office.
23       Q.    As a collective body of

Page 286

1    persons working?
2        A.    Yes.
3        Q.    You all -- and that was
4    Clifford McCants?
5        A.    Yes.
6        Q.    Now, do you know why he would
7    have signed a personnel notice when you
8    went back to the Lanier side?
9        A.    No.
10       Q.    And you had not seen that
11   notice before today?
12       A.    No.
13       Q.    You have been presented
14   several personnel notices that you did not
15   sign?
16       A.    Yes.
17           MR. SUGGS:  Objection,
18   leading.
19       Q.    Is it your --
20           MS. MUHAMMAD:  I mean, it's in
21   the record, and you acknowledged them
22   yourself that she did not sign them.
23           MR. SUGGS:  It's still

Page 287

1    leading.
2            MS. MUHAMMAD:  That she had
3    not signed.
4        Q.    But is it your testimony that
5    you, on those that were not signed by you,
6    did you see them before today?
7        A.    Yes, I have seen some.
8        Q.    Some of them?
9        A.    But I haven't seen them all.
10   Because some of them, as I said, was new,
11   like the last one that I received, I
12   didn't never see that notice.  That was a
13   written notice after they separated me.
14       Q.    Okay.  So the separation
15   notice, you never saw before?
16       A.    No.  I didn't have no idea I
17   was -- they was writing me up.  Which I
18   never seen the notice, the write-up, they
19   just -- write-ups, they be done already
20   did that before they called you to the
21   office.  You see, they be done written up
22   what they want to write up about you.  And
23   then they will explain everything to you

Page 288

1    saying what mistake you made and all.
2        Q.    There was an exhibit,
3    Exhibit 43, that was signed by Mr. Jack
4    Black?
5        A.    Jeff Black.
6        Q.    Jeff Black.  Okay.  Jeff.  I
7    believe you testified that you didn't know
8    about that document?
9            MR. SUGGS:  Objection,
10   leading.
11       A.    No, I don't.
12       Q.    And on Exhibit 41, you
13   testified about the creelers?
14       A.    Creelers.
15       Q.    Creelers having some -- that's
16   47.  Let me turn these around so I can
17   read the numbers.  If you will take a look
18   at that with me.  I believe you testified
19   that that was your second warning that you
20   had received?
21       A.    They never would say how many
22   write-ups that I had.
23       Q.    But on the document itself,

72

Tyler Eaton Morgan Nichols & Pritchett, Inc.

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 289 to 292)

Page 289

1 does it show that second is checked
2 somewhere on there?
3     A.   Let me see.
4     Q.    Just take a look at the top
5 part of the document and see if there's
6 a -- does it show that it's the second
7 one?
8     A.    On 10, where I had --
9     Q.    Okay.  At the very top here it
10 reads this is the first, second, third.
11 And it looks like one of them is checked.
12     A.   Yes.  Second shift.
13     Q.   Is that shift or --
14     A.   Yes, second shift.
15     Q.    -- warning?
16            MR. SUGGS:  No, it's not
17 shift.
18     A.    Warning?
19     Q.    Read that little caption
20 there.
21     A.    Okay.  First, second.  This is
22 the first -- this is the second one,
23 warning.

Page 290

1     Q.    Within?
2     A.    Within twelve months of the
3 date.
4     Q.    Now, does it show a date on
5 there that it says within?
6     A.    10/15/04.
7     Q.    All right.  You testified
8 about the creelers having some
9 responsibility and the running short of
10 the three section beams.  Do you recall?
11     A.    Let's see right here, on this
12 where it says three sections from that
13 was -- the lead short of what the ends or
14 C0 two hundred style.  Now, the two
15 hundred, CO, I ain't never run a CO of two
16 hundred.
17     Q.    So who would have -- and I --
18     A.    Okay.  Now, the way they had
19 our frame, we run so many one style, it
20 wasn't like they was switching different
21 styles on you, well, because you are going
22 to get confused when they get to doing
23 that.  So like they'll run, say a CO, we

Page 291

1 would use a ticket the color of this, and
2 they didn't change it.  If that's what
3 they put you on, CO, that's what you run.
4 And then they come back with this angel,
5 they have an angel cotton, call it angel,
6 they will put that on one machine.
7     Q.    Okay.  On this particular
8 warning report that you received, it shows
9 that on October the 9th of 2004, you ran
10 three section beams?
11     A.    And all of them was supposed
12 to have been short of ends.
13     Q.    That was --
14     A.    But I don't understand it.
15 And it was three thirty-three.
16     Q.    And not the two hundred?
17     A.    It wasn't the two hundred.  I
18 don't know where the two hundred come
19 about unless they are speaking that I was
20 supposed to have been -- they have got
21 four hundred here ends, and then they have
22 got them saying that I was supposed to
23 have been a four hundred and I was

Page 292

1 supposed to have been running a three
2 ninety-four.  I don't understand it.  And
3 the ladies who creeled that frame in, that
4 throw I got to go and put them packages up
5 from the outside of that frame, not the
6 inside.
7     Q.    So, if you say that this --
8 the problem started with the creelers?
9     A.    Creelers.
10     Q.    Then when it gets to you --
11     A.    I'm responsible for whatever.
12     Q.    -- the problem already existed
13 before it got to you?
14     A.    That's right.  That's right.
15     Q.    And you didn't sign this
16 particular --
17     A.    No.
18     Q.    -- warning, did you?
19     A.    No.
20     Q.    On Exhibit 30, Mr. Suggs
21 showed you a notice that was signed by Mr.
22 Tilley that reminded you that you were not
23 to wear head phones.  Was there a

73

Tyler Eaton Morgan Nichols & Pritchett, Inc.

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 293 to 296)

Page 293

1  requirement that you couldn't wear head
2  phones when you were in the smoker?
3      A.   Well, they always said on
4  safety -- well, really, they didn't want
5  us to wear them.
6      Q.   If you were on the line or on
7  the smoker or in the smoker?
8      A.   In the smoker -- well, I don't
9  guess they wanted you to wear them even
10 inside the plant period.
11     Q.   Was that a written policy?
12     A.   No.  I never seen nothing in
13 writing.
14     Q.   On Exhibit Number 31, this is
15 another personnel notice that Mr.
16 Sorrell --
17     A.   Lyn Sorrell.
18     Q.   -- recommended and signed.  In
19 July 1996, were you working sheets or
20 towels at that time?
21     A.   At that time, we were making
22 sheeting.
23     Q.   Okay.  So you didn't work on

Page 294

1  towels the entire time that you were
2  working as a warper operator?
3      A.   No.  And that was on Lanier
4  side.  Lyn Sorrell was, I think, was a
5  supervisor on third shift, I believe.
6      Q.   Okay.  How long did you work
7  at WestPoint doing sheets?
8      A.   About twenty, twenty-five --
9  no, about twenty years.
10     Q.   Your total time at WestPoint
11 was about thirty years?
12     A.   Yes.
13     Q.   So, for about ten years, you
14 would have worked towels?
15     A.   No.  I was a spooler operator,
16 that's when I first went down, spooler.
17     Q.   So, how much time would you
18 have worked in towels?
19     A.   Towels, I only worked in
20 towels for about three years, I guess.
21 Not quite three years.  About two.
22     Q.   During the time that you
23 worked at WestPoint Stevens and WestPoint

Page 295

1  Homes, did you receive any commendations
2  for your work performance?
3      A.   Yes, I used to, but after the
4  shift changed, after they changed
5  supervision like personnel, supervisors,
6  shift change to like they mostly went to
7  Lanier or Carter mill.  After that, I
8  didn't receive no more recommendations or
9  how good your job went after that.
10     Q.   Do you know a person by the
11 name of McGill?
12     A.   Yes.
13     Q.   What was his position with --
14     A.   Plant manager.
15     Q.   -- WestPoint?  Did you ever
16 receive any commendations from him?
17     A.   Yes, we received a letter from
18 him about how good your job performance
19 was through the mail.  And also my
20 twenty-five years of service of WestPoint
21 Lanier mill.
22          (Whereupon, Plaintiff's
23          Exhibit 67 was marked

Page 296

1          for identification.)
2          MR. SUGGS:  Can we be off the
3  record just for a minute?  Would that be
4  all right with you?
5          (Whereupon, a break was had
6          from 4:05 P.M. until 4:06 P.M.)
7      Q.   (BY MS. MUHAMMAD:)  I present
8  to you, Ms. Gibson, Plaintiff's Exhibit
9  67.
10     A.   Yes.
11     Q.   You had testified before we
12 took the break off the record that you had
13 received a commendation for your
14 twenty-five years of service?
15     A.   Yes.
16     Q.   Does that document represent
17 that commendation?
18     A.   Yes.
19     Q.   And when was it received?
20     A.   On the 15th day of August,
21 2000.  Signed on the 19th day of June,
22 2001.
23     Q.   So, as of August 15th, 2000,

74

Tyler Eaton Morgan Nichols & Pritchett, Inc.

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

Page 297

1  you had been employed at WestPoint Stevens
2  for twenty-five years?
3      A.  Yes.
4      Q.  And this award is called the
5  Quarter Century Club Award?
6      A.  Yes.
7      Q.  When Mr. Suggs asked you
8  regarding whether you had any information
9  that supports your claim for
10  discrimination and you, I believe,
11  testified that, yes, you felt you had been
12  discriminated against because of your age?
13      A.  Yes, age.
14      Q.  When you testified to that,
15  you didn't mention that you had discussed
16  this matter with anyone other than your
17  lawyer?
18      A.  Oh --
19      Q.  Have you discussed this matter
20  with anyone other than your lawyer?
21      A.  Yes, the EEOC.
22      Q.  And prior to discussing your
23  claim with the representative at EEOC, did

Page 298

1  you have any knowledge of what age
2  discrimination is?
3      A.  Well, they are basing it on
4  age discrimination.
5      Q.  Did you have any knowledge of
6  it?
7      A.  No, not at that time.
8      Q.  So you became aware of age
9  discrimination once you had a conference
10  with the EEOC?
11      A.  EEOC, yes.
12      Q.  And after having that
13  conference and becoming aware that you had
14  a claim that you could file for that, were
15  you able then to look back at your
16  experiences and those different write-ups
17  and the different things that you were
18  going through at WestPoint to --
19      A.  Oh, yes.
20      Q.  -- help you in any way
21  understand why you could say you had age
22  discrimination?
23      A.  Yes.

Page 299

1      Q.  Okay.  Prior to 1996, I don't
2  think there were any, in looking through
3  the exhibits, that there were any
4  personnel notices that you received --
5      A.  No.
6      Q.  -- alleging poor performance?
7      A.  No.  I was getting
8  recommendations, but --
9      Q.  Now, you are saying
10  recommendations or do you mean
11  commendations?
12      A.  Commendations.
13      Q.  About your performance?
14      A.  Performance, yes.
15      MR. SUGGS:  Now, tell me that
16  question again.
17      MS. MUHAMMAD:  Prior to 1996,
18  I believe that was the earliest one that I
19  saw, 1996.  There were --
20      MR. SUGGS:  Are you asking
21  about warnings or personnel notices?
22      MS. MUHAMMAD:  Warnings.  I
23  may have said personnel notices, but I

Page 300

1  meant warnings.
2      Q.  Had you received any --
3      MR. SUGGS:  Well, there was
4  one in 1993, another one in 1993, one in
5  1995, another one in 1995, another one in
6  1995.  So there are one, two, three, four,
7  five, before 1996.
8      MS. MUHAMMAD:  That you
9  submitted as exhibits here today?
10      MR. SUGGS:  Uh-huh.
11      MS. MUHAMMAD:  And you show
12  them as warnings, not as the personnel
13  notices?  I don't have notices.
14      For those notices that --
15  dating from 1993 forward to -- well, all
16  notices beyond ten years prior to Ms.
17  Gibson's separation, I make the motion to
18  strike those exhibits that were offered.
19  The objection is that they are too remote
20  in time to be considered.
21      Q.  (BY MS. MUHAMMAD:)  The person
22  that you had testified earlier about who
23  was trained on the job to receive your

Page 301

1  position once you were terminated, let me
2  make sure I have her name correct. Did
3  you say it's Shannon?
4      A.   Sharon.
5      Q.   Sharon?
6      A.   Jennings Heard, yeah.
7      Q.   Jennings. And do you know her
8  to be younger than you?
9      A.   Yes.
10     Q.   And she was hired after you
11 were separated from WestPoint?
12     A.   She was hired before I was
13 separated.
14     Q.   And when I say hired, I mean
15 she was hired into the job that you
16 formerly did after you were separated?
17     A.   I don't --
18     Q.   Do you know that?
19     A.   I don't know that.
20     Q.   But you do know that she's
21 working as a warper operator --
22     A.   Yes.
23     Q.   -- at WestPoint Stevens?

Page 302

1      A.   Yes.
2          MR. SUGGS: Object to the
3  form, leading.
4      Q.   Did you not testify that you
5  know that she works there?
6      A.   Yes.
7      Q.   Prior to that question?
8      A.   Yes.
9      Q.   In what year were you born?
10     A.   11/8/47.
11     Q.   1947. At the time of your
12 separation from WestPoint, were you --
13 what was your age?
14     A.   Fifty-eight.
15     Q.   Fifty-eight years old?
16     A.   Yes.
17     Q.   Mr. Suggs had asked you about
18 the applications you made for employment,
19 and on about three of them, I believe, you
20 showed that you were laid off at WestPoint
21 Stevens?
22     A.   Yes, I --
23     Q.   Okay. And when he asked you

Page 303

1  about that, I believe you testified that
2  you, on one occasion, at A1, you said you
3  gave that reason because you didn't --
4  you wanted to get the job?
5      A.   Get the job.
6          MR. SUGGS: Objection,
7  leading.
8      Q.   Was there any other position
9  that you put on the application as laid
10 off because you were afraid that you would
11 not get the job?
12     A.   No, the only word I used was
13 laid off. They was -- they never would
14 ask, when I just turned my application in,
15 I didn't have an interview, but no one but
16 A1 --
17     Q.   Asked you about why you didn't
18 put --
19     A.   Why didn't I sign my reason
20 for leaving WestPoint Stevens. So, she
21 asked me, I said well, I just put down,
22 told her about laid off and she wrote it
23 on the sheet but --

Page 304

1      Q.   Okay. And you testified, I
2  believe earlier, that you gave a reason
3  why you did that?
4      A.   Oh, my reasons was I was
5  afraid if I put I was separated or fired
6  that I wouldn't get a job.
7      Q.   And you made that on the --
8  was that your thinking at the time you
9  made the application for Troup County?
10     A.   Yes.
11     Q.   Okay.
12     A.   At that time.
13     Q.   And I believe he also showed
14 that you had it on your application to
15 AIC?
16     A.   Yes.
17     Q.   And that was your thinking
18 then also?
19     A.   Yes.
20     Q.   There were several exhibits
21 that Mr. Suggs showed you that had what I
22 believe you testified to be your signature
23 on them, Exhibit -- started with

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 305 to 308)

Page 305

1   Exhibit 14. And these exhibits had to do
2   with acknowledging either having read or
3   received a copy of some policies in the
4   handbook at WestPoint. I believe his
5   question asked you if that was the -- if
6   you acknowledged on your hand those
7   particular exhibits, and that one that you
8   are looking at is Exhibit 14. You
9   testified that that's your signature, but
10  is that your --
11        MR. SUGGS: Objection,
12  leading.
13      Q.   Is that your handwriting on
14  the line that shows the date?
15      A.   Yes.
16      Q.   You wrote that date on that
17  particular document?
18      A.   No, I didn't write the date on
19  it.
20      Q.   So, you signed the document is
21  what you are testifying to?
22      A.   Yes.
23      Q.   Okay. That is your signature?

Page 306

1       A.   Yes.
2       Q.   But the date on that document
3   is not your handwriting --
4       A.   No.
5       Q.   -- on the date? Okay. And
6   I'll have you take a look at Exhibit
7   Number -- well, let me ask you about this,
8   do you know who wrote that date on that
9   document, Exhibit 14?
10      A.   No, I don't.
11      Q.   Now, on Exhibit 15, is that
12  your signature on that document?
13      A.   Yes.
14      Q.   Did you write that date on
15  that particular document?
16      A.   Yes, I think I did.
17      Q.   You recognize that to be your
18  handwriting?
19      A.   Yes.
20      Q.   On Exhibit 16?
21      A.   Yes.
22      Q.   Do you recognize that to be
23  your signature and your handwriting on the

Page 307

1   date?
2       A.   Yes.
3       Q.   On Exhibit 17, do you
4   recognize that to be your handwriting on
5   the date on that document?
6       A.   Yes.
7       Q.   And on Exhibit 18, do you
8   recognize that to be your handwriting?
9       A.   Yes.
10      Q.   On both the signature and the
11  date?
12      A.   Yes.
13        MS. MUHAMMAD: On the questions
14  during the deposition regarding the arrest
15  of Ms. Gibson, I move to strike all of
16  that testimony from the record.
17      A.   Okay.
18        MS. MUHAMMAD: I have nothing
19  further.
20        MR. SUGGS: Are you going to
21  read and sign?
22        MS. MUHAMMAD: I think we
23  probably should.

Page 308

1         MR. SUGGS: Fine with me. I
2   have nothing further.
3         MS. MUHAMMAD: I have
4   something further.
5       Q.   (BY MS. MUHAMMAD:) Do you
6   know a Carolyn Johnson?
7       A.   Yes.
8       Q.   Do you know her age?
9       A.   No.
10      Q.   Do you know her to be younger
11  than you are?
12      A.   No, I don't.
13      Q.   Was she employed as a warper
14  operator at WestPoint Stevens?
15      A.   Yes.
16      Q.   Do you know a Jimmy Waites?
17      A.   Yes.
18      Q.   Was he employed at WestPoint
19  Stevens when you were employed there?
20      A.   Yes.
21      Q.   In what position?
22      A.   He was supervisor.
23      Q.   Did he serve as your

77

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 309 to 312)

| Page 309 | Page 311 |
|---|---|
| 1 supervisor? | 1 that? |
| 2    A.   Whenever I worked over, worked | 2    A.   Bill Anderson. |
| 3 his shift, I worked under him. | 3    Q.   Were you, in fact, the oldest |
| 4    Q.   Would he be able to testify as | 4 and highest paid warper operator at |
| 5 to your performance? | 5 WestPoint Stevens before your separation? |
| 6    A.   Yes, if I were to contact him, | 6    A.   Well, I wasn't the oldest, I |
| 7 but I don't know where he live. | 7 mean, I had been there the longest warper |
| 8    Q.   Did anyone ever make a comment | 8 operator. With pay, the same. The only |
| 9 to you about they are getting rid of all | 9 time you make more money, when you work |
| 10 of the old employees? | 10 over. |
| 11    A.   Yes. | 11    Q.   Were you ever asked to work |
| 12    MR. SUGGS: Object to the | 12 over? |
| 13 form, vague. | 13    A.   Yes. |
| 14    Q.   At a time when you were still | 14    Q.   Did you ever work over? |
| 15 employed at WestPoint Stevens -- | 15    A.   Yes. |
| 16    A.   Yes. | 16    Q.   Did you ever refuse to work |
| 17    Q.   -- did you ever hear anyone | 17 over? |
| 18 make that -- | 18    A.   No. |
| 19    A.   Yes. | 19    Q.   Any time you were asked to |
| 20    Q.   Was that prior to 2005? | 20 work over, you would work over? |
| 21    MR. SUGGS: Objection, | 21    A.   Yes. |
| 22 leading. | 22    Q.   How often would you work |
| 23    Q.   Do you know the period of time | 23 overtime, Ms. Gibson? |

| Page 310 | Page 312 |
|---|---|
| 1 that it was that it happened? | 1    A.   Well, mostly if anyone is out, |
| 2    A.   Yes. | 2 they couldn't get nobody else to work, |
| 3    Q.   When? | 3 they would ask me if it's sweeping, |
| 4    A.   In 2005, 2004, when other | 4 hauling, drawing. |
| 5 plants was closed, they were getting ready | 5    Q.   So you worked other than as a |
| 6 to close a plant, and in order to bring in | 6 warper operator when you would work over? |
| 7 new people or temp services, they would | 7    A.   Warper operator, yes. |
| 8 start wanting to write you up and stuff | 8 Winding. |
| 9 like that. | 9    Q.   Did you ever have any |
| 10    Q.   Did you ever hear anyone say | 10 complaints about your work when you worked |
| 11 if Sharon Jennings messes up, it will be | 11 overtime? |
| 12 your fault because you are the oldest and | 12    A.   No. Once I think it was Lyn |
| 13 highest paid warper operator? | 13 Sorrell, second shift. |
| 14    MR. SUGGS: Objection, | 14    Q.   But other than that one time |
| 15 leading. | 15 during the entire thirty years you were |
| 16    Q.   Have you ever heard that term? | 16 there? |
| 17    A.   I heard the term, but not from | 17    A.   No. Not with -- if doing |
| 18 Sharon Jennings. It was from Shannon | 18 extra, working on the side. The only |
| 19 Johnson. | 19 complaints I ever had is working on the |
| 20    Q.   You heard that about Shannon | 20 warper. And the other job performance or |
| 21 Johnson? | 21 the other jobs, it was all right. |
| 22    A.   Shannon Johnson, yes. | 22    Q.   Did you know your job as a |
| 23    Q.   Okay. Who did you hear say | 23 warper? |

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                  http://www.TylerEaton.com

PATRICIA J. GIBSON
WESTPOINT STEVENS, INC., ET AL.

PATRICIA J. GIBSON
July 12, 2007

(Pages 313 to 315)

Page 313

1    A.  Operator, yes.
2    Q.  Or as warper operator?
3    A.  Yes.
4    Q.  Would you consider that you
5 were -- you could be an expert in that
6 position?
7         MR. SUGGS:  Objection,
8 irrelevant.
9    Q.  You can answer.
10    A.  Yes.
11        MS. MUHAMMAD:  I have nothing
12 further.
13        MR. SUGGS:  Nothing.
14
15    FURTHER THE DEPONENT SAITH NOT
16
17 (Deposition concluded at 4:26 P.M.)
18
19
20
21
22
23

Page 314

1    DEPONENT'S CERTIFICATE
2
3    I, PATRICIA J. GIBSON, the witness
4 herein, have read the transcript of my
5 testimony and the same is true and
6 correct, to the best of my knowledge.  Any
7 corrections and/or additions, if any, are
8 listed separately.
9
10
11
12    PATRICIA J. GIBSON
13
14
15    Sworn to and subscribed before me,
16 this the     day of         , 2007, to
17 certify which witness my hand and seal of
18 office.
19
20
21
22    NOTARY PUBLIC IN AND FOR
23    THE STATE OF ALABAMA

Page 315

1         C E R T I F I C A T E
2
3
4  STATE OF ALABAMA
5  JEFFERSON COUNTY
6
7      I hereby certify that the
8 above and foregoing deposition was taken
9 down by me in stenotypy, and the questions
10 and answers thereto were reduced to
11 typewriting under my supervision, and that
12 the foregoing represents a true and
13 correct transcript of the deposition given
14 by said witness upon said hearing.
15      I further certify that I am
16 neither of counsel nor of kin to the
17 parties to the action, nor am I in anywise
18 interested in the result of said cause.
19
20
21
22
23      COMMISSIONER-NOTARY PUBLIC

# Patricia Gibson
# Dxs. 1-3



**IMPORTANT NOTE:** If your response is not received by 08/09/06 a determination may be made based solely on information furnished by the claimant.

# NOTICE OF CLAIM AND REQUEST FOR SEPARATION INFORMATION

Return to:

AIC OPERATIONS INC
155 ALABAMA ST
AUBURN AL 36830

ADJUDICATION SUPPORT
ROOM 3438
649 MONROE STREET
MONTGOMERY, AL  36131
FAX NUMBER 334 353-1265

The individual identified below has filed a claim for Unemployment Compensation benefits.

1. CLAIMANT'S NAME:  GIBSON/PATRICIA J
2. SOCIAL SECURITY NO:
3. CLAIM DATE:  12/26/05
4. ACCT NUMBER:  0029864004

5. DATE MAILED:  08/01/06
6. EFFECTIVE DATE:  07/30/06
7. CALL-CENTER :  6001
8. TYPE OF CLAIM:  A-01

The claimant identified you as his/her last employer and alleges the reason for separation to be:
41    LACK OF WORK
LDW 07/28/06

## EMPLOYER RESPONSE (INSTRUCTIONS FOR COMPLETION ON REVERSE)

9. Claimant's last day employed was ___7-28-06___
(If temporary layoff, enter expected date of recall: _____

10. If the claimant earned wages or was paid vacation and/or sick pay or will receive a pension upon termination with you **on or after the date shown in item #6.** above, complete the applicable space(s) below:
   a. GROSS WAGES   for hours worked. **(AFTER DATE IN #6)**   $ ___.00___

   b. HOLIDAY  $ _____ paid for which holiday ? _____

   c. VAC, SICK $ _____  Was vacation pay for a specific time period following separation ? (circle one) Yes  No If Yes what was the period ? _____ to _____

   d. WARN PAY $ _____ paid for period _____ to _____

   e. PENSION $ _____ per month.  Effective date: _____

11. DISCHARGED. What was the date of the final incident that caused the discharge: _____

12. WARNING FOR SAME OR SIMILAR INCIDENT :(CIRCLE ONE)  YES  NO  WARNING DATE: _____

13  QUIT: Date quit: _____ Reason for quit _____

14. REASON FOR SEPARATION: (ATTACH ADDITIONAL SHEET IF NECESSARY)
_____
_____
_____

DEFENDANT'S EXHIBIT
P Gibson

15:  Enter your federal identification number: ___00 298 64 004___

_Jackie Cox_               _HR Mgr._          334 502-7542  8-2-06
Print Name                    Title            Telephone No.    Date

```
REPORT: PEP547
DISTRIBUTION: MOLLIE
FROM:  6/01/01  THRU:  6/07/27
SELECTION: 01
OPTIONS: 090538
```

AUBURN INVESTMENT CASTING ABSENCES REPORT

```
DATE 07/27/06
TIME 10/19/52          PAGE   1
```

7-27-06

| DEPARTMENT EMPLOYEE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| LOC 01 | | | | | | | | | |

| | SHIFT | START DATE | END DATE | SEQ | ABSENCE HOURS | DAYS | P Y | AUTHORIZED BY | ABSENCE CDE DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|
| 090538  GIBSON, PATRICIA | 3 | 060112 | | 01 | .02 | | | UST | UNEXCUSED SHORT TIME |
| | | 060331 | | 01 | .08 | | | UST | UNEXCUSED SHORT TIME |
| | | 060407 | | 01 | .03 | | | UST | UNEXCUSED SHORT TIME |
| | | 060417 | | 01 | 8.00 | 1 Y | | H | HOLIDAY |
| | | 060427 | | 01 | .03 | | | UST | UNEXCUSED SHORT TIME |
| | | 060529 | | 01 | 8.00 | 1 Y | | H | HOLIDAY |
| | | 060703 | | 01 | 8.00 | 1 Y | | H | HOLIDAY |
| | | 060704 | | 01 | 8.00 | 1 Y | | TLO | TEMPORARY LAYOFF |
| | | 060705 | | 01 | 24.00 | 3 | | H | HOLIDAY |
| | | 060710 | | 01 | 40.00 | 5 | | TLO | TEMPORARY LAYOFF |
| | | 060717 | 060724 | 01 | 40.00 | 5 | | TLO | TEMPORARY LAYOFF |

4457

WPH
000442

# AUBURN INVESTMENT CASTINGS

## EMPLOYEE STATUS FORM

Effective Date _____06/09/06_____    Hire Date _____03/09/2006_____    Adjusted Hire Date _____

*(Please check all that apply)*

☐ **New Hire**
  ☐ **Rehire** - Previous Termination Date:_____

☒ Hourly
☐ Salary Exempt
☐ Salary Non-Exempt

☐ **Trainee:** Update upon completion

☒ **Change** -._____
☐ **Transfer** - From: _____    To: _____
**Termination**
STATUS CODE  A  TERMINATION CODE _____
EXPLANATION_____ ~~Over~~ 3m4h5 _____

| | |
|---|---|
| FULL NAME    Patricia Gibson | DEPARTMENT    Foundry Utility II Wax Operator |
| ADDRESS | EMPLOYEE NO.    90538 |
| CITY | SOC. SEC. NO. |
| STATE/ZIP    AL.          COUNTY | BIRTHDATE |
| PHONE NO. | G/L ACCOUNT NO. |
| GENDER    Female | G/L COST CENTER |
| WORK STATE    AL | POSITION |

**(CODES LISTED ON REVERSE SIDE)**

EEOC JOB CATEGORY _____    ETHNIC GROUP _____    VETS-100 CODE _____    WORKERS COMP CODE _____

| | FROM | | TO | |
|---|---|---|---|---|
| SUPERVISOR: | | | | |
| DEPARTMENT: | | | | |
| SHIFT: | 3rd | | 3rd | |
| WORK SCHEDULE: | | | | |
| BONUS GROUP: | | | | |
| JOB TITLE & GRADE: | | | | |
| BASE PAY RATE: | 8.69 | Per Hour | 9.33 | Per Hour |
| SERVICE PAY: | | Per Hour | | Per Hour |
| OTHER PAY: Lead Pay | . | Per Hour | | Per Hour |
| SHIFT PREMIUM: | .25 | Per Hour | .25 | Per Hour |
| TOTAL HOURLY PAY RATE: | 8.94 | Per Hour | 9.58 | Per Hour |

## AUTHORIZATION FOR PAYMENT

VACATION PAY: _____ DAYS / HOURS = $_____
BONUS PAY:    $_____ TYPE_____
SEVERANCE PAY: _____ WEEKS = $_____
OTHER PAY:    $_____    EXPLAIN _____
COMMENTS: _____

| FOR NEW EMPLOYEES THIS FORM MUST BE ACCOMPANIED BY:<br>• FEDERAL W-4 FORM<br>• STATE W-4 FORM | |
|---|---|

APPROVED BY:    *Jackie Cox, HR Manager*    DATE    05/31/2006

*Revised: 8/30/04*

WPH
000449



**AUBURN INVESTMENT CASTINGS**

# EMPLOYEE STATUS FORM

Effective Date _03/08/06_    Hire Date _03/08/06_    Adjusted Hire Date _____

*(Please check all that apply)*

☑ **New Hire**
   ☐ **Rehire** - Previous Termination Date: _____

☐ **Change** - _____

☐ **Transfer** - From: _____    To: _____

**Termination**
STATUS CODE ____    TERMINATION CODE _____
EXPLANATION _____

☒ **Hourly**
☐ **Salary Exempt**
☐ **Salary Non-Exempt**

☐ **Trainee:** Update upon completion

---

FULL NAME _Patricia Gibson_
ADDRESS _403 Fairwood Drive_
CITY _Valley_
STATE/ZIP _Al. 36854_    COUNTY _____
PHONE NO. _____
GENDER _Female_
WORK STATE _AL_
**(CODES LISTED ON REVERSE SIDE)**

DEPARTMENT _Foundry Utility II Inspect._
EMPLOYEE NO. _90538_
SOC. SEC. NO. _____
BIRTHDATE _____
G/L ACCOUNT NO. _____
G/L COST CENTER _____
POSITION _____

EEOC JOB CATEGORY ____    ETHNIC GROUP ____    VETS-100 CODE ____    WORKERS COMP CODE ____

---

| | FROM | TO |
|---|---|---|
| SUPERVISOR: | _Steve Holley_ | _03/13/06_ |
| DEPARTMENT: | | _AO_ |
| SHIFT: | | |
| WORK SCHEDULE: | | |
| BONUS GROUP: | | _3rd Shift_ |
| JOB TITLE & GRADE: | | |
| BASE PAY RATE: | _8.69_ Per Hour | _8.69_ Per Hour |
| SERVICE PAY: | Per Hour | Per Hour |
| OTHER PAY: | Per Hour | Per Hour |
| SHIFT PREMIUM: | Per Hour | _25_ Per Hour |
| **TOTAL HOURLY PAY RATE:** | _8.69_ Per Hour | _8.94_ Per Hour |

---

**AUTHORIZATION FOR PAYMENT**

VACATION PAY: _____ DAYS / HOURS = $_____
BONUS PAY: $_____ TYPE _____
SEVERANCE PAY: _____ WEEKS = $_____
OTHER PAY: $_____ EXPLAIN _____
COMMENTS: _____
_____
_____

*Revised: 8/30/04*

# CONTRACT LABOR
## CONTACT INFORMATION & WORK HISTORY

### PERSONAL INFORMATION

Print Name  _Gibson_     _Patricia_     _Jones_          Date of Application  _1-4-06_
            Last          First          Middle

Address  _403  Fair Wood Dr._     _Valley_     _ALA;_  _36854_
         Number and Street                     City      State    Zip Code

Telephone  _334 - 756- 9275_                    Social Security # _____
           Area Code   Number

Are you a citizen or national of the U.S., or an alien lawfully admitted for          ☑ YES    ☐ NO
Permanent residence, or an alien authorized to work in the U.S.? (If hired,
You must present evidence of identity and employment eligibility.)

Are you at least 18 years of age?                                                     ☑ YES    ☐ NO

Have you ever worked a contract labor assignment                                      ☐ YES    ☑ NO
at Auburn Investment Castings?

Is there anything which would prevent you from reporting to work                      ☐ YES    ☑ NO
each day on time to perform your job duties?

Are you related to anyone that works here?                                            ☐ YES    ☑ NO

Have you been convicted of a felony?  Are there any felony charges                    ☐ YES    ☑ NO
pending against you?  A "yes" answer will not necessarily disqualify
you from consideration.

What days and hours are you available for work?  _Any Hours_

### EDUCATION AND TRAINING

Circle Highest Grade Completed in Each Category

| Grade School | High School | College/Tech School | Grad School |
|---|---|---|---|
| 1 2 3 4 5 6 7 8 | 1 2 (3) 4 | 1 2 3 4 | 1 2 3 4 |

| | NAME | LOCATION | COURSE/ DEGREE | GRADUATED (YES/NO) |
|---|---|---|---|---|
| High School | PS 271 Brooklyn NY | | | |
| College | | | | |
| Graduate | | | | |
| Business | | | | |
| Trade | | | | |
| Other | | | | |

Auburn Investment Castings   Rev. 8/27/04

## SPECIAL SKILLS

Do you have any other experience, training, qualifications or skills which you feel are related to the job for which you have applied? This includes, but is not limited to: Licenses, Foreign Languages, Machine or Instrument Operation, Computer Skills, etc.

_____

_____

_____

_____

## MILITARY SERVICE

Branch of Service: _____    From: _____    To: _____
                                                      Month / Year       Month / Year

Final Rank: _____    Military Occupation: _____

Service Schools or Special Experience: _____

## EMPLOYMENT EXPERIENCE

| COMPANY NAME | LENGTH OF EMPLOYMENT | | HOURLY RATE/SALARY | |
|---|---|---|---|---|
| *West Point Stevens* | FROM *1975* | | STARTING | |
| | MONTH  YEAR | | $ | PER |
| Address *P.O. Box # 248* | TO *8-26-05* | | FINAL | |
| *Valley Ala. 36854* | MONTH  YEAR | | $ *11* | PER *00* |
| Phone *706-645-7223* | Describe Major Duties: | | | |
| Job Title *Warper Operator* | *Warper Operator* | | | |
| Department *Prep* | | | | |
| Supervisor *Billy Joe Steward* | | | | |
| Reason for Leaving *Laid off* | | | | |
| COMPANY NAME | LENGTH OF EMPLOYMENT | | HOURLY RATE/SALARY | |
| | FROM | | STARTING | |
| | MONTH  YEAR | | $ | PER |
| Address | TO | | FINAL | |
| | MONTH  YEAR | | $ | PER |
| Phone | Describe Major Duties: | | | |
| Job Title | | | | |
| Department | | | | |
| Supervisor | | | | |
| Reason for Leaving | | | | |

Auburn Investment Castings  Rev. 8/27/04

Page    2

WPH
000477

| COMPANY NAME | LENGTH OF EMPLOYMENT | | HOURLY RATE/SALARY | |
|---|---|---|---|---|
| | FROM | | STARTING | |
| | | MONTH   YEAR | $ | PER |
| Address | TO | | FINAL | |
| | | MONTH   YEAR | $ | PER |
| Phone | Describe Major Duties: | | | |
| Job Title | | | | |
| Department | | | | |
| Supervisor | | | | |
| Reason for Leaving | | | | |

| COMPANY NAME | LENGTH OF EMPLOYMENT | | HOURLY RATE/SALARY | |
|---|---|---|---|---|
| | FROM | | STARTING | |
| | | MONTH   YEAR | $ | PER |
| Address | TO | | FINAL | |
| | | MONTH   YEAR | $ | PER |
| Phone | Describe Major Duties: | | | |
| Job Title | | | | |
| Department | | | | |
| Supervisor | | | | |
| Reason for Leaving | | | | |

| COMPANY NAME | LENGTH OF EMPLOYMENT | | HOURLY RATE/SALARY | |
|---|---|---|---|---|
| | FROM | | STARTING | |
| | | MONTH   YEAR | $ | PER |
| Address | TO | | FINAL | |
| | | MONTH   YEAR | $ | PER |
| Phone | Describe Major Duties: | | | |
| Job Title | | | | |
| Department | | | | |
| Supervisor | | | | |
| Reason for Leaving | | | | |

Sign your name: *Patricia J. Gibson*    Date: 1-4-06

Print your name: PATRICIA J. Gibson

WPH
000478

Page   3



DEFENDANT'S EXHIBIT 2 P. Gibson

# TROUP COUNTY SCHOOL SYSTEM

P.O. Box 1228
LaGrange, Georgia 30241
(706) 812-7900
Fax (706) 812-7904

TARYL W. ANDERSON
Director of Personnel

TO:     PATRICIA GIBSON

FROM:   Troup County Board of Education

RE:     Employment Information

**WPH
000725**

Welcome to the Troup County School System. We hope your association with the schools will be a rewarding experience.

Please be aware of the system policies regarding sick leave, drug and alcohol abuse, sexual harassment, and worker's compensation. You will be asked to sign statements that you will respect these policies. Should you find that you are unable to go to work because of illness or an emergency, you must call your supervisor at your earliest opportunity and report your reason for not being at work on a daily basis.

**Paraprofessionals** are required to maintain a valid Paraprofessional Certificate by attending training sessions provided by the school system. Paraprofessionals will receive the Professional Learning Unit (PLU) schedule at the beginning of each school year. Each school has a contact person who is a liaison for the training program.

Questions or information related to **Employee Benefits** should be directed to Pam Crews, Merry Hubbard or Ellen Hubbard in the Payroll Office at the Administrative Services Center (706-812-7900). If you wish to enroll any family member in the State Merit Health Insurance, you must report each individual's social security number and birth date at the time of enrollment. You are solely responsible for obtaining any previous **experience verifications** for payroll purposes. These must be received within 90 days of employment for consideration.

Questions or information regarding **Worker's Compensation** should be directed to Annette Duffee (706-812-7900) at the Administrative Services Center.

Support personnel or non-certified employees are "at will" employees and continued employment is at the will of the Troup County Board of Education.
••••••••••••••••••••••••••••••••••••••••••••••••••••••

Location: FRANKLIN FOREST ELEMENTARY SCHOOL     Position:   CUSTODIAN

Hire Date: 11/17/06     Experience:   10 YEARS APPROVED

Payroll Information: $8.89 AN HOUR, 8 HOURS A DAY, 240 DAYS (12 MONTHS)

$8.89 X 8 X 240 = $17,068.80 ANNUAL SALARY  MONTHLY SALARY = $1,422.40
YOUR DECEMBER CHECK (12/20/06) WILL INCLUDE YOUR MONTHLY SALARY OF $1,422.40, PLUS
THE SUBSTITUTE PAY FROM NOVEMBER 6TH – 16TH, AND YOUR REGULAR DAILY PAY AT $8.89
AN HOUR FOR NOVEMBER 17, 20, 21, 27, 28, 29 AND 30.
BEGINNING AT THE END OF JANUARY 2007 THROUGH JUNE 2007 YOUR MONTHLY SALARY IS $1,422.40.

## TROUP COUNTY SCHOOLS

**Personnel Recommendation Form**

**For Office Use Only:**
Don Miller  ✓
BD  _N/A_
PR  ✓
400  _N/A_
R  _N/A_
ID#  _____

Name: _Patricia Gibson_    Location: _FFE_

Position: _Custodian_    Grade: ____ Subject: ____

Beginning Date: _10/16/06_    Comments: _30 day Temporary_
_(after 30 days)_

Funding Source: (Title I, VI-B, Pre-K, Local, Other) _____

---

**Check all that apply:**

_____ New Position (Attach copy of authorization/details)

✓ Replacement Position
Replacing : _Eddie Nave_

✓ Transfer From: (Name of School) _Operations Center-Alternate_
_(30 day probationary period)_
_____ Transfer Within School: (Position/Grade/Subject-Old Assignment)_____

_____ Termination/Resignation  (Attach copy of resignation/documentation)
Last day to work: _____
Personnel notified?  Y_____  N_____        Payroll notified?  Y_____  N_____

---

**Certified:**
I have verified certification with the
Personnel Department and checked
at least two references for the person I
am recommending.
_____ This individual is "Highly Qualified"

Signed:_____

**Non-Certified:**    _one_
I have checked at least ~~two~~ references
for the person I am recommending.
Signed: _MW_
Hours Per Day: _8_
Days Per Year: _240_
Hourly Wage: _____
Previous Experience: _____
(Must be verified in writing before granted)

---

I recommend the above listed person for employment.

_Janet Johnson_          _10-16-06_
Principal/Administrator          Date

_____
Program Director (If Applicable)          Date

_____
Transferring Principal          Date

_M. Whitters_     _10/16/06_
Other          Title          Date

_Daryl W Anders_  _10/18/06_
Director of Personnel          Date

Revised:  8/23/05

WPH
000727

## TROUP COUNTY SCHOOLS

### Personnel Recommendation Form

| For Office Use Only |  |
|---|---|
| Don Miller | ✓ |
| BD | ✓ |
| PR | |
| 400 | |
| R | |
| ID# | 37718 |

Name: _Patricia Gibson_    Location: _Operations Center_

Position: _Temporary Custodian_    Grade: _____    Subject: _____

Beginning Date: _9/12/06_    Comments: _Temporary only_

Funding Source: (Title I, VI-B, Pre-K, Local, Other) _____

---

**Check all that apply:**

_____ New Position (Attach copy of authorization/details)

✓ Replacement Position
    Replacing : _Carla Slaughter_

_____ Transfer From: (Name of School) _____

_____ Transfer Within School: (Position/Grade/Subject-Old Assignment)_____

_____ Termination/Resignation  (Attach copy of resignation/documentation)
    Last day to work: _____
    Personnel notified?  Y_____  N_____        Payroll notified?  Y_____  N_____

---

**Certified:**
  I have verified certification with the
  Personnel Department and checked
  at least two references for the person I
  am recommending.
  _____ This individual is "Highly Qualified"

  Signed:_____

**Non-Certified:**
  I have checked at least two references
  for the person I am recommending.
  Signed:_____ _N/W_
  Hours Per Day: _8_
  Days Per Year: _240_        ✓
  Hourly Wage: _7.14_
  Previous Experience: _10_
  (Must be verified in writing before granted)

---

I recommend the above listed person for employment.

| | |
|---|---|
| Principal/Administrator        Date | Transferring Principal        Date |
| _Frank O. Gurly_ 9/13/06 | _M. Whet_ 9/12/06 |
| Program Director (If Applicable)    Date | Other        Title        Date |
| | _Garyl Cinc_ 9/14/06 |
| Director of Personnel        Date | |

WPH
000728

# TROUP COUNTY BOARD OF EDUCATION
# APPLICATION FOR EMPLOYMENT

## CUSTODIAN

ID: _____

CHD: ___Received
___Approved
___See File

_- would reravel_
_for any school_

_- has worked for_
_whole life_

Date: 7/19/06

Position Desired: Full Time ___ Part-Time: ___   Temp or Sup OK

Have you ever been employed by the Troup County School System? _____Yes  _✓_ No

If yes, Name of School _____ Position: _____ Dates: _____

**********************************************************************************

Full Name: _Gibson_      _Patricia_         _Jones_
           Last          First            Middle/Maiden

Current address: _403 fairwood Dr._  _Fairfax_  _Al_  _36854_  How long _29y/s_
                 #    Street           City    State  Zip

Former Address: _____        _____ How Long _____
                #    Street                     City  State  Zip

Telephone (_334_) _756-9275_ • _706 585 3890 cell_

Social Security Number _____

US Citizen _✓_ Yes ___ No     If no do you currently have a work visa? ___ Yes ___ No

## EDUCATIONAL BACKGROUND

| | Name of Institute | Location | Grade Completed | Diploma, Certificate or Degree Earned (Attach Copy) |
|---|---|---|---|---|
| High School | PS 271 Brooklyn NY | New york | 11 | |
| College | | | | |
| Trade | | | | |
| Business | | | | |

## U. S. MILITARY HISTORY

| Date Entered | Branch | Date Discharged | Type of Discharge |
|---|---|---|---|
|  |  |  |  |

Highest rank attained and unit: _____

Armed Forces Reserve of National Guard: _____ Active _____ Inactive

Indicate specific skills acquired in the U. S. Armed Forces _____

_____

_____

## WORK HISTORY
**(Please start with last employer first, include last 15 years of employment)**

| Name of Firm | Supervisor Name | City, State Telephone Number | Position | Dates of Employment | Reason for leaving |
|---|---|---|---|---|---|
| Aurburn Investment | Steve Holly | Aurburn AL. | Inspector | Jan. 9 06 until June 30,06 | LAyoff |
| West Point Stevens | Greg Tillery | NALLEy AL. (706) 645. | WARper Operador | 30yrs. until 8-15-05 | LAyoff  30yrs |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

If you are currently employed may we contact your employer for reference? ✓ Yes ____ No

✗ Drivers License Number: _____ State: _AL_ Expiration Date: _11-30-7_

WPH
000735

**Do you have any of the following which might be significant to your application?**

Equipment Operation: _____

Special Studies or Training: _____ N/A _____

Special Skills or Abilities: _____

Comments: _____

_____

_____

## PERSONAL REFERENCES

| Full Name | Complete Address | Telephone Number | Official Position | Friend or Relative |
|-----------|-----------------|------------------|-------------------|--------------------|
| Marie Trammell | 1617 Plum St West Point Ga | (706) 578-9790 | Disabled | Friend |
| Winifred Lovelace | 197 Reed PO. W.P. GA | (706) 518-7442 | Electronic Tech | Relative |
| Willie Mae Gibson | | (334) 706-6231 | Retired | Relative |

**Do you have friends or relatives working for the Troup County Board of Education?**

| NAME | SCHOOL | POSITION | FRIEND OR RELATIVE |
|------|--------|----------|--------------------|
| Molly Magby | Valley Jr. | Cook (food server) | Friend |
| Betty Heard | PO Box 665 Lafayette Ala, | Teacher | Relative 334/497-1486 |
| Jackie Jackson | West Point | Teacher | 706-645-2016 Friend |
| | | | |
| | | | |

It is a state law (HB1187) that all applicants for employment with the school system have a criminal background check completed. An authorization to access and release criminal history form is attached to this application. It must be filled out, then we will send to the Troup County Sheriff's Department for the criminal background check.

3

WPH
000736

**TROUP COUNTY SCHOOL BOARD POLICY GBD/GAK:** Failure by an applicant to disclose any conviction, plea of guilty or plea of nolo contendere, whether felony or misdemeanor, on the application for employment shall disqualify the applicant from employment.

Have you ever pleaded guilty or no contest to, or been convicted of any criminal offense, whether felony or misdemeanor?

_____ YES          __✓__ NO

**\*\*EACH CONVICTION (including traffic violations) SHOULD BE REPORTED EVEN IF YOU THINK IT IS NO LONGER ON YOUR RECORD.\*\***

If so, please write a brief statement describing the offense for which you were charged. Include the dates of the offense, court, county, state and the verdict.

N/A

I hereby certify that all information contained herein is correct to the best of my knowledge. I understand that falsification of any part of this form shall be cause for rejection of my application or dismissal from my position.

The consent form must be completely filled out, signed, and returned to this office. The Sheriff's Department will process your form and return the results to the Personnel Department of the Troup County School System.

Once we have received your background clearance, your application will be considered active/updated.

NAME (PLEASE PRINT) _Patricia Gibson_

SIGNATURE: _Patricia G. Gibson_

DATE: _7/19/06_

**AN EQUAL OPPORTUNITY EMPLOYER:**

The Troup County Board of Education does not discriminate on the basis of race, sex, religion, national origin, age or disability in the educational and employment policies under which it operates and will honor all appropriate laws relating to discrimination.

**FINGERPRINTING:**
APPLICANTS WHO ARE OFFERED AND ACCEPT EMPLOYMENT WILL BE FINGERPRINTED BY SCHOOL OFFICIALS AS REQUIRED BY LAW. A MONEY ORDER IN THE AMOUNT OF $24.00 MADE PAYABLE TO THE "GBI" (GEORGIA BUREAU OF INVESTIGATION) MUST BE GIVEN TO THE OFFICIAL AT THE TIME OF FINGERPRINTING.

WPH
000737

**TROUP COUNTY SCHOOL BOARD POLICY GBD/GAK:** Failure by an applicant to disclose any conviction, plea of guilty or plea of nolo contendere, whether felony or misdemeanor, on the application for employment shall disqualify the applicant from employment.

Have you ever pleaded guilty or no contest to, or been convicted of any criminal offense, whether felony or misdemeanor?

_____YES        ⁄___NO

**\*\*EACH CONVICTION (including traffic violations) SHOULD BE REPORTED EVEN IF YOU THINK IT IS NO LONGER ON YOUR RECORD.\*\***

If so, please write a brief statement describing the offense for which you were charged. Include the dates of the offense, court, county, state and the verdict.

N/A

I hereby certify that all information contained herein is correct to the best of my knowledge. I understand that falsification of any part of this form shall be cause for rejection of my application or dismissal from my position.

The consent form must be completely filled out, signed, and returned to this office. The Sheriff's Department will process your form and return the results to the Personnel Department of the Troup County School System.

Once we have received your background clearance, your application will be considered active/updated.

NAME (PLEASE PRINT) *Patricia Gibson*

SIGNATURE: *Patricia J. Gibson*

DATE: *7/19/06*

**AN EQUAL OPPORTUNITY EMPLOYER:**

The Troup County Board of Education does not discriminate on the basis of race, sex, religion, national origin, age or disability in the educational and employment policies under which it operates and will honor all appropriate laws relating to discrimination.

**FINGERPRINTING:**
APPLICANTS WHO ARE OFFERED AND ACCEPT EMPLOYMENT WILL BE FINGERPRINTED BY SCHOOL OFFICIALS AS REQUIRED BY LAW. A MONEY ORDER IN THE AMOUNT OF $24.00 MADE PAYABLE TO THE "GBI" (GEORGIA BUREAU OF INVESTIGATION) MUST BE GIVEN TO THE OFFICIAL AT THE TIME OF FINGERPRINTING.

WPH
000738

# TROUP COUNTY BOARD OF EDUCATION POST-HIRE
## HEALTH QUESTIONNAIRE (QUESTIONARIO DE SALUD)

Please Print
Por favor
Impresión

Name
Nombre __Gibson    Patricia    J.__

Telephone: __334-756-9275__

Social Security Number
Numero de Suguro Social

Last First          Middle Initial
Apellido    1u Nombre    Inicial

Address
Domicilio __403 Fair Wood Dr.__     City
Ciudad __Fair Fax__     State
Estado __ALA__     Zip Code
Zip Code __36854__

### Medical History (Historia Medica)

Do you have or have you ever had any of the following? (Please check EACH of the following Yes or No.  Any Yes answer must be fully explained below.) Answer ALL questions.
*Tiene o ha tenido las siguientes? (Conteste Si o No. Las respuestas Si deben ser explicidas completamente abajo.) Conteste a TODAS las preguntas.*

| | Yes Si | No No | | Yes Si | No No |
|---|---|---|---|---|---|
| Epilepsy / *Epilepsia* | ☐ | ☐ | Psychiatric or Psychological Treatment or Evaluation / *Tratamiento o Evaluación Siguiatrica o Sicológica* | ☐ | ☑ |
| Diabetes (Sugar problems) / *Diabetis (Problemas de Azúcar)* | ☐ | ☑ | Hemophilia or other blood disease / *Hemofilia o Otra Enfermedad de la Sangre* | ☐ | ☑ |
| Cardiac (Heart) Disease / *Enfermedad Cardiaca (Corazón)* | ☐ | ☑ | Osteomylitis / *Osteomelitis* | ☐ | ☑ |
| Marie Strumpell Disease / *Mál de Marie Strumpell* | ☐ | ☑ | Stiff Joints / *Problemas en las Articulaciones* | ☐ | ☑ |
| Any Loss of Vision / *Perdida de Vista* | ☐ | ☐ | Hypoglycemia (Sugar Problems) / *Hipoglicemia (Problemas de Azúcar)* | ☐ | ☑ |
| Polio / *Polio* | ☐ | ☑ | Muscular Dystrophy / *Distrofia Muscular* | ☐ | ☑ |
| Any Amputation / *Aiguna Amputación* | ☐ | ☑ | Thrombophlebitis / *Trombofiebitis* | ☐ | ☑ |
| Cerebral Palsy / *Paralisis Cerebral* | ☐ | ☑ | Herniated Intervertebral Disc / *Hernia en los Discos Vertebrales* | ☐ | ☑ |
| Multiple Sclerosis / *Esclerosis Múltiple* | ☐ | ☑ | Back Surgery / *Cirugía de la Espalda* | ☐ | ☑ |
| Parkinson's Disease / *Mál de Parkinson* | ☐ | ☑ | Allergies / *Alergias* | ☑ | ☐ |
| Vascular (Circulation) Disorder / *Problemas Circulatorios* | ☐ | ☑ | Arthritis / *Arthritis* | ☑ | ☐ |

Height
Estatura    Ft. __4__ Pies    In. __11__ Plgs.

Weight
Peso    __155__ Lbs.

Have you ever received treatment for a back, neck, or knee condition or head injury?    Ha recibido usted    __NO__
*tratamiento por algún problema en las espalda, cuello o rodilla o golpe a la cabeza?*

Do you now or have you ever suffered from aches or pains of the back?
*Padece usted o ha padecido de dolores en la espalda?*    __NO__

Have you ever had any surgery? *Ha tenido alguna vez*    __Yes__
*cualquier tipo de cirugia?*

Do you now or have you ever had any physical disabilities impairments or handicaps?
*Tiene usted o ha tenido impedimentos físicos o mentales?*    __NO__

**WPH**
**000748**

## TROUP COUNTY BOARD OF EDUCATION POST-HIRE

Have you ever had a workers' compensation injury? *Ha tenido usted alguna vez accidentes de trabajo?* _____ NO _____

Have you ever received a disability rating for any reason? Ha sido usted alguna vez clasificado como desabilitado? _____ NO _____

Have you ever received compensation or medical benefits under workers' compensation? *Ha reibido usted compensación o beneficios médicos por accidentes de trabajo?* ___ NO ___

Explain fully any Yes answer.

*Explique completamente cualquier respuesta de Si.* _____ NO _____

Do you have any questions about the completion of this form. *Usted tiene cualquier pregunta sobre la terminación de esta forma.* _____ NO _____

Have you ever been diagnosed with carpal tunnel syndrome? If so, did you receive treatment (ie surgery, therapy, etc.) for this condition? Also, please give dates for this treatment and diagnosis.
Ha sido diagnosticado jamas usted con el sindrome del tunel cerca de la muneca? Si ese es el caso, racibida el tratamiento (por ejemplo: lacirugia, la terapia, etc.) para esta condicion? Tambien, da por favor no olvidar las fechas para este tratamiento y el diagnostico. ___ NO ___

I have been fully advised that if I am injured on the job, regardless of how minor the injury may seem, I am to report that injury immediately to my supervisor.    *Yo he sido totalmente instruido que si yo sufro algún accidente en el trabajo debo reportarlo inmediatamente a mi supervisor, aún cuando al accidente aparezca ser pequeno.*    Yes (Si) ☑    No (No) ☐

I certify the above answers to be true and correct. I understand that any false or misleading answers to these questions may be sufficient reason for the denial of workers' compensation benefits and a basis for termination. Also, making false or misleading statements for the purpose of obtaining workers' compensation benefits can be punishable by fines and or a prison sentence.

Certifico las respuestas antedichas para estar verdad y correcto. Entiendo que cualquier respuesta falsa o de engaño a estas preguntas puede ser suficiente razón de la negación de las ventajas de la remuneración de los trabajadores y de una base para la terminación. También, la fabricación de declaraciones falsas o engañosas con el fin de obtener las ventajas de la remuneración de los trabajadores puede ser castigable por mu ltas y o una oración de la prisión

| | | |
|---|---|---|
| Applicant's Signature / Firma del Aplicante | *Patricia G. Gibson* | Date / Fecha 9-12-06 |
| Witness / Testigo | *Susan Harris* | Date / Fecha 9-12-06 |

NOTE: If applicant is unable to read and write, he is to make his mark in the place for his signature. The witness is to certify that he has read the above requested information to the applicant and that the answers are those of the applicant. Sign in the space for witness to certify.
Si el aplicante no sabe leer y escribir, debe poner su marca en el espacio de la firma. El testigo debe certificar que ha leído la información del documento al aplicante y que las preguntas han sido contestadas poreste. Firme en el espacio del testigo.

Current employment practices should be reviewed by employers and/or their corporate attorneys, for compliance with the American with Disabilities Act (ADA), and other state and federal laws governing employment rules and regulations.

*Facsimile* BEN 281 (Revised 7/04)
Modified for Electronic Usage 0704

## ALABAMA DEPARTMENT OF INDUSTRIAL RELATIONS
### UNEMPLOYMENT COMPENSATION AGENCY

| | |
|---|---|
| NAME<br>Gibson/Patricia | |
| SOCIAL SECURITY NUMBER (No Dashes/Spaces) | |
| DATE BENEFIT YEAR BEGAN<br>122604 | |
| EFFECTIVE DATE, IF RENEWAL<br>082805 | |

### FACT FINDING REPORT

**BEN 281, Page 1 Only**

| TYPE CLAIM<br>1 | O/C | INPUT DATE |
|---|---|---|

**BEN 241 WAS:** ☐ Timely Received   ☐ Timely Mailed, Late Received   ☐ Mailed Late   ☐ Not Received

---

### EMPLOYER'S STATEMENT   Phone # (706) 6457201

| Calvin Ogletree | HR/Safety Manager | 092105 |
|---|---|---|
| Person Interviewed | Title | Date |

DATE/TIME 092105 10:53 ☒ AM ☐ PM          INITIALS myb

Spoke with Mr. Ogletree on today. Asked if there was negligence on clmt's part or misconduct. Er relayed that when the company changed from sheeting to towels in the textile industry, the work the claimant was performing became more fast-paced.  It became more than the clmt could handle. The fast-paced requirement for the clmt took away from the quality and attention needed to perform the job to standards.  We hated to let her go; she gave the company a lot of good years up until this change in work requirement occurred. There was no misconduct on the clmt's part. Nothing intentional on her part.
          Mary Billups, Examiner D/A

---

### CLAIMANT'S STATEMENT

**My separation resulted from:** ☐ Voluntary Quit   ☐ Discharge   ☐ No Work Available   ☐ Other

| DATE/TIME | ☐ AM ☐ PM | INITIALS |
|---|---|---|

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

MAY 2 5 2007

*Daniel J. Somers*

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

Interviewer:                              Date

DEFENDANT'S
EXHIBIT
3
P. Gibson

**WPH**
**000604**

## Client Status Sheet for Patricia J Gibson (05/25/2007)

**Contact Information**

| | |
|---|---|
| Contact Name: | Patricia J Gibson |
| Address: | 403 Fair Wood DriveValley, AL 36854 |
| Phone 1: | (334) 756-9275 |

**Alternate Contacts**

None Entered

**Demographics Information**

### Miscellaneous Demographics Info

| | | |
|---|---|---|
| Eligibility Date: | | 07/07/2006 |
| Area/County of Residence: | CERTIFIED AND TRUE COPY OF ALA. | Chambers |
| Area/County of Residence type: | DEPT OF INDUSTRIAL RELATIONS | Not Entered |
| Area/County of Service | RECORDS. | Lee |
| EES Client ID | MAY 25 2007 | Not Entered |
| Other Agency Client ID | | Not Entered |

*Daniel J. Somers*

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

### Personal

| | |
|---|---|
| Social Security Number | |
| Date of Birth | |
| Race | Black or African American |
| Gender | Female |
| Are you a single, separated, divorced or widowed individual with primary responsibility for one or more dependents under the age 18? | No |
| Number in Family | |
| Individual with Disability (For this question, disability means, a physical or mental impairment that substantially limits one or more of the major life activities of an individual.) | No |
| Education Status | Not attending school; High School graduate |
| Highest Grade Completed | High School Graduate |
| Have you served on Active Duty with the Armed Forces of the United States? | No |

### Veteran Information

| | |
|---|---|
| Are you a homeless veteran? | Not entered |
| Are you the spouse of any person who died on active military duty or of a military service-connected disability? | No |
| Are you the spouse of any member of the Armed Forces serving on active duty who at the time of this registration has been in any one or more of the following categories for more than 90 days: | No |
| Are you the spouse of any person who has a total disability permanent in nature resulting from a military service-connected disability? | No |
| Are you the spouse of a veteran who died while diagnosed with a total disability permanent in nature resulting from a military service-connected disability? | No |
| Are you the spouse of a military service member of the armed forces who is receiving transitional services prior to retirement or discharge from military service? | Not Entered |

### Migrant Worker

**WPH
000636**

Zip
Phone
Email
Wage                                          11.00
Wage Type                                     Hourly
Wage Descriptor
Hours Per Week                                40-49
Explanation of Hours Per Week, If Unable to
Determine
Reason for leaving position                   Fired

Client Notes

No Client Notes Entered

Job Referrals

Job Title: Machining and Assembly Production
Company: BRIGGS & STRATTON CORPORATION
Date of Referral: 07/07/2006
Date to Report: 07/07/2006
Outcome Status: Not Hired
Station Desk: 7402
Office: 85740000

Job Title: Assemblers
Company: Masterbrand Cabinets
Date of Referral: 07/10/2006
Date to Report: 07/10/2006
Outcome Status: Not Hired
Station Desk: 7470
Office: 85740000

**WPH**
**000641**

Job Developments
No Job Developments Entered

Job Placements
No Job Placements Entered

LE (07/07/2006) - Wages Prior Registration

**First Quarter Wages**
UI Wages are present.
Supplemental wages are not present in this quarter.

**Second Quarter Wages**
UI Wages are present.
UI Wages are present.
Supplemental wages are not present in this quarter.

**Third Quarter Wages**
UI Wages are not present.
Supplemental wages are not present in this quarter.

**Fourth Quarter Wages**
UI Wages are present.
UI Wages are present.
Supplemental wages are not present in this quarter.

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

MAY 2 5 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

# Patricia Gibson
# Dxs. 4-9

**Name:** William J. Willson

**Address:** 205 Fair Wood Dr

**City, State, Zip:** Valley Ala., 36854

**Today's Date:** 11-7-05

**How did you hear about us?** New paper valley time

**Will you commute 30 minutes to work?**

**Do you have your own automobile?** Yes

**Do you have a clean driving record?** Yes ☑ No ☐

**If not, how do you plan to get to work?**

**When can you begin work?** RIGHT now

**What shifts can you work?** 1st ☑ 2nd ☐ 3rd ☐ Any ☐ Part or Full Time?

**Home Phone #** 334-756-9275

**Answering Machine?** Yes ☐ No ☐

**Caller I.D.?** Yes ☐ No ☐

**Cellular Phone #** 585-2890

**Have you ever been self-employed?** Yes ☐ No ☑

**Did you complete** High School ☑  GED ☐  College ☐  Technical School ☐

**Degree obtained:**

**Other companies you've applied with in the last 2 weeks:**

**What days of the week can you work?** M T W Th F Sa All (Circle)

**Are you able to pass a drug test RIGHT NOW?** Yes

**Lowest Hourly Salary Acceptable:**

**Can you work in a Smoke Free Environment?** Yes

List last five (5) places of employment starting with your most recent employer:

| Name /Type of Company | Supervisor's name | Telephone # | City/State | Your title | Start Date | End Date | Pay | Why did you leave? | Interviewer Use (Skills) |
|---|---|---|---|---|---|---|---|---|---|
| West Point Home Runnie | | 706-645-7939 | Valley | Warren Operator | 1975 | 9-26-05 | 8.00 | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

I hereby declare that all statements contained in this application are true and correct and understand that false or inaccurate information in the application will be the basis for termination. I understand that if employed, my employment will not be for any fixed period of time and may be terminated by A-1 Employment, Inc. at any time. I also authorize A-1 Employment, Inc. to release the information contained herein and its findings and work history of my employment to other forms or persons upon request. I also understand and agree that I may be expected to work on a wide variety of job assignments in the Lee, Chambers and Macon County areas and agree to accept assignments for which I am qualified as they become available. I also understand my failure to report to A-1 Employment, Inc. for work will indicate I have quit.

I further understand I am an ineligible for hire by any employer A-1 Employment, Inc. for a period of 180 days with each separate employer A-1 Employment, Inc. places me with and acknowledge I am ineligible for hire by any employer A-1 Employment, Inc. has referred me to without express written consent. I understand that my first check will have a deduction in the amount of $30.00 to cover the costs of my drug screening test. Dated: 11-7-05  Signature:

I hereby authorize A-1 Employment, Inc. to investigate my background inclusive of criminal activity and verify this information as well as examine any and all criminal records and arrests on file in all counties in the State of Alabama or any other state. In doing so, I understand that I am waiving my right of confidentiality concerning my criminal history. Dated: 11-7-05  Signature:

I hereby authorize and give full permission to A-1 Employment, Inc. and/or their medical company physician to send a specimen of my urine, saliva, hair, and/or blood to a laboratory for screening test using S.A.M.H.S.A. standards for the presence of illegal drugs, alcohol, or prescription medication taken without a prescription. I will hold all parties harmless, meaning I will not sue nor hold responsible for any alleged harm to me or interfering with my obtaining a job or continuing employment due to not submitting to the tests or as a result of report of the test. This includes, but is not limited to possible clerical or laboratory error. This policy and authorization has been explained to me in a language I understand and I have asked any questions about the test and these questions have been answered to my satisfaction. I understand A-1 Employment, Inc. will require a drug screen whenever an on the job accident is reported in accordance with A-1 Employment Inc.'s injury policy and this authorization is my consent. My refusal to submit to drug testing will be grounds for termination. Dated:  Signature:

License #/State of Issue:

SS#

DEFENDANT'S EXHIBIT
P.G. 0500





Gibson

Gipson

Barrow

Vacner

Jones

Alias'

11/07/05

BCCV

ITR

already pt in GEmpact

WPH
000542

## EMPLOYMENT ELIGIBILITY VERIFICATION (Form I-9)

**EMPLOYEE INFORMATION AND VERIFICATION: (To be completed and signed by employee.)**

| Name. (Print or Type) Last | First | Middle | Birth Name |
|---|---|---|---|
| Gibson | Patricia | Jones | |

| Address: Street Name and Number | City | State | ZIP Code |
|---|---|---|---|
| 4037 Air wood Dr. | Valley | Ala | 36854 |

| Date of Birth (Month, Day/Year) | Social Security Number |
|---|---|
| | |

I attest, under penalty of perjury, that I am (check a box):

- ☑ 1. A citizen or national of the United States.
- ☐ 2. An alien lawfully admitted for permanent residence (Alien Number A_____).
- ☐ 3. An alien authorized by the Immigration and Naturalization Service to work in the United States (Alien Number A_____ or Admission Number _____, expiration of employment authorization, if any _____).

I attest, under penalty of perjury, the documents that I have presented as evidence of identity and employment eligibility are genuine and relate to me. I am aware that federal law provides for imprisonment and/or fine for any false statements or use of false documents in connection with this certificate.

| Signature | Date (Month/Day/Year) |
|---|---|
| Patricia J. Gibson | 11-7-05 |

**PREPARER TRANSLATOR CERTIFICATION** (To be completed if prepared by person other than the employee.) I attest, under penalty of perjury, that the above was prepared by me at the request of the named individual and is based on all information of which I have any knowledge.

| Signature | Name (Print or Type) |
|---|---|
| | |

| Address (Street Name and Number) | City | State |
|---|---|---|
| | | |

**EMPLOYER REVIEW AND VERIFICATION: (To be completed and singed by employer.)**

**Instructions:**
Examine one document from List A and check the appropriate box, *OR* examine one document from List B *and* one from List C and check the appropriate boxes. Provide the *Document Identification Number and Expiration Date* for the document checked.

| List A<br>Documents that Establish<br>Identity and Employment Eligibility | List B<br>Documents that Establish<br>Identity | | List C<br>Documents that Establish<br>Employment Eligibility |
|---|---|---|---|
| | | and | |
| ☐ 1. United States Passport | ☑ 1. A State-issued drivers' license or a State-issued I.D. card with a photograph, or information, including name, sex, date of birth, height, weight, and color of eyes. (Specify State) _____ | | ☐ 1. Original Social Security Number Card (other than a card stating it is not valid for employment) |
| ☐ 2. Certificate of United States Citizenship | | | ☐ 2. A birth certificate issued by State, county, or municipal authority bearing a seal or other certification |
| ☐ 3. Certificate of Naturalization | ☐ 2. U.S. Military Card | | |
| ☐ 4. Unexpired foreign passport with attached Employment Authorization | ☐ 3. Other (Specify document and issuing authority) | | ☐ 3. Unexpired INS Employment Authorization Specify form # _____ |
| ☐ 5. Alien Registration card with photograph | | | |
| *Document Identification* | *Document Identification* | | *Document Identification* |
| # _____ | # _____ | | # _____ |
| *Expiration Date (if any)* | *Expiration Date (if any)* | | *Expiration Date (if any)* |
| | 11/30/07 | | |

**CERTIFICATION:** I attest, under penalty of perjury, that I have examined the documents presented by the above individual, that they appear to be genuine and to relate to the individual named, and that the individual, to the best of my knowledge, is eligible to work in the United States.

| Signature | Name (Print or Type) | Title |
|---|---|---|
| Mindy Decker | Mindy Decker | EMPLOYMENT CONSULTANT |

| Employer Name | Address | Date |
|---|---|---|
| A-1 EMPLOYMENT, INC. | 400 SOUTH 8TH STREET, SUITE 101, OPELIKA, AL 36801 | 11/07/05 |

U.S. Department of Justice

## PRE-APPLICATION QUESTIONNAIRE

1. What is your name? *Patricia J. Gibson*

2. Have you been here before? *No*

3. Were we able to put you to work? *I don't know*

4. Do you have access to a telephone? *Yes*

5. Do you have reliable transportation? *Yes*

6. What job(s) are you applying for? *Bentley*

7. What pay rate are you willing to start at? *Any Job*

8. Are you willing to take a drug screen right now? *Yes*

9. Are you confident you can pass this drug screen right now? *Yes*

10. Will you release your background history including your criminal record? *Yes*

Dated: *11-7-05*    Signature: *Patricia J. Gibson*

I hereby authorize A-1 Employment, Inc. to investigate my background inclusive of criminal activity and verify this information as well as examine any and all criminal records and arrests on file in all counties in the State of Alabama or any other state. In doing so, I understand that I am waiving my right of confidentiality concerning my criminal history.

Dated: *11-7-05* Signature: *P. J. G*    SS#_____ License #/_____    State of Issue *Ala*

I hereby authorize and give full permission to A-1 Employment, Inc. and/or their medical company physician to send a specimen of my urine, saliva, hair, and/or blood to a laboratory for screening test using S.A.M.H.S.A. standards for the presence of illegal drugs, alcohol, or prescription medication taken without a prescription. I will hold all parties harmless, meaning I will not sue nor hold responsible for any alleged harm to me or interfering with my obtaining a job or continuing employment due to not submitting to the tests or as a result of report of the test. This includes, but is not limited to possible clerical or laboratory error. This policy and authorization has been explained to me in a language I understand and I have asked any questions about the test and these questions have been answered to my satisfaction. I understand A-1 Employment, Inc. will require a drug screen whenever an on the job accident is reported in accordance with A-1 Employment, Inc.'s injury policy and this authorization is my consent. My refusal to submit to drug testing will be grounds for termination.

Dated: *11-7- 05*    Signature: *Patricia J. Gibson*

| Date | Employer | Company Name | Address | Phone Number |
|------|----------|--------------|---------|--------------|

Who Placed?_____
What Pay?_____Job #_____    Absences, remarks, follow-ups from interviews, & other comments:
What Shift?_____Department?_____
Start Date?_____Supervisor?_____
What Job Title?_____

Interview Date/Time:

| Date | Employer | Company Name | Address | Phone Number |
|------|----------|--------------|---------|--------------|

Who Placed?_____
What Pay?_____Job #_____    Absences, remarks, follow-ups from interviews, & other comments:
What Shift?_____Department?_____
Start Date?_____Supervisor?_____
What Job Title?_____

WPH
000544

Interview Date/Time:

First Choice Personnel, Inc.
(hereafter called the Personnel Service)

NAME Gibson   Patricia   Jones                    **DO NOT WRITE IN SHADED AREAS.**
   Last      First     Middle

INTERVIEW DATE _____

1. How were you referred _____
2. Date of Birth _____
3. Social Security # _____
4. Address  403 Fair Wood Dr.
5. Valley Ala; 36854
6. City  Fair Fax Ala;
7. State  Alabama   8. Zip Code  36854
9. Minimum required wage  8.00
10. Home Phone  334-756-9275
11 Message Phone  706-585-3890
12. Emergency Contact  334-756-2205
   Emergency Phone _____

FOR OFFICE USE ONLY

INTERVIEWER _____

PRIMARY WORK CLASSIFICATION _____

Have you ever been convicted of a violation? (other than traffic)

☐ Yes ☑ No    What? _____

Circle Highest Grade Comp.  Last School Attended  Graduated

High School  1   2   3   4   11th Grade

College  1 2 3 4 5 6+ _____

Degree: _____

Other Education: _____
_____

**EMPLOYMENT HISTORY (List most recent FIRST and INCLUDE ANY LAPSES IN EMPLOYMENT)**

| DATE FROM/TO | COMPANY NAME AND ADDRESS | PAY RATE | SUPERVISOR NAME/PHONE | DUTIES | REASON FOR LEAVING |
|---|---|---|---|---|---|
| From 1975 8/26-05 | Lanier Carter mill | | Billy Joe See | Ward Warper operator | Laid off |
| | | | | | |
| | | | | | |
| | | | | | |

**TEMPORARY SERVICE (If your have ever worked for a Temporary Service, please list)**

| DATE FROM/TO | COMPANY NAME AND ADDRESS | PAY RATE | SUPERVISOR NAME/PHONE | DUTIES | REASON FOR LEAVING |
|---|---|---|---|---|---|
| | | | | | |

MISCELLANEOUS NOTES

Anyshias , weekends , Aub/ope.
        OK.          Area

Cora Hicks

DEFENDANT'S EXHIBIT
S
P. Gibson

# REFERENCES

(INCLUDE NAME, COMPLETE ADDRESS, TELEPHONE NUMBER)

1. _Cora Hicks  334- 756- 2205_

2. _____

3. _____

# RELEASE OF CRIMINAL RECORDS

I, the undersigned, do hereby authorize the Personnel Service to examine any and all criminal records and arrests on file in the counties in the State of _____ or any other state. In doing so, I understand that I am waiving my right to confidentiality concerning my criminal history.

_Patricia Jones Gibson_
Signature

Date of Release
_11- 8- 47_

Print Applicant's Name

Date of Birth

Driver's License State and Number

Social Security Number

# DRUG SCREEN AUTHORIZATION AND CONSENT

I hereby authorize and give full permission to have First Choice Personnel, Inc. and /or their medical company physician send a specimen of my urine and/or blood to a laboratory for a screening  test using N.I.D.A. standards for the presence of illegal drugs, alcohol, inhalants, or prescription medications with or without a prescription.

First Choice Personnel, Inc. may drug  test  using N.I.D.A. standards by three methods: Pre-employment: Prior to being sent on assignment; Randomly: Random selection of some employees for testing will be done unannounced; For Cause: when it is the company's belief that a drug problem exists (such as evidence of drug abuse, accidents, injuries in the workplace, fights or other behavioral symptoms of drug abuse, negative performance patterns, excessive absenteeism or tardiness) for cause testing will be utilized.

I will hold all parties concerned harmless, meaning I will not sue or hold any party responsible for any alleged harm to me or for interfering with my obtaining a job or continuing employment due to not submitting to the test or as a result of a report of the test. This includes, but is not limited to, possible clerical or laboratory error.

This policy and authorization has been explained to me in a language I understand, and I have been told if I have any questions about the test that they will be answered. I understand that this is a legal binding document because First Choice Personnel, Inc. is sending me for the examination(s) and I am responsible for payment. (After 240 hours of service I will be reimbursed for this drug screen test.)

I UNDERSTAND FIRST CHOICE PERSONNEL, INC. WILL REQUIRE A DRUG SCREEN WHENEVER AN ON-THE-JOB ACCIDENT OR INJURY IS REPORTED IN ACCORDANCE WITH FIRST CHOICE PERSONNEL, INC. POLICY AND THIS AUTHORIZATION AND CONSENT. I ALSO UNDERSTAND THAT MY REFUSAL TO SUBMIT TO A DRUG TEST AFTER AN ACCIDENT WILL FORFEIT MY RIGHT TO RECOVER BENEFITS UNDER SECTION 25-5-1 OF THE ALABAMA WORKERS' COMPENSATION LAW.

PRINT NAME _Patricia  J.  Gibson_

SIGNATURE _Patricia J. Gibson_    DATE _1- 3-06_

# DISCLOSURE STATEMENT

I hereby declare that all statements contained in this application are true and correct and understand that false or inaccurate information in the application will be the basis for termination. I hereby authorize this Personnel Service to investigate my background and verify this information. I understand that if employed, my employment will not be for any fixed period of time and may be terminated by the Personnel Service at any time. I also authorize this Personnel Service to release the information contained herein and its findings and work history of my employment to other firms or persons upon request. I also understand and agree that I may be expected to work a variety of job assignments and agree to accept assignments for which I am qualified as they become available. I also understand my failure to report to the Personnel Service for work will indicate I have quit. I also agree to submit to a drug screen upon request or as specified in the Personnel Service substance abuse policy.

PRINT NAME _Patricia J. Gibson_  SIGNATURE _Patricia J. Gibson_

# ON-THE-JOB INJURIES

I understand that I am required to IMMEDIATELY report any ON-THE-JOB injury to my supervisor first and then to the Personnel Service.

I understand that the Personnel Service must approve all treating physicians, diagnostic testing, therapeutic or surgical treatment. FAILURE TO OBTAIN APPROVAL FROM THE PERSONNEL SERVICE WILL RESULT IN AN UNAUTHORIZED TREATMENT AND IT WILL BE MY RESPONSIBILITY AS TO ALL MEDICAL EXPENSES RESULTING FROM THOSE UNAPPROVED.

I agree that it is my responsibility to cooperate and work with the Personnel Service and all physicians, diagnostic testing facilities and anyone providing such therapeutic, surgical or other treatment in an effort to get well and return to gainful employment or to reach the maximum recovery possible. I further understand that if I refuse or fail to do so, I will be subject to termination of employment with the Personnel Service and assigned companies.

| _Patricia Jones Gibson_ | _1-3-06_ |
|---|---|
| Employee Signature | Date |
| _CA.A._ | _1/3/06_ |
| Witness | Date |

# PLEDGE TO THE PERSONNEL SERVICE

As an employee of the Personnel Service aforementioned, I pledge:

1. That I understand the importance of safety in my job and will always abide by all safety rules set forth by the Personnel Service and the employer to which I am assigned.
2. That once I accept an assignment for the Personnel Service, whether temporary or permanent, I obligate myself to complete the assignment as agreed.
3. That I understand that if I DO NOT COMPLETE the designated assignment as outlined in my job agreement satisfactorily (as determined by the Personnel Service and the client), MY HOURLY RATE WILL REVERT TO MINIMUM WAGE automatically for all hours worked that are unpaid. I also understand that I will NOT be allowed to work for the Personnel Service for A PERIOD OF ONE (1) YEAR OR 12 MONTHS.
4. That I understand that only I or the Personnel Service can terminate my employment. When an assignment ends I must report to the Personnel Service for my next job assignment. FAILURE TO DO SO OR TO ACCEPT MY NEXT JOB ASSIGNMENT WILL INDICATE THAT I HAVE VOLUNTARILY QUIT AND WILL NOT BE ELIGIBLE FOR UNEMPLOYMENT BENEFITS.
5. That I understand if the client requires me to be drug screen tested for an assignment, the CHARGES FOR THE DRUG SCREENING TEST WILL AUTOMATICALLY BE DEDUCTED FROM MY SALARY ON MY FIRST PAYCHECK.
6. That I understand I am representing the Personnel Service and any impression I make on the client reflects on the reputation of the Personnel Service, and that I will represent the Personnel Service to the best of my ability.
7. That I will do the best job I am able to do, and if I have ay problems during my job assignment I will contact the Personnel Service immediately and follow any suggestions made to enable me to finish my assignment.
8. That I understand that if I miss one (1) day's work due to illness I must obtain a doctor's excuse. I also must CALL THE PERSONNEL SERVICE, NOT THE CLIENT, to report off work.

By signing below, I pledge to follow the above guidelines and that I understand and agree to everything that has been stated.

| _____ | _1/3/06_ |
|---|---|
| Employee Signature | Date |
| _CA.A._ | _1/3/06_ |
| Personnel Service Representative | Date |

WPH
000521

# FIRST ✓ CHOICE
## PERSONNEL, INC.

"Your First Choice for Personnel Resources"

## JOB AGREEMENT

### Order Number

**Company Assigned** Auburn Investment

**Position** inspector          **Hourly Wage** $ 8.00

**Job Description** inspecting parts

**Supervisor** Pat Sankovosky   **Dress Code** long pants, shirt, shoes

**Hours** 11:00 pm - 7:00 am   **Length of Assignment** Temp

**Safety Equipment Required:**

will train on 1st          1. _____

7:00 am - 3:00 pm          2. _____

                           3. _____

I understand that failure to wear the Safety Equipment listed above is a violation of First Choice's Safety Program and that this can lead to disciplinary action up to and including termination of my employment.

I, Patricia Jones Gibson, have been assigned to the above
**(Print Your Name)**
referenced temporary job by First Choice Personnel, Inc, and agree to all of the policies and procedures indicated in the First Choice Personnel Employee hand book. I will represent First Choice Personnel to the best of my ability. I will contact First Choice Personnel if I am unable to report to work for any reason. I also understand that if I do not complete the assignment in full, my pay rate will revert to $5.15 an hour. I understand that I am required to work 500 hours through First Choice Personnel before going full time. I also understand that the terms of the agreement are subject to change.

_Patricia Jones Gibson_          1-4-06

**Signature**                     **Date**

**Social Security Number**

_[signature]_                     1/4/06

**First Choice Representative Signature**   **Date**

225 Broad Street • Gadsden, Alabama 35901 • (256) 549-0005 • (256) 549-0091

WPH
000509

DEFENDANT'S
EXHIBIT
P. Gibson



**KELLY** SERVICES

Gibson, Patricia

Name *Last, First, M.I.*        Social Security No.        Primary Job Family

7/E

# EMPLOYMENT APPLICATION

Office, Call Center, Education, Marketing, Electronic Assembly, Light Industrial

## Contact Information *(Please print. Do not complete the shaded areas.)*

Professional Title *(e.g., CPA, MD, PhD)*

Last Name **Gibson**    First Name **Patricia**    Initial **P.G.**    Preferred Name *(Nickname)*

Other Name Used *(e.g., Maiden name or alias)*    Dates Other Name Used *(mm/yyyy)*
From / To /

Telephone No. **(334) 756-9815**    Ext. or **706-585-3890**

Telephone Type: ☑ Cellular ☐ Fax ☐ Home
☐ Pager ☐ Voice Mail ☐ Work

Alternate Telephone No. ( )    Ext.

Telephone Type: ☐ Cellular ☐ Fax ☐ Home
☐ Pager ☐ Voice Mail ☐ Work

E-mail Type and Address
☐ Business ☐ Personal

In case of emergency, notify:
Name **Jerry Gibson**    Telephone No. **(334) 756-9275**    Ext.

Telephone Type: ☐ Cellular ☐ Fax ☐ Home
☐ Pager ☐ Voice Mail ☐ Work

## Address *(List all addresses for the past 10 years. Please print. If you need more space, please ask a Kelly staff member for additional paper.)*

1. ☐ Current Address ☐ Paycheck Address    2. ☐ Paycheck Address ☐ Previous Address    3. ☐ Previous Address

Address **403 Fair Wood Dr.**    Apt./Box No.    Address    Apt./Box No.

City **Valley Ala.**    City    City

County **Chambus**    County    County

State **Alabama**    Postal Code **36854**    State    Postal Code    State    Postal Code

From *(mm/yyyy)* **5/30/1965** To *(mm/yyyy)* /    From *(mm/yyyy)* / To *(mm/yyyy)* /    From *(mm/yyyy)* / To *(mm/yyyy)* /

Indicate the area/cross streets near your address

## Education

Education Level *(Check only one [highest level achieved])*
☑ High School (No Diploma)    ☐ Business School
☐ High School (Diploma/GED)    ☐ College/University (No Degree)
☐ Diploma Program    ☐ Associate's Degree
☐ Trade School    ☐ Bachelor's Degree
☐ Vocational School    ☐ Master's Degree

☐ Doctor of Philosophy (PhD)
☐ Doctorate/Other Professional Degree
☐ Juris Doctor (Law)
☐ Post-Doctorate
☐ Other:

Completion Date *(Past High School only)* **5/30/1965**    GPA    Course of Study *(Major/Minor)*    School Name/Institution *(For last degree achieved above)* and Location *(City, State, County)* **P.S. 271 Brooklyn New York**    If you are currently pursuing a degree, please provide the type of degree, expected completion date, and school name.

Discipline:
☐ Arts ☐ Business ☐ Education ☐ Engineering
☐ Law ☐ Science ☐ Social Science
☐ Information Technology ☐ Healthy/Medical ☐ Other:

Status:
☐ Completed ☐ In Progress ☐ Not Pursuing

## Work Experience *(List last employer first. Please complete even if a résumé is attached.)*

1. Employer **Auburn Investigation**    2. Employer **West Point Stevens**    3. Employer

Job Title **Inspector**    Job Title **Warper Operator**    Job Title

Is employer a staffing company? ☐ Yes ☐ No
If yes, at what company(s) were you assigned?

Is employer a staffing company? ☐ Yes ☐ No
If yes, at what company(s) were you assigned?

Is employer a staffing company? ☐ Yes ☐ No
If yes, at what company(s) were you assigned?

WPH
000510

*Latacia*

Social Security No. _____    Primary Job Family _____    Interview Date _____

## Address (List all addresses for the past 10 years. Please print. If you need more space, please ask a Kelly staff member for additional paper.)

| 1. ☐ Current Address ☐ Paycheck Address | 2. ☐ Paycheck Address ☐ Previous Address | 3. ☐ Previous Address |
|---|---|---|
| Address 403 Fair Wood Dr. | Apt./Box No. | Address | Apt./Box No. | Address | Apt./Box No. |
| City Valley Ala. | City | City |
| County Chambus | County | County |
| State Alabama | Postal Code 36854 | State | Postal Code | State | Postal Code |
| From (mm/yyyy) 1/9/06 To (mm/yyyy) / | From (mm/yyyy) / To (mm/yyyy) / | From (mm/yyyy) / To (mm/yyyy) / |

Indicate the area/cross streets near your address _____

## Education

Education Level (Check only one (highest level achieved))
☐ High School (No Diploma)        ☐ Business School
☐ High School (Diploma/GED)       ☐ College/University (No Degree)
☐ Diploma Program                 ☐ Associate's Degree
☐ Trade School                    ☐ Bachelor's Degree
☐ Vocational School               ☐ Master's Degree

☐ Doctor of Philosophy (PhD)
☐ Doctorate/Other Professional Degree
☐ Juris Doctor (Law)
☐ Post-Doctorate
☐ Other: _____

Discipline
☐ Arts            ☐ Information Technology
☐ Business        ☐ Law
☐ Education        ☐ Science
☐ Engineering     ☐ Social Science
☐ Health/Medical  ☐ Other:

Completion Date (Post High School only) (mm/dd/yyyy) 5/30/1965    School Name/Institution (For level achieved above) and Location (City, State, County) P.S. 271 Brooklyn New York

GPA _____    Course of Study (Major/Minor) _____

Level Verified ☐ Yes    Status ☐ Completed ☐ In Progress ☐ Not Pursuing

If you are currently pursuing a degree, please provide the type of degree, expected completion date, and school name.

## Work Experience (List last employer first. Please complete even if a resume is attached.)

**1. Employer** Auburn Invest.castin9

Job Title Inspector

Is employer a staffing company? ☐ Yes ☐ No
If yes, at what company(s) were you assigned?
(List most recent/significant positions)

Pay Rate/Salary $ 9.53   Per _____

Start (mm/yyyy) 1/9/06   End (mm/yyyy) 7/28/06

Supervisor Steve Halley

Address 155 Ala. St   Apt./Box No. _____

City Auburn   State Ala   Postal Code 36832   Ext. _____

Telephone No. (334) 821-7500

Job Duties _____

Reason for Leaving Temporary Lay off

**2. Employer** West Point Stevens

Job Title Warper Operator

Is employer a staffing company? ☐ Yes ☐ No
If yes, at what company(s) were you assigned?
(List most recent/significant positions)

Pay Rate/Salary $ 10.59   Per _____

Start (mm/yyyy) 8/16/1995   End (mm/yyyy) 8/16/05

Supervisor Billy Joe Steaud

Address Lanier Mill P.O.Box 872 248   Apt./Box No. _____

City Valley   State Ala   Postal Code 36854   Ext. _____

Telephone No. (334) 645-7322

Job Duties _____

Reason for Leaving Lay off

**3. Employer** _____

Job Title _____

Is employer a staffing company? ☐ Yes ☐ No
If yes, at what company(s) were you assigned?
(List most recent/significant positions)

Pay Rate/Salary $ _____   Per _____

Start (mm/yyyy) /   End (mm/yyyy) /

Supervisor _____

Address _____   Apt./Box No. _____

City _____   State _____   Postal Code _____   Ext. _____

Telephone No. ( ) _____

Job Duties _____

Reason for Leaving _____

© 2004 Kelly Services, Inc.    For additional Hiring Process Kits, order Item 5900.

Emp. Auth. Exp. Date *(mm/dd/yyyy)*:

1. _____
2. _____

## Background Information   *(Applicants in Hawaii: Do not complete this section until instructed to do so.)*

*When completing this section, do not disclose information regarding court convictions that have been judicially sealed, expunged, eradicated, impounded or dismissed. Do not disclose information regarding juvenile adjudications or minor traffic violations. A conviction record does not automatically bar you from employment. All of the job-related circumstances surrounding convictions will be considered.*

1. **In the last 7 years, have you been convicted of, pled guilty or no contest to, been imprisoned, or been on probation or parole for any felony?**
   ☐ Yes   ☑ No

2. **In the last 7 years, have you been convicted of, pled guilty or no contest to, been imprisoned, or been on probation or parole for any misdemeanor?**
   ☐ Yes   ☑ No

   *Applicants in Alaska: Do not disclose information regarding felony convictions that are more than 10 years old.*

   *Applicants in Alaska: Do not disclose information regarding misdemeanor convictions that are more than 10 years old.*
   *Applicants in California: Do not disclose information regarding marijuana offenses that are more than 2 years old.*
   *Applicants in Georgia: Do not disclose any first offender discharge as described under Georgia Law.*
   *Applicants in Massachusetts: Do not disclose information regarding misdemeanor convictions or completion of any incarceration that is more than 5 years old and first convictions for drunkenness, simple assault, an affray, or disturbing the peace.*

   *Applicants in Nevada: Do not disclose misdemeanor convictions that did not result in imprisonment.*

3. **Do you currently have charges pending?**   ☐ Yes   ☑ No

   *Applicants in Massachusetts and Washington: Do not answer question 3.*

4. **Are you currently on probation?**   ☐ Yes   ☑ No

5. **If you answered Yes to any of the questions above, please explain completely:**

## Agreement

### General Information

I understand that I may be offered employment with Kelly Services, Inc. ("Kelly") subject to my availability for work, Kelly's ability to find suitable positions for me, and the results of reference checking or other screening procedures. My employment will begin on the first day of my first position.

The term of employment with Kelly is not guaranteed. Kelly or I may end the employment relationship at any time, with or without cause, subject to applicable laws. Thus, my employment is considered to be "at will." The length of any position I accept depends on the needs of Kelly's customer and may be canceled by Kelly or the customer at any time.

Kelly will provide me with the details of any position I accept. If the customer significantly changes the responsibilities of my position, I will promptly notify Kelly. Kelly will pay me for my work while assigned to Kelly's customer. If Kelly overpays me, Kelly may deduct such overpayment from any proper compensation that Kelly owes me.

### Release for Reference Checks

I authorize Kelly to contact my previous employers for work-related references.

### Release for Background Screening
*Not applicable in Arizona*

I authorize Kelly to verify any information that I provide in connection with my employment. I release Kelly, its customer, its authorized representatives, and the consumer reporting agency from all liability resulting from the use of background information about me for employment purposes.

### Release of Personal Information

I authorize Kelly to collect, use, store, transfer, and purge the personal information that I have provided for employment-related purposes. Kelly's privacy statement is available to me upon request.

### Training

As a benefit to me, Kelly may offer me the opportunity to enhance my skills through training programs. These programs do not constitute an offer, promise, or guarantee of future positions. Training is strictly voluntary, and I may not be paid for time spent in training.

### Non-Disclosure/Assignment of Intellectual Property Rights Agreement

Without Kelly's prior written approval, I will not publish, use, copy, retain possession of, or disclose any proprietary or confidential information of any Kelly customer. Upon completion of the position, I will return to the customer all documents, papers, and other records that may embody confidential customer information.

In addition, I understand that the ownership of any work I create while in this position will belong to Kelly or its customer, and I will assign any intellectual property rights that arise from my work according to Kelly's request. Thus, my work while in this position will

### Communication and Information Systems User Agreement

I understand that communication and information systems belonging to Kelly and/or Kelly's customers (such as e-mail, Internet, intranet, voicemail, fax machines, and the like) are intended for legitimate business purposes and that I will not be afforded any privacy when using these systems. Any use of these systems for personal business is at the sole discretion of Kelly or customer management and must be used in an appropriate and reasonable manner. Access to and use of these systems may be terminated at any time without notice.

These communication and information systems in an inappropriate or offensive manner (including sexually explicit words or images, racial epithets or slurs, and/or demeaning words or images that may be considered offensive to others) may result in termination of my position or employment.

### Notice of Assignment End

Upon completion of each assignment, I will notify Kelly of my availability for work. I understand that I will be responsible for maintaining regular contact with Kelly and that failure to do so will indicate that I have either voluntarily quit or am not actively seeking work. Failure to contact Kelly may affect my eligibility for unemployment benefits.

### Employment Relationships

As a Kelly employee, I understand that I am not an employee of the customers to whom Kelly assigns me, regardless of any customer statement, conduct, or belief.

I acknowledge that I will not be eligible to participate in or to receive benefits from any customer's benefits plans or policies, and I waive and disavow all rights to receive them, apply for them, or participate in them.

### Statement of Understanding

I certify that I am at least 18 years of age and that I have completed this form to the best of my ability. I understand that falsification of information may lead to ineligibility for or termination of employment.

I have read this agreement; I understand it; and I agree to its terms.

Signature _____   Date  8/08/06

Witness Signature _____

WPH
000511

# Alabama Department of

Reply May Be Made To:

Driver License Division
P O Box 1471
Montgomery AL  36102-1471

# Public Safety

DRIVER LICENSE ABSTRACT

03/08/2007

PAGE    1

---

NAME: PATRICIA JONES GIBSON                    LICENSE NO:              STATUS: CURRENT
ISSUE DATE: 11/26/2003                          LICENSE CLASS: DM  CDL STATUS: UNLICENSED
EXPIRATION DATE: 11/30/2007                     BIRTH DATE:                RACE: B    SEX: F
RESTRICTIONS:                                   ENDORSEMENTS:

---

| CONVICTION DATE | OFFENSE DESCRIPTION | OFF DATE | COM VEH | COURT/AGENCY | REP CNSL |
|---|---|---|---|---|---|

---

11/21/2005 SPEEDING    62/45 MPH ZONE    10/16/2005 P    LEE COUNTY DISTRICT COURT       N

I hereby certify that this is a true and
correct copy of the records in the Driver
License Division of the Alabama Depart-
ment of Public Safety.

*F A Bingham*

F A BINGHAM, MAJOR
DRIVER LICENSE DIVISION

```
***    THE INCLUSION OF ACCIDENT DATA IN THIS REPORT    ***
***       IN NO WAY IMPLIES FAULT OR LIABILITY.         ***
***                                                     ***
***    THIS REPORT CONTAINS INFORMATION REPORTED TO     ***
***       THIS DEPARTMENT FOR THE LAST 3 YEARS.         ***
```





DEFENDANT'S
EXHIBIT
7
P.Gibson

Gibson

### WESTPOINT STEVENS
# WORK RESTRICTIONS

NAME _____ Retired _____ DATE 2/16/98

FACILITY _____ S.S.N. _____

DEPARTMENT _____ Pd _____

A  (✓)  Permanent
B  ( )  Temporary - Expires _____
C  ( )  Replaces All Previous Work Restrictions
D  ( )  No Restrictions
E  ( )  Rejected

01  ( )  Limited Standing and/or Walking _____ Hours Per Day
02  ( )  Unable to Use      R ( )   L ( )   Foot ( )   Leg ( )
03  ( )  Limited Use of     R ( )   L ( )   Foot ( )   Leg ( )
04  ( )  Unable to Use      R ( )   L ( )   Hand ( )   Arm ( )
05  ( )  Limited Use of     R ( )   L ( )   Hand ( )   Arm ( )
06  ( )  Limited Lifting and Carrying
        (_____Lb Limit) or Equivalent Exertion in Pushing or Pulling
07  ( )  Limited Stooping and Bending
08  ( )  No Exposure to Cotton Dust
09  ( )  No Exposure to Respiratory Irritants
10  ( )  No Exposure to Hazardous Machinery
11  ( )  No Work At Elevations Above Floor Level
12  ( )  Increased Risk to Injuring Self or Co-workers
13  ( )  No Operation of Powered Mobile Equipment (Lift Trucks, etc.)
14  ( )  No Exposure to _____
                        (Name of Agent)
15  ( )  No Exposure to Skin Irritants or Solvents
16  ( )  No Work Involving Production Deadlines
17  (✗)  Must Wear Glasses ( )
18  ( )  No Work Requiring Good Near-Visual Acuity
19  (✗)  Limited Color Discrimination
20  ( )  Must Wear Eye Protection at All Times
21  ( )  No Exposure to Identified High-Noise-Level Areas Unless Personal Protective Equipment is Worn
22  ( )  Limited Ability to Understand Speech
23  ( )  Can Work Only _____ Hours Per Day
24  ( )  Can Work Only _____ Days Per Week
25  ( )  Can Work All Shifts Except _____
26  ( )  No Shift Rotation
27  ( )  Must Use Respirator When Working in Area with Exposure Potential to _____
                                                                    (name of chemical or other agent)
28  ( )  Remarks: _____

This copy should be prepared in triplicate with White copy going to the Health Record; Yellow copy to the individual's first level supervisor; and Pink copy to the Human Resources Department.

_____
EXAMINER'S SIGNATURE

WP-54543-REV. 9-95

WPH
000134



DEFENDANT'S EXHIBIT 8
P. Gibson

**The Orthopaedic Clinic**

121 North 20th Street
P.O. Box 2125
Opelika, Alabama 36603-2125
(334) 749-8303

Date: 8/21/00

Patient: _Patricia Shaw_

The above patient is presently under our care and

☒ should return

☐ should not return

☐ school

☒ regular work

☐ light work

☐ physical education

Diagnosis: _Right total Shoulder_

Restriction(s): _____

Length of Restriction(s): _____

Next Appointment: _PRN Return as needed_

_James K. Wheeler M.D., P.C._

10 Medical Park
Valley, Alabama 36854-0095
(334) 756-3146

WPH
000135

*TCP 165*

**Distribution:**  1. Human Resources Department     2. Department Manager     3. Employee's Copy     **LEAVE OF ABSENCE**

| Name of Employee | Facility |
|---|---|
| *Patricia Gibson* | *Lanier* |

| Address while on Leave | Telephone No. while on Leave | Last Day Worked Prior to Leave |
|---|---|---|
| *403 Fairwood Dr. Valley Al. 36854* | *334-756-9275* | *12-23-97* |

**Reason for Leave (check one)**

☑ Medical    ☐ No Work Available    ☐ Other_____
☐ Pregnancy    ☐ Sickness in Family    ☐ Intermittent or Reduced Schedule (provide details)
☐ Workers' Comp    ☐ Military

**Leave of Absence Granted**

| From Date | To Date, Inclusive |
|---|---|
| *1-1-98* | *2-1-98* |

This leave is granted so that employee may be absent from work for a specified period without breaking his/her continuous service record. An employee absent without leave, or who fails to report for work before expiration of a leave, is subject to separation. Employee, in accepting this leave, agrees to following rules governing leaves of absence:

| Approved By (Initials) | To Date, Inclusive |
|---|---|
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |

• **MEDICAL, PREGNANCY, OR OTHER PHYSICAL DISABILITY** — A Leave of Absence may be granted for a period of one month, unless otherwise clearly indicated, with monthly extensions as warranted by the nature of the disability, normally not to exceed a total of one year. It is employee's responsibility to notify his/her Supervisor in all cases, giving approximate time of return to work. If additional time is required, employee should request an extension from the Supervisor. A physician's certificate may be required.

An employee on pregnancy leave who has been medically cleared to return to work but needs additional leave time for child care or other related problems may be granted personal leave time (see "Other Valid Reasons" below) for a period of one month, with monthly extensions as warranted by the nature of the problem, not to exceed a total of three months. A combination of pregnancy leave and personal leave shall not exceed one year.

• **WORKERS' COMPENSATION** — In any case of compensable illness or injury under Workers' Compensation, a Workers' Compensation leave will be granted in writing for expected period of legal, temporary disability. Leave may be extended as needed but not to exceed one year.

• **NO WORK AVAILABLE** — A leave for a maximum of one year (or a period equal to the employee's length of service, whichever is less) may be granted because of a curtailment in operations or a reduction in force layoff. Should the employee's job not be available at the end of that period, a Separation Notice shall be issued. The Supervisor and/or Human Resources Manager shall inform the employee of his/her type of leave, depending upon any job offers made to the employee while on layoff.

If an employee should be on a sickness, pregnancy, physical disability, or other type leave at the time he/she is to be laid off, his/her no-work-available leave time shall be counted from the date he/she is affected by the layoff. However, the type leave shall not be changed until the employee has been cleared to return to work.

• **MILITARY LEAVE** — The maximum military leave time is three months.

• **OTHER VALID REASONS** — The maximum leave of absence is three months.

• **INTERMITTENT OR REDUCED SCHEDULE** — The maximum accumulated time off is 12 weeks annually.

• Any leave time taken under the WPS Leave of Absence Policy which is mandated by the Family and Medical Leave Act will count simultaneously toward leave time allowed by this policy.

An employee who works elsewhere while on Leave of Absence (other than No Work Available) is subject to discharge.

| Date Returned to Work |
|---|
| *2-17-98* or |
| Date Terminated |
| If terminated, last date worked |

— HEALTHCARE COVERAGE —
WHILE ON EXTENDED LEAVE OF ABSENCE

Group healthcare coverage ends when an employee begins a leave of absence other than FMLA leave, in which case it ends after 12 weeks; however, an employee may continue healthcare coverage under COBRA at regular employee group rates for a period of time and later convert to COBRA rates, depending on type leave. See your Human Resources Department for details.

GROUP LIFE INSURANCE COVERAGE
WHILE ON LEAVE OF ABSENCE

Group life insurance coverage remains in effect for length of eligible Company leave except for no-work-available leaves, in which coverage is limited to first six months or until individual is covered as an employee by another group life insurance plan — whichever comes first.

Note: In healthcare and life insurance coverage for employee and dependents, required premiums must be paid and kept up to date or coverage may lapse.

| Supervisor |
|---|
| *Greg Lilley* |
| Department Manager |
| *Ray Scott* |
| Human Resources Manager |
| *TV* |
| Operating Head of Facility (as required) |
| Date of Final Approval |

• **RETURN TO WORK** — At least one week before leave expiration, employee must notify his/her Supervisor of intent to return to work. Employee returning from leave must satisfactorily complete return-to-work physical examination. Human Resources Department arranges for examination upon request.

| Employee Signature | Date |
|---|---|

WP-1112-CS-Rev. 4/96

NOTE: For information regarding FMLA leaves, see opposite side of form.

WPH
0000136



**WESTPOINT STEVENS**
BED PRODUCTS DIVISION

*January 16, 1998*

*Patricia Gibson*
*403 Fairwood Drive*
*Valley, AL. 36854*

*Dear Patricia:*

*Attached to this letter is a copy of the leave of absence your department has prepared for you.*

*Please read the back and front of the leave. If you have any questions call me at 706-645-7227 so I can discuss these areas with you.*

*Your rights under cobra began effective the last day worked for all leaves except medical leaves. When your leave is for medical reasons your rights under cobra begin 84 days after the last day worked. In both cases medical insurance provided under cobra extends for a period not to exceed 18 months from the effective date.*

*Please note that while you are on leave you need to contact your supervisor each time you visit your doctor so the two of you can discuss the status of your leave. Please make sure that you contact your supervisor. The number for your supervisor is 706-645-7229.*

*Please do not hesitate to call if I can be of assistance.*

*Sincerely,*

*Tim Wilbanks*

**WPH**
**000137**



WESTPOINT STEVENS
BED PRODUCTS DIVISION

January 16, 1998

Patricia Gibson
403 Fairwood Drive
Valley, AL. 36854

Dear Patricia:

Attached to this letter is a copy of the Leave of Absence which your Department Manager
granted so that your continuous employment record with WestPoint Stevens will continue
without interruption.

Please read carefully giving special attention to the section that includes information concerning
your insurance premiums.

It is very important that premiums are paid weekly at a minimum. You have a 30 day grace
period in which to make premium payments current. However, if premiums are not made current
your coverage will be cancelled and cannot be reinstated until you return to work.

If you have Universal Life and your leave is expected to last longer than six weeks, you will need
to contact Commercial Union Insurance Company toll free at (1-800-343-5560) and make
arrangements to pay these premiums directly to them.

Please let me know if you have questions and I will be glad to assist you.

Sincerely,

Sherry Burns
Insurance Coordinator

**WPH**
**000138**

LANIER/CARTER MILLS, POST OFFICE BOX 246, VALLEY, ALABAMA 36854 • AHILA 706 645-7227

,4384

**Distribution:**     1. Human Resources Department     2. Department Manager     3. Associate's Copy     **LEAVE OF ABSENCE**

| Name of Associate Patricia Gibson | Social Security No. | Facility Lanier |
|---|---|---|
| Address while on Leave 403 Fairwood Dr. Valley AL 36854 | Telephone No. while on Leave | Last Day Worked Prior to Leave 12-11-03 |

Reason for Leave (check one)     Is this leave covered by FMLA:    Yes ___  No ___

☒ Medical          ☐ No Work Available     ☐ Other_____
☐ Pregnancy        ☐ Sickness in Family    ☐ Intermittent or Reduced Schedule (provide details)
☐ Workers' Comp    ☐ Military

| Leave of Absence Granted | |
|---|---|
| From Date | To Date, Inclusive |
| 12-12-03 | 1-12-04 |
| Approved By (Initials) | To Date, Inclusive |

This leave is granted so that associate may be absent from work for a specified purpose without breaking his/her continuous service record. <u>An associate absent without leave, or who fails to report for work before expiration of a leave, is subject to separation.</u> Associate, in accepting this leave, agrees to following rules governing leaves of absence:

· MEDICAL, PREGNANCY, OR OTHER PHYSICAL DISABILITY–A Leave of Absence may be granted for a period of one month, unless otherwise clearly indicated, with monthly extensions as warranted by the nature of the disability, normally, not to exceed a total of one year. It is associate's responsibility to notify his/her Supervisor in all cases, giving approximate time of return to work. If additional time is required, associate should request an extension from the Supervisor. A physician's certificate may be required.

An associate on pregnancy leave who has been medically cleared to return to work but needs additional leave time for child care or other related problems may be granted personal leave time (see "Other Valid Reasons" below) for a period of one month, with monthly extensions as warranted by the nature of the problem, not to exceed a total of three months. A combination of pregnancy leave and personal leave shall not exceed one year.

· WORKER'S COMPENSATION–In any case of compensable illness or injury under Workers' Compensation, a Workers' Compensation leave will be granted in writing for expected period of legal, temporary disability. Leave may be extended as needed but not to exceed one year.

· NO WORK AVAILABLE–A leave for a maximum of one year (or a period equal to the associate's length of service, whichever is less) may be granted because of a curtailment in operations or a reduction in force layoff. Should the associate's job not be available at the end of that period, a Separation Notice shall be issued. The Supervisor and/ or Human Resources Manager shall inform the associate of his/her type of leave, depending upon any job offers made to the associate while on layoff.

If an associate should be on a sickness, pregnancy, physical disability, or other type leave at the time he/she is to be laid off, his/her no-work-available leave time shall be counted from the date he/she is affected by the layoff. However, the type leave shall not be changed until the associate has been cleared to return to work.

· MILITARY LEAVE–The maximum military leave time is three months.

· OTHER VALID REASONS–The maximum leave of absence is three months.

· INTERMITTENT OR REDUCED SCHEDULE–The maximum accumulated time off is 12 weeks annually.

· Any leave time taken under the Family and Medical Leave Act <u>will count concurrently</u> toward leave time allowed by the Company's Leave of Absence policy.

**An associate who works elsewhere while on Leave of Absence (other than No Work Available) is subject to discharge.**

| # | |
|---|---|
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |


DEFENDANT'S EXHIBIT 9 P. Gibson

| Date Returned to Work  or  1-5-04 |
|---|
| Date Terminated |
| If terminated, last date worked |

────── HEALTHCARE COVERAGE ──────
WHILE ON EXTENDED LEAVE OF ABSENCE

Group healthcare coverage ends when a associate begins a leave of absence other than FMLA leave, in which case it ends after 12 weeks; however, an associate may continue healthcare coverage under COBRA at regular associate group rates for a period of time and later convert to COBRA rates, depending on type leave. See your Human Resources Department for details.

GROUP LIFE INSURANCE COVERAGE
WHILE ON LEAVE OF ABSENCE

Group life insurance coverage remains in effect for length of eligible Company leave except for no-work-available leaves, in which coverage is limited to first six months or until individual is covered as an associate by another group life insurance plan – whichever comes first.

Note: In healthcare and life insurance coverage for associate and dependents, required premiums must be paid and kept up to date or coverage may lapse.

| Supervisor Ken Warren |
|---|
| Department Manager |
| Human Resource Manager Calvin E. Oglesbee |
| Operating Head of Facility (as required) |
| Date of Final Approval |

· RETURN TO WORK -- <u>At least one week before leave expiration, associate must notify his/her Supervisor of intent to return to work.</u> Associate returning from leave must satisfactorily complete return-to-work physical examination. Human Resources Department arranges for examination upon request.

| Patricia Gibson | 12-29-03 |
|---|---|
| Associate Signature  R.W.  TG | Date |

WP-1112-CS-Rev. 1/99

**NOTE: For information regarding FMLA leaves, see opposite side of form**

WPH 000195



WESTPOINT STEVENS

BED PRODUCTS DIVISION

December 31, 2003

Patricia Gibson
403 Fairwood Drive.
Valley, Alabama 36854

Dear Patricia:

Attached to this letter is a copy of the leave of absence your department has prepared for you.

Please read the back and front of this leave. If you have any questions call me at 706-645-7201 so I can discuss these areas with you.

Your rights under cobra began effective the last day worked for all leaves except medical leaves. When your leave is for medical reasons your rights under cobra begin 84 days after the last day worked. In both cases medical insurance provided under cobra extends for a period not to exceed 18 months from the effective date.

Please note that while you are on leave you need to contact your supervisor each time you visit your doctor so the two of you can discuss the status of your leave. Please make sure that you contact your supervisor.

Please do not hesitate to call if I can be of assistance.

Sincerely,

*Calvin E. Ogletree*

Calvin Ogletree
Human Resource Manager

**WPH
000196**



**W E S T P O I N T   S T E V E N S**

BED PRODUCTS DIVISION

December 31, 2003

Patricia Gibson
403 Fairwood Drive.
Valley, Alabama 36854

Dear Patricia:

Attached to this letter is a copy of the Leave Of Absence, which your Department Manager has granted.

Please read carefully and review your address and telephone number for accuracy. If this information is not correct, you will need to contact the personnel office so necessary changes can be made.

If you are on leave under the care of a physician, you may qualify for A&S benefits. You will need to come by the insurance office to pick up a disability form.

While on leave, your insurance premiums should be paid to the insurance office weekly at a minimum. You have a 30-day grace period in which to make premium payments current. However, if premiums are not made current your coverage will be canceled and cannot be reinstated until you return to work.

If you have Universal Life and your leave is expected to last longer than six weeks, you will need to contact Commercial Union Insurance Company toll free at (1-800-343-5660) and make arrangements to pay premiums directly to them.

Please let me know if you have questions and I will be glad to help you.

Sincerely,

Teresa Gates
Human Resource Secretary

**WPH**
**000197**

LANIER/CA.  _R MILLS, POST OFFICE BOX 248, VALLEY, ALABAMA 36..._ • AREA 706 645-7227

WESTPOINT STEVENS
# WORK RESTRICTIONS

NAME _Patricia Gibson_    S.S.N. _____    DATE _01/05/04_

FACILITY _Sumis_    DEPARTMENT _Prep_

A ( H ) Permanent    B ( ) Temporary - Expires _____
C ( ) Replace All Previous Restrictions    D ( ) No Restrictions    E ( ) Rejected

---

| | | | |
|---|---|---|---|
| 01 | ( ) | Limited Standing / Sitting / Walking | |
| | | Standing ____ Hrs/Day ( ) Sitting ____ Hrs/Day ( ) Walking ____ Hrs/Day ( ) | |
| 02 | ( ) | Unable to use  R ( ) L ( )    Hand ( ) Arm ( ) Foot ( ) Leg ( ) | |
| 03 | ( ) | Limited Use of  R ( ) L ( )    Hand ( ) Arm ( ) Foot ( ) Leg ( ) | |
| 04 | ( ) | No Repetitive use of:  Hands ( ) Arms ( ) Shoulders ( ) | |
| | | Right:  No Fine Manipulating ( ) No Simple Grasping ( ) No Pushing/Pulling ( ) | |
| | | Left:   No Fine Manipulating ( ) No Simple Grasping ( ) No Pushing/Pulling ( ) | |
| 05 | ( ) | Limitations for Lifting/Carrying/Pushing/Pulling | |

| | | |
|---|---|---|
| 10 lbs. | Never ( ) | _____ Hrs/Day ( ) |
| 11 - 20 lbs. | Never ( ) | _____ Hrs/Day ( ) |
| 21 - 50 lbs. | Never ( ) | _____ Hrs/Day ( ) |
| 51 - 100+ lbs. | Never ( ) | _____ Hrs/Day ( ) |

| | | | | |
|---|---|---|---|---|
| 06 | ( ) | Restricted Bending | Never ( ) | _____ Hrs/Day ( ) |
| 07 | ( ) | Restricted Squatting | Never ( ) | _____ Hrs/Day ( ) |
| 08 | ( ) | Restricted Crawling | Never ( ) | _____ Hrs/Day ( ) |
| 09 | ( ) | Restricted Climbing | Never ( ) | _____ Hrs/Day ( ) |
| 10 | ( ) | Restricted Reaching Above Shoulder Level: Never ( ) _____ Hrs/day ( ) | | |
| 11 | ( ) | No Exposure to Cotton Dust | | |
| 12 | ( ) | No Exposure to Respiratory Irritants | | |
| 13 | ( ) | No Exposure to Hazardous Machinery | | |
| 14 | ( ) | No Work at Elevations Above Floor Level | | |
| 15 | ( ) | No Operation of Powered Equipment (Lift Trucks, etc.) | | |
| 16 | ( ) | No Exposure to _____ (name of agent) | | |
| 17 | ( ) | No Exposure to Skin Irritants or Solvents | | |
| 18 | ( ) | No Work Involving Production Deadlines | | |
| 19 | ( H ) | Must Wear Glasses | | |
| 20 | ( ) | No Work Requiring Good Near-Visual Acuity | | |
| 21 | ( ) | Limited Color Discrimination | | |
| 22 | ( ) | Must Wear Eye Protection at All Times | | |
| 23 | ( ) | No Exposure to Identified High Noise Level Areas Unless PPE is Worn | | |
| 24 | ( ) | Can Work Only ____ Hrs/Day ( )   Can Work Only ____ Days/Week ( ) | | |
| 25 | ( ) | Can Work All Shifts Except _____ | | |
| 26 | ( ) | No Shift Rotation | | |
| 27 | ( ) | Must Use Respirator When Exposed to _____ (name chemical/agent) | | |
| 28 | ( ) | Fire Brigade | | |
| 29 | ( ) | D O T - Department of Transportation | | |
| 30 | ( H ) | Additional Restrictions or Remarks: ① Tornol 95 dut work RN | | |

② Sun lft earplies

③ may RTW today

---

This copy should be prepared in triplicate with White copy going to the Health Record;  Yellow copy to the individual's
supervisor;  and Pink copy to the Human Resources Department.

_____
Examiner's Signature

**ENRIQUE DUPRAT, M.D., F.A.C.S.**
General Surgery

39 Medical Park
Valley, AL 36854
(334) 756-8800

Name _Lemicie Gibson_

Diagnosis _Ganglion wrist_ Date _12/29/03_

☒ Was seen in office today

☒ Will be unable to work/go to school
from _12/12/03_ to _1/04/04_

☐ Can perform light duty
from _____ to _____

☒ Can perform regular duty
from _1/05/04_

Comments _____
_____
_____
_____

_____ M.D.

# Patricia Gibson
# Dx. 10, Part 1

DsehDebt, CLOSED

## U.S. Bankruptcy Court
## Middle District of Alabama (Opelika)
## Bankruptcy Petition #: 03-81614

*Assigned to:* Dwight H. Williams Jr.
Chapter 7
Voluntary
No asset

*Date Filed:* 10/23/2003
*Date Terminated:* 02/13/2004
*Date Discharged:* 02/10/2004

*Debtor*
**Jerry Gibson**
403 Fairwood Drive
Valley, AL 36854
SSN: xxx-xx-5337

represented by **W. Gregory Ward**
W. Gregory Ward, Attorney at
Law
301-A No. Lanier Ave.
Lanett, AL 36863
334-642-6008
Fax : 334-642-6154
Email:
wgward@mindspring.com

*Joint Debtor*
**Patricia J. Gibson**
403 Fairwood Drive
Valley, AL 36854
SSN: xxx-xx-1936
*aka*
**Patricia Barrow**

represented by **W. Gregory Ward**
(See above for address)

*Bankruptcy Admin.*
**Bankruptcy Administrator**
U. S. Bankruptcy Administrator
One Church Street
Montgomery, AL 36104

*Trustee*
**Cecil M. Tipton, Jr.**
Ray & Tipton
P. O. Box 191
Opelika, AL 36801
334 742-9400



DEFENDANT'S
EXHIBIT
10
P. Gibson

| Filing Date | # | Docket Text |
|---|---|---|
| 10/23/2003 | 1 | Chapter 7 Voluntary Petition. Receipt Number 03-8712, Fee Amount $200. Filed by Walter Gregory Ward on behalf of Jerry Gibson and Patricia J. Gibson. (LO, ) Modified receipt on 10/23/2003 (LO, ). (Entered: 10/23/2003) |
| 10/23/2003 | 4 | Motion to Avoid Nonpossessory Nonpurchase Security Interest Lien *of American General Finance* Filed by Walter Gregory Ward on behalf of Jerry Gibson, Patricia J. Gibson. (DW, ) (Entered: 10/24/2003) |

| 10/24/2003 | 2 | Appointing Interim Trustee and Approving Standing Bond. Cecil M. Tipton added to the case. (Non-Image Entry). (JV, ) (Entered: 10/24/2003) |
|---|---|---|
| 10/24/2003 | 3 | Meeting of Creditors (Image of notice will be displayed in the Certificate of Service, which will be filed within 5 days). Section 341(a) Meeting of Creditors and Discharge Hearing to be held on 12/4/2003 at 10:00AM at U.S. Bankruptcy Court, Federal Courthouse, Opelika, AL. Last day to oppose discharge or dischargeability is 2/2/2004. (JV, ) (Entered: 10/24/2003) |
| 10/29/2003 | 5 | BNC Certificate of Service - Meeting of Creditors. Service Date 10/29/03. (Related Doc # [3]) (Admin.) (Entered: 10/30/2003) |
| 10/31/2003 | 6 | Order Conditionally Granting Motion To Avoid Nonpossessory Nonpurchase Security Intersts Lien. (Related Doc # 4) Entered On 10/31/2003. (Objections no later than 12/1/2003) (DW, ) (Entered: 10/31/2003) |
| 11/25/2003 | 7 | Reaffirmation Agreement and Attorneys Declaration Between Debtor and General Motors Acceptance Corporation Filed by W. Gregory Ward on behalf of Jerry Gibson, Patricia J. Gibson. (CO, ) (Entered: 11/25/2003) |
| 11/25/2003 | 8 | Motion for Relief from Stay. Receipt Number cc0309809, Fee Amount $150. Filed by Leonard-AD Math on behalf of Green Tree - AL, L.L.C.. (Attachments: # 1 Exhibit) (Math, Leonard-AD) Modified receipt on 11/26/2003 (DH, ). (Entered: 11/25/2003) |
| 12/02/2003 | 9 | Order Conditionally Granting Motion For Relief From Stay. (Related Doc # 8) Entered On 12/2/2003. (GW, ) (Entered: 12/02/2003) |
| 12/04/2003 | 10 | BNC Certificate of Service - Order Terminating Stay Conditionally Ch 7 - No. of Notices: 2. Service Date 12/04/2003. (Related Doc # 9) (Admin.) (Entered: 12/05/2003) |
| 12/04/2003 | 12 | Reaffirmation Agreement and Attorneys Declaration Between Debtor and Washington Mutual Filed by W. Gregory Ward on behalf of Jerry Gibson, Patricia J. Gibson. (DW, ) (Entered: 12/05/2003) |
| 12/04/2003 | 13 | Reaffirmation Agreement and Attorneys Declaration Between Debtor and HomeQ Servicing Corporation Filed by W. Gregory Ward on behalf of Jerry Gibson, Patricia J. Gibson. (DW, ) (Entered: 12/05/2003) |
| 12/05/2003 | 11 | Trustee's Final Report of No Distribution: The trustee states upon present information and belief there is no property available for distribution to creditors from the estate. The trustee requests this report be approved; the estate be closed; the trustee be discharged from office, and the bond of the trustee be canceled concurrent with the surety or sureties on the bond being released from further liability on said bond. (Non-Image Entry) (Tipton, Cecil) (Entered: 12/05/2003) |
| 12/12/2003 | 14 | Amended Schedules. The following creditors were added: GreenTree--AL, LLC.. Filed by W. Gregory Ward on behalf of Jerry Gibson, Patricia J. Gibson. (Attachments: # 1 Revision Amendment to Chapter 7 List of Creditors) (Ward, W.) (Entered: 12/12/2003) |

| 02/10/2004 | 15 | Discharge Order Discharging Debtor(s) Entered On 2/10/2004 (RE: related document(s)[3] Meeting of Creditors Chapter 7 No Asset, ). (RLW, ) (Entered: 02/10/2004) |
| 02/12/2004 | 16 | BNC Certificate of Service - Order of Discharge - No. of Notices: 23. Service Date 02/12/2004. (Related Doc # 15) (Admin.) (Entered: 02/13/2004) |
| 02/13/2004 | 17 | Order Discharging Trustee, Releasing Bond Liability and Closing Case. The estate of the above named Debtor having been fully administered, it is ORDERED that: The accounts and report of the Trustee are hereby filed;The Trustee be and is hereby discharged as trustee of the estate of the above named debtor and the bond is cancelled;and the Chapter 7 case of the above named Debtor is closed. U.S. Bankruptcy Judge (Non-Image Entry). (CO, ) (Entered: 02/13/2004) |
| 02/13/2004 | 18 | Bankruptcy Case Closed (Non-Image Entry). (CO, ) (Entered: 02/13/2004) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/07/2007 13:35:38 | | | |
| **PACER Login:** | od0028 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 03-81614 Fil or Ent: filed Doc From: 0 Doc To: 99999999 Term: included Format: HTML |
| **Billable Pages:** | 2 | **Cost:** | 0.16 |

(Official Form 1) (12/02) West Group, Rochester, NY

| FORM B1 | United States Bankruptcy Court | Voluntary Petition |
|---|---|---|
| | *MIDDLE* District of *ALABAMA* | |

| Name of Debtor (If individual, enter Last, First, Middle): | Name of Joint Debtor (Spouse)(Last, First, Middle): |
|---|---|
| *Gibson, Jerry* | *Gibson, Patricia J.* |

| All Other Names used by the Debtor in the last 6 years (include married, maiden, and trade names): *NONE* | All Other Names used by the Joint Debtor in the last 6 years (include married, maiden, and trade names): *aka Patricia Barrow* |
|---|---|

| Soc. Sec./Tax I.D. No. (If more than one, state all): 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 | Soc. Sec./Tax I.D. No. (If more than one, state all): 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 |
|---|---|
| Street Address of Debtor (No. & Street, City, State & Zip Code): *403 Fairwood Drive* *Valley AL  36854* | Street Address of Joint Debtor (No. & Street, City, State & Zip Code): *403 Fairwood Drive* *Valley AL  36854* |
| County of Residence or of the Principal Place of Business:  *Chambers* | County of Residence or of the Principal Place of Business:  *Chambers* |
| Mailing Address of Debtor (if different from street address): *SAME* | Mailing Address of Joint Debtor (if different from street address): *SAME* |

| Location of Principal Assets of Business Debtor (if different from street address above): *NOT APPLICABLE* |
|---|

### Information Regarding the Debtor (Check the Applicable Boxes)

**Venue** (Check any applicable box)

☒ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

| **Type of Debtor** (Check all boxes that apply) | **Chapter or Section of Bankruptcy Code Under Which the Petition is Filed** (Check one box) |
|---|---|
| ☒ Individual(s)   ☐ Railroad | ☒ Chapter 7   ☐ Chapter 11   ☐ Chapter 13 |
| ☐ Corporation   ☐ Stockbroker | ☐ Chapter 9   ☐ Chapter 12 |
| ☐ Partnership   ☐ Commodity Broker | ☐ Sec. 304 - Case ancillary to foreign proceeding |
| ☐ Other_____   ☐ Clearing Bank | |

| **Nature of Debts** (Check one box) | **Filing Fee** (Check one box) |
|---|---|
| ☒ Consumer/Non-Business   ☐ Business | ☒ Full Filing Fee attached |
| **Chapter 11 Small Business**  (Check all boxes that apply) | ☐ Filing Fee to be paid in installments (Applicable to individuals only) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form No. 3. |
| ☐ Debtor is a small business as defined in 11 U.S.C. § 101 | |
| ☐ Debtor is and elects to be considered a small business under 11 U.S.C. § 1121(e) (Optional) | |

| **Statistical/Administrative Information**     (Estimates only) | THIS SPACE IS FOR COURT USE ONLY |
|---|---|
| ☒ Debtor estimates that funds will be available for distribution to unsecured creditors. | U.S. BANKRUPTCY COURT MONTGOMERY, ALABAMA 03 OCT 23 AM 9: 30 |
| ☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors. | |

| Estimated Number of Creditors | 1-15 ☐ | 16-49 ☒ | 50-99 ☐ | 100-199 ☐ | 200-999 ☐ | 1000-over ☐ |
|---|---|---|---|---|---|---|

| Estimated Assets | | | | | | |
|---|---|---|---|---|---|---|
| $0 to $50,000 ☐ | $50,001 to $100,000 ☒ | $100,001 to $500,000 ☐ | $500,001 to $1 million ☐ | $1,000,001 to $10 million ☐ | $10,000,001 to $50 million ☐ | $50,000,001 to $100 million ☐ | More than $100 million ☐ |

| Estimated Debts | | | | | | |
|---|---|---|---|---|---|---|
| $0 to $50,000 ☐ | $50,001 to $100,000 ☐ | $100,001 to $500,000 ☒ | $500,001 to $1 million ☐ | $1,000,001 to $10 million ☐ | $10,000,001 to $50 million ☐ | $50,000,001 to $100 million ☐ | More than $100 million ☐ |

200.⁰⁰ LO

[Official Form 1] (12/02) West Group, Rochester, NY

| **Voluntary Petition** | Name of Debtor(s): | FORM B1, Page 2 |
| *(This page must be completed and filed in every case)* | *Jerry Gibson* and *Patricia J. Gibson* | |

**Prior Bankruptcy Case Filed Within Last 6 Years (If more than one, attach additional sheet)**

| Location Where Filed: | Case Number: | Date Filed: |
| *NONE* | | |

**Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor (If more than one, attach additional sheet)**

| Name of Debtor: | Case Number: | Date Filed: |
| *NONE* | | |
| District: | Relationship: | Judge: |

## Signatures

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct.
[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.
I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X *Jerry Gibson*
   Signature of Debtor

X *Patricia J. Gibson*
   Signature of Joint Debtor

Telephone Number (If not represented by attorney)

*10/21/2003*
Date

### Signature of Attorney

X _____
   Signature of Attorney for Debtor(s)

*W. Gregory Ward WAR029*
Printed Name of Attorney for Debtor(s)

*Attorney at Law*
Firm Name

*301-A North Lanier Avenue*
Address

*Lanett AL  36863-2017*

*334-642-6008*          *10/21/2003*
Telephone Number          Date

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
   Signature of Authorized Individual

_____
Printed Name of Authorized Individual

_____
Title of Authorized Individual

*10/21/2003*
Date

### Exhibit A

(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under Chapter 11)

☐ Exhibit A is attached and made a part of this petition.

### Exhibit B

(To be completed if debtor is an individual whose debts are primarily consumer debts)

I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.

X _____    *10/21/2003*
   Signature of Attorney for Debtor(s)          Date

### Exhibit C

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health and safety?

☐ Yes, and exhibit C is attached and made a part of this petition.
☒ No

### Signature of Non-Attorney Petition Preparer

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

_____
Printed Name of Bankruptcy Petition Preparer

_____
Social Security Number

_____
Address

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

X _____
   Signature of Bankruptcy Petition Preparer

_____
Date

A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. § 110; 18 U.S.C. § 156.

**Voluntary Petition**
*(This page must be completed and filed in every case)*

Jerry Gibson and
Patricia J. Gibson

**Prior Bankruptcy Case Filed Within Last 6 Years (If more than one, attach additional sheet)**

| Location Where Filed: | Case Number: | Date Filed: |
|---|---|---|
| NONE | | |

**Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor (If more than one, attach additional sheet)**

| Name of Debtor: | Case Number: | Date Filed: |
|---|---|---|
| NONE | | |
| District: | Relationship: | Judge: |

## Signatures

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct.

[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _Jerry Gibson_
    Signature of Debtor

X _Patricia J. Gibson_
    Signature of Joint Debtor

_____
Telephone Number (if not represented by attorney)

10/21/2003
Date

### Signature of Attorney

X _W. J. W_
    Signature of Attorney for Debtor(s)

W. Gregory Ward WAR029
Printed Name of Attorney for Debtor(s)

Attorney at Law
Firm Name

301-A North Lanier Avenue
Address

Lanett AL  36863-2017

334-642-6008          10/21/2003
Telephone Number           Date

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
    Signature of Authorized Individual

_____
Printed Name of Authorized Individual

_____
Title of Authorized Individual

10/21/2003
Date

### Exhibit A

(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under Chapter 11)

☐ Exhibit A is attached and made a part of this petition

### Exhibit B

(To be completed if debtor is an individual whose debts are primarily consumer debts)

I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.

X _____          10/21/2003
    Signature of Attorney for Debtor(s)          Date

### Exhibit C

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health and safety?

☐ Yes, and exhibit C is attached and made a part of this petition.
☒ No

### Signature of Non-Attorney Petition Preparer

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

_____
Printed Name of Bankruptcy Petition Preparer

_____
Social Security Number

_____
Address

_____

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

X _____
    Signature of Bankruptcy Petition Preparer

_____
Date

A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. § 110; 18 U.S.C. § 156.

Form B 201 (4/98) West Group, Rochester, NY

# UNITED STATES BANKRUPTCY COURT
## NOTICE TO INDIVIDUAL CONSUMER DEBTOR

The purpose of this notice is to acquaint you with the four chapters of the federal Bankruptcy Code under which you may file a bankruptcy petition. The bankruptcy law is complicated and not easily described. Therefore, you should seek the advice of an attorney to learn of your rights and responsibilities under the law should you decide to file a petition with the court. Court employees are prohibited from giving you legal advice.

## Chapter 7: Liquidation ($170 filing fee plus $30 administrative fee)

1. Chapter 7 is designed for debtors in financial difficulty who do not have the ability to pay their existing debts.

2. Under chapter 7 a trustee takes possession of all your property. You may claim certain of your property as exempt under governing law. The trustee then liquidates the property and uses the proceeds to pay your creditors according to priorities of the Bankruptcy Code.

3. The purpose of filing a chapter 7 case is to obtain a discharge of your existing debts. If, however, you are found to have committed certain kinds of improper conduct described in the Bankruptcy Code, your discharge may be denied by the court, and the purpose for which you filed the bankruptcy petition will be defeated.

4. Even if you receive a discharge, there are some debts that are not discharged under the law. Therefore, you may still be responsible for such debts as certain taxes and student loans, alimony and support payments, criminal restitution, and debts for death or personal injury caused by driving while intoxicated from alcohol or drugs.

5. Under certain circumstances you may keep property that you have purchased subject to valid security interest. Your attorney can expain the options that are available to you.

## Chapter 13: Repayment of All or Part of the Debts of an Individual with Regular Income ($155 filing fee plus $30 administrative fee)

1. Chapter 13 is designed for individuals with regular income who are temporarily unable to pay their debts but would like to pay them in installments over a period of time. You are only eligible for chapter 13 if your debts do not exceed certain dollar amounts set forth in the Bankruptcy Code.

2. Under chapter 13 you must file a plan with the court to repay your creditors all or part of the money that you owe them, using your future earnings. Usually, the period allowed by the court to repay your debts is three years, but no more than five years. Your plan must be approved by the court before it can take effect.

3. Under chapter 13, unlike chapter 7, you may keep all your property, both exempt and non-exempt, as long as you continue to make payments under the plan.

4. After completion of payments under the plan, your debts are discharged except alimony and support payments, student loans, certain debts including criminal fines and restitution and debts for death or personal injury caused by driving while intoxicated from alcohol or drugs, and long term secured obligations.

## Chapter 11: Reorganization ($800 filing fee plus $30 administrative fee)

Chapter 11 is designed primarily for the reorganization of a business but is also available to consumer debtors. Its provisions are quite complicated, and any decision by an individual to file a chapter 11 petition should be reviewed with an attorney.

## Chapter 12: Family farmer ($200 filing fee plus $30 administrative fee)

Chapter 12 is designed to permit family farmers to repay their debts over a period of time from future earnings and is in many ways similar to chapter 13. The eligibility requirements are restrictive, limiting its use to those whose income arises primarily from a family-owned farm.

I, the debtor, affirm that I have read this notice.

| | | |
|---|---|---|
| 10/21/2003 | *Jerry Gibson* | |
| Date | Signature of Debtor | |
| 10/21/2003 | *Patricia G. Gibson* | Case Number |
| Date | Signature of Joint Debtor | |

DEBTOR COPY      COURT COPY
(circle one)

FORM B6 (6/90) West Group, Rochester, NY

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re *Jerry Gibson and Patricia J. Gibson*

Case No.
Chapter  7

_____ / Debtor


# SUMMARY OF SCHEDULES

Indicate as to each schedule whether that schedule is attached and state the number of pages on each. Report the totals from Schedules A, B, D, E, F, I, and J in the boxes provided. Add the amounts from Schedules A and B to determine the total amount of the debtor's assets. Add the amounts from Schedules D, E and F to determine the total amount of the debtor's liabilities.

| NAME OF SCHEDULE | Attached (Yes/No) | No. of Sheets | ASSETS | LIABILITIES | OTHER |
|---|---|---|---|---|---|
| A-Real Property | Yes | 1 | $   69,000.00 | | |
| B-Personal Property | Yes | 3 | $   16,525.00 | | |
| C-Property Claimed as Exempt | Yes | 1 | | | |
| D-Creditors Holding Secured Claims | Yes | 1 | | $   76,457.46 | |
| E-Creditors Holding Unsecured Priority Claims | Yes | 1 | | $       0.00 | |
| F-Creditors Holding Unsecured Nonpriority Claims | Yes | 4 | | $   45,552.66 | |
| G-Executory Contracts and Unexpired Leases | Yes | 1 | | | |
| H-Codebtors | Yes | 1 | | | |
| I-Current Income of Individual Debtor(s) | Yes | 1 | | | $    2,054.00 |
| J-Current Expenditures of Individual Debtor(s) | Yes | 1 | | | $    1,957.00 |
| Total Number of Sheets in All Schedules ► | | 15 | | | |
| Total Assets ► | | | $   85,525.00 | | |
| Total Liabilities ► | | | | $  122,010.12 | |

FORM B6A (10/89) West Group, Rochester, NY

In re <u>Jerry Gibson and Patricia J. Gibson</u> _____ / Debtor     Case No._____

(if known)

# SCHEDULE A-REAL PROPERTY

Except as directed below, list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a cotenant, community property, or in which the debtor has a life estate. Include any property in which the debtor holds rights and powers exercisable for the debtor's own benefit.  If the debtor is married, state whether the husband, wife, or both own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."  If the debtor holds no interest in real property, write "None" under "Description and Location of Property."

Do not include interests in executory contracts and unexpired leases on this schedule. List them in Schedule G-Executory Contracts and Unexpired Leases.

If an entity claims to have a lien or hold a secured interest in any property, state the amount of the secured claim. See Schedule D. If no entity claims to hold a secured interest in the property, write "None" in the column labeled "Amount of Secured Claim."

If the debtor is an individual or if a joint petition is filed, state the amount of any exemption claimed in the property only in Schedule C-Property Claimed as Exempt.

| Description and Location of Property | Nature of Debtor's Interest In Property | Husband--H Wife--W Joint--J Community--C | Current Market Value of Debtor's Interest, In Property Without Deducting any Secured Claim or Exemption | Amount of Secured Claim |
|---|---|---|---|---|
| 403 Fairwood Drive, Valley, AL  1 bath, 3 bedroom house | | J | $ 69,000.00 | $ 61,552.64 |
| | | | | |

| No continuation sheets attached | | **TOTAL $**<br>(Report also on Summary of Schedules.) | 69,000.00 | |

FORM B6B (10/89) West Group, Rochester, NY

In re *Jerry Gibson and Patricia J. Gibson* _____ / Debtor     Case No. _____

(if known)

# SCHEDULE B-PERSONAL PROPERTY

Except as directed below, list all personal property of the debtor of whatever kind. If the debtor has no property in one or more of the categories, place an "X" in the appropriate position in the column labeled "None." If additional space is needed in any category, attach a separate sheet properly identified with the case name, case number, and the number of the category. If the debtor is married, state whether husband, wife, or both own property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor is an individual or a joint petition is filed, state the amount of any exemptions claimed only in Schedule C-Property Claimed as Exempt.

Do not list interests in executory contracts and unexpired leases on this schedule. List them in Schedule G-Executory Contracts and Unexpired Leases. If the property is being held for the debtor by someone else, state that person's name and address under "Description and Location of Property."

| Type of Property | None | Description and Location of Property | Husband--H Wife--W Joint--J Community--C | Current Market Value of Debtor's Interest, in Property Without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 1. Cash on hand. | | *100*<br>*Location: In debtor's possession* | J | $ 100.00 |
| 2. Checking, savings or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives. | X | | | |
| 3. Security deposits with public utilities, telephone companies, landlords, and others. | X | | | |
| 4. Household goods and furnishings, including audio, video, and computer equipment. | | *3 bedroom sets, living room, dining room, refrigerator*<br>*Location: In debtor's possession* | J | $ 4,000.00 |
| | | *lawn mower; Apple computer (no longer works); t.v.*<br>*Location: In debtor's possession* | J | $ 150.00 |
| | | *panasonic tv*<br>*Location: In debtor's possession* | J | $ 1,300.00 |
| 5. Books, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles. | X | | | |
| 6. Wearing apparel. | | *usual and customary clothing*<br>*Location: In debtor's possession* | J | $ 500.00 |
| 7. Furs and jewelry. | X | | | |
| 8. Firearms and sports, photographic, and other hobby equipment. | X | | | |

Page  1  of  3

FORM B6B (10/89) West Group, Rochester, NY

In re *Jerry Gibson and Patricia J. Gibson* _____ / Debtor    Case No. _____

<span style="text-align:right">(if known)</span>

## SCHEDULE B-PERSONAL PROPERTY

(Continuation Sheet)

| Type of Property | N o n e | Description and Location of Property | Husband--H Wife--W Joint--J Community--C | Current Market Value of Debtor's Interest, in Property Without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 9. Interests in insurance policies. Name insurance company of each policy and itemize surrender or refund value of each. | X | | | |
| 10. Annuities. Itemize and name each issuer. | X | | | |
| 11. Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Itemize. | X | | | |
| 12. Stock and interests in incorporated and unincorporated businesses. Itemize. | X | | | |
| 13. Interests in partnerships or joint ventures. Itemize. | X | | | |
| 14. Government and corporate bonds and other negotiable and non-negotiable instruments. | X | | | |
| 15. Accounts Receivable. | X | | | |
| 16. Alimony, maintenance, support, and property settlements to which the debtor is or may be entitled. Give particulars. | X | | | |
| 17. Other liquidated debts owing debtor including tax refunds. Give particulars. | X | | | |
| 18. Equitable or future interests, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule of Real Property. | X | | | |
| 19. Contingent and non-contingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust. | X | | | |
| 20. Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims. Give estimated value of each. | X | | | |
| 21. Patents, copyrights, and other intellectual property. Give particulars. | X | | | |
| 22. Licenses, franchises, and other general intangibles. Give particulars. | X | | | |
| 23. Automobiles, trucks, trailers and other vehicles. | | *1998 Chevrolte C1500 Pickup 1/2 ton v-8 short bed* *Location: In debtor's possession* | J | $ 10,475.00 |
| 24. Boats, motors, and accessories. | X | | | |
| 25. Aircraft and accessories. | X | | | |

Page ___2___ of ___3___

FORM B6B (10/89) West Group, Rochester, NY

In re *Jerry Gibson and Patricia J. Gibson* _____ / Debtor    Case No. _____

<span style="text-align:right">(if known)</span>

# SCHEDULE B-PERSONAL PROPERTY

(Continuation Sheet)

| Type of Property | N o n e | Description and Location of Property | Husband—H Wife—W Joint—J Community—C | Current Market Value of Debtor's Interest, In Property Without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 26. Office equipment, furnishings, and supplies. | X | | | |
| 27. Machinery, fixtures, equipment and supplies used in business. | X | | | |
| 28. Inventory. | X | | | |
| 29. Animals. | X | | | |
| 30. Crops - growing or harvested. Give particulars. | X | | | |
| 31. Farming equipment and implements. | X | | | |
| 32. Farm supplies, chemicals, and feed. | X | | | |
| 33. Other personal property of any kind not already listed. Itemize. | X | | | |

Page ___3___ of ___3___

Total ➡    $ 16,525.00

**(Report total also on Summary of Schedules.
Include amounts from any continuation sheets attached**

FORM B6C (6/90) West Group, Rochester, NY

In re *Jerry Gibson and Patricia J. Gibson* _____ / Debtor    Case No. _____

(if known)

## SCHEDULE C-PROPERTY CLAIMED AS EXEMPT

Debtor elects the exemptions to which debtor is entitled under:

(Check one box)

☐ 11 U.S.C. § 522(b) (1):  Exemptions provided in 11 U.S.C. § 522(d). Note: These exemptions are available only in certain states.

☒ 11 U.S.C. § 522(b) (2):  Exemptions available under applicable nonbankruptcy federal laws, state or local law where the debtor's domicile has been located for the 180 days immediately preceding the filing of the petition, or for a longer portion of the 180-day period than in any other place, and the debtor's interest as a tenant by the entirety or joint tenant to the extent the interest is exempt from process under applicable nonbankruptcy law.

| Description of Property | Specify Law Providing each Exemption | Value of Claimed Exemption | Current Market Value of Property Without Deducting Exemptions |
|---|---|---|---|
| 403 Fairwood Drive, Valley, AL 1 bath, 3 bedroom house | Ala. Code Title 6-10-2, 5-10-4 | $ 6,000.00 | $ 69,000.00 |
| 100 | Ala. Code Title 6-10-6, 6-10-126 | $ 100.00 | $ 100.00 |
| 3 bedroom sets, living room, dining room, refrigerator | Ala. Code Title 6-10-6, 6-10-126 | $ 4,000.00 | $ 4,000.00 |
| lawn mower; computer(no longer works); t.v. | Ala. Code Title 6-10-6, 6-10-126 | $ 0.00 | $ 150.00 |
| panasonic tv | Ala. Code Title 6-10-6, 6-10-126 | $ 1,300.00 | $ 1,300.00 |
| usual and customary clothing | Ala. Code Tit. 6-10-6, 6-10-126 | $ 500.00 | $ 500.00 |
| 1998 Chevrolte C1500 Pickup 1/2 ton v-8 short bed | Ala. Code Title 6-10-6 | $ 475.00 | $ 10,475.00 |

Page No. <u>1</u> of <u>1</u>

FORM B6D (6/90) West Group, Rochester, NY

In re _Jerry Gibson and Patricia J. Gibson_ _____ / Debtor    Case No. _____

(if known)

## SCHEDULE D-CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and account number, if any, of all entities holding claims secured by property of the debtor as of the date of filing of the petition. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests. List creditors in alphabetical order to the extent practicable. If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column marked "Codebtor," include the entity on the appropriate schedule of creditors and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedules. Report this total also on the Summary of Schedules.

☐ Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| Creditor's Name and Mailing Address Including Zip Code | Codebtor | Date Claim was Incurred, Nature of Lien, and Description and Market Value of Property Subject to Lien H—Husband W—Wife J—Joint C—Community | Contingent | Unliquidated | Disputed | Amount of Claim Without Deducting Value of Collateral | Unsecured Portion, if any |
|---|---|---|---|---|---|---|---|
| Account No: Creditor # : 1 Home-Q Servicing Wachovia P.O. Box 13716 Sacramento CA 95853-3716 | J | 3-12-01 Mortgage Value: $ 69,000.00 | | | | $ 61,552.64 | $ 0.00 |
| Account No: Creditor # : 2 American General Finance 2485 Airport Thruway P.O. Box 4281 Columbus GA 31904-0281 | W | 2001 Non-purchase Money Security lawn mower; computer(no longer works); t.v.--non-pmsi Value: $ 150.00 | | | | $ 3,604.82 | $ 3,454.82 |
| Account No: Creditor # : 3 GMAC P.O. Box 105677 Atlanta GA 30348 | J | 2000 Car Loan Value: $ 10,475.00 | | | | $ 10,000.00 | $ 0.00 |
| Account No: Creditor # : 4 Washington Mutual 1461 Gateway Drive Opelika AL 36801-0000 | J | Purchase Money Security panasonic tv Value: $ 1,300.00 | | | | $ 1,300.00 | $ 0.00 |

No continuation sheets attached

Subtotal $ (Total of this page)    76,457.46

Total $ (Use only on last page. Report total also on Summary of Schedules)    76,457.46

FORM B6E (4/98) West Group, Rochester, NY

In re _Jerry Gibson and Patricia J. Gibson_ _____ / Debtor    Case No._____
                                                                              (if known)

# SCHEDULE E-CREDITORS HOLDING UNSECURED PRIORITY CLAIMS

A complete list of claims entitled to priority, listed separately by type of priority, is to be set forth on the sheets provided. Only holders of unsecured claims entitled to priority should be listed in this schedule. In the boxes provided on the attached sheets, state the name and mailing address, including zip code, and account number, if any, of all entities holding priority claims against the debtor or the property of the debtor, as of the date of the filing of the petition.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of claims listed on each sheet in the box labeled "Subtotal" on each sheet. Report the total of all claims listed on this Schedule E in the box labeled "Total" on the last sheet of the completed schedule. Repeat this total also on the Summary of Schedules.

☒  Check this box if debtor has no creditors holding unsecured priority claims to report on this Schedule E.

**TYPES OF PRIORITY CLAIMS**    (Check the appropriate box(es) below if claims in that category are listed on the attached sheets)

☐  **Extensions of credit in an involuntary case**
Claims arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee or the order for relief. 11 U.S.C. § 507(a)(2).

☐  **Wages, salaries, and commissions**
Wages, salaries, and commissions, including vacation, severance, and sick leave pay owing to employees and commissions owing to qualifying independent sales representatives up to $4,650* per person earned within 90 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(3).

☐  **Contributions to employee benefit plans**
Money owed to employee benefit plans for services rendered within 180 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(4).

☐  **Certain farmers and fishermen**
Claims of certain farmers and fishermen, up to $4,650* per farmer or fisherman, against the debtor, as provided in 11 U.S.C. § 507(a)(5).

☐  **Deposits by individuals**
Claims of individuals up to $2,100* for deposits for the purchase, lease, or rental of property or services for personal, family, or household use, that were not delivered or provided. 11 U.S.C. § 507(a)(6).

☐  **Alimony, Maintenance or Support**
Claims of a spouse, former spouse, or child of the debtor, for alimony, maintenance, or support, to the extent provided in 11 U.S.C. § 507(a)(7).

☐  **Taxes and Certain Other Debts Owed to Governmental Units**
Taxes, custom duties, and penalties owing to federal, state, and local governmental units as set forth in 11 U.S.C. § 507(a)(8).

☐  **Commitments to Maintain the Capital of an Insured Depository Institution**
Claims based on commitments to FDIC, RTC, Director of the Office of Thrift Supervision, Comptroller of the Currency, or Board of Governors of the Federal Reserve System, or their predecessors or successors, to maintain the capital of an insured depository institution. 11 U.S.C. § 507(a)(9).

*Amounts are subject to adjustment on April 1, 2004, and every three years thereafter with respect to cases commenced on or after the date of adjustment.

No continuation sheets attached

FORM B6F (9/97) West Group, Rochester, NY

In re _Jerry Gibson and Patricia J. Gibson_____ / Debtor     Case No._____

(if known)

# SCHEDULE F-CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

State the name, mailing address, including zip code, and account number, if any, of all entities holding unsecured claims without priority against the debtor or the property of the debtor, as of the date of filing of the petition. Do not include claims listed in Schedules D and E. If all creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedules. Report this total also on the Summary of Schedules.

☐ Check this box if debtor has no creditors holding unsecured nonpriority claims to report on this Schedule F.

| Creditor's Name and Mailing Address Including Zip Code | Codebtor | Date Claim was Incurred, and Consideration for Claim. If Claim is Subject to Setoff, so State. | Contingent | Unliquidated | Disputed | Amount of Claim |
|---|---|---|---|---|---|---|
| | | H--Husband W--Wife J--Joint C--Community | | | | |
| Account No:<br>Creditor # : 1<br>Axsys National Bank<br>16 McLeland Road<br>St. Cloud MN 56303-2198 | W | Credit Card Purchases | | | | $ 866.75 |
| Account No:<br>Creditor # : 2<br>BankFirst<br>P.O. Box 5052<br>Sioux Falls SD 57117-5052 | J | Credit Card Purchases | | | | $ 265.36 |
| Account No:<br>Creditor # : 3<br>Capital One Bank<br>P. O. Box 85147<br>Richmond VA 23276 | W | Credit Card Purchases | | | | $ 5,582.61 |
| Account No:<br>Creditor # : 4<br>Capital One Bank<br>P. O. Box 85147<br>Richmond VA 23276 | H | Credit Card Purchases | | | | $ 644.90 |

_3_ continuation sheets attached

| | |
|---|---|
| Subtotal $<br>(Total of this page) | 7,359.62 |
| Total $<br>(Report total also on Summary of Schedules) | |

FORM B6F (9/97) West Group, Rochester, NY

In re *Jerry Gibson and Patricia J. Gibson* _____ / Debtor    Case No._____

(if known)

## SCHEDULE F-CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

(Continuation Sheet)

| Creditor's Name and Mailing Address Including Zip Code | Codebtor | Date Claim was Incurred, and Consideration for Claim. If Claim is Subject to Setoff, so State. H—Husband W—Wife J—Joint C—Community | Contingent | Unliquidated | Disputed | Amount of Claim |
|---|---|---|---|---|---|---|
| Account No: Creditor # : 5 Capital One Bank P. O. Box 25131 Richmond VA 23276-0001 | W | Credit Card Purchases | | | | $ 513.08 |
| Account No: Creditor # : 6 Capital One Bank P. O. Box 85147 Richmond VA 23276 | H | Credit Card Purchases | | | | $ 2,431.15 |
| Account No: Representing: Capital One Bank | | Sarzaur & Schwartz, P.C. Attorneys at Law P.O. Box 11366 Birmingham AL 35202-1366 | | | | |
| Account No: Creditor # : 7 Capital One Bank P. O. Box 85147 Richmond VA 23276 | H | Credit Card Purchases | | | | $ 1,899.76 |
| Account No: Representing: Capital One Bank | | Allied Interstate P.O. Box 361774 Columbus OH 43236 | | | | |
| Account No: Creditor # : 8 Cross Country Bank c/o Simm Associates, Inc. P.O. Box 7526 Newark DE 19714-7526 | H | Credit Card Purchases | | | | $ 1,475.78 |

Sheet No. _1_ of _3_ continuation sheets attached to Schedule of
Creditors Holding Unsecured Nonpriority Claims

Subtotal $
(Total of this page)    6,319.77

Total $
(Report total also on Summary of Schedules)

FORM B6F (9/97) West Group, Rochester, NY

In re <u>Jerry Gibson and Patricia J. Gibson</u> _____ / Debtor     Case No._____

<span style="margin-left:auto">(if known)</span>

# SCHEDULE F-CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

(Continuation Sheet)

| Creditor's Name and Mailing Address Including Zip Code | C o d e b t o r | Date Claim was Incurred, and Consideration for Claim. If Claim is Subject to Setoff, so State. | c o n t i n g e n t | U n l i q u i d a t e d | D i s p u t e d | Amount of Claim |
|---|---|---|---|---|---|---|
| | | H—Husband W—Wife J—Joint C—Community | | | | |
| Account No:<br>Creditor # : 9<br>Direct Merchants Credit Bank<br>P.O. Box 22128<br>Tulsa Oklahoma 74121-2128 | H | Credit Card Purchases | | | | $ 2,657.64 |
| Account No:<br>Creditor # : 10<br>Fleet<br>P.O. Box 15480<br>Wilmington DE 19850-5480 | W | Credit Card Purchases | | | | $ 7,831.85 |
| Account No:<br>Creditor # : 11<br>Household Bank, N.A.<br>c/o Asset Acquisition Group<br>P.O. Box 370470<br>Denver CO 80237-0470 | H | Credit Card Purchases | | | | $ 954.61 |
| Account No:<br>Creditor # : 12<br>Household Credit Services<br>P.O. Box 98715<br>Las Vegas NV 89193-8715 | H | Credit Card Purchases | | | | $ 604.75 |
| Account No:<br>Creditor # : 13<br>Household Credit Services<br>P.O. Box 5222<br>Carol Stream IL 60197-5222 | W | Credit Card Purchases | | | | $ 3,635.00 |
| Account No:<br>Creditor # : 14<br>Regions Bank<br>Box 371357<br>Pittsburgh PA 15250-7357 | J | Balance due after leased vehicle turned back in | | | | $ 15,672.59 |

Sheet No. _2_ of _3_ continuation sheets attached to Schedule of
Creditors Holding Unsecured Nonpriority Claims

Subtotal $ <br>
(Total of this page)<br>
Total $ <br>
(Report total also on Summary of Schedules)

31,356.44

FORM B6F (9/97) West Group, Rochester, NY

In re _Jerry Gibson and Patricia J. Gibson_ _____ / Debtor    Case No. _____

(if known)

# SCHEDULE F-CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

(Continuation Sheet)

| Creditor's Name and Mailing Address including Zip Code | C o d e b t o r | Date Claim was Incurred, and Consideration for Claim. If Claim is Subject to Setoff, so State. H--Husband W--Wife J--Joint C--Community | C o n t i n g e n t | U n l i q u i d a t e d | D i s p u t e d | Amount of Claim |
|---|---|---|---|---|---|---|
| Account No: _____  Creditor # : 15 Texaco/Shell Credit Card Center P.O. Box 790001 Houston TX 77279-0001 | H | Credit Card Purchases | | | | $ 516.83 |
| Account No: | | | | | | |
| Account No: | | | | | | |
| Account No: | | | | | | |
| Account No: | | | | | | |
| Account No: | | | | | | |

Sheet No. _3_ of _3_ continuation sheets attached to Schedule of Creditors Holding Unsecured Nonpriority Claims

| | |
|---|---|
| Subtotal $ (Total of this page) | 516.83 |
| Total $ (Report total also on Summary of Schedules) | 45,552.66 |

FORM B6G (10/89) West Group, Rochester, NY

In re _Jerry Gibson and Patricia J. Gibson_ _____ / Debtor    Case No. _____

(if known)

# SCHEDULE G-EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Describe all executory contracts of any nature and all unexpired leases of real or personal property. Include any timeshare interests.
State nature of debtor's interests in contract, i.e., "Purchaser," "Agent," etc. State whether debtor is the lessor or lessee of a lease.
Provide the names and complete mailing addresses of all other parties to each lease or contract described.

NOTE: A party listed on this schedule will not receive notice of the filing of this case unless the party is also scheduled in the appropriate schedule of
creditors.

☒ Check this box if the debtor has no executory contracts or unexpired leases.

| Name and Mailing Address, Including Zip Code, of other Parties to Lease or Contract | Description of Contract or Lease and Nature of Debtor's Interest. State whether Lease is for Nonresidential Real Property. State Contract Number of any Government Contract. |
|---|---|
| | |

FORM B6H (6/90) West Group, Rochester, NY

In re _Jerry Gibson and Patricia J. Gibson_ _____ / Debtor     Case No. _____

(if known)

# SCHEDULE H-CODEBTORS

Provide the information requested concerning any person or entity, other than a spouse in a joint case, that is also liable on any debts listed by debtor in the schedules of creditors. Include all guarantors and co-signers. In community property states, a married debtor not filing a joint case should report the name and address of the nondebtor spouse on this schedule. Include all names used by the nondebtor spouse during the six years immediately preceding the commencement of this case.

☒ Check this box if the debtor has no codebtors.

| Name and Address of Codebtor | Name and Address of Creditor |
| --- | --- |
| | |

FORM B6I (6/90) West Group, Rochester, NY

In re *Jerry Gibson and Patricia J. Gibson* _____ / Debtor    Case No. _____

(if known)

## SCHEDULE I-CURRENT INCOME OF INDIVIDUAL DEBTOR(S)

The column labeled "Spouse" must be completed in all cases filed by joint debtors and by a married debtor in a chapter 12 or 13 case whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.

| Debtor's Marital Status: *Married* | DEPENDENTS OF DEBTOR AND SPOUSE | | |
|---|---|---|---|
| | NAMES | AGE | RELATIONSHIP |
| | | | |

| EMPLOYMENT: | DEBTOR | SPOUSE |
|---|---|---|
| Occupation | *drawing tender* | *warp operatior* |
| Name of Employer | *West Point Stevens* | *West Point Stevens* |
| How Long Employed | *6 years* | *27 years* |
| Address of Employer | *P.O. Box 71* *West Point GA  31833* | *P.O. Box 71* *West Point GA  31833* |

| Income: (Estimate of average monthly income) | | DEBTOR | SPOUSE |
|---|---|---|---|
| Current Monthly gross wages, salary, and commissions (pro rate if not paid monthly) | $ | 1,027.00 | $ 1,027.00 |
| Estimated Monthly Overtime | $ | 0.00 | $ 0.00 |
| SUBTOTAL | $ | 1,027.00 | $ 1,027.00 |
| LESS PAYROLL DEDUCTIONS | | | |
| a. Payroll Taxes and Social Security | $ | 0.00 | $ 0.00 |
| b. Insurance | $ | 0.00 | $ 0.00 |
| c. Union Dues | $ | 0.00 | $ 0.00 |
| d. Other  (Specify): | $ | 0.00 | $ 0.00 |
| | $ | 0.00 | $ 0.00 |
| | $ | 0.00 | $ 0.00 |
| SUBTOTAL OF PAYROLL DEDUCTIONS | $ | 0.00 | $ 0.00 |
| TOTAL NET MONTHLY TAKE HOME PAY | $ | 1,027.00 | $ 1,027.00 |
| Regular income from operation of business or profession or farm (attach detailed statement) | $ | 0.00 | $ 0.00 |
| Income from Real Property | $ | 0.00 | $ 0.00 |
| Interest and dividends | $ | 0.00 | $ 0.00 |
| Alimony, maintenance or support payments payable to the debtor for the debtor's use or that of dependents listed above. | $ | 0.00 | $ 0.00 |
| Social Security or other government assistance Specify: | $ | 0.00 | $ 0.00 |
| Pension or retirement income | $ | 0.00 | $ 0.00 |
| Other monthly income Specify: | $ | 0.00 | $ 0.00 |
| | $ | 0.00 | $ 0.00 |
| TOTAL MONTHLY INCOME | $ | 1,027.00 | $ 1,027.00 |

TOTAL COMBINED MONTHLY INCOME    $ _____ 2,054.00
(Report also on Summary of Schedules)

Describe any increase or decrease of more than 10% in any of the above categories anticipated to occur within the year following the filing of this document:

FORM B6J (6/90) West Group, Rochester, NY

In re _Jerry Gibson and Patricia J. Gibson_ _____ / Debtor    Case No. _____

(if known)

## SCHEDULE J-CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR

Complete this schedule by estimating the average expenses of the debtor and the debtor's family. Pro rate any payments made bi-weekly, quarterly, semi-annually, or annually to show monthly rate.

☐ Check this box if a joint petition is filed and debtor's spouse maintains a separate household. Complete a separate schedule of expenditures labeled "Spouse."

| | |
|---|---:|
| Rent or home mortgage payment (include lot rented for mobile home) | $ 666.00 |
| Are real estate taxes included?    Yes ☐    No ☒ | |
| Is property insurance included?    Yes ☐    No ☒ | |
| Utilities: Electricity and heating fuel | $ 100.00 |
|     Water and sewer | $ 30.00 |
|     Telephone | $ 35.00 |
|     Other    _cable t.v._ | $ 40.00 |
|     Other    _garbage collection_ | $ 34.00 |
|     Other    _propane gas_ | $ 55.00 |
| Home maintenance (Repairs and upkeep) | $ 0.00 |
| Food | $ 220.00 |
| Clothing | $ 0.00 |
| Laundry and dry cleaning | $ 0.00 |
| Medical and dental expenses | $ 0.00 |
| Transportation (not including car payments) | $ 50.00 |
| Recreation, clubs and entertainment, newspapers, magazines, etc. | $ 0.00 |
| Charitable contributions | $ 0.00 |
| Insurance (not deducted from wages or included in home mortgage payments) | |
|     Homeowner's or renter's | $ 62.00 |
|     Life | $ 58.00 |
|     Health | $ 0.00 |
|     Auto | $ 139.00 |
|     Other | $ 0.00 |
| Taxes (not deducted from wages or included in home mortgage) | |
| Specify: | |
| Installment payments: (in chapter 12 and 13 cases, do not list payments to be included in the plan) | $ 0.00 |
|     Auto | $ 0.00 |
|     Other:    _Auto loan to GMAC_ | $ 399.00 |
| Alimony, maintenance, and support paid to others | $ 69.00 |
| Payments for support of additional dependents not living at your home | $ 0.00 |
| Regular expenses from operation of business, profession, or farm (attach detailed statement) | $ 0.00 |
| Other: | $ 0.00 |
| TOTAL MONTHLY EXPENSES    (Report also on Summary of Schedules) | $ 1,957.00 |

FORM B6 (6/90) West Group, Rochester, NY

In re _Jerry Gibson and Patricia J. Gibson_ _____ / Debtor    Case No. _____

(if known)

# DECLARATION CONCERNING DEBTOR'S SCHEDULES

## DECLARATION UNDER PENALTY OF PERJURY BY AN INDIVIDUAL DEBTOR

I declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of ___16___ sheets, and that they are true and correct to the best of my knowledge, information and belief.

Date: _10/21/2003_ _____     Signature _Jerry Gibson_ _____
                                          Jerry Gibson

Date: _10/21/2003_ _____     Signature _Patricia J. Gibson_ _____
                                          Patricia J. Gibson

Form 7 (9/00) West Group, Rochester, NY

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re *Jerry Gibson*
   *and*
   *Patricia J. Gibson*
   *aka Patricia Barrow*

Case No.
Chapter  7

_____/ Debtor

### STATEMENT OF FINANCIAL AFFAIRS

This statement is to be completed by every debtor. Spouses filing a joint petition may file a single statement on which the information for both spouses is combined. If the case is filed under chapter 12 or chapter 13, a married debtor must furnish information for both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed. An individual debtor engaged in business as a sole proprietor, partner, family farmer, or self-employed professional, should provide the information requested on this statement concerning all such activities as well as the individual's personal affairs.

Questions 1-18 are to be completed by all debtors. Debtors that are or have been in business, as defined below, also must complete Questions 19-25. If the answer to any question is "None," or the question is not applicable, mark the box labeled "None." If additional space is needed for the answer to any question, use and attach a separate sheet properly identified with the case name, case number (if known), and the number of the question.

### DEFINITIONS

"In business." A debtor is "in business" for the purpose of this form if the debtor is a corporation or partnership. An individual debtor is "in business" for the purpose of this form if the debtor is or has been, within the six years immediately preceding the filing of this bankruptcy case, any of the following: an officer, director, managing executive, or owner of 5 percent or more of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership; a sole proprietor or self-employed.

"Insider." The term "insider" includes but is not limited to: relatives of the debtor; general partners of the debtor and their relatives; corporations of which the debtor is an officer, director, or person in control; officers, directors, and any owner of 5 percent or more of the voting or equity securities of a corporation debtor and their relatives; affiliates of the debtor and insiders of such affiliates; any managing agent of the debtor. 11 U.S.C. §101.

**1. Income from employment or operation of business.**

State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the two years immediately preceding this calendar year. (A debtor that maintains, or has maintained, financial records on the basis of a fiscal rather than a calendar year may report fiscal year income. Identify the beginning and ending dates of the debtor's fiscal year.) If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income of both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| AMOUNT | SOURCE (if more than one) |
|---|---|
| Year to date:$19892.52 | *West Point Stevens all three years* |
|   Last Year:$26788.45 | |
| Year before:$25967.95 | |
| | |
| Year to date:22095.65 | *West Point Stevens all three years* |
|   Last Year:33839.47 | |
| Year before:30452.52 | |

**2. Income other than from employment or operation of business.**

State the amount of income received by the debtor other than from employment, trade, profession, or operation of the debtor's business during the two years immediately preceding the commencement of this case. Give particulars. If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income for each spouse whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

Form 7 (9/00)  West Group, Rochester, NY

**3. Payments to creditors.**

a. List all payments on loans, installment purchases of goods or services, and other debts, aggregating more than $600 to any creditor, made within 90 days immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|
| Creditor:Home-Q (house payment) Address: | 16th of each month | $666.00 monthly | |

b. List all payments made within one year immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

**4. Suits and administrative proceedings, executions, garnishments and attachments.**

a. List all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing of this bankruptcy case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

b. Describe all property that has been attached, garnished or seized under any legal or equitable process within one year immediately preceding the commencement of this case.(Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

**5. Repossessions, foreclosures and returns.**

List all property that has been repossessed by a creditor, sold at a foreclosure sale, transferred through a deed in lieu of foreclosure or returned to the seller, within one year immediately preceding the commencement of this case.(Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR OR SELLER | DATE OF REPOSSESSION FORECLOSURE SALE, TRANSFER OR RETURN | DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|
| Name: Region's Bank Address:Box 371357, Pittsburgh, PA  15250-7357 | 5-23-2003 | Description:2000 300M Chrysler Value: |

**6. Assignments and receiverships.**

a. Describe any assignment of property for the benefit of creditors made within 120 days immediately preceding the commencement of this case.(Married debtors filing under chapter 12 or chapter 13 must include any assignment by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

b. List all property which has been in the hands of a custodian, receiver, or court-appointed official within one year immediately preceding the commencement of this case.(Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

Statement of Affairs - Page 2

Form 7 (9/00) West Group, Rochester, NY

**7. Gifts.**

List all gifts or charitable contributions made within one year immediately preceding the commencement of this case except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member and charitable contributions aggregating less than $100 per recipient.(Married debtors filing under chapter 12 or chapter 13 must include gifts or contributions by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

**8. Losses.**

List all losses from fire, theft, other casualty or gambling within one year immediately preceding the commencement of this case or since the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include losses by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

**9. Payments related to debt counseling or bankruptcy.**

List all payments made or property transferred by or on behalf of the debtor to any persons, including attorneys, for consultation concerning debt consolidation, relief under the bankruptcy law or preparation of a petition in bankruptcy within one year immediately preceding the commencement of this case.

☒ NONE

**10. Other transfers.**

List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of this case.(Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

**11. Closed financial accounts.**

List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within one year immediately preceding the commencement of this case. Include checking, savings, or other financial accounts, certificates of deposit, or other instruments; shares and share accounts held in banks, credit unions, pension funds, cooperatives, associations, brokerage houses and other financial institutions. (Married debtors filing under chapter 12 or chapter 13 must include information concerning accounts or instruments held by or for either or both spouses whether or not a joint petition is filed, unless spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF INSTITUTION | TYPE AND NUMBER OF ACCOUNT AND AMOUNT OF FINAL BALANCE | AMOUNT AND DATE OF SALE OR CLOSING |
|---|---|---|
| *Institution:Charter Bank* *Address:West Point, GA* | *Account Type and No.:IRA account* *Final Balance:$5,000.00* *Debtor closed this IRA account in 2002. Used money to catch up mortgage payments.* | |

**12. Safe deposit boxes.**

List each safe deposit or other box or depository in which the debtor has or had securities, cash, or other valuables within one year immediately preceding the commencement of this case.(Married debtors filing under chapter 12 or chapter 13 must include boxes or depositories of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

**13. Setoffs.**

List all setoffs made by any creditor, including a bank, against a debt or deposit of the debtor within 90 days preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

Form 7 (9/00)  West Group, Rochester, NY

**14. Property held for another person.**

List all property owned by another person that the debtor holds or controls.

☒ NONE

---

**15. Prior address of debtor.**

If the debtor has moved within the two years immediately preceding the commencement of this case, list all premises which the debtor occupied during that period and vacated prior to the commencement of this case. If a joint petition is filed, report also any separate address of either spouse.

☒ NONE

---

**16. Spouses and Former Spouses**

If the debtor resides or resided in a community property state, commonwealth or territory (including Alaska, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, or Wisconsin) within the six-year period immediately preceding the commencement of the case, identify the name of the debtor's spouse and of any former spouse who resides or resided with the debtor in the community property state.

☒ NONE

---

**17. Environmental Information**

For the purpose of this question, the following definitions apply:

"Environmental Law" means any federal, state, or local statute or regulation regulating pollution, contamination, release of hazardous or toxic substances, wastes or material into the air, land, soil, surface water, groundwater, or other medium, including, but not limited to, statutes or regulations regulating the cleanup of these substances, wastes, or material.

"Site" means any location, facility, or property as defined under any Environmental Law, whether or not presently or formerly owned or operated by the debtor, including, but not limited to disposal sites.

"Hazardous Material" means anything defined as hazardous waste, hazardous substance, toxic substance, hazardous material, pollutant, or contaminant or similar term under and Environmental Law;

a. List the name and address of every site for which the debtor has received notice in writing by a governmental unit that it may be liable or potentially liable under or in violation of an Environmental Law. Indicate the governmental unit, the date of the notice, and, if known, the Environmental Law;

☒ NONE

---

b. List the name and address of every site for which the debtor provided notice to a governmental unit of a release of Hazardous Material. Indicate the governmental unit to which the notice was sent and the date of the notice.

☒ NONE

---

c. List all judicial or administrative proceedings, including settlements or orders, under any Environmental Law, with respect to which the debtor is or was a party. Indicate the name and address of the governmental unit that is or was a party to the proceeding, and the docket number.

☒ NONE

---

Form 7 (9/00) West Group, Rochester, NY

**18. Nature, location and name of business**

a. If the debtor is an individual, list the names, addresses, taxpayer identification numbers, nature of the businesses and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partnership, sole proprietorship, or was a self-employed professional within the six years immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within the six years immediately preceding the commencement of this case.

If the debtor is a partnership, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities within the six years immediately preceding the commencement of this case.

If the debtor is a corporation, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities, within the six years immediately preceding the commencement of this case.

☒ NONE

b. Identify any business listed in response to subdivision a., above, that is "single asset real estate" as defined in 11 U.S.C. § 101.

☒ NONE

## DECLARATION UNDER PENALTY OF PERJURY BY INDIVIDUAL DEBTOR

I declare under penalty of Perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct to the best of my knowledge, information, and belief.

Date __10/21/2003__          Signature _____Jerry Gibson_____
                                       Jerry Gibson

Date __10/21/2003__          Signature _____Patricia J. Gibson_____
                                       Patricia J. Gibson

Penalty for making a false statement: Fine of up to $500,000 or imprisonment for up to 5 years or both, 18 U.S.C. § 152 and § 3571.

Rule 2016(b) (8/91) West Group, Rochester, NY

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re *Jerry Gibson*
    *and*
    *Patricia J. Gibson*
    *aka Patricia Barrow*

Case No.
Chapter 7

_____ / Debtor

Attorney for Debtor: *W. Gregory Ward*

## STATEMENT PURSUANT TO RULE 2016(B)

The undersigned, pursuant to Rule 2016(b), Bankruptcy Rules, states that:

1.  The undersigned is the attorney for the debtor(s) in this case.

2.  The compensation paid or agreed to be paid by the debtor(s), to the undersigned is:
    a)  For legal services rendered or to be rendered in contemplation of and in
        connection with this case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $_____ 800.00
    b)  Prior to the filing of this statement, debtor(s) have paid . . . . . . . . . . . . . . . $_____ 800.00
    c)  The unpaid balance due and payable is . . . . . . . . . . . . . . . . . . . . . . . . . $_____ 0.00

3.  $_____ 200.00 _____ of the filing fee in this case has been paid.

4.  The Services rendered or to be rendered include the following:
    a)  Analysis of the financial situation, and rendering advice and assistance to the debtor(s) in determining whether to
        file a petition under title 11 of the United States Code.
    b)  Preparation and filing of the petition, schedules, statement of financial affairs and other documents required by the c
    c)  Representation of the debtor(s) at the meeting of creditors.

5.  The source of payments made by the debtor(s) to the undersigned was from earnings, wages and compensation for
    services performed, and
        *None other*

6.  The source of payments to be made by the debtor(s) to the undersigned for the unpaid balance remaining, if any, will
    be from earnings, wages and compensation for services performed, and
        *None other*

7.  The undersigned has received no transfer, assignment or pledge of property from debtor(s) except the following for
    the value stated:
        *None*

8.  The undersigned has not shared or agreed to share with any other entity, other than with members of undersigned's
    law firm, any compensation paid or to be paid except as follows:
        *None*

Dated: *10/21/2003*

Respectfully submitted,

X_____

Attorney for Petitioner: *W. Gregory Ward*
    *Attorney at Law*
    *301-A North Lanier Avenue*
    *Lanett AL  36863-2017*

FORM B8 (9/97) West Group, Rochester, NY

# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF ALABAMA

In re *Jerry Gibson and Patricia J. Gibson*

Case No.
Chapter  7

_____ / Debtor

## CHAPTER 7 INDIVIDUAL DEBTOR'S STATEMENT OF INTENTION

1. I have filed a schedule of assets and liabilities which includes consumer debts secured by property of the estate.

2. I intend to do the following with respect to the property of the estate which secures those consumer debts:

a. **Property to Be Surrendered.**

| Description of Property | Creditor's Name |
|---|---|
| *None* | |

b. **Property to Be Retained.**                                    [Check any applicable statement.]

| Description of Property | Creditor's Name | Property is claimed as exempt | Property will be redeemed pursuant to 11 U.S.C. § 722 | Debt will be reaffirmed pursuant to 11 U.S.C. § 524(c) |
|---|---|---|---|---|
| *None* | | | | |

**Signature of Debtor(s)**

Date: 10/21/2003

Debtor: *Jerry Gibson  Patricia J. Gibson*

# Patricia Gibson
# Dx. 10, Part 2

FORM B8 (9/97) West Group, Rochester, NY

# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF ALABAMA

In re *Jerry Gibson and Patricia J. Gibson*

Case No.
Chapter  7

_____ / Debtor

## CHAPTER 7 STATEMENT OF INTENTION - SPOUSE'S DEBTS

1. I have filed a schedule of assets and liabilities which includes consumer debts secured by property of the estate.

2. I intend to do the following with respect to the property of the estate which secures those consumer debts:

a.  **Property to Be Surrendered.**

| Description of Property | Creditor's Name |
|---|---|
| *None* | |

b.  **Property to Be Retained.**                                    [Check any applicable statement.]

| Description of Property | Creditor's Name | Property is claimed as exempt | Property will be redeemed pursuant to 11 U.S.C. § 722 | Debt will be reaffirmed pursuant to 11 U.S.C. § 524(c) |
|---|---|---|---|---|
| *lawn mower; computer(no longer works); t.v.* | *American General Finance* | *522-F motion to avoid lien* | | |

**Signature of Debtor(s)**

Date: 10/21/2003                    Debtor: *Jerry Gibson Patricia J. Gibson*

FORM B8 (9/97) West Group, Rochester, NY

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re *Jerry Gibson and Patricia J. Gibson*

Case No. _____
Chapter  7

_____/ Debtor

## CHAPTER 7 STATEMENT OF INTENTION - JOINT DEBTS

1. I have filed a schedule of assets and liabilities which includes consumer debts secured by property of the estate.

2. I intend to do the following with respect to the property of the estate which secures those consumer debts:

a.  **Property to Be Surrendered.**

| Description of Property | Creditor's Name |
|---|---|
| *None* | |

b.  **Property to Be Retained.** [Check any applicable statement.]

| Description of Property | Creditor's Name | Property is claimed as exempt | Property will be redeemed pursuant to 11 U.S.C. § 722 | Debt will be reaffirmed pursuant to 11 U.S.C. § 524(c) |
|---|---|---|---|---|
| *panasonic tv* | *Washington Mutual* | X | | X |
| *1998 Chevrolte C1500 Pickup 1/2 ton v-8 short bed* | *GMAC* | X | | X |
| *403 Fairwood Drive, Valley, AL 1 bath, 3 bedroom house* | *Home-Q Servicing* | X | | X |

### Signature of Debtor(s)

Date: *10/21/2003* _____

Debtor: *Jerry Gibson*

Date: *10/21/2003* _____

Joint Debtor: *Patricia J. Gibson*

JERRY GIBSON
403 FAIRWOOD DRIVE
VALLEY, AL  36854


PATRICIA J. GIBSON
403 FAIRWOOD DRIVE
VALLEY, AL  36854


W. GREGORY WARD
301-A NORTH LANIER AVENUE
LANETT, AL  36863-2017


HOME-Q SERVICING
WACHOVIA
P.O. BOX 13716
SACRAMENTO, CA  95853-3716


ALLIED INTERSTATE
P.O. BOX 361774
COLUMBUS, OH  43236


AMERICAN GENERAL FINANCE
2485 AIRPORT THRUWAY
P.O. BOX 4281
COLUMBUS, GA  31904-0281


AXSYS NATIONAL BANK
16 MCLELAND ROAD
ST. CLOUD, MN  56303-2198


BANKFIRST
P.O. BOX 5052
SIOUX FALLS, SD  57117-5052


CAPITAL ONE BANK
P. O. BOX 85147
RICHMOND, VA  23276

CAPITAL ONE BANK
P. O. BOX 25131
RICHMOND, VA  23276-0001


CROSS COUNTRY BANK
C/O SIMM ASSOCIATES, INC.
P.O. BOX 7526
NEWARK, DE  19714-7526


DIRECT MERCHANTS CREDIT BANK
P.O. BOX 22128
TULSA, OKLAHOMA  74121-2128


FLEET
P.O. BOX 15480
WILMINGTON, DE  19850-5480


GMAC
P.O. BOX 105677
ATLANTA, GA  30348


HOUSEHOLD BANK, N.A.
C/O ASSET ACQUISITION GROUP
P.O. BOX 370470
DENVER, CO  80237-0470


HOUSEHOLD CREDIT SERVICES
P.O. BOX 98715
LAS VEGAS, NV  89193-8715


HOUSEHOLD CREDIT SERVICES
P.O. BOX 5222
CAROL STREAM, IL  60197-5222

REGIONS BANK
BOX 371357
PITTSBURGH, PA  15250-7357


SARZAUR & SCHWARTZ, P.C.
ATTORNEYS AT LAW
P.O. BOX 11366
BIRMINGHAM, AL  35202-1366


TEXACO/SHELL
CREDIT CARD CENTER
P.O. BOX 790001
HOUSTON, TX  77279-0001


WASHINGTON MUTUAL
1461 GATEWAY DRIVE
OPELIKA, AL  36801-0000

```
                                                        ┌──────────────────────────┐
                                                        │        FILED             │
    IN THE UNITED STATES BANKRUPTCY COURT               │     OCT 23 2003          │
          MIDDLE DISTRICT OF ALABAMA                     │  U.S. BANKRUPTCY COURT   │
               EASTERN DIVISION                          │   MONTGOMERY, ALABAMA    │
                                                        └──────────────────────────┘
```

In Re:                          )              Case No: 2003-
    Jerry Gibson                )
    Patricia Gibson

### MOTION TO AVOID LIEN

COMES NOW the Debtor in the above-entitled case, by and through the attorney of record, and files this complaint to avoid the lien of the creditor, **American General Finance**, pursuant to section 522(f) of the Bankruptcy Code, to the extent that such lien impairs an exemption to which debtor is entitled, which lien is:

()      A judicial lien;

(X)     A non-possessory, non-purchase-money security in any:

(A)     Household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family or household use of the debtor or a dependent of the debtor.

(B)     Implements, professional books or tools, of the trade of the debtor or the trade of a dependent of the debtor:

(C)     Professionally prescribed health aids for the debtor or a dependent of the debtor.

WHEREFORE, the debtor moves this Honorable Court to avoid the lien thereon.


_____
W. GREGORY WARD
Attorney for Debtor
301-A North Lanier Avenue
Lanett, AL 36863
(334) 642-6008


### CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this foregoing document upon the following document upon the following by placing a copy of same in the United States Mail, postage prepaid and properly addressed on October 21, 2003.


_____
OF COUNSEL


American General Finance
2485 Airport
P.O. Box 4281
Columbus, GA 31904-0281

Hon. Curtis C. Reding
Chapter 13 Trustee
P.O. Box 173
Montgomery, AL 36101

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re

JERRY GIBSON
PATRICIA J. GIBSON,

Debtors.

Case No. 03-81614-DHW
Chapter 7

**ORDER ON MOTION TO AVOID LIEN**

The debtors filed a motion on October 23, 200 under 11 U.S.C. § 522(f)(1)(B) to avoid the fixing of a nonpossessory, nonpurchase-money security interest held by creditor American General Finance in the property described in the motion.

Upon consideration of the motion, the court concludes that the motion should be GRANTED without further notice and a hearing unless the creditor files a timely objection which is well-grounded in fact and law and **requests a hearing**. Accordingly, it is

ORDERED that if no such objection and request for hearing is filed on or before **December 1, 2003**, the security interest in the property listed in the motion is AVOIDED to the extent that it impairs the debtors' allowed exemptions, is in property of the type set out in 11 U.S.C. § 522(f)(1)(B), and is a nonpurchase-money, nonpossessory interest.

Done this 31 day of October, 2003.

/s/ Dwight H. Williams, Jr.
United States Bankruptcy Judge

c: W. Gregory Ward,  Attorney for Debtors
American General Finance
Cecil M. Tipton, Jr.,

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re:

Jerry Gibson & Patricia J. Gibson,
Debtor(s)

**FILED**

NOV 25 2003

U.S. BANKRUPTCY COURT
MONTGOMERY, ALABAMA

ORIGINAL

Chapter 7 Case

Bky. No. 03-81614-DHW

**AGREEMENT TO REAFFIRM DEBT**

1.    On the date this case was filed, Jerry Gibson & Patricia J. Gibson was indebted to General Motors Acceptance Corporation ("Creditor") based upon a Contract dated June 2, 2001 (the "Contract").

2.    Creditor has a valid and perfected security interest in a U98 CHEVGMT-400 VIN 1GCEC14R1WZ173087.

3.    The undersigned agrees to pay Creditor the sum of $14,790.44 with interest thereon at the rate of 10.00% per annum computed from October 23, 2003 as follows:

[ x ]   payment of $440.58 on October 17, 2003, and

[   ]   payment of $_____ on _____, and

[ x ]   in monthly installments of $399.88 commencing on November 17, 2003 and
        continuing on the same day of each succeeding month.

4.    This Agreement incorporates all the terms and conditions of the documents evidencing the above-described indebtedness, except as otherwise specifically stated in this Agreement.

5.    **THIS AGREEMENT IS NOT REQUIRED UNDER THE BANKRUPTCY CODE, UNDER NONBANKRUPTCY LAW, OR UNDER ANY AGREEMENT NOT IN ACCORDANCE WITH SUBSECTION 524(c) OF THE BANKRUPTCY CODE.**

**NOTICE TO THE DEBTOR(S):  THIS AGREEMENT MAY BE RESCINDED AT ANY TIME PRIOR TO DISCHARGE OR WITHIN SIXTY DAYS AFTER THIS AGREEMENT IS FILED WITH COURT, WHICHEVER OCCURS LATER, BY GIVING WRITTEN NOTICE TO CREDITOR AT THE ADDRESS SET FORTH BELOW.**

Dated _11-10-03_

_Patricia J. Gibson_
Debtor

Dated _11-10-03_

_Jerry Gibson_
Debtor

Dated _NOV 18 2003_

GENERAL MOTORS ACCEPTANCE CORPORATION

By _S. Broniak_

S. Broniak, Agent
PO Box 5055
Troy, Michigan  48007-5055
(800) 551-5377

**DECLARATION OF ATTORNEY FOR DEBTOR(S)**

The undersigned hereby declares, under penalty of perjury, as follows:  I am the attorney who has represented the Debtor(s) during the course of negotiating the above Agreement.  This Agreement represents a fully informed and voluntary agreement by Debtor(s), and does not impose any undue hardship on the Debtor(s) or a dependent of the Debtor(s).  I have fully advised the Debtor(s) of the legal effect and consequences an agreement of the kind specified in Section 524(c) of the Bankruptcy Code and any default under such agreement.

Dated _11-11-03_

_W. Gregory Ward_
WALTER GREGORY WARD, Attorney for Debtor(s)

340-2121-08884

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

IN RE:                        ) CHAPTER 7
    JERRY   GIBSON            )
                              ) CASE NO. 03-81614-DHW-7
            Debtor(s).        )

<u>MOTION FOR RELIEF FROM AUTOMATIC STAY</u>

Now Comes the Movant, GREEN TREE - AL, L.L.C., a creditor herein, by its attorneys, Chambless ❖ Math, P.C. and for its Motion for Relief from the Automatic Stay, states as follows:

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. Section 1334, as referred under 28 U.S.C. Section 157, and it constitutes a "core proceeding" within the meaning of the latter statute.

2. This Motion is made pursuant to Bankruptcy Rule 4001, and in conformity with Bankruptcy Rule 9014.

3. Movant is precluded by the force and effect of paragraph (4) and (5) of Section 362(a) of the Bankruptcy Code from enforcing movant's lien against property of the estate and property of the Debtor.

4. The Debtor was at the time of the filing of his petition, and still is, justly and truly indebted to the movant in the sum of $38,835.93 plus interest as provided contract rate until paid.

5. The consideration was an obligation for the sum and on the date shown on the security agreement entered into between the

debtor and the movant.

6. There are no setoffs or counterclaims to said debt, and it is free from any charge forbidden by applicable law.

7. Pursuant to said obligation, the movant has a security interest in goods as follows: 2000 CAVALIER MOBILE HOME AND APPURTS.

8. The value of the property in which the movant has a security interest is less than the amount of the debt.

9. The Debtor has failed to reaffirm, redeem or surrender said property as required by the Code. The debtor does not have equity in said property and it is not necessary for an effective reorganization. Movant is and will continue to suffer irreparable harm from continuation of the 11 U.S.C. Section 362 automatic stay.

10. Meanwhile, Debtor(s) continue(s) to use and enjoy the movant's collateral while same continues to depreciate in value without adequate protection and compensation to movant.

11. The Trustee may be claiming an interest in the collateral and should maintain same or be forever barred.

WHEREFORE, movant moves for an Order granting relief from the Section 362 Stay, directing the Debtor to surrender possession of said property to the movant, and for an Order barring the Debtor's right of redemption. The movant further prays that the Trustee be directed to maintain and represent any interest he may claim in the

subject collateral or be forever barred.

GREEN TREE - AL, L.L.C.


By: Leonard N. Math

Of Counsel:
Chambless ❖ Math, P.C.
P.O. Box 230759
Montgomery, Alabama 36123-0759
334-272-2230

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was

served on all attorneys of record as set forth below by electronic

notice and\or by depositing a copy thereof in the United States

mail postage prepaid on November 26, 2003.

Cecil M. Tipton
Chapter 7 Trustee
P.O. Box 191
Opelika AL 36801

Walter Gregory Ward
Attorney at Law
301-A No. Lanier Avenue
Lanett AL 36863

JERRY  GIBSON
403 FAIRWOOD DRIVE
VALLEY AL 36854

s/ Leonard N. Math
Chambless ❖ Math, P.C.

NOV-24-2003 MON 10:35 AM CONSECO FINANCE CORP        FAX NO. 605 355 7034        P. 03

JAN-19-2003  12:38  FROM                                    TO        DISBURSEMENT DATE: 01-21-2000
(Green Tree Finance Corporation 1997, 1999.)                         ACCT# 22337095

GT-10-01-101 (6/89) MH-RIC                    ALABAMA                            153-4

## MANUFACTURED HOME RETAIL INSTALLMENT CONTRACT
## AND SECURITY AGREEMENT (CONV. - FHA - VA)  (SI)   Date  1/18/2000

BUYER:    GIBSON, JERRY, 2030 WAVERLY PKWY LOT 71, OPELIKA, AL 36801                    #2

SELLER:   SOUTHERN INVESTMENT CORP. SOUTHERN HOMES OUTLET CENTER, 1900 COLUMBUS PARKWAY, OPELIKA, AL 36804

ASSIGNEE: CONSECO FINANCE CORP-ALABAMA, 326 INTERSTATE PARK DRIVE, MONTGOMERY, AL 36109

### FEDERAL TRUTH-IN-LENDING ACT DISCLOSURES

| ANNUAL PERCENTAGE RATE (The cost of my credit as a yearly rate.) | FINANCE CHARGE (The dollar amount the credit will cost me.) | Amount Financed (The amount of credit provided to me or on my behalf.) | Total of Payments (The amount I will have paid after I have made all payments as scheduled.) | Total Sale Price (The total cost of my purchase on credit, including my down payment of $ 4000.00 |
|---|---|---|---|---|
| 12.80 % | $ 102425.80 | $ 35015.00 | $ 137440.80 | $ 141440.80 |

My payment schedule will be:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 360 | 381.78 | Monthly beginning 3/01/2000 |

SECURITY: I am giving a security interest in:
XX   The goods or property being purchased.    N/A   Other (Describe): _____ N/A _____
FILING FEES: $ 15.00 .  LATE CHARGE: If a payment is more than 15 days late, I will be charged _____
$3.00 or 5.0% of the unpaid amount of the installment, whichever is less
PREPAYMENT: If I pay off early, I N/A may XX will not be charged a prepayment penalty.
ASSUMPTION: Someone buying my home may, subject to conditions, be allowed to assume the remainder of the Contract on the original terms.
See the Contract document below for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

### ITEMIZATION OF THE AMOUNT FINANCED

| | | |
|---|---|---|
| 1. Cash Sale Price (including Taxes of) | $ 1500.00 | $ 39000.00 |
| 2. Gross Trade-in | $ .00 | |
| Less Amount Owed on Trade-in | $ .00 | |
| Net Trade-in | $ .00 | |
| Description: Make | | |
| Year  0000  Size  00 X 00 | | |
| 3. Cash Down Payment | $ 4000.00 | |
| 4. Total Down Payment | | $ 4000.00 |
| 5. Unpaid Balance of Cash Sale Price (1 - 4) | | $ 35000.00 |
| 6. Paid to Public Officials | | 15.00 |
| 7.*Paid to Insurance Companies | | .00 |
| 8. Paid to Appraiser | | .00 |
| 9.*a. Paid to CREDITOR FOR PTS/ORIG. FEES | | 2100.90 |
| b. Paid to | | .00 |
| c. Paid to | | .00 |
| d. Paid to | | .00 |
| e. Paid to | | .00 |
| f. Paid to | | .00 |
| g. Paid to | | .00 |
| 10. Principal Balance (5 + 6 + 7 + 8 + 9 a...g.) | | 37115.90 |
| 11. Prepaid Finance Charges | | 2100.90 |
| 12. Amount Financed (10 - 11) | | 35015.00 |

*Seller and/or Assignee and/or their affiliates may receive commissions or other compensation from businesses to whom these charges are due.

### PHYSICAL DAMAGE INSURANCE

Physical Damage Insurance is required but I may obtain it from anyone I want that is acceptable to you. If I get the insurance checked below from you or through you, I will pay you

$ .00 for insurance protection for a term of 00 years.
N/A  Comprehensive ($ .00 deductible)
N/A  Flood
N/A  Liability
N/A  Other
N/A  Vendor's Single Interest

### OPTIONAL CREDIT LIFE AND DISABILITY INSURANCE

Credit Life and Disability Insurance are not required to obtain credit and will not be provided unless I sign and agree to pay the additional cost.

The term of this insurance is 00 years.

| | | |
|---|---|---|
| N/A  Single Credit Life Insurance | $ | .00 |
| N/A  Joint Credit Life Insurance | $ | .00 |
| N/A  Single Credit Disability Insurance | $ | .00 |
| Total | $ | .00 |

X _____
Signature of Buyer(s) insured                    Date

### CONTRACT AND SECURITY AGREEMENT

1. DEFINITIONS: "I", "me", "my" means the Buyer(s). "You", "your" means the Seller and also the Assignee or their affiliates (after the Contract is assigned by Seller). The "parties" means the Buyer and Seller, together. "Manufactured Home" means the manufactured home and any other property described on page 2. "Contract" or "Agreement" means this Retail Installment Contract and Security Agreement.

Bankers Systems, Inc. St. Cloud, MN Form GT-MH-RIC-AL-AL 5/30/95       ORIGINAL       GT-10-01-101 (9/99)       JG       page 1 of Al

NOV-24-2003 MON 10:36 AM CONSECO FINANCE CORP          FAX NO. 605 355 7034          P. 04

JAN-19-2000  12:39  FROM                    TO  1334700060580    P. 03
                                                  2 2 3 3 7 0 9 5

Conseco Tower Financial Corporation, 1997, 1998.

| New or Used | Manufactured Home | | | |
|---|---|---|---|---|
| | YEAR AND MAKE | MODEL | SERIAL NUMBER | SIZE |
| N | 2000 | CAVALIER | ALCA 0799680 S 52875 | 16 X 80 |

| X Stove | X Refrigerator | | Washer | | Dryer | X | Air Conditioner | | Wheels/Axles |

Other (Describe)  DISHWASHER/SEATING/FURNITURE/SHELVES

**2. PURCHASE:** I have the option of buying the Manufactured Home for the cash price or buying on credit. The cash price is shown on page 1 at the "Cash Sale Price", and the credit price is shown on page 1 as the "Total Sale Price". I choose to buy on credit. Assignee and others may compensate Seller and/or its affiliates for arranging the financing, any insurance, any warranties and any other items or services sold with the Manufactured Home.

**3. SECURITY INTEREST:** I give you a security interest under the applicable certificate of title law or Uniform Commercial Code in the Manufactured Home and any property added or attached to it, to secure my obligation under this Contract. I also grant you a security interest in any interest I may have in proceeds and premium refunds of any insurance and service contracts purchased with this Contract. I agree to execute any application for certificate of title or document, financing statement or other document necessary to perfect your security interest in the Manufactured Home. To the extent, if any, that any Contract (whether or not accompanied by any one or more original) constitutes chattel paper (as such term is defined in the Uniform Commercial Code in effect in the applicable jurisdiction) no security interest in any Contract may be created in any document(s) other than the original.

**4. PAYMENTS AND LATE CHARGE:** I will pay you the amount shown as the "Total of Payments" according to the payment schedule shown on page 1. I also agree to pay a late charge for late payment as shown on page 1.

**5. NSF FEE:** If any payment instrument which I submit to you is returned unpaid for any reason, I will pay you a fee of $26.00.

**6. PREPAYMENT: I MAY PREPAY THIS LOAN IN WHOLE OR IN PART AT ANY TIME. I WILL NOT PAY A PENALTY UPON PREPAYMENT UNLESS OTHERWISE STATED IN THE NEXT SENTENCE. IF I PREPAY IN FULL WITHIN   N/A   MONTHS OF THE DATE OF THIS NOTE, I WILL PAY YOU A PENALTY OF N/A .  PARTIAL PREPAYMENTS WILL NOT EXCUSE OR REDUCE ANY LATER SCHEDULED PAYMENT UNTIL THIS NOTE IS PAID IN FULL.**

**7. SIMPLE INTEREST CONTRACT:** This is a simple interest contract. The interest rate is   12.00%  per annum

Interest will accrue upon the unpaid principal balance outstanding from time to time until paid in full. The Finance Charge, Total of Payments and Payment Schedule were computed based on the assumption that payment will be made on the dates scheduled for payment. Early payments will reduce my final payment. Late payments will increase my final payment. My final payment will be equal to all unpaid sums due under this Contract. My promise requires me to pay the final payment on the date due even if the amount of the final payment differs from the amount of the final payment disclosed.

**8. NO WARRANTIES:** I agree that there are no warranties of any type covering the Manufactured Home. I am buying the Manufactured Home AS IS and WITH ALL FAULTS and, THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE MANUFACTURED HOME IS WITH ME. I agree that any implied warranty of merchantability and any implied warranty of fitness for a particular purpose are specifically excluded and do not cover the Manufactured Home. This No Warranties provision does not apply to the extent that any law prohibits it and it does not cover any separate written warranties.

**9. PROTECTION OF THE MANUFACTURED HOME:** I will: (a) keep the Manufactured Home in good condition and not commit waste; (b) pay all taxes, charges and lot rent due for the Manufactured Home and the real estate it is located on; (c) not move, use illegally, sell, lease or otherwise transfer the Manufactured Home; (d) not attach the Manufactured Home to any real estate and the Manufactured Home will always be treated as personal property unless you consent in writing and state law permits such contrary treatment; and (e) not let anybody else have any interest in the Manufactured Home.

**10. INSURANCE:** I will keep the Manufactured Home insured against such risks and in such amounts as you may reasonably require with an insurance company satisfactory to you. I will arrange for you to be named as loss payee on the policy. I agree to provide you written evidence of insurance as requested by you from time to time. If you finance the purchase of any such insurance for me, I will repay you for the cost of that insurance, plus interest up to the contract rate of interest. I authorize you to furnish account data to a licensed insurance agent of your choice so such agent may solicit the purchase of insurance, property, warranty or other insurance from me. I agree that this insurance company may make any payments due under the policy directly to you, and I direct the insurance company to do so. You may do whatever you think is necessary to be sure that any proceeds of the insurance will be used to repair the Manufactured Home or pay off this Contract. I give you a power of attorney (which I cannot cancel) so that you may do whatever you need to in order to collect the insurance proceeds. If I fail to obtain, maintain or pay for the required insurance, and you may (but are not required to) purchase such insurance in an amount allowed by law. I will immediately repay you for any amounts you spend in purchasing the insurance, plus interest up to the contract rate of interest or, at your option, pay you over time as a workout of the obligation. If I owe you for any insurance (or for late charges, attorneys' fees or collection costs), I understand that I owe an additional sum for these debts beyond my monthly principal and interest payment. My monthly payment will therefore be greater than that stated on page 1 until such additional debts are paid in full.

**11. DEFAULT:** I will be in default if: (i) I do not make a payment on time; or (ii) I do not keep any of my other promises under this Contract; or (iii) I file a case, or someone else files a case against me, under the United States Bankruptcy Code; or (iv) you feel in good faith that the Manufactured Home is in danger or that I will not be able to continue my payments. The default described under (iv) does not apply if this Contract is guaranteed by the Veteran's Administration. You will give me notice of the default except when I voluntarily surrender or abandon the Manufactured Home. I will have the right to cure the default during the notice period. If I do not cure the default, you may do either or both of the following: (a) Acceleration: You can require me to immediately pay you the entire remaining balance of this Contract; and/or (b) Repossession: You can repossess the Manufactured Home. Once you get possession of the Manufactured Home you may sell it. If the amount from the sale, after expenses, is less than what I owe you, I will pay you the difference. If there is any property left in the Manufactured Home when you repossess, you may dispose of it as provided by law. If I default, you can do whatever is necessary to correct my default. If you spend money to correct my default, I will pay you back immediately with interest at the contract rate of interest.

**12. NOTICE:** Except for any notice required under applicable law to be given in another manner, (a) any notice to me provided for in this Contract shall be given in writing by mailing such notice by certified mail, addressed to me at the Manufactured Home address or

Bankers Systems, Inc., St. Cloud, MN Form GT-4AHROLAZLA  8/20/98          ORIGINAL          GT-10-01-101 (8/98)          JO          (page 2 of 4)

NOV-24-2003 MON 10:36 AM CONSECO FINANCE CORP     FAX NO. 605 355 7034     P. 05

JAN-19-2000 12:40 FROM                                    TO     13347063009H     P.04
22337095

©Green Tree Financial Corporation, 1997, 1999.

at such other address as I may designate by notice to you in writing, and (b) any notice to you shall be given in writing by certified mail, return receipt requested, to your address stated herein or to such other address as you may designate by notice to me in writing.

**13. ATTORNEY'S FEES:** If after I default you hire an attorney who is not a salaried employee to collect what I owe under this Contract or to get possession of the Manufactured Home or to enforce my agreements herein, I will pay you your reasonable attorney's fees, court costs and out-of-pocket expenses at the maximum allowed by law.

**14. MISCELLANEOUS PROVISIONS:** This written Contract is the only agreement that covers my purchase of the property. This Contract can only be modified or amended, or provisions in it waived (given up), by a written modification to this Contract signed by you. You can decide not to use or enforce any of your rights under this Contract without losing them. For example, you can extend the time for making some payments without extending others. If any part of this Contract cannot be enforced because of a law which prohibits it, all other parts can still be enforced. I agree to cooperate with you regarding any requests after closing to correct errors made concerning this Contract or the transaction and to provide any and all additional documentation deemed necessary by you to complete this transaction.

**15. ARBITRATION:** All disputes, claims, or controversies arising from or relating to this Agreement or the relationships which result from this Agreement, or the validity of this arbitration clause or the entire Agreement, shall be resolved by binding arbitration by one arbitrator selected by you with my consent. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, Title 9 of the United States Code. Judgment upon the award rendered may be entered in any court having jurisdiction. The parties agree and understand that they choose arbitration instead of litigation to resolve disputes. The parties understand that they have a right or opportunity to litigate disputes in court, but that they prefer to resolve their disputes through arbitration, except as provided herein. THE PARTIES VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT THEY HAVE TO A JURY TRIAL, EITHER PURSUANT TO ARBITRATION UNDER THIS CLAUSE OR PURSUANT TO A COURT ACTION BY YOU (AS PROVIDED HEREIN). The parties agree and understand that all disputes arising under case law, statutory law, and all other laws including, but not limited to, all contract, tort, and property disputes, will be subject to binding arbitration in accord with this agreement. I agree that I shall not have the right to participate as a representative or a member of any class of claimants pertaining to any claim arising from or relating to this Agreement. The parties agree and understand that the arbitrator shall have all powers provided by law and the Agreement. These powers shall include all legal and equitable remedies, including, but not limited to, money damages, declaratory relief, and injunctive relief. Notwithstanding anything hereunto the contrary, you retain an option to use judicial or non-judicial relief to enforce a security agreement relating to the collateral secured in a transaction underlying this arbitration agreement, to enforce the monetary obligation or to foreclose on the collateral. Such judicial relief would take the form of a lawsuit. The institution and maintenance of an action for judicial relief in a court to foreclose upon any collateral, to obtain a monetary judgment or to enforce the security agreement, shall not constitute a waiver of the right of any party to compel arbitration in this Agreement, including the filing of a counterclaim in a suit brought by you pursuant to this provision.

**16. WAIVER OF JURY TRIAL:** I HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY THAT I HAVE IN ANY SUBSEQUENT LITIGATION BETWEEN ME AND THE SELLER, OR MY AND ANY ASSIGNEE OF THE SELLER, WHERE SUCH LITIGATION ARISES OUT OF, IS RELATED TO, OR IS IN CONNECTION WITH ANY PROVISION OF THIS CONTRACT WHETHER THE CONTRACT IS ASSERTED AS THE BASIS FOR A CLAIM, COUNTERCLAIM OR CROSSCLAIM, OR A DEFENSE TO A CLAIM, COUNTERCLAIM OR CROSSCLAIM.

**17. ADDITIONAL TERMS:** N/A

---

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

---

MY SIGNATURE BELOW ACKNOWLEDGES THAT I UNDERSTAND THAT PARAGRAPHS 15 AND 16 ABOVE REQUIRE BINDING ARBITRATION AND THAT I WAIVE MY RIGHT TO A JURY TRIAL IF A DISPUTE ARISES UNDER THIS CONTRACT.

YOU HAVE THE OPTION TO PROVIDE SUCH PHYSICAL DAMAGE INSURANCE AS IS REQUIRED, IN CONNECTION WITH THIS PURCHASE, EITHER THROUGH AN EXISTING POLICY OR BY A POLICY INDEPENDENTLY OBTAINED BY YOU.

BUYER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS CONTRACT. CAUTION - IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.

X _Jerry Gibson_                    1-18-2000          X _____
Signature of Buyer JERRY GIBSON          Date          Signature of Buyer          Date

ORIGINAL

Banker Systems, Inc., St. Cloud, MN Form GT-MHRCLA/AL 4/30/99          GT-10-01-101 (8/99)  (page 3 of 4)

NOV-24-2003 MON 10:37 AM CONSECO FINANCE CORP    FAX NO. 605 355 7034    P. 06

JAN-19-2000  12:41  FROM    TO    13347050068  P.05
22337095
#2    GIBSON - 4736029

Greens Tree Financial Corporation, 1987, 1999.

## ASSIGNMENT BY SELLER

For good and valuable consideration, the adequacy and sufficiency of which are hereby acknowledged, Seller hereby sells, assigns, and transfers its entire right, title, and interest in the Contract and the property described therein (the "Property") to Assignee. Such assignment is made pursuant to the terms contained herein and in a separate Dealer Agreement, which is incorporated herein by reference; and pursuant to such policies, procedures, and requirements as issued by the Assignee from time to time.

IN ADDITION TO THE ABOVE, this Assignment includes that certain provision to follow, provided that, if none of the following provisions has been checked by the Seller, this Assignment shall be considered to have been checked "With Recourse": A. "Without Recourse". The assignment of the Contract is and shall be without recourse against the Seller except as provided above and in any separate dealer agreement between Seller and Assignee relating to the purchase of Contracts. B. "Limited Recourse". In the event of default of Buyer before Buyer shall have paid the number of monthly payments under the Contract as set forth below under "Limited Recourse", the Seller will, upon demand, repurchase the Contract from Assignee for the full amount remaining unpaid under the Contract. C. "Repurchase", if the Assignee repossesses the Manufactured Home, the Seller will, upon demand, repurchase the Contract from the Assignee for the full amount remaining unpaid under the Contract. D. "With Recourse". The Seller unconditionally guarantees payment of the full amount remaining unpaid under the Contract and agrees to purchase the Contract from the Assignee, upon demand, for the full amount then unpaid, whenever the Contract shall be in default. E. "Limited Repurchase". In the event of default of Buyer before Buyer shall have paid the number of monthly payments under the Contract as set forth below under "Limited Repurchase", the Seller will, upon demand, repurchase the Contract from the Assignee for the full amount remaining unpaid under the Contract if the Assignee repossesses the Manufactured Home.

Seller, by signing below, executes this Contract and also assigns the same to the Assignee in accordance with the foregoing provisions. The Seller's Assignment will also include that certain provision set forth above which is checked below:

SOUTHERN INVESTMENT CORP

SOUTHERN HOMES OUTLET CENTER    Date: 1-18-2000

By: X _____    (Seller)    Title: _____

( ) A. Without Recourse ( ) B. Limited Recourse ( ) C. Repurchase ( ) D. With Recourse ( ) E. Limited Repurchase
Payments    Payments

U. S. Bank Trust
National Association

Bankers Systems, Inc., St. Cloud, MN Form GT-MHRCLAZ1L 8/20/99    ORIGINAL    GT-10-01-101 (8/99)    JC    (page 4 of 4)

NOV-24-2003 MON 10:37 AM CONSECO FINANCE CORP     FAX NO. 605 355 7034          P. 07



## STATE OF ALABAMA
### DEPARTMENT OF REVENUE

#### CERTIFICATE OF TITLE FOR A VEHICLE     0204

| TITLE NO. | VEHICLE IDENTIFICATION NUMBER | TRANS. CODE | DATE ISSUED |
|---|---|---|---|
| 25616701 | ALCA01575E0S52975 | 01 | 03/01/2000 |

| YR. MODEL | MAKE | MODEL | BODY TYPE | PREV AL TITLE NO. |
|---|---|---|---|---|
| 2000 | CAVALIE | CAVALIER | HT | |

| CYL | NEW | USED | DEMO | PURCHASE DATE | NO. LIENS | COLOR | ODOMETER |
|---|---|---|---|---|---|---|---|
| 00 | XX | | | 01/19/2000 | 1 | SAND | EXEMPT |

NAME(S) AND MAILING ADDRESS OF OWNER(S)

GIBSON JERRY

2030 WAVERLY PKW 71
OPELIKA        AL 36801

RESIDENT ADDRESS IF DIFFERENT

MAIL TO
CONSECO FINANCE CORP 4LABA
4625 RIVER GREEN PKW
DULUTH        GA 30096-2583

LEGEND(S)

RELEASE OF LIEN
The holder of Lien on the vehicle described in this Certificate does hereby state that the lien described in said Certificate of Title is released and discharged.

First Lienholder

1ST LIENHOLDER'S NAME, ADDRESS AND LIEN DATE 01/19/2000
CONSECO FINANCE CORP 4LABAMA
4625 RIVER GREEN PKW
DULUTH        GA 30096

2ND LIENHOLDER'S NAME, ADDRESS AND LIEN DATE

By _____
    Signature of Authorized Agent

Date _____

Second Lienholder

By _____
    Signature of Authorized Agent

Date _____

CONTROL NUMBER
23778124

This certificate serves as an official document of the Department of Revenue and proves by the evidence that an application for certificate of title has been made for the vehicle classified herein, pursuant to the provisions of the Motor Vehicle laws of this State, and that the owner named on the face hereof has been duly recorded in the lawful owner of the vehicle described. Further, the said vehicle is subject to the security interest(s) (lien) shown herein, if any, and unencumbered title, he subject to a mechanic's lien or a services by statute to this United States, this State or any political subdivision of this State to other manner herein not recorded or so noted with the Department.

COMMISSIONER OF REVENUE

KEEP IN A SAFE PLACE. ANY ALTERATION OR ERASURE VOIDS THIS TITLE.

UNITED STATES BANKRUPTCY COURT
# Middle District of Alabama

IN RE:
**Jerry Gibson and Patricia J. Gibson** , Debtor(s)

Case No.: 03−81614

Chapter: 7
Judge: Dwight H. Williams Jr.

### ORDER TERMINATING STAY CONDITIONALLY

Upon consideration of the motion for relief from the stay imposed by 11 U.S.C. Section 362(a) filed by Green Tree−Al, LLC December 19, 2003 the court concludes that the motion should be GRANTED CONDITIONALLY. Accordingly, it is

ORDERED that the stay in this case with respect to this creditor, to permit enforcement of a lien against the property of the estate or of the debtor described in the motion, is TERMINATED effective 12:00 PM on **Green Tree−Al, LLC December 19, 2003** ,without further order of the court, unless prior to the effective time a party in interest for cause files an objection with the court stating the cause and requests the stay continued in effect. On such request, the objecting party shall immediately give notice to the creditor, and the stay shall continue in effect pending the conclusion of the hearing on the objection and determination of the motion.

Dated:  12/2/03

Dwight H. Williams Jr.
United States Bankruptcy Judge



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

IN RE:                                    *
    Jerry Gibson,                         *
    Patricia Gibson                       *
                                          *       Case No.  03-81614
    Debtors                               *
--------------------------------          *

## REAFFIRMATION AGREEMENT

For good and valuable consideration, and by this promise in writing, the undersigned,

Jerry Gibson and Patricia Gibson, Debtors having filed a petition for relief in Bankruptcy Case

No. 03-81614, in the United States Bankruptcy Court, hereby acknowledges an indebtedness due

WASHINGTON MUTUAL in the sum of $ _____, said indebtedness being secured

by a loan on the following described property:

**PURCHASE MONEY SECURITY - PANASONIC TV**

Now therefore, I, Jerry and Patricia Gibson, as of the date set forth herein, without any

condition or contingence whatsoever, hereby reaffirm our debt to WASHINGTON MUTUAL in

payments according to the original contract.  Any prior payments will be added to the end of the

note and are to be paid out of the regular payments which are to begin at the next regular

payment date after the reaffirmation agreement is filed.  All terms of the original contract are

hereby ratified, affirmed, and still binding.  No discharge in bankruptcy which may be in the

future granted upon said petition shall diminish, change or affect my obligation under the

purchase money credit agreement with WASHINGTON MUTUAL.

I UNDERSTAND THIS AGREEMENT IS NOT REQUIRED UNDER ANY LAW,

INCLUDING BANKRUPTCY LAW, NOR IS IT REQUIRED BASED UPON ANY

PREVIOUS AGREEMENT WITH THIS CREDITOR.

THIS AGREEMENT MAY BE RESCINDED AT ANY TIME PRIOR TO DISCHARGE OR WITHIN SIXTY (60) DAYS AFTER THIS AGREEMENT IS FILED WITH THE COURT, WHICHEVER IS LATER, BY GIVING NOTICE OF RESCISSION TO THE HOLDER OF THIS CLAIM.

Jerry Gibson, Debtor

Date: 11-26-03

Patricia Gibson, Debtor

Date: 11-26-03

DECLARATION OF ATTORNEY FOR DEBTOR

This agreement represents a fully informed and voluntary agreement by the debtors and does not impose an undue hardship on the debtors or a dependent of the debtors. The debtors have been notified of the legal effect and consequence of entering in to this agreement and the creditor's remedies in the event of default under this agreement.

W. Gregory Ward
301-A North Lanier Avenue
Lanett, AL 36863
Attorney for the Debtor

WASHINGTON MUTUAL

Washington Mutual
1461 Gateway Drive
Opelika, AL 36801

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

**FILED**

DEC 04 2003

U.S. BANKRUPTCY COURT
MONTGOMERY, ALABAMA

IN RE: Jerry and Patricia Gibson,          *    Case No.03-81614
       Debtors          *
                                 *

## CLERK'S NOTICE OF FILING

Please take notice that the undersigned, on behalf of the debtor, has sent to you for filing the

following:

**REAFFIRMATION AGREEMENT - Washington Mutual**

**REAFFIRMATION AGREEMENT - Home-Q Servicing Corporation**

On December 3, 2003.

W. Gregory Ward
Attorney for Creditor
301-A North Lanier Ave.
Lanett, AL  36863
ASB-1373-A33W

Curtis C. Reding, Trustee
P.O. Box 173
Montgomery, AL 36103-0173

RECEIVED
DEC 01 2003
BY:

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
OPELIKA DIVISION

**FILED**

| | | |
|---|---|---|
| IN RE: | § | |
| JERRY GIBSON | § | CASE NO. 03-81614-DHW |
| PATRICIA J. GIBSON | § | |
| AKA PATRICIA BARROW | § | CHAPTER 7 |
| | § | |

DEC 0 4 2003

U.S. BANKRUPTCY COURT
MONTGOMERY, ALABAMA
Deputy Clerk

REAFFIRMATION AGREEMENT

PART A - AGREEMENT

| Creditor's Name and Address | Terms of Agreement |
|---|---|
| HOMEQ Servicing Corporation fka TMS Mortgage, Inc.<br>1100 Corporate Center Drive, 3rd Floor, Building C<br>Raleigh, North Carolina 27607 | a) Loan Number 5546217<br>Original Principal Amount $64,000.00<br>b) Secured by a Deed of Trust/Mortgage on real property located at<br>403 Fairwood Drive<br>Valley, Alabama 36854<br>(the "Property")<br>c) Estimated Market Value<br>as of Petition Date $ Unknown |
| Date Set for Discharge<br>February 2, 2004 | |

THE PARTIES UNDERSTAND THAT THIS AGREEMENT IS PURELY VOLUNTARY, THAT THE
DEBTORS MAY RESCIND THE AGREEMENT AT ANY TIME PRIOR TO DISCHARGE, OR
WITHIN 60 DAYS AFTER SUCH AGREEMENT IS FILED WITH THE COURT, WHICHEVER
OCCURS LATER, BY GIVING NOTICE OF RESCISSION TO THE CREDITOR, AND THAT THIS
AGREEMENT IS NOT REQUIRED UNDER TITLE 11 OF THE UNITED STATES BANKRUPTCY
CODE, UNDER NONBANKRUPTCY LAW, OR UNDER ANY AGREEMENT NOT IN ACCORDANCE
WITH THE PROVISIONS OF 11 USC §524(C).

Date: 11-30-03

_____
Signature of Debtor

_____
Signature of Creditor
By: Hilary B. Bonial / William E. "Gene" Sollows / Joe M. Lozano, Jr.
Authorized Agent

_____
Signature of Joint Debtor

## PART B - ATTORNEY'S DECLARATION

This agreement represents a fully informed and voluntary agreement by the Debtors and does not impose an undue hardship on the Debtors, or any dependent of the Debtors. Further, I have fully advised the Debtors of the legal effect and consequences of an agreement of the kind specified in 11 USC §524(c) and any default under such an agreement.

DATE: ___12-1-03___          _____
                             Signature of Debtors' Attorney

## PART C - WAIVER OF HEARING

A HEARING ON THE REAFFIRMATION AGREEMENT IS WAIVED AND THE COURT IS REQUESTED TO APPROVE THE REAFFIRMATION AGREEMENT WITHOUT THE NECESSITY OF A HEARING, AND TO ENTER AN ORDER APPROVING THE REAFFIRMATION AGREEMENT.

## PART D - MOTION FOR COURT APPROVAL OF AGREEMENT
### (Complete only when Debtors are not represented by an attorney)

We, the Debtors, affirm(s) the following to be true and correct:

1) We are not represented by an attorney in connection with this bankruptcy case.

2) We are, and wish to remain in possession of the Property and represent that continued payment of the installments due on the subject loan is in our best interest and will not impose undue hardship upon us, or any of our dependents.

Therefore, We ask this Court for an Order approving this Reaffirmation Agreement.

DATE: 11-30-03          _____
                        Signature of Debtor

                        _____
                        Signature of Joint Debtor

## PART E - COURT ORDER

The Court grants the Debtors' motion and approves the voluntary agreement upon terms specified above.

DATE: _____          _____
                               Bankruptcy Judge

7613-N-0064
reaff

FORM B6F (12/03) West Group, Rochester, NY

In re _Jerry Gibson and Patricia J. Gibson_____ / Debtor     Case No. _03-81614___

(if known)

# SCHEDULE F-CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
## Amended

State the name, mailing address, including zip code, and last four digits of any account number, if any, of all entities holding unsecured claims without priority against the debtor or the property of the debtor, as of the date of filing of the petition. Do not include claims listed in Schedules D and E. If all creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedules. Report this total also on the Summary of Schedules.

☐ Check this box if debtor has no creditors holding unsecured nonpriority claims to report on this Schedule F.

| Creditor's Name and Mailing Address including Zip Code | C o d e b t o r | H–Husband W–Wife J–Joint C–Community | Date Claim was Incurred, and Consideration for Claim. If Claim is Subject to Setoff, so State. | C o n t i n g e n t | U n l i q u i d a t e d | D i s p u t e d | Amount of Claim |
|---|---|---|---|---|---|---|---|
| Account No:    nown | | | unknown | | | | _Unknown_ |
| _Creditor # : 1_ _GreenTree--AL, LLC_ _c/o Chambless, Math, LLC_ _P.O. Box 230759_ _Montgomery AL 36123-2230_ | | | _Unknown_ _This is a disputed debt. Jerry Gibson contends that he did not sign_ | | | | |
| Account No: | | | | | | | |
| Account No: | | | | | | | |
| Account No: | | | | | | | |

No continuation sheets attached

Subtotal $    0.00
(Total of this page)
Total $    0.00
(Report total also on Summary of Schedules)

IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

IN RE:                              )
Jerry Gibson                        ) Chapter 7 Case No: 03-81614
Patricia J. Gibson                  )

## AMENDMENT TO CHAPTER 7 LIST OF CREDITORS ,
## MATRIX AND SCHEDULE F

Your petitioner respectfully shows that he duly filed a petition in this Court on October 23,

2003, and certain names and statutory facts relative to the claims of certain creditors were omitted

from this list, which are as follows:

| CREDITOR | CHARACTER OF DEBT | AMOUNT |
|---|---|---|
| GreentTree–AL, LLC (as assignee of Conseco Finance Corp.–Alabama) | mobile home | unknown, but approx. $35,000.00 |

The above-named creditor did not receive a notice of the §341 meeting of creditors, but has

actual knowledge of this Chapter 7. They appeared at the §341 meeting of creditors, corresponded

with Debtors' attorney prior to the §341 meeting of creditors, and filed a motion to lift the stay.

Debtors move to be allowed to amend in this disputed debt out of an abundance of caution and to

insure that a discharge is entered that included this creditor.  Debtor Jerry Gibson is the only one

whose name appears on the note and mortgage, and Debtor denies that they contain his signature,

that he signed them, or that he is in any way responsible for the debt.

WHEREFORE, the premises considered, Debtors move this Court to amend this debt into

their Chapter 7 petition.

On December 12, 2003.

_Jerry Gibson_

Jerry Gibson individually and for Patricia Gibson


_W. Gregory Ward_

W. GREGORY WARD
Attorney for Debtor
301-A North Lanier Avenue
Lanett, AL 36863
(334) 642-6008

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing on the following by placing a copy of the same in the United States mail postage prepaid and properly addressed on December 12, 2003.


OF COUNSEL

Hon. Leonard N. Math
Chambless & Math, P.C.
P.O. Box 230759
Montgomery, AL  36123-0759

Hon. Cecil M. Tipton
Chapter 7 Trustee
P.O. Box 191
Opelika, AL 36801

Form B18 (Official Form 18)(12/03)

# United States Bankruptcy Court

## Middle District of Alabama
### Case No. 03–81614
### Chapter 7

In re: Debtor(s) (name(s) used by the debtor(s) in the last 6 years, including married, maiden, trade, and address):

Jerry Gibson
403 Fairwood Drive
Valley, AL 36854

Patricia J. Gibson
aka Patricia Barrow
403 Fairwood Drive
Valley, AL 36854

Social Security No.:
   xxx–xx–5337

   xxx–xx–1936

Employer's Tax I.D. No.:

## DISCHARGE OF DEBTOR(S)

It appearing that the debtor(s) is entitled to a discharge,

**IT IS ORDERED:**

The debtor is granted a discharge under section 727 of title 11, United States Code, (the Bankruptcy Code).

BY THE COURT

Dated: 2/10/04

Dwight H. Williams Jr.
United States Bankruptcy Judge

**SEE THE BACK OF THIS ORDER FOR IMPORTANT INFORMATION.**

FORM B18 continued (7/97)

## EXPLANATION OF BANKRUPTCY DISCHARGE
## IN A CHAPTER 7 CASE

This court order grants a discharge to the person named as the debtor. It is not a dismissal of the case and it does not determine how much money, if any, the trustee will pay to creditors.

### Collection of Discharged Debts Prohibited

The discharge prohibits any attempt to collect from the debtor a debt that has been discharged. For example, a creditor is not permitted to contact a debtor by mail, phone, or otherwise, to file or continue a lawsuit, to attach wages or other property, or to take any other action to collect a discharged debt from the debtor. *[In a case involving community property:]* [There are also special rules that protect certain community property owned by the debtor's spouse, even if that spouse did not file a bankruptcy case.] A creditor who violates this order can be required to pay damages and attorney's fees to the debtor.

However, a creditor may have the right to enforce a valid lien, such as a mortgage or security interest, against the debtor's property after the bankruptcy, if that lien was not avoided or eliminated in the bankruptcy case. Also, a debtor may voluntarily pay any debt that has been discharged.

### Debts That are Discharged

The chapter 7 discharge order eliminates a debtor's legal obligation to pay a debt that is discharged. Most, but not all, types of debts are discharged if the debt existed on the date the bankruptcy case was filed. (If this case was begun under a different chapter of the Bankruptcy Code and converted to chapter 7, the discharge applies to debts owed when the bankruptcy case was converted.)

### Debts that are Not Discharged.

Some of the common types of debts which are not discharged in a chapter 7 bankruptcy case are:

a. Debts for most taxes;

b. Debts that are in the nature of alimony, maintenance, or support;

c. Debts for most student loans;

d. Debts for most fines, penalties, forfeitures, or criminal restitution obligations;

e. Debts for personal injuries or death caused by the debtor's operation of a motor vehicle while intoxicated;

f. Some debts which were not properly listed by the debtor;

g. Debts that the bankruptcy court specifically has decided or will decide in this bankruptcy case are not discharged;

h. Debts for which the debtor has given up the discharge protections by signing a reaffirmation agreement in compliance with the Bankruptcy Code requirements for reaffirmation of debts.

**This information is only a general summary of the bankruptcy discharge. There are exceptions to these general rules. Because the law is complicated, you may want to consult an attorney to determine the exact effect of the discharge in this case.**

Form B18 (Official Form 18)(12/03)

# United States Bankruptcy Court

## Middle District of Alabama
### Case No. 03-81614
### Chapter 7

In re: Debtor(s) (name(s) used by the debtor(s) in the last 6 years, including married, maiden, trade, and address):

Jerry Gibson
403 Fairwood Drive
Valley, AL 36854

Patricia J. Gibson
aka Patricia Barrow
403 Fairwood Drive
Valley, AL 36854

Social Security No.:
xxx-xx-5337

xxx-xx-1936

Employer's Tax I.D. No.:

## DISCHARGE OF DEBTOR(S)

It appearing that the debtor(s) is entitled to a discharge,

**IT IS ORDERED:**

The debtor is granted a discharge under section 727 of title 11, United States Code, (the Bankruptcy Code).

BY THE COURT

Dated: 2/10/04

Dwight H. Williams Jr.
United States Bankruptcy Judge

## SEE THE BACK OF THIS ORDER FOR IMPORTANT INFORMATION.

FORM B18 continued (7/97)

## EXPLANATION OF BANKRUPTCY DISCHARGE
## IN A CHAPTER 7 CASE

This court order grants a discharge to the person named as the debtor. It is not a dismissal of the case and it does not determine how much money, if any, the trustee will pay to creditors.

### Collection of Discharged Debts Prohibited

The discharge prohibits any attempt to collect from the debtor a debt that has been discharged. For example, a creditor is not permitted to contact a debtor by mail, phone, or otherwise, to file or continue a lawsuit, to attach wages or other property, or to take any other action to collect a discharged debt from the debtor. *[In a case involving community property:]* [There are also special rules that protect certain community property owned by the debtor's spouse, even if that spouse did not file a bankruptcy case.] A creditor who violates this order can be required to pay damages and attorney's fees to the debtor.

However, a creditor may have the right to enforce a valid lien, such as a mortgage or security interest, against the debtor's property after the bankruptcy, if that lien was not avoided or eliminated in the bankruptcy case. Also, a debtor may voluntarily pay any debt that has been discharged.

### Debts That are Discharged

The chapter 7 discharge order eliminates a debtor's legal obligation to pay a debt that is discharged. Most, but not all, types of debts are discharged if the debt existed on the date the bankruptcy case was filed. (If this case was begun under a different chapter of the Bankruptcy Code and converted to chapter 7, the discharge applies to debts owed when the bankruptcy case was converted.)

### Debts that are Not Discharged.

Some of the common types of debts which are not discharged in a chapter 7 bankruptcy case are:

a. Debts for most taxes;

b. Debts that are in the nature of alimony, maintenance, or support;

c. Debts for most student loans;

d. Debts for most fines, penalties, forfeitures, or criminal restitution obligations;

e. Debts for personal injuries or death caused by the debtor's operation of a motor vehicle while intoxicated;

f. Some debts which were not properly listed by the debtor;

g. Debts that the bankruptcy court specifically has decided or will decide in this bankruptcy case are not discharged;

h. Debts for which the debtor has given up the discharge protections by signing a reaffirmation agreement in compliance with the Bankruptcy Code requirements for reaffirmation of debts.

**This information is only a general summary of the bankruptcy discharge. There are exceptions to these general rules. Because the law is complicated, you may want to consult an attorney to determine the exact effect of the discharge in this case.**

**BAE SYSTEMS**

Enterprise Systems Incorporated
11487 Sunset Hills Road
Reston, Virginia 20190-5210

# CERTIFICATE OF SERVICE

District/off: 1127-3          User: rwalker          Page 1 of 1          Date Rcvd: Feb 10, 2004
Case: 03-81614               Form ID: B18            Total Served: 25

The following entities were served by first class mail on Feb 12, 2004.
```
db      Jerry Gibson,    403 Fairwood Drive,    Valley, AL 36854
jdb     Patricia J. Gibson,    403 Fairwood Drive,    Valley, AL 36854
aty     Leonard-AD Math,    Chambless, Math, Moore, Brown, & Carr,PC,    P.O. Box 230759,
            Montgomery, AL 36123-0759
aty     W. Gregory Ward,    W. Gregory Ward, Attorney at Law,    301-A No. Lanier Ave.,    Lanett, AL 36863
tr      Cecil M. Tipton, Jr.,    Ray & Tipton,    P. O. Box 191,    Opelika, AL 36801
ust     Teresa R. Jacobs, BA,    U. S. Bankruptcy Administrator,    One Church Street,    Montgomery, AL 36104
819682  ALLIED INTERSTATE,    P.O. BOX 361774,    COLUMBUS, OH 43236
819683  AMERICAN GENERAL FINANCE,    2485 AIRPORT THRUWAY,    P.O. BOX 4281,    COLUMBUS, GA 31904-0281
819684  AXSYS NATIONAL BANK,    16 MCLELAND ROAD,    ST. CLOUD, MN 56303-2198
819685  BANKFIRST,    P.O. BOX 5052,    SIOUX FALLS, SD 57117-5052
819688  CROSS COUNTRY BANK,    C/O SIMM ASSOCIATES, INC.,    P.O. BOX 7526,    NEWARK, DE 19714-7526
819689  DIRECT MERCHANTS CREDIT BANK,    P.O. BOX 22128,    TULSA, OKLAHOMA 74121-2128
819690  FLEET,    P.O. BOX 15480,    WILMINGTON, DE 19850-5480
819691  GMAC,    P.O. BOX 105677,    ATLANTA, GA 30348
846910  GreenTree--AL, LLC,    c/o Hon. Leonard N. Math,    Chambless & Math, P.C.,    P.O. Box 230759,
            Montgomery,  AL 36123-0759
819681  HOME-Q SERVICING,    WACHOVIA,    P.O. BOX 13716,    SACRAMENTO, CA 95853-3716
819692  HOUSEHOLD BANK, N.A.,    C/O ASSET ACQUISITION GROUP,    P.O. BOX 370470,    DENVER, CO 80237-0470
819694  HOUSEHOLD CREDIT SERVICES,    P.O. BOX 98715,    LAS VEGAS, NV 89193-8715
819693  HOUSEHOLD CREDIT SERVICES,    P.O. BOX 5222,    CAROL STREAM, IL 60197-5222
819695  REGIONS BANK,    BOX 371357,    PITTSBURGH, PA 15250-7357
819696  SARZAUR & SCHWARTZ, P.C.,    ATTORNEYS AT LAW,    P.O. BOX 11366,    BIRMINGHAM, AL 35202-1366
819697  TEXACO/SHELL,    CREDIT CARD CENTER,    P.O. BOX 790001,    HOUSTON, TX 77279-0001
819698  WASHINGTON MUTUAL,    1461 GATEWAY DRIVE,    OPELIKA, AL 36801-0000
```

The following entities were served by electronic transmission on Feb 11, 2004 and receipt of the transmission
was confirmed on:
```
819686  EDI: CAPITALONE.COM Feb 11 2004 00:45:00     CAPITAL ONE BANK,    P. O. BOX 25131,
            RICHMOND, VA 23276-0001
819687  EDI: CAPITALONE.COM Feb 11 2004 00:45:00     CAPITAL ONE BANK,    P. O. BOX 85147,
            RICHMOND, VA 23276
                                                                            TOTAL: 2
```

```
        ***** BYPASSED RECIPIENTS (undeliverable, * duplicate) *****
cr      Green Tree - AL, L.L.C.
828327* American General Finance,    2485 Airport Thruway,    P.O. Box 4281,    Columbus, GA 31904-0281
                                                                    TOTALS: 1, * 1
```

I, Joseph Speetjens, declare under the penalty of perjury that I have served the attached document on the above listed entities in the manner
shown, and prepared the Certificate of Service and that it is true and correct to the best of my information and belief.

First Meeting of Creditor Notices only (Official Form 9): Pursuant to Fed. R. Bank. P. 2002(a)(1), a notice containing the complete Social
Security Number (SSN) of the debtor(s) was furnished to all parties listed.  This official court copy contains the redacted SSN as required
by the bankruptcy rules and the Judiciary's privacy policies.

Date: Feb 12, 2004                     Signature:    _Joseph Speetjens_

# Patricia Gibson
# Dxs. 11-18

# West Point Pepperell

**EMPLOYMENT RECORD**

NAME ~~Carter Barrow~~ Gibson
~~BARROW~~, Patricia Jane

SOCIAL SECURITY NO.

ADDRESS
403 Fairwood Drive – Fairfax, Al. 36854

EMPLOYEE NO.
8528 ~~0330~~ 34384

Ph: 756-9275

| DATE OF BIRTH | SEX F | MARITAL STATUS M |
|---|---|---|

| DATE ON JOB | PLANT A DEPT. | DEPARTMENT | OCCUPATION | DATE SEPARATED | REASON FOR LEAVING |
|---|---|---|---|---|---|
| 9-4-73 | Lan't | Spinning ~~Bg.~~ #3 | Spooler Lr. | 1-7-74(Sep:1-21-74) | NO REPORT. |
| 8-15-75 | Lanier | Prep | Spooler Tender | | |
| 7-25-77 | Lanier | Spinning | Warp Spinner | | |
| 10-1-79 | " | Prep. | Warper Oper. | 8-26-05 | Misconduct / Three Written Warnings. |

CONTINUOUS SERVICE DATE
~~9-4-73~~   8-15-75

P - 52377

DEFENDANT'S EXHIBIT
11
P. Gibson

# West Point Pepperell

FACILITY/ORGANIZATION
# LANETT MILL

**EMPLOYEE INDUCTION CHECK LIST**
SHEET 1

| EMPLOYEE | DEPARTMENT | JOB |
|---|---|---|
| Patricia Jones Barrow | Training | Spooler Lr.---3rd |

### Induction By PERSONNEL DIRECTOR before clearance for work

Welcome - what are you called
by your friends - your nickname    **Patricia**

| | | |
|---|---|---|
| Company citizenship | ☑ | Problems or Complaints ☑ |
| Pay and Fringe Benefits | ☑ | Safety and First Aid ☑ |
| Company position regarding union | ☑ | Rules, Incident Reports and Warnings ☑ |
| Statement about equal employment opportunity | ☑ | Jobs for relatives or friends ☑ |
| Communications | ☑ | Ask if there are any questions ☑ |

_PERSONNEL DIRECTOR_                     **8-31-73**
                                          DATE

### To Be Covered by PERSONNEL DIRECTOR or Trained Administrative Employee

Federal Withholding ☐

State Withholding ☑

Social Security ☑

Unemployment Insurance ☑

Workmen's Compensation ☑

Savings Bonds ☐

## COMPANY INSURANCE

Three months waiting period ☐

Basic Hospital and Surgical ☑

Weekly Accident & Sickness ☑

Life Insurance ☑

Dependent Life Insurance ☑

Other Dependent Insurance ☐

Major Medical Benefits ☐

Cost to Employee - weekly payroll deduction ☑

Company participation in cost ☐

Duplication of coverage provision ☐

Importance of coverage - -
Designation of Beneficiary
  Beneficiary changes
  Dependent changes
  Why, Where, When can be made ☐

Insurance booklet - gives complete information ☑

Ask if there are any questions ☑

## PAY & OTHER INFORMATION

Vacation with pay ☑

Premium and Holiday pay ☑

Jury Duty pay ☑

Reporting pay ☑

Call-in pay ☑

Service Award program ☑

Profit Sharing Retirement Plan ☑

Fallout shelters ☑

Leave of Absence policy ☑

Attendance - excused and unexcused absences ☑

Re-examination policy ☑

Garnishment policy ☑

Personnel Record - confidential - importance of keeping up-to-date and building a good record ☑

Combined Charities or Community Chest ☑

Ask if there are any questions ☑

Instruction and Clearance For Work ☑

## AGAIN WELCOME TO THE COMPANY

_PERSONNEL DIRECTOR
OR ADMINISTRATIVE ASSISTANT_                **8-31-73**
                                             DATE

WP - 52341

DEFENDANT'S EXHIBIT

00744

Induction By DEPARTMENT HEAD when Employee reports to department for work

DATE REPORTED
FOR WORK ▶ 9 - 4 - 73

## GENERAL

Greeting and welcome ........................................... ☑

Check Clearance Form ........................................... ☑

Objectives and goals ........................................... ☑

Products and people ........................................... ☑

How the department fits into
the over-all picture ........................................... ☑

Importance of the new
employee's job ........................................... ☑

Importance of quality and
quantity -- profit sharing ........................................... ☑

Detailed job description ........................................... ☑

Duties and responsibilities ........................................... ☑

Importance of co-operation ........................................... ☑

## HANDLING OF PROBLEMS OR COMPLAINTS

Open door policy ........................................... ☑

Steps for employee to take ........................................... ☑

## WORK CONDITIONS

Hours of work ........................................... ☑

Starting and stopping time ........................................... ☑

Time gates open and close ........................................... ☑

Time to go on job ........................................... ☑

Parking areas ........................................... ☑

Most convenient route to job ........................................... ☑

Importance of promptness and
regular attendance ........................................... ☑

A fair day's work for a fair
day's pay ........................................... ☑

## COMMUNICATIONS

Methods of keeping employees informed --
personal contact and bulletin boards ........................................... ☑

Desire to deal directly with
employees ........................................... ☑

West Point Pepperell magazine,
newsletters, newspapers and radios ........................................... ☑

Desire to have employees come to
supervision with problems or suggestions ........................................... ☑

Change of address or family status ........................................... ☑

Unusual observations which could affect
the employee or the Company ........................................... ☑

## PAY DATA

Beginning rate ........................................... ☑

Maximum rate on job ........................................... ☑

Overtime ........................................... ☑

Third shift premium ........................................... ☑

Where, when and how paid ........................................... ☑

Potential advancement ........................................... ☑

Statement regarding Company pay
and fringe benefit program ........................................... ☑

## SAFETY

Importance of not being disabled ........................................... ☑

Loss of time and earnings ........................................... ☑

Cost to employee and Company ........................................... ☑

Review general safety rules ........................................... ☑

Cover departmental safety rules ........................................... ☑

Discuss any hazards in the
department or on the job to which
the employee is assigned ........................................... ☑

Explain how, where and when to
report accidents — place emphasis
on prompt report ........................................... ☑

## SOLICITATION

Charities covered ........................................... ☑

Explain no-solicitation protection
to employee ........................................... ☑

Written permission required for
in-plant solicitation ........................................... ☑

Consequences for canvassing or
soliciting without written permission ........................................... ☑

## INCIDENT REPORT, WARNINGS, DISCIPLINE OR DISCHARGE

VIOLATIONS

Excessive absences or tardiness ........................................... ☑

Leaving work or work area
during work time or without
permission of supervisor ........................................... ☑

Failure to carry out job assignment ........................................... ☑

Failure to follow safety rules or
building a poor safety record ........................................... ☑

Failure to cooperate in helping to
keep department a clean, safe
and better place to work ........................................... ☑

VIOLATIONS CONTINUED

SHEET 2

Misconduct off the job that reflects
unfavorably on the Company or employees ............... ☑

Horse-play, gambling, or indecent
conduct or language while on duty ..................... ☑

FLAGRANT VIOLATIONS

Reporting to work under the
influence of intoxicants ............................. ☑

Possessing concealed weapons ........................ ☑

Damaging or abusing Company property ............... ☑

Fighting ........................................... ☑

Soliciting on Company property
without written permission .......................... ☑

**AGAIN WELCOME TO YOUR DEPARTMENT**

_____
DEPARTMENT HEAD            DATE

---

FACILITY/ORGANIZATION

| EMPLOYEE | DEPARTMENT | JOB |
|---|---|---|
| *Patricia Barron* | *Training* | *Spooler Carmer* |

Induction By IMMEDIATE SUPERVISOR when Employee reports on the job

DATE REPORTED
ON THE JOB ▶ 9-4-73

**GENERAL**

Tell the employee you are glad
to have him/her on your team ........................ ☑

Take and check Work Clearance Form .................. ☑

Get employee to talk personally
about family, experiences, interests ................. ☑

Let the employee know you are ready to help
in every way possible to adjust to new job ........... ☑

**TOUR OF DEPARTMENT**

Where to leave hat and coat ......................... ☑

Point out and explain rules for use of -
    Bulletin Board ................................. ☑
    Smoking Area ................................... ☑
    Drinking Fountain .............................. ☑
    Vending Area ................................... ☑
    Toilet Facilities .............................. ☑

Introduce employee to other employees
and explain the different operations in
the room -- compliment older employees
when you can, truthfully ............................ ☑

Explain employee's duties and respon-
sibilities, and how the employee's job
will fit into the overall picture ..................... ☑

Importance of cooperation - stress the
fact that you are proud of your team
and happy to have him/her join it .................... ☑

Re-emphasize importance of quantity and
quality - promptness - regular attendance ........... ☑

Explain to the employee that you are
there to help personally in every way
possible.

Assure employee of fair and impartial treatment ..... ☑

Ask employee to come to you at any time with
any problem or difficulty that might affect the
employee or the Company ............................ ☑

Review departmental safety rules-
emphasize Hazards in the room ...................... ☑

Review When, Where, How employee
will be paid ....................................... ☑

Review Starting and Stopping time .................. ☑

Ask if there are any questions ...................... ☑

Assign another employee in area the responsibility
of getting the new employee oriented to the facili-
ties in the room: ................................... ☑

**NOW INTRODUCE EMPLOYEE TO HIS/HER
NEW JOB** .......................................... ☑

*Keep this form until after your First Week
Follow-Up on the new Employee.*

---

First Week Follow-Up By IMMEDIATE SUPERVISOR

**CHECK WITH NEW EMPLOYEE
FREQUENTLY DURING EACH DAY
FOR THE FIRST WEEK**

Ask the employee how he/she is getting along ......... ☐

Ask for any questions or comments .................. ☐

Tell the employee how he/she is progressing ......... ☐

Ask other employees around the job vicinity to show
an interest in & offer encouragement to new employee ☐

*Sign and return this form to Department Head
when you feel new employee is indoctrinated.*

_____
SUPERVISOR            DATE

WPH
000007

## Follow-Up Interview By DEPARTMENT HEAD at the end of first week

Review again all items in
Departmental Induction section ............................. ☐

Clear up any questions or
misunderstandings ............................................. ☐

If you can sincerely do so, commend
the employee for his progress ............................... ☐

*Sign and forward this form with the Personnel Intro-
duction & Work Clearance form to the Personnel
Department immediately after the interview.*

_____
DEPARTMENT HEAD                    DATE

## Induction By PLANT MANAGER or ASSISTANT By end of second week

Welcome ........................................................ ☐

Plant - Products - People ................................... ☐

Company philosophy .......................................... ☐

*Sign and return to Personnel Office*

_____
PLANT MANAGER OR ASSISTANT      DATE

## Follow-Up Interview By DEPARTMENT HEAD at End of Probationary Period

Review policies that go into
effect after probationary period ........................... ☐

Clear up any misunderstandings ............................ ☐

Review all fringe benefits .................................. ☐

Listen - get employee to talk
about personal reactions to job
fringe benefits, supervision,
Company image, or anything else ........................... ☐
IF ANY COMMENT,
NOTE HERE :

PLEASE COMPLETE AND RETURN

ONE COPY TO PERSONNEL BY:

FEB 8 1974

Emphasize that we are glad to have
him/her with West Point Pepperell
and that we want him/her to feel free
to come to anyone in management
with any problems or suggestions,
at any time ................................................. ☐

*Sign and return to Personnel office*

_____
DEPARTMENT HEAD                    DATE

## Follow-Up Interview By PERSONNEL DIRECTOR at the end of first year's employment

Listen - get employee to talk
about personal reactions to job,
fringe benefits, supervision,
Company image, or anything else ........................... ☐
IF ANY COMMENT,
NOTE HERE :

_____

_____

_____

Emphasize that we are glad to have him/her with
West Point Pepperell and that we want him/her
to feel free to come to anyone in management with
any problems or suggestions at any time ................. ☐

Clear up any misunderstandings ............................ ☐

Review all fringe benefits .................................. ☐

_____
PERSONNEL DIRECTOR               DATE

**EMPLOYEE INDUCTION CHECK LIST**

WP - 52341

**WPH
000008**

00744

 **WestPoint Pepperell**    **APPLICATION FOR EMPLOYMENT**



| SOCIAL SECURITY NO.▶ | |
|---|---|

## GENERAL

**NAME** First _Jane_ Middle    Maiden    Last
_PATRICIA_ _Barrow_

**RESIDENCE ADDRESS** Number • Street    City    State    Zipcode
_10 BAYLiNE St._ _LANETT_ _ALA._ _36863_

**COUNTY OF RESIDENCE** _Chamble_    **HOME TELEPHONE** _642-3255_    **MAILING ADDRESS (If Different)**

**BIRTH DATE (Mo. Day Yr.)**    **MARITAL STATUS**    **SEX** _F_

AGE _25_    Do you have A Birth Certificate? ☐ NO ☑ YES

☐ 1) SINGLE  ☑ 2) MARRIED  ☐ 3) SEPARATED  ☐ 4) DIVORCED  ☐ 5) WIDOWED

**HEIGHT** _5 11_    **WEIGHT** _138_

## JOB PREFERENCE

**JOB (S) PREFERRED**    **LOCATION (S) PREFERRED**    **SHIFT** _3_    **CAN YOU WORK ANY SHIFT?** ☑ YES ☐ NO
_Spinning_    _LANett Mill_
_Any_    _T Fax_

## EDUCATION & TRAINING

| LAST ELEMENTARY OR HIGH SCHOOL ATTENDED | CITY & STATE | NO. OF YEARS COMPLETED | DATE LEFT Month • Year |
|---|---|---|---|
| _Drew JR. High_ | _Lanett Ala._ | _9_ | _9   62_ |
| COLLEGES OR VOCATIONAL SCHOOLS | CITY & STATE | | |

**CORRESPONDENCE COURSES OR OTHER TRAINING**
_Gun Service Mail Cassor_
_Menter Made Police Gard_

| MAJOR FIELD OR COURSES OF STUDY | DEGREES EARNED | DID YOU GRADUATE? | IF YES, SHOW YR |
|---|---|---|---|
| | | | |

| TYPING SPEED WPM | OFFICE SKILLS | |
|---|---|---|
| DICTATION WPM | OTHER SKILLS | |

Additional Information may be entered on the last page of this form.

## ACTIVITIES

| SCHOOL ACTIVITIES & HONORS |
|---|
| COMMUNITY ACTIVITIES & HONORS |

## EMERGENCY CONTACT

**NOTIFY THIS PERSON▶**    Last Name _Ollie_    First Name _Sones_    Initial    **RELATIONSHIP** _Mother_

**ADDRESS** Number _10_ Street _Bayline St._    City _Lanett_    State _Ala_    Zipcode _36863_

**TELEPHONE NO. OR OTHER WAY TO CONTACT ▶** _642-1631_

PLOYMENT RECORD

E YOU EVER WORKED FOR THIS
PANY OR ANY OF
SUBSIDIARIES?    ☐ YES ☒ NO

WestPoint Pepperell was previously West Point Mfg. Co. • Pepperell Mfg. Co.
Cabin Crafts, Inc. • Alamac Knitting Mills, Inc.

PLOYMENT HISTORY — Start with present job and last job and work back

| LOYER _unShine Laundry_ | JOB _Packer_ | 615-0000 _Business No._ |
| ADDRESS _8 Lexington Ave_ | DATES FROM _11/24/65_ TO _1972_ | NAME OF SUPERVISOR _Johney Costello_ | RATE OF PAY |
| r & STATE _Klyn. 33, N.Y._ | WHY DID YOU LEAVE? _Went out Bisness_ | | |

| LOYER _(Dave Omming_ | JOB _Owner)_ _Mobility_ | NAME OF SUPERVISOR |
| DRESS _Recd unemployment after last employment._ | DATES FROM TO | |
| Y & STATE _Only job_ | WHY DID YOU LEAVE? | RATE OF PAY |

| LOYER | JOB |
| DRESS | DATES FROM TO | NAME OF SUPERVISOR |
| Y & STATE | WHY DID YOU LEAVE? | RATE OF PAY |

| PLOYER | DATES FROM TO | JOB |
| DRESS | WHY DID YOU LEAVE? | RATE OF PAY |

| PLOYER | DATES FROM TO | JOB |
| DRESS | WHY DID YOU LEAVE? | RATE OF PAY |

| PLOYER | DATES FROM TO | JOB |
| DRESS | WHY DID YOU LEAVE? | RATE OF PAY |

| PLOYER | DATES FROM TO | JOB |
| DRESS | WHY DID YOU LEAVE? | RATE OF PAY |

| PLOYER | DATES FROM TO | JOB |
| DRESS | WHY DID YOU LEAVE? | RATE OF PAY |

| PLOYER | DATES FROM TO | JOB |
| DRESS | WHY DID YOU LEAVE? | RATE OF PAY |

LITARY  Have you served in the Armed Forces of the United States? ☒ NO  ☐ YES

| BRANCH | DATE ENTERED | DATE OF DISCHARGE | TYPE DISCHARGE | LAST RANK | DRAFT OR RESERVE STATUS |

NY OTHER INFORMATION

EALTH  Do you have, or have you ever had, sickness or injury of the following? Answer Yes or No for each

| S _NO_ | EARS _NO_ | ARMS _NO_ | HANDS _NO_ | FEET _NO_ | LEGS _NO_ | BACK _NO_ | HEART _NO_ | OTHER - IDENTIFY _NO_ |

XPLAIN ANY " YES " ANSWER

on the back

ISBAND OR WIFE (Include Maiden Name)

WPH
000010

List any other children or brothers and sisters on the back.

**HUSBAND OR WIFE (Include Maiden Name)** — detail on the back

| | DATE OF BIRTH | EMPLOYED BY | |
|---|---|---|---|
| **HUSBAND OR WIFE (Include Maiden Name)** | X if dependent on you | | |
| Eddie Barron ✓ | 11-23-54 | Fairfax Mill | 8-28-73 |
| **SON OR DAUGHTER** | | N O | |
| **SON OR DAUGHTER** | | | |
| **SON OR DAUGHTER** | | | |
| **SON OR DAUGHTER** | | | |
| **SON OR DAUGHTER** | | | |

| | APPROX. AGE | |
|---|---|---|
| **FATHER** Robert Jones | | Drawing S.S |
| **MOTHER (Include Maiden Name)** Ollie Goodwin Jones | | Mr. Willie Hunt |
| **BROTHER OR SISTER** Tommie Lee Allison | 8-26-46 | Sub. Sanitation |
| **BROTHER OR SISTER** | | |
| **BROTHER OR SISTER** | | |
| **BROTHER OR SISTER** | | |
| **BROTHER OR SISTER** | | |
| **ANY OTHER MEMBERS OF YOUR HOUSEHOLD NOT LISTED ABOVE** | | |
| **NAME ALL FORMER HUSBANDS OR WIVES** | | |

**OTHER RELATIVES & CLOSE FRIENDS Who Work For The Company**

| NAME | RELATIONSHIP | PLANT OR OFFICE |
|---|---|---|
| Tommie Barron | Uncle | Lanett Mill |
| Marion Barron | Cousin | Lanett Mill |
| | | |
| | | |

**PERSONAL REFERENCES — Do not name former employers or relatives**

| NAME | OCCUPATION | PHONE NUMBER | ADDRESS |
|---|---|---|---|
| Allen Colwell | Lanett Mill | 644-2096 | 30 Bayline St. Va |
| John Henry Morris | Lanett Mill | 644-4575 | 2 Bayline St. |
| Nettie Barron | Unemployed | 212-771-7615 | N.Y.C. |

I understand that false statements on this application may be considered sufficient cause for dismissal. I further understand that the use of this application does not indicate there are any positions open and does not in any way obligate this Company. This application will remain active for a period of ninety days, after which time I may renew it.

MY PAST EMPLOYERS MAY BE CONTACTED. MY PRESENT EMPLOYER MAY  MAY NOT  (Strike out one) BE CONTACTED.

Long Spo-4

| Applicant's Signature | Patricia Barron | Witness | Linda D. Royal |
|---|---|---|---|

| Reviewed By | R. B. Reeves | Operating Head of Facility | |
|---|---|---|---|
| | Facility Personnel Director | | |

WPH
000011

## West Point Pepperell

*Thursday 1:00*

*Lanier- Cot Spooler tender*

**APPLICATION FOR EMPLOYMENT**

*Lanier-3R*

SOCIAL SECURITY NO.▶

**GENERAL** *Bobby C.*

| NAME | First | Middle | Maiden | Last |
|---|---|---|---|---|
| Patricia | | | Jones | Barrow |

**RESIDENCE ADDRESS** Number • Street  City  State  Zipcode
12 Bay Line St. Lanett  Alabama 36863

**COUNTY OF RESIDENCE** Chambus

**HOME TELEPHONE** 644-1698

**MAILING ADDRESS (If Different)**

**BIRTH DATE (Mo. Day Yr.)**

AGE 27  Do you have A Birth Certificate? ☐ NO ☑ YES

**MARITAL STATUS**
☐ 1) SINGLE
☐ 2) MARRIED   ☐ 4) DIVORCED
☐ 3) SEPARATED ☑ 5) WIDOWED

**SEX** F  **HEIGHT** 5 2  **WEIGHT** 122

### JOB PREFERENCE

**JOB (S) PREFERRED**
Inspection Cloth
Spooling
Qu

**LOCATION (S) PREFERRED**

**SHIFT** Any

**CAN YOU WORK ANY SHIFT?** ☑ YES ☐ NO

### EDUCATION & TRAINING

| LAST ELEMENTARY OR HIGH SCHOOL ATTENDED | CITY & STATE | NO. OF YEARS COMPLETED | DATE LEFT Month • Year |
|---|---|---|---|
| Drew Jr. | Lanett Ala, | 9 | 19 61 |

**COLLEGES OR VOCATIONAL SCHOOLS**  CITY & STATE

**CORRESPONDENCE COURSES OR OTHER TRAINING**

**MAJOR FIELD OR COURSES OF STUDY**  **DEGREES EARNED**

**DID YOU GRADUATE?**  **IF YES, SHOW YR**

**TYPING SPEED** WPM  **OFFICE SKILLS**

**DICTATION** WPM  **OTHER SKILLS**

Additional Information may be entered on the last page of this form.

### ACTIVITIES

**SCHOOL ACTIVITIES & HONORS**

**COMMUNITY ACTIVITIES & HONORS**

DEFENDANT'S EXHIBIT 13 P. Gibson

### EMERGENCY CONTACT

**NOTIFY THIS PERSON▶** Last Name Ollie  First Name Jones  Initial  **RELATIONSHIP** Mother

**ADDRESS** Number 10  Street Bay Line St.  City Lanett  State ALA,  Zipcode 36823

**TELEPHONE NO. OR OTHER WAY TO CONTACT ▶** 644-1698

NAME (Last, First, Middle, Maiden) Barrow Patricia

SOCIAL SECURITY NO. 1422-62-1736

DATE 7/18/75

**EMPLOYMENT RECORD**

| HAVE YOU EVER WORKED FOR THIS COMPANY OR ANY OF ITS SUBSIDIARIES? ☑ YES ☐ NO | West Point Pepperell was previously West Point Mfg. Co. • Pepperell Mfg. Co. • Cabin Crafts, Inc. • Alamac Knitting Mills, Inc. |
|---|---|

**EMPLOYMENT HISTORY —** Start with present job or last job and work back

| EMPLOYER | JOB | | |
|---|---|---|---|
| West Point Pepprell | Spinsding | | |
| ADDRESS | DATES FROM 3 mo    To | NAME OF SUPERVISOR | |
| CITY & STATE | WHY DID YOU LEAVE? | | RATE OF PAY |
| Lanett Ala | Sickness (husband) | | $108. |
| EMPLOYER | | | |
| Sunshine Laundry | | | |
| ADDRESS 796 Lexington Ave. | DATES FROM 3 yrs To | NAME OF SUPERVISOR | |
| CITY & STATE | WHY DID YOU LEAVE? | | RATE OF PAY |
| Brooklyn N.Y. | Job ran out | | $74.00 |
| EMPLOYER | JOB | | |
| Valley Car Wash | | | |
| ADDRESS Lanett Ala. | DATES FROM 2014 To   mo.   Still Emp. | NAME OF SUPERVISOR | |
| CITY & STATE | WHY DID YOU LEAVE? | | RATE OF PAY |
| EMPLOYER | DATES FROM | TO | JOB | | $42.00 |
| ADDRESS | WHY DID YOU LEAVE? | | RATE OF PAY |
| EMPLOYER | DATES FROM | TO | JOB |
| ADDRESS | WHY DID YOU LEAVE? | | RATE OF PAY |
| EMPLOYER | DATES FROM | TO | JOB |
| ADDRESS | WHY DID YOU LEAVE? | | RATE OF PAY |
| EMPLOYER | DATES FROM | TO | JOB |
| ADDRESS | WHY DID YOU LEAVE? | | RATE OF PAY |
| EMPLOYER | DATES FROM | TO | JOB |
| ADDRESS | WHY DID YOU LEAVE? | | RATE OF PAY |
| EMPLOYER | DATES FROM | TO | JOB |
| ADDRESS | WHY DID YOU LEAVE? | | RATE OF PAY |

**MILITARY** Have you served in the Armed Forces of the United States? ☐ NO  ☐ YES

| IF YES | BRANCH | DATE ENTERED | DATE OF DISCHARGE | TYPE DISCHARGE | LAST RANK | DRAFT OR RESERVE STATUS |
|---|---|---|---|---|---|---|
| ANY OTHER INFORMATION | | | | | | |

**HEALTH** Do you have, or have you ever had, sickness or injury of the following? Answer Yes or No for each

| EYES | EARS | ARMS | HANDS | FEET | LEGS | BACK | HEART | OTHER - IDENTIFY |
|---|---|---|---|---|---|---|---|---|
| NO | NO | NO | NO | NO | NO | NO | NO | |

EXPLAIN ANY "YES" ANSWER

Explain in more detail on the back page if you want to.

**FAMILY RECORD**

WPH
000003

## FAMILY RECORD

Give Full Name (s)

**HUSBAND OR WIFE (Include Maiden Name)**

List any other children or brothers and sisters on the back.

| | X if dependent on you | DATE OF BIRTH | EMPLOYED BY |
|---|---|---|---|
| **SON OR DAUGHTER** Sanide E. Jones | | 3/31/60 | |
| **SON OR DAUGHTER** Miles E. Jones | | 5/8/62 | |
| **SON OR DAUGHTER** | | | |
| **SON OR DAUGHTER** | | | |
| **SON OR DAUGHTER** | | | |
| **FATHER** Robert Jones | | | Retired |
| **MOTHER** (Include Maiden Name) Ollie Goodman | | | Domestic |
| **BROTHER OR SISTER** Jimmie Lee Allen | APPROX. AGE 28 | Mr. Darden | |
| **BROTHER OR SISTER** | | | |
| **BROTHER OR SISTER** | | | |
| **BROTHER OR SISTER** | | | |
| **BROTHER OR SISTER** | | | |
| **ANY OTHER MEMBERS OF YOUR HOUSEHOLD NOT LISTED ABOVE** | | | |
| **NAME ALL FORMER HUSBANDS OR WIVES** | Eddie Lawrence Barron | | |

**OTHER RELATIVES & CLOSE FRIENDS Who Work For The Company**

| NAME | RELATIONSHIP | PLANT OR OFFICE |
|---|---|---|
| Rev. Otis Hill | | |
| John Henry Thomas | | |
| Sammy Thomas | | |
| Elijah Barrow | | |
| Marion Woody | | |

**PERSONAL REFERENCES** — Do not name former employers or relatives

| NAME | OCCUPATION | PHONE NUMBER | ADDRESS |
|---|---|---|---|
| John Henry Thomas | | 644-4515 | |
| Allen Cubwell | | | |
| Charlie Lion | | 644-2477 | |

I understand that false statements on this application may be considered sufficient cause for dismissal. I further understand that the use of this application does not indicate there are any positions open and does not in any way obligate this Company. This application will remain active for a period of ninety days, after which time I may renew it.

MY PAST EMPLOYERS MAY BE CONTACTED. MY PRESENT EMPLOYER **MAY** (Strike out one) BE CONTACTED.
**MAY NOT**

| Applicant's Signature | Patricia J. Barron | Witness | John Boone |
|---|---|---|---|
| Reviewed By | Mad Clerical   8/28/31 | | |
| | **Facility Personnel Director** | | **Operating Head of Facility** |

WPH
000004

**WEST POINT - PEPPERELL, INC.**

# WESTPOINT STEVENS

## "BUILD YOUR JOB SECURITY" BOOKLET

Facility: _Lanier prep_     Employee: _Patrisia J. Barron_

### EMPLOYEE ACKNOWLEDGMENT

I have received a copy of the Company's booklet entitled "How You Can Help BUILD YOUR JOB SECURITY and Other Important Information - A GUIDEBOOK FOR EMPLOYEES - (Revised 5-1-94)," and I understand that the statements contained in this guidebook which I have received do not constitute a contract of employment and are subject to change from time to time. While it certainly is the Company's desire that each employee enjoy long-lasting employment with the Company, it is recognized that employees are free to resign at any time, just as the Company may terminate employees at any time and for any reason not prohibited by law. I also understand that if I have any questions about the contents after reading the booklet, I should contact my supervisor.

_Harvey Neighlan_

Signature of Supervisor or Other
Person Issuing Booklet and
Witnessing Employee Signature

_Patrisia J. Barron_

Employee Signature

_6-11-94_

Date

EC-050194 B.VF

**WPH**
**000073**



DEFENDANT'S EXHIBIT
14
P. Gibson

# WESTPOINT STEVENS

## "BUILD YOUR JOB SECURITY" BOOKLET

**Facility:** *Lanier*                    **Associate:** *Patricia J. Gibson*

### ASSOCIATE ACKNOWLEDGMENT

I have received a copy of the Company's booklet entitled "How You Can Help BUILD YOUR JOB SECURITY and Other Important Information - A GUIDEBOOK FOR ASSOCIATES - (Revised 7-15-98)," and I understand that the statements contained in this guidebook which I have received do not constitute a contract of employment and are subject to change from time to time. While it certainly is the Company's desire that each associate enjoy long-lasting employment with the Company, it is recognized that associates are free to resign at any time, just as the Company may terminate associates at any time and for any reason not prohibited by law. I also understand that if I have any questions about the contents after reading the booklet, I should contact my supervisor.

*Patricia J. Gibson*
Associate Signature

*9-1-98*
Date

*Dry Lilly     9-1-98*
Signature of Supervisor or Other
Person Issuing Booklet and
Witnessing Associate Signature

EC-071598-BAF


DEFENDANT'S EXHIBIT 15
P. Gibson

WPH
000141

# WESTPOINT STEVENS

## "BUILD YOUR JOB SECURITY" BOOKLET

Facility: _Lanier_                    Associate: _Patricia Gibson_

### ASSOCIATE ACKNOWLEDGMENT

I have received a copy of the Company's booklet entitled "How You Can Help BUILD YOUR JOB SECURITY and Other Important Information - A GUIDEBOOK FOR ASSOCIATES - (Revised 12-1-00)," and I understand that the statements contained in this guidebook that I have received do not constitute a contract of employment and are subject to change from time to time. While it certainly is the Company's desire that each associate enjoy long-lasting employment with the Company, it is recognized that associates are free to resign at any time, just as the Company may terminate associates at any time and for any reason not prohibited by law. I also understand that if I have any questions about the contents after reading the booklet, I should contact my supervisor.

_[signature]_
Signature of Supervisor or Other
Person Issuing Booklet and
Witnessing Associate Signature

_[signature]_
Associate Signature

2-16-01
Date

CC-120100-BAF

DEFENDANT'S EXHIBIT 16 P. Gibson

## PERSONNEL NOTICE

W E S T P O I N T   S T E V E N S

☑ INITIATED BY COMPANY          ☐ AT REQUEST OF EMPLOYEE

| EMPLOYEE | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|
| Patricia Gibson | 34384 | 4 |

| FACILITY | DEPARTMENT | ROOM | SHIFT |
|---|---|---|---|
| Lanier | Prep | Waiper | 1st |

**TYPE OF NOTICE**
1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

| SUPERVISOR | NOTICE DATE |
|---|---|
| Greg Tilley | 12-13-02 |

EFFECTIVE DATE OF CHANGE: 1-2-03

**SITUATION IN BRIEF**

Department, Job, (Shift) or Rate Change

**DETAILS**

| Present | | Proposed | |
|---|---|---|---|
| Dept. # | 03 | Dept. No. | 03 |
| Dept. Name | Prep | Dept. Name | Prep |
| Shift | 6 | Shift | 1st ✓ |
| Job # | 361 | Job # | 361 |
| Job Title | Waiper Operator | Job Title | Waiper Operator |

**DEFENDANT'S EXHIBIT 17 P. Gibson**

# W E S T P O I N T   S T E V E N S

## "BUILD YOUR JOB SECURITY" BOOKLET

**Facility:** Lanier          **Associate:** Pat Gibson

### ASSOCIATE ACKNOWLEDGMENT

I have received a copy of the Company's booklet entitled "How You Can Help BUILD YOUR JOB SECURITY and Other Important Information - A GUIDEBOOK FOR ASSOCIATES - (Revised 05-07-03)," and I understand that the statements contained in this guidebook that I have received do not constitute a contract of employment and are subject to change from time to time. While it certainly is the Company's desire that each associate enjoy long-lasting employment with the Company, it is recognized that associates are free to resign at any time, just as the Company may terminate associates at any time and for any reason not prohibited by law. I also understand that if I have any questions about the contents after reading the booklet, I should contact my supervisor.

_Patricia Gibson_
Associate Signature

7/15-03
Date

_Greg Tilley_
Signature of Supervisor or Other
Person Issuing Booklet and
Witnessing Associate Signature

CC-051503-BAF

**WPH
000175**

# W E S T P O I N T   S T E V E N S

## "A GUIDEBOOK FOR HOURLY ASSOCIATES" BOOKLET

DEFENDANT'S EXHIBIT 18 P. Gibson

**Facility:** _Lanier_                    **Associate:** _Patricia Gibson_

                                                    PRINT NAME

I have received a copy of the Company's booklet entitled "A GUIDEBOOK FOR HOURLY ASSOCIATES" - (Revised 07-01-04)." THIS GUIDEBOOK FOR ASSOCIATES IS INTENDED TO SUMMARIZE DESIGNATED POLICIES, PROCEDURES, AND PRACTICES OF WESTPOINT STEVENS INC. THE ASSOCIATE IS ADVISED THAT BECAUSE BUSINESS CONDITIONS AND CONSIDERATIONS MAY CHANGE FROM TIME TO TIME, WESTPOINT STEVENS INC. RESERVES THE RIGHT TO MODIFY, AMEND, ELIMINATE, OR DEVIATE FROM ANY OR ALL OF ITS POLICIES, PROCEDURES, OR PRACTICES IN ITS SOLE DISCRETION AS IT MAY CONSIDER APPROPRIATE FOR ITS BUSINESS PURPOS-ES. THIS GUIDEBOOK SUPERSEDES AND REPLACES ANY AND ALL PRIOR GUIDEBOOKS WHICH ARE HEREBY REVOKED, AND DECLARED NULL AND VOID.

ALL ASSOCIATES ARE FURTHER ADVISED THAT THIS GUIDEBOOK IS NOT A CONTRACT OF EMPLOYMENT. THE EMPLOYMENT RELATIONSHIP BETWEEN WESTPOINT STEVENS INC. AND ITS ASSOCIATES IS AT-WILL AND VOLUNTARY. THIS MEANS THAT EITHER WESTPOINT STEVENS INC. OR AN ASSOCIATE CAN TERMINATE THE EMPLOYMENT RELATIONSHIP AT-WILL AND AT ANY TIME WITH OR WITHOUT CAUSE AND WITH OR WITHOUT NOTICE. THE EMPLOYMENT AT-WILL STATUS OF EACH ASSOCIATE CANNOT BE ALTERED BY ANY ORAL STATEMENT OR REPRESENTATION, BUT CAN ONLY BE CHANGED BY A WRITTEN CONTRACT, WHICH MUST BE SIGNED BY THE PRESIDENT OF THE COMPANY.

### ACKNOWLEDGEMENT

MY SIGNATURE BELOW ACKNOWLEDGES RECEIPT OF THE NEW GUIDEBOOK, WHICH TAKES EFFECT IMMEDIATELY. I HAVE READ THE DISCLAIMER WRITTEN ABOVE, AND I UNDERSTAND IT AND ACKNOWLEDGE THAT THE GUIDEBOOK IS NOT AN EMPLOYMENT CONTRACT. I KNOW THAT MY EMPLOYMENT IS "AT-WILL" AND VOLUNTARY AS DESCRIBED ABOVE. I ALSO UNDERSTAND THAT IF I HAVE ANY QUESTIONS ABOUT THE CONTENTS AFTER READING THE BOOKLET, I SHOULD CONTACT MY SUPERVISOR/MANAGER.

Signature of Supervisor or Other
Person Issuing Booklet and
Witnessing Associate Signature

Associate Signature _Patricia J. Gibson_

Date _7-22-04_

CC-070104-BAF

## HUMAN RESOURCES POLICY MANUAL

### DISCLAIMER

THE HUMAN RESOURCES POLICY MANUAL IS INTENDED TO SUMMARIZE DESIGNATED POLICIES, PROCEDURES, AND PRACTICES OF WESTPOINT STEVENS INC. THE POLICY IS ISSUED TO MEMBERS OF WESTPOINT STEVENS' MANAGEMENT AND IS NOT INTENDED TO BE DISTRIBUTED TO ASSOCIATES. THE HUMAN RESOURCES POLICY MANUAL IS DESIGNED FOR USE BY MANAGEMENT ONLY; IT IS NOT INTENDED FOR USE BY NONMANAGEMENT ASSOCIATES AND IS NOT A HANDBOOK FOR ASSOCIATES.

ALL ASSOCIATES ARE ADVISED THAT BECAUSE BUSINESS CONDITIONS AND CONSIDERATIONS MAY CHANGE FROM TIME TO TIME, WESTPOINT STEVENS INC. RESERVES THE RIGHT TO MODIFY, AMEND, ELIMINATE, OR DEVIATE FROM ANY AND ALL OF ITS POLICIES, PROCEDURES, AND PRACTICES IN ITS SOLE DISCRETION AS IT MAY CONSIDER APPROPRIATE FOR ITS BUSINESS PURPOSES. ACCORD-INGLY, THE MANUAL IS IN LOOSE-LEAF FORMAT FOR MAXIMUM FLEXIBILITY, WITH MULTIPLE SECTIONS. IT IS ANTICIPATED THAT MATERIAL WILL BE ADDED AND DELETED PERIODICALLY.

THE HUMAN RESOURCES POLICY MANUAL SUPERSEDES AND REPLACES ANY AND ALL PRIOR HUMAN RESOURCES POLICY MANU-ALS, WHICH ARE HEREBY REVOKED, AND DECLARED NULL AND VOID. ALL ASSOCIATES ARE FURTHER ADVISED THAT THIS HUMAN RESOURCES POLICY MANUAL IS NOT A CONTRACT OF EMPLOYMENT. THE EMPLOYMENT RELATIONSHIP BETWEEN WESTPOINT STEVENS INC. AND ITS ASSOCIATES IS AT-WILL AND VOLUNTARY. THIS MEANS THAT EITHER WESTPOINT STEVENS INC. OR AN ASSO-CIATE CAN TERMINATE THE EMPLOYMENT RELATIONSHIP AT-WILL AND AT ANY TIME, WITH OR WITHOUT CAUSE, AND WITH OR WITHOUT NOTICE. THE EMPLOYMENT AT-WILL STATUS OF EACH ASSOCIATE CANNOT BE ALTERED BY ANY ORAL STATEMENT OR REPRESENTATION, BUT CAN ONLY BE CHANGED BY A WRITTEN CONTRACT, WHICH MUST BE SIGNED BY THE PRESIDENT OF THE COMPANY.

### ACKNOWLEDGEMENT

MY SIGNATURE BELOW ACKNOWLEDGES THE PUBLICATION OF THE NEW WESTPOINT STEVENS HUMAN RESOURCES POLICY MANUAL, WHICH TAKES EFFECT IMMEDIATELY. I HAVE READ THE DISCLAIMER WRITTEN ABOVE AND UNDERSTAND AND ACKNOWLEDGE THAT THE MANUAL IS NOT AN EMPLOYMENT CONTRACT. I KNOW THAT MY EMPLOYMENT IS "AT-WILL" AND VOLUNTARY, AS DESCRIBED ABOVE.

_Billy Stewart_
Signature of Supervisor or Other
Person Witnessing Associate Signature

Associate Signature _Patricia J. Gibson_

Date _7-22-04_

WPH
000185

CC-070104-HRP

# Patricia Gibson
# Dx. 19, Part 1
# WPH 000329-360

# A Guidebook
# for
# Hourly Associates

### (Revised 07-01-04)



WESTPOINT STEVENS

WPH
000329



DEFENDANT'S
EXHIBIT
19
P. Gibson

THIS GUIDEBOOK FOR ASSOCIATES IS INTENDED TO SUM-
MARIZE DESIGNATED POLICIES, PROCEDURES, AND PRAC-
TICES OF WESTPOINT STEVENS INC. THE ASSOCIATE IS
ADVISED THAT BECAUSE BUSINESS CONDITIONS AND
CONSIDERATIONS MAY CHANGE FROM TIME TO TIME,
WESTPOINT STEVENS INC. RESERVES THE RIGHT TO MODI-
FY, AMEND, ELIMINATE, OR DEVIATE FROM ANY OR ALL OF
ITS POLICIES, PROCEDURES, OR PRACTICES IN ITS SOLE
DISCRETION AS IT MAY CONSIDER APPROPRIATE FOR ITS
BUSINESS PURPOSES. THIS GUIDEBOOK SUPERSEDES AND
REPLACES ANY AND ALL PRIOR GUIDEBOOKS, WHICH ARE
HEREBY REVOKED, AND DECLARED NULL AND VOID.

ALL ASSOCIATES ARE FURTHER ADVISED THAT THIS
GUIDEBOOK IS NOT A CONTRACT OF EMPLOYMENT. THE
EMPLOYMENT RELATIONSHIP BETWEEN WESTPOINT
STEVENS INC. AND ITS ASSOCIATES IS AT-WILL AND VOL-
UNTARY. THIS MEANS THAT EITHER WESTPOINT STEVENS
INC. OR AN ASSOCIATE CAN TERMINATE THE EMPLOY-
MENT RELATIONSHIP AT-WILL AND AT ANY TIME WITH OR
WITHOUT CAUSE AND WITH OR WITHOUT NOTICE. THE
EMPLOYMENT AT-WILL STATUS OF EACH ASSOCIATE CAN-
NOT BE ALTERED BY ANY ORAL STATEMENT OR REPRE-
SENTATION, BUT CAN ONLY BE CHANGED BY A WRITTEN
CONTRACT, WHICH MUST BE SIGNED BY THE PRESIDENT
OF THE COMPANY.

### ACKNOWLEDGEMENT

MY SIGNATURE BELOW ACKNOWLEDGES RECEIPT OF THE
NEW GUIDEBOOK, WHICH TAKES EFFECT IMMEDIATELY. I
HAVE READ THE DISCLAIMER WRITTEN ABOVE, AND I
UNDERSTAND IT AND ACKNOWLEDGE THAT THE GUIDE-
BOOK IS NOT AN EMPLOYMENT CONTRACT. I KNOW THAT
MY EMPLOYMENT IS "AT-WILL" AND VOLUNTARY AS
DESCRIBED ABOVE. I ALSO UNDERSTAND THAT IF I HAVE
ANY QUESTIONS ABOUT THE CONTENTS AFTER READING
THIS BOOKLET, I SHOULD CONTACT MY SUPERVISOR/
MANAGER

_____        _____

Associate Signature                              Date


_____

Print Name

WPH
000330

# Table of Contents

Your job is important . . . . . . . . . . . . . . . . 1

Our policy on Equal Employment
    Opportunity . . . . . . . . . . . . . . . . . . . . 3

Our policy on sexual harassment . . . . . . . 4

Zero tolerance for violence . . . . . . . . . . 5

We abide by FMLA . . . . . . . . . . . . . . . . 6

Positive associate relations . . . . . . . . . . . 8

You and your supervisor . . . . . . . . . . . . . 10

Probationary period helps
    you settle in . . . . . . . . . . . . . . . . . . . . 12

Be regular in your attendance . . . . . . . . 13

Start your job on time . . . . . . . . . . . . . . 17

Always put safety first . . . . . . . . . . . . . 18

Reduce waste wherever possible . . . . . . 19

Strive for the best in quality . . . . . . . . 20

Conserve time, supplies
    and equipment . . . . . . . . . . . . . . . . . . 21

In doubt? Ask questions . . . . . . . . . . . . 22

Tell us when things go wrong . . . . . . . . 23

Our policy on job-related complaints
    and problems . . . . . . . . . . . . . . . . . . 24

Follow the rules of your job .......... 29

Some things to avoid ............... 32

It shouldn't happen to you .......... 40

Seniority is important to you ......... 46

Wide range of benefits
available to associates .......... 48

Keep your records straight .......... 50

Your access to records .............. 53

Bulletin boards provide facts ....... 55

Our policy concerning
a drug-free workplace ........... 56

Our Goals ........... Inside back cover

# Your job is important

---

WestPoint Stevens is a fine team of thousands of associates in several states working together to help meet the home fashions consumer product needs of people in every walk of life.

Around the clock, day in and day out, customers across the land and around the world depend upon our products for their comfort, health and general well-being.

No matter what your job may be, you can be sure that it is important to our continued successful operation. Otherwise, that job wouldn't exist.

Each associate who does his or her job well is a help to everyone else in the organization. Your welfare, progress and future depend on how well other team members do their jobs. And their welfare depends on how well you do yours.

Also, keep this in mind: Your job is like a savings bank account. The more you put into it, the more important you make it … and the more satisfying and rewarding it will be.

In other words, when YOU make your job important, it is likely to return the favor.

2

# Our Policy On Equal Employment Opportunity; Anti-Harassment, Retaliation

A fundamental philosophy that has guided the Company and its predecessors through the years is belief in the importance of good employee relations and treating individuals with dignity and respect. Consistent with this philosophy, it is WestPoint Stevens policy not to discriminate against any individual because of race, color, religion, sex, national origin, age, disability or veteran's status. All associate facilities will be maintained on a nonsegregated basis, and all qualified associates are free to participate in Company-sponsored activities and educational programs.

Discrimination, harassment, retaliation, coercion, interference or intimidation of any associate due to his/her race, religion, color, national origin, sex, age, disability or veteran's status is strictly forbidden. It is also against Company policy to harass or retaliate against any associate due to the associate filing a complaint of discrimination/harassment or due to the associate's cooperation in the Company's investigation of a complaint. Any associate who experiences such activity should follow the regular complaint procedure or notify his/her Human Resources Manager or Division Director of Human Resources. Complaints will be investigated promptly and thoroughly and confidentiality will be maintained to the extent possible.

3

# Our Policy On Sexual Harassment

This policy affirms the Company's position of zero tolerance regarding sexual harassment. It is WestPoint Stevens policy to promote an atmosphere free of sexual harassment in any form at all levels of employment — including, but not limited to, unwelcome sexual advances, requests for sexual favors, spoken or written abuse related to an associate's sex, showing or displaying pornographic or sexually explicit objects in the workplace and other verbal or physical conduct of a sexual nature.

Such actions or conduct are viewed as creating an intimidating, harmful and offensive work environment and are therefore prohibited. Any associate found to be involved in such behavior is subject to discipline up to and including discharge.

We encourage any associate who is subject to treatment he/she believes is sexual harassment to follow the regular complaint procedure or report it to his/her Human Resources Manager or Division Director of Human Resources, whose name and number can be found on the Complaints Poster on facility bulletin boards. Charges of sexual harassment will be investigated immediately and in a manner as confidential as possible.

Harassment, retaliation, coercion, interference or intimidation of any associate due to the associate's filing a complaint of sexual harassment is strictly forbidden.

4

# Zero Tolerance for Violence

WestPoint Stevens mandates a "zero tolerance for violence" environment and will make every effort to prevent violent incidents from occurring. Violence for purpose of the policy includes but is not restricted to physically harming another, verbal abuse, shoving, pushing, harassment, intimidation, coercion, threatened or actual use of weapons and threats or talk of violence. Any associate who violates this policy will be subject to discipline up to and including discharge.

# We abide by FMLA

WestPoint Stevens abides by provisions of the Family and Medical Leave Act (FMLA) of 1993.

In most cases, the Company's Leave of Absence Policy requires fewer qualifications and provides better leave benefits than FMLA. Ask your Human Resources Manager for details.

The basic provisions of the FMLA are posted on facility bulletin boards, and information on the provisions of the Company's Leave of Absence policy is available in your Human Resources Department.

Generally, an associate, after meeting certain qualifications, may take a leave of absence for the following reasons: an associate's own serious health condition, to care for an associate's spouse, child or parent who has a serious health condition and/or to care for an associate's child after birth or placement with the associate for adoption or

6

foster care. Advance notice and medical certification may be required.

Please see your supervisor or Human Resources Manager if you have any questions regarding leaves of absence.

**NOTE: A leave of absence is normally issued for a specified length of time. Be sure you know when your leave expires by requesting a copy of your leave of absence. Failure to return to work at the expiration of your leave or failure to extend your leave will result in termination of your employment.**

**An associate who works elsewhere while on leave of absence (except for no work available) is subject to termination.**

# Positive associate relations

We realize that our strength and future growth depend directly upon the contribution made by each of us. We also know that high productivity and efficiency result from your individual job satisfaction and happiness.

WestPoint Stevens' policy is to always be fair and honest with you and to respect your rights as an individual. We shall continue to work to achieve mutual respect in our working relationships. We will always insist that everyone does all in his/her power to carry out this policy.

To continue working together successfully, everyone must realize that harmonious relationships are not entirely a matter of rules, but are the outgrowth of daily decisions and friendly attitudes of team spirit.

WestPoint Stevens will remain strong only if we continue to improve. The

Company needs the assistance and cooperation of each and every associate that we may earn a profit and have the means to keep abreast of modern developments and ahead of our competition. It is your responsibility to help keep our Company growing and progressing every day you're on the job.

# You and your supervisor

In your work, it's good to remember one fact: No one wants you to succeed in your job more than your immediate supervisor. In most instances, your immediate supervisor will be a Shift Supervisor/Manager. In the first few weeks or months you are on the job, your immediate supervisor and others in the Company will invest in you one of their most valuable assets — time.

Supervisors are in their jobs because of demonstrated ability to work with others, to help those for whom they have responsibility and to approach job problems objectively and with a determination to act in the best interest of all concerned.

Your performance directly affects your supervisor's performance, by which he/she, in turn, is measured. He/she will do everything in his/her power to help you succeed on your job. Keep your supervisor informed on the work you're doing. If there's anything

10

affecting your work in any way, he/she will want to know about it and — working with you — deal with it promptly.

Your best source of information about your job is your supervisor. When you have a question about any job duties, do not hesitate to ask your supervisor for the answer. He/she will generally give it to you at once. If he/she cannot, he/she will get the answer for you as soon as he/she can.

It is a part of the supervisor's job, and he/she will cooperate with you at all times.

# Probationary period helps you settle in

Newly hired and re-hired associates are required to serve a probationary period of up to three calendar months.

"Probationary period" is defined as a period of time in which the associate becomes oriented to the job and surroundings, demonstrates potential abilities on the job and gives the supervisor an opportunity to evaluate these abilities.

At the same time, you have the opportunity to decide if you like your new job and surroundings.

During the probationary period, if the supervisor determines you lack the ability to meet required standards of the job, he/she may recommend transfer to another job or termination of employment.

12

# Be regular in your attendance

Your supervisor, co-workers, and our Company are counting on you to help meet production schedules, deliver orders on time and provide the services our customers require. You therefore are expected to be at your assigned place on time each day that you are scheduled to work.

If you must be absent for a legitimate cause that can be anticipated, be sure to talk with your supervisor in advance.

If you cannot report for work because of an unexpected illness or happening, you should notify your supervisor promptly. Tell your supervisor WHY you must be absent and WHEN you expect to return. Your supervisor will decide whether your absence meets the guidelines and is excusable.

Failure to give proper notice, unexcused

absences and excessive excused absences can lead to disciplinary action ... and, in some cases, discharge.

Remember, too, that absences from scheduled work result in the loss of wages and can affect your eligibility for Holiday Pay, as well as the amount of your Vacation Pay.

Absenteeism hurts us all. Let's work together each day to avoid it!

# According to Company policy:

1. You will be subject to disciplinary action if you fail to give proper notice of an absence which you can anticipate more than one hour. (This type of absence is referred to as a "No Report.")

2. You will be subject to disciplinary action if you fail to give proper notice within one working day after the beginning of an absence that is caused by emergency conditions and could not be anticipated.

3. Three consecutive workdays of absence without notification ("No Report") is

14

considered as a voluntary quit.

4.  In standard three-shift operations, three consecutive workdays of unexcused absence will result in the employee's discharge.

5.  In four-shift continuous operations, two consecutive workdays of unexcused absence will result in the employee's discharge.

6.  Excessive excused absences:

    a.  Standard three-shift operations — six partial- or full-day periods of excused absence (other than written leaves of absence or absence for which an associate is paid) within any six-month period will result in disciplinary action.

    b.  Four-shift continuous operations — three partial- or full-day periods of excused absence (other than written leaves of absence or absence for which an associate is paid) within any six-month period will result in disciplinary action.

**NOTE:** Any number of consecutive days of excused full-day absences for the same cause is considered one period of absence.

Consecutive partial-day absences are considered separate periods of absence if separated by a period of worktime.

Any time on leave is not considered "active employment" in determining a six-month period.

To determine the number of excused periods of absence, measure backward six months from the latest absence (plus a period equal to any time spent on written leave of absence). All periods of excused absence within that six months are counted, even if they have figures in previous disciplinary action.

For disciplinary action, full-day absences and partial-day absences are handled separately.

WPH
000348

# Start your job on time

An associate not at his/her assigned work station at the beginning of the first hour of his/her work schedule is considered tardy.

Lateness not only can affect your own performance and paycheck, but also can waste the time of others whose work may be delayed by your tardiness.

If you think you will be late for work, contact your supervisor immediately. Give the reason for your delay and the time you expect to arrive.

Help your department get off to a good start each workday. Begin your job on time.

# Always put safety first

We believe in putting safety FIRST. This means doing each job the safe way all of the time.

Your Company provides you a safe place in which to work. Safety, however, is a two-way street. The responsibility for accident prevention must be shared by all — the Company and every associate.

You should know the safety rules and follow them in your daily work. If you see any unsafe conditions or practices, report them promptly.

And be sure to notify your supervisor immediately of any accident, no matter how slight the injury may be.

**WPH**
**000350**

# Reduce waste wherever possible

Every time we waste a little material, misuse a little time or make a little error, the cost of our work goes up and our efficiency goes down.

Like the drip-drip-drip of a leaking faucet, waste slowly but surely adds up to much needless expense.

The higher our costs, the harder it is to attract and hold customers, operate at a profit and stay in business.

Whatever your job, you can help reduce costs. Join our team of waste-watchers. Be careful with materials, supplies and goods in process. Use every minute wisely. Learn from your past mistakes. Eliminate errors.

WPH
000351

19

# Strive for the best in quality

WestPoint Stevens has long been noted for the quality of its people and its products. We value this fine reputation and want to preserve it.

Our team takes great pride in quality workmanship, and we look to our new associates for the same careful and prideful work.

The need for excellence in our products and services has never been greater. Customers expect it more than ever. To keep our sales up and our jobs secure, we must satisfy their requirements.

Top quality doesn't just happen. It's the result of you and your co-workers doing your BEST at all times.

WPH
000352

# Conserve time, supplies and equipment

"Conserve" means "to keep from being damaged, lost or wasted." This, in a nutshell, is exactly what we need to do with our time, our supplies and our equipment.

Listen to and follow instructions. Stick to the procedures and meet the standards of your job. Avoid interfering with the work of others.

Take good care of all equipment for which you are responsible. Don't operate or attempt to repair machinery without training or authorization.

Handle supplies carefully. Guard against damage. Use only what your job requires. Store surplus items properly. Practice good housekeeping.

21

# In doubt?
# Ask questions

Puzzled about what to do and how to do it? Find out the right way before you start. Never hesitate to ask questions about your work or anything related to it. You will save valuable time and avoid unnecessary problems by making this a habit in your job.

Whenever you do have questions at work, the person to talk with is your supervisor. An important part of his/her job is to see that you are properly instructed, that your questions are answered and that you have opportunities to express your ideas or suggestions. Help your supervisor help you. Listen carefully to instructions. Ask questions when in doubt.

WPH
000354

# Tell us when things go wrong

In a family or in a group of people at work, it is not unusual for some misunderstandings and problems to come up from time to time.

At WestPoint Stevens, when something about your job is bothering you, we want to know about it as soon as possible.

Our policy is to give prompt, careful and courteous consideration to all problems/complaints of associates.

To get results without delay, discuss your problem or complaint with management. You should, of course, start with your immediate supervisor. But, if you prefer, go directly to your Department Manager first or, if necessary, Human Resources Manager.

# Our policy on job-related complaints and problems

Our policy is to give prompt, careful, courteous attention to all associate problems or complaints. You are encouraged to bring anything bothering you to management's attention.

Our intent is to provide a friendly hearing in a spirit of understanding and helpfulness at all levels of management. Be assured that your standing with the Company will not be jeopardized because of bringing your complaint or problem to management's attention.

The goodwill of our associates is a highly valuable Company asset. To keep the informal personal relationship that has characterized our management-associate teamwork over the years, we follow a simple procedure for handling complaints and problems, questions and suggestions as outlined on the next four pages.

24

WPH
000356

Follow these steps to give your facility management the opportunity to resolve your complaint or problem and to avoid unnecessary delay. If you feel it is necessary, go directly to your Department Manager or Human Resources Manager instead of your immediate Supervisor. In any event, you can be sure of a friendly, helpful hearing and responsible guidance.

If your complaint is due to discrimination or harassment, you may go DIRECTLY to step 3 or outside your facility to step 5.

# Step 1:
# See your Supervisor

**Talk with him/her about your problem. He/she has the authority to settle most matters. If he/she cannot settle matters or help you solve your problem, he/she will arrange for you to talk with your Department Manager.**

25

# Step 2:
# See your Department Manager

He/she will listen carefully and make every reasonable effort to suggest a satisfactory solution. If the problem cannot be resolved, he/she will direct you to your Human Resources Manager.

# Step 3:
# See your Human Resources Manager

Your Human Resources Manager will make a conscientious effort to bring about understanding and reach a solution that is fair to all concerned. If he/she cannot, he/she will arrange for you to see your Assistant Manager or Manager.

26

# Step 4:
# See your Assistant Manager, Superintendent, or Manager

In seeking to reach a fair solution, he/she will consider all of the facts. It is hoped that all problems and complaints can be settled within the facility in which they occur. However, if you feel it is necessary to go still further, your Manager will arrange for you to see your General Manager, where applicable, or the Director of Human Resources for your Division.

# Step 5:
# See Your Division Director of Human Resources
(Name and telephone number appears in Complaint Poster on bulletin boards)

He/she will investigate thoroughly and try to reach a mutually satisfactory

27

# Patricia Gibson
# Dx. 19, Part 2
# WPH 000361-392

solution. If you wish, he/she will arrange for you to see the Vice President - Manufacturing of your Division.

# Step 6:
# See Your Vice President of Human Resources

As a final step, you may see the Corporate Vice President - Human Resources or, if you prefer, another appropriate Corporate Vice President. It is, of course, hoped that only the rarest of complaints or problems will require this level of review for a solution, but it is an available step to each associate when all other steps have failed to provide a fair and satisfactory solution to your problem or complaint.

WPH
000360

# Follow the rules of your job

Rules and regulations are a necessary and accepted part of everyday living. Whether in the plant, office or community — at work or play — we depend upon them for the guidance, protection and well-being of everyone.

At WestPoint Stevens, we have a number of important rules and regulations that apply to each job. It is management's responsibility to enforce these rules and regulations impartially in each department and facility for the benefit of all.

Your cooperation in following the rules and regulations of your job will not only help you and your department achieve maximum efficiency, but also can help your development on the job.

Failure by anyone to follow established rules and regulations can lead to disciplinary

action, ranging from formal counseling to dismissal — depending upon the seriousness and frequency of offenses. Violations will be dealt with firmly in keeping with established Company policies.

If you do not know or understand the rules and regulations of your job, now is the time to tell your supervisor. Management sincerely wants to help each associate in every possible way to have and hold satisfying and rewarding employment with the Company.

WestPoint Stevens believes in the fundamental principle of fair and honest dealings with associates. Good employee relations and human dignity on the job are the cornerstones on which the Company was built and which it has grown. WestPoint Stevens' progressive disciplinary policy was written with this philosophy in mind. However, as explained in the Disclaimer and Acknowledgement on the first page of the Guidebook, WestPoint Stevens may, at its discretion, terminate an associate at any time for any reason.

# Appeals

Should an associate who has been disciplined or discharged feel that he/she has been dealt with unjustly, the person may use the Company's Problems and Complaints Procedure to seek relief. The procedure is outlined in detail on pages 25 through 28 of this booklet.

# Some things to avoid

## (Violations considered "less than intolerable")

Here are some — <u>but not all</u> — of the things that normally will result in disciplinary action:

1. Failure to give proper notice on an absence (No Report);

2. In standard three-shift operations, unexcused absences up through **two** consecutive workdays (note: three consecutive days of unexcused absence will result in associate's discharge);

3. In four-shift continuous operations, **one** workday of unexcused absence (note: two consecutive days of unexcused absence will result in associate's discharge);

4. Excessive excused absences:

   a. Standard three-shift operations — six partial- or full-day periods of excused absence (other

32

than written leaves of absence or those absences for which an associate is paid) within any six-month period of active employment;

b. Four-shift continuous operations — three partial- or full-day periods of excused absence (other than written leaves of absence or those absences for which an associate is paid) within any six-month period of active employment;

5. Excessive Tardiness:

a. Standard three-shift operations — six periods of tardiness within any six-month period of active employment;

b. Four-shift continuous operations — three periods of tardiness within any six-month period of active employment.

6. Interfering with the work of others — offensive personal habits that interfere with production and efficiency;

7. Poor job performance — low production, defective workmanship, excessive waste, loafing, leaving job without permission, etc.;

8.  Violation of safe practices and exposing self or others to possible injury (other than serious violations that endanger life and safety of associates), also failure to report a work-connected accident or injury. Examples of such violations are:

   a.  Blowing off the person with compressed air;

   b.  Blowing off machinery, walls, etc., without checking for other people in the area;

   c.  Pushing loads while "blind" (when path of travel is obscured);

   d.  Operating equipment without proper training and authorization;

   e.  Running in the plant;

   f.  Smoking in unauthorized area;

   g.  Failure to properly report an injury;

   h.  Taking shortcuts that violate proper procedure;

9.  Improper use or care of Company property;

10. Reporting (but prior to actually

34

beginning work) under the influ-
ence of intoxicants — such as alco-
hol and unprescribed dangerous
drugs, as well as prescribed drugs,
which induce unsafe mental or
physical state (note: for drivers of
Company vehicles, this will result
in immediate discharge);

11.  Violation of Solicitation, Distribution
     of Literature, Associate
     Contributions and/or Sale of Products
     or Collection of Money policies;

12.  Sleeping on the job (note: in cer-
     tain jobs where associates may be
     endangered or Company property
     may be damaged by such action,
     this will result in immediate dis-
     charge);

13.  Misconduct — failure to follow
     instructions and/or work rules;

14.  Sexual misconduct of a nature con-
     sidered to be less than intolerable;

15.  Unauthorized audio or video
     recording or photography on
     Company property or in Company
     facilities (note: in certain cases
     involving investigation of poten-
     tially illegal conduct or activity
     that concerns security of a facility

or its personnel, recording may be authorized by Corporate Security Director);

16. Entering the facility during non-work hours without authorization or approval of an appropriate member of management;

17. Failure to cooperate in Company investigations relating to security when activity warranting such investigations is considered less than intolerable;

18. Failure to wear proper protective equipment (hearing, respirator, chemical exposure, etc.) when required;

19. Failure to wear or have security badge (for facilities having such security measures in place) as required.

20. Acts of violence in the workplace considered to be less than intolerable including but not restricted to verbal abuse, harassment, intimidation, coercion and threats or talk of violence.

21. Garnishments (see pages 38-39.)

36

WPH
000368

# Discipline procedures

Summarized here through page 39 are procedures which management follows in administering disciplinary action for type of offenses listed on preceding pages: Items No. 1 through No. 21:

a. First Offense — Formal Counseling, with written Counseling Report placed in associate's personnel file.

b. Second Offense — Verbal Warning, with written Warning Report placed in associate's personnel file.

c. Subsequent Offenses — Verbal Warning, with written Warning Report of each such offense placed in associate's personnel file.

d. Three written warnings within a 12-month period, whether for same or a different offense, shall constitute discharge (Note: These procedures are to be applied to probationary associates, in whole or in part,

37

WPH
- 000369

solely at management's discretion.)

**(The written report of each verbal warning will be prepared and signed by the associate's immediate supervisor. The associate is asked to sign each such report.)**

Item No. 21 (garnishments) (note: discipline administered in connection with garnishments is subject to restrictions of applicable state laws and administrative provisions of the Company's Garnishments Policy):

    a.    First Garnishment - Formal Counseling (Counseling Report);

*b.    Second Garnishment within any 12-month period - First Warning Report;

*c.    Third Garnishment within any 12-month period — Second Warning Report;

    d.    Fourth Garnishment within any 12-month period — Third Warning Report and automatic discharge.

    *    Failure by associate to get a release within one week from

38

second or third garnishment within any 12-month period also will result in automatic discharge.

Any time on leave of absence is not considered "active employment" in determining a 12-month period.

**NOTE:** **Also see following pages for some other types of offenses that are considered sufficient reason for immediate discharge.**

**Notwithstanding these discipline procedures, as explained in the Disclaimer and Acknowledgement on the first page of this Guidebook, WestPoint Stevens may, at its discretion, terminate an associate at any time for any reason.**

# It shouldn't happen to you

## (Violations considered to be "intolerable")

Immediate discharge of an associate for a serious offense is unpleasant for everyone. Management prefers, of course, that it never happen at WestPoint Stevens. Occasionally, however, someone goes beyond limits of acceptable conduct. Violations of this type simply cannot be tolerated. Among other things, they interfere with our operations — and, in some cases, even endanger lives of our associates and other people.

Therefore, for our mutual protection, any associate who commits an intolerable offense will be promptly discharged in keeping with procedures established by Company policy.

Intolerable offenses shall include, but are not restricted to, the following:

WPH
000372

1.  Unexcused absence:

    a.  In standard three-shift opera-
        tions, **three** consecutive work-
        days of unexcused absence;

    b.  In four-shift continuous opera-
        tions, **two** consecutive work-
        days of unexcused absence;

2.  Possession and/or use of alcohol,
    unprescribed dangerous drugs or
    similar dangerous intoxicants in the
    facility;

3.  Drivers of Company vehicles report-
    ing under the influence of intoxicants
    — such as alcohol and unprescribed
    dangerous drugs, as well as pre-
    scribed drugs which induce unsafe
    mental or physical state — and/or
    possessing and/or using such intoxi-
    cants on the job;

4.  Possession or use of deadly weapons
    in the facility;

5.  Deliberate falsification or misrepre-
    sentation of records;

6.  Theft on Company property;

7.  Fighting or physical assault, except
    in the case of a victim of unwarrant-

ed physical assault;

8. Gross insubordination and/or deliberate refusal to follow instructions;

9. Criminal acts, promiscuous or indecent behavior or other conduct within the facility that may make an associate's continued employment not in the best interest of the Company or its associates;

10. Willful damage to Company property or to property of others;

11. Dangerous horseplay; examples:

   a. Intentionally pointing compressed air toward a person;

   b. Aiming a moving lift truck toward a person;

   c. Tripping a person near machinery in motion;

   d. "Tickling" a person known to be highly nervous near machinery in motion.

12. Serious violations of safe practice endangering life or health of self or others. Some examples are:

   a. Starting machinery without

42

checking to see if everyone is clear;

b. By-passing interlocks on elevators and production machinery;

c. Driving lift trucks too fast and failure to use flashing lights and horns;

d. Working on electrical equipment without power being locked out;

e. Repairing, oiling, cleaning and adjusting machinery while it is in motion.

f. Hoisting loads over the heads of other associates;

g. Failure to use proper protective equipment — welder's shield, gloves, aprons, goggles, etc. — where required;

h. Rendering inoperative or removing guards.

13. Unauthorized work elsewhere while on leave of absence.

14. Misconduct or activities away from

the facility, including criminal activity, the nature of which may make an associate's continued employment not in the best interest of the Company or its associates;

15. Sleeping on the job when the nature of the associate's job (such as, but not limited to, watchman or boiler tender) is such that his/her sleeping on the job tends to endanger associates and/or damage Company property; also, an associate's deliberate attempt to sleep while at work;

16. Sexual misconduct of a nature considered to be intolerable.

17. Refusal to cooperate in Company investigations relating to security when activity warranting such investigations is considered intolerable;

18. Testing positive on a drug test;

19. Refusal to submit to drug test;

20. Working or attempting to work when obviously under the influence of alcohol or drugs and endangering the life or health of self or others;

44

21.  Failure by associate to get a release within stated time frame from second or third garnishment within any 12-month period or occurrence of a fourth garnishment in any 12-month period;

22.  Employment with a direct competitor when the Company determines such employment could have a detrimental effect on Company operations.

23.  Retaliating against, harassing or intimidating a fellow associate for opposing discrimination/harassment or filing a complaint of discrimination/harassment or for cooperating in an investigation of discrimination/harassment.

24.  Acts of violence in the workplace considered to be intolerable including but not restricted to verbal abuse, shoving, pushing, harassment, intimidation, coercion, threatened or actual use of weapons and threats or talk of violence.

WPH
000377

45

# Seniority is important to you

The Company recognizes that an associate's length of service, or seniority, is an important factor in many aspects of his/her job, including benefit programs, transfers, layoffs and recalls and the filling of job vacancies. The Company also recognizes that the full utilization of the skills and efforts of its associates provides the most effective utilization of its work force; consequently, length of service, skills, work experience and job performance are interrelated to achieve a more effective and better satisfied work force.

**Company seniority** is the length of time that a person has been continuously employed by the Company at any of its locations. Company seniority determines eligibility for insurance, vacations, vacation pay, awards under the Service Recognition

46

WPH
000378

Program and other benefits.

**Plant seniority** is the length of time that a person has been continuously employed by the plant. Plant seniority within departments applies, to the extent indicated by the Seniority Policy, in layoffs, recalls, transfers and job bidding.

Make sure that you know your seniority dates. If you do not, ask your supervisor.

47

WPH
000379

# Wide range of benefits available to associates

A wide range of benefits is available to WestPoint Stevens associates. In some cases, certain eligibility requirements must be met; other benefits become available upon employment.

Your benefits will be explained to you during your orientation as a new associate and for several such benefits, there are brochures and summary plan description booklets that provide the details in a greater degree.

If you have questions, please ask your supervisor or Human Resources Manager.

Among the benefits for eligible associates are:

48

**Group Health (Medical, Dental, Drug and Vision)**

**Group Life Insurance**

**Retirement Plan**

**Retirement Savings Value (401K) Plan**

**Universal Life Insurance Plan**

**Employees' Credit Association**

**Accident and Sickness Plan**

**Early Retiree Medical Coverage**

**Medicare Supplement Plan**

**Tuition Reimbursement**

**Vacations and Vacation Pay**

**Holiday Pay**

**Service Awards**

**Associate Purchase Card**

**Retirement Plaque**

**Call-In Pay**

**Reporting Pay**

**Funeral Pay**

**Jury-Duty Pay**

**Leaves of Absence**

**NOTE: All benefit plans are subject to change. If and when changes do occur, affected associates will be notified.**

# Keep your records straight

While you are employed with WestPoint Stevens, your Human Resources Department must maintain accurate and complete records covering your service with the Company.

It is to your advantage to help us keep information about you and your family status up to date. This is important:

– to YOU, because it helps ensure that you will receive all of the advantages and benefits to which you and your family are entitled;

– to the GOVERNMENT, because various laws require the maintenance of records and withholding of wages for income tax, social security and other federal and state programs;

50

WPH
000382

&mdash;    to the COMPANY, so that we may carry out our responsibilities as an employer.

All of the necessary information normally is obtained from each new associate at the time of employment. However, because personal circumstances change from time to time, each associate must cooperate in updating such information as changes take place.

When any of the following conditions occur, please talk with your supervisor for guidance and assistance in getting the necessary changes made at the Human Resources Department:

1.    Change of mailing address, residence address or telephone number;

2.    Change of person to be notified in case of accident or emergency;

3.    Change in your legal name;

4.    Change in marriage status;

5.    Change in number of income tax exemptions;

6.    A birth or death in the immediate family;

7.    A desire on your part to change your

Group Life Insurance and/or Retirement Plan beneficiary or beneficiaries;

8.    Any change affecting the eligibility of your dependents for coverage under the Company's Group Health, Life Insurance and Retirement Savings plans.

Among other things, the Internal Revenue Service says that a new Withholding Exemption Certificate (Form W-4 or W-4A) MUST be filed by you within 10 days if the number of exemptions you previously claimed DECREASES. (Also, you may file a new W-4 or W-4A at any time if the number of your exemptions increases.) These forms, as well as additional information on this subject, are available at your Human Resources Office.

# Your access to records

As an associate, you have the right to review and/or obtain copies of certain records that pertain to you.

WestPoint Stevens has for many years had various programs designed to protect associates from potential hazards and, under these programs, the Company has compiled medical records. It has long been Company policy to provide our associates access to these records. To review or obtain a copy of these medical records, contact the Occupational Health Nurse at your facility. She will provide a medical authorization and release form for you to sign and will arrange for you to review your records or to receive copies of them.

These same protective programs also generate exposure records — i.e., a record of hazardous substances to which you may be exposed on the job and the level to which you're exposed. Associates are made aware of their exposures as a result of periodic moni-

toring in the workplace and notification of the results afterwards. Again, you may obtain a copy of your exposure records. To do so, contact your Human Resources Manager.

You may also have health records associated with your health coverage under the WestPoint Stevens Welfare Benefits Plan. While generally these records are held by the provider of the coverage (for example, Blue Cross and Blue Shield of Georgia), if WestPoint Stevens has any records associated with your health coverage, you have certain rights with regard to these records under the privacy regulations of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Please refer to the Notices of Privacy Practices for a more complete description of the HIPAA practices of WestPoint Stevens Inc. and your rights with regard to your health information.

Your personal records are also open to review by you. Although copies are not made available, your Human Resources Manager will be glad to arrange a time to sit down and review with you the personnel records relating to your employment with the Company.

WPH
000386

# Bulletin boards provide facts

Our plant bulletin boards are used to convey important information such as job vacancies, governmental notices and plant and departmental notices. Notices originated by associates must be submitted to the Human Resources Department for approval and posting. Notices relating to the sale or purchase of any item or other solicitations cannot be posted.

WPH
000387

55

# Our policy concerning a drug-free workplace

It is WestPoint Stevens policy to maintain a work environment free from use of illegal drugs at all Company locations. It is against Company policy to hire persons using illegal drugs. In order to be considered for employment, applicants must submit to a urine test to determine if the applicant may be using illegal drugs.

Associates are also subject to urine testing for illegal drugs if there is reasonable cause to believe an associate is under the influence of drugs. Associates who return to work after rehabilitation for drug or alcohol abuse are subject to periodic unannounced testing.

Associates may also be subject to random drug testing and testing after an on-the-job injury requiring treatment by a medical care

56

WPH
000388

provider away from the facility. An associate testing positive for illegal drugs (including prescription drugs if not prescribed for the associate tested) will be terminated.

The Company will also comply with all federal, state and local laws and regulations related to drug and alcohol testing.

The unlawful manufacture, distribution, dispensation, possession, use or abuse of a controlled substance is prohibited in the workplace. Any associate found guilty of any one of these prohibitions shall be subject to immediate discharge.

In compliance with the Federal Drug-Free Workplace Act of 1988, the Company requires, as a condition of employment, that associates abide by this policy statement and notify Company management of any criminal drug statute conviction for a violation occurring in the workplace no later than five days after such a conviction.

If you have any questions concerning this policy or if you have any questions concerning drug rehabilitation, ask your supervisor or Human Resources Manager. This policy, like others, is subject to revision at any time. You will be notified at your facility of any revisions that may affect you.

# NOTES:

WPH
000390

# OUR GOALS

WestPoint Stevens is in business to make a profit. Clearly and simply stated, this is the reason for our continued existence.

To do so, management recognizes that it must conduct the affairs of the Company so as to serve best the interests of the customer, the associate and the community.

WestPoint Stevens, therefore, has at least four basic objectives:

1. To provide products of the highest quality at a price and with a service to justify the continued patronage of our customers;

2. To provide maximum employment under safe, healthy, satisfying conditions at the highest rates of pay and benefits that competition permits;

3. To make an adequate profit so as to provide a fair return and to attract additional capital for corporate purposes and growth;

4. To be a good citizen.

Each associate, by doing his or her work properly, helps the Company achieve these objectives and thereby builds job security.



WESTPOINT
STEVENS

CC-070104-BYJS

WPH
000392

# Patricia Gibson
# Dx. 20-46

# What to do if you have a complaint or problem

**W**estPoint Stevens's policy is to give prompt, careful and courteous consideration to all problems or complaints of associates. You are encouraged to bring anything that is bothering you to the attention of management.

To provide a friendly hearing in a spirit of understanding and helpfulness at all levels of management is the purpose of our policy. You are assured that your standing with the Company will not be jeopardized because of your having brought your complaint or problem to management's attention.

The goodwill of our associates is a highly regarded Company asset. To maintain the informal personal relationship which has characterized our management-associate teamwork through the years, we follow a simple procedure for handling complaints and problems, as well as questions and suggestions. An outline of this procedure is provided below.

---

Follow these steps to give your facility management the opportunity to resolve your complaint or problem and to avoid unnecessary delay. If you feel it is necessary, go directly to your Department Manager or Human Resources Manager instead of your immediate Supervisor. In any event, you can be sure of a friendly, helpful hearing and responsible guidance.

**If your complaint is due to discrimination or harassment, you may go DIRECTLY to step 3 or outside your facility to step 5**

---

## 1 See Your Supervisor

Talk with him/her about your problem. He/she has the authority to settle most matters. If he/she cannot settle matters or help you solve your problem, he/she will arrange for you to talk with your Department Manager.

## 2 See Your Department Manager

He/she will listen carefully and make every reasonable effort to suggest a satisfactory solution. If the problem cannot be resolved, he/she will direct you to your Human Resources Manager.

## 3 See Your Human Resources Manager

Your Human Resources Manager will make a conscientious effort to bring about understanding and reach a solution that is fair to all concerned. If he/she cannot, he/she will arrange for you to see your Assistant Manager or Manager.

## 4 See Your Assistant Manager, Superintendent or Manager

In seeking to reach a fair solution, he/she will consider all of the facts. It is hoped that all problems and complaints can be settled within the facility in which they occur. However, if you feel it is necessary to go still further, your Manager will arrange for you to see your General Manager, where applicable, or the Director of Human Resources for your Division.

## 5 See Your Division Director of Human Resources

He/she will investigate thoroughly and try to reach a mutually satisfactory solution. If you wish, he/she will arrange for you to see your Vice President - Manufacturing.

Name and Telephone Number of Director of Human Resources Inserted Here

## 6 See Your Vice President of Human Resources

As a final step, you may see the Corporate Vice President - Human Resources or, if you prefer, another appropriate Corporate Vice President. It is hoped that only the rarest complaints or problems will require this level of review for solution, but it is an available step to each associate when all other steps have failed to provide a fair and satisfactory solution to your problem or complaint.





## WESTPOINT STEVENS

CC-110139-CP

**WPH 000393**



# WESTPOINT STEVENS

☑ **COUNSELING REPORT**          ☐ **WARNING REPORT***

*THIS IS THE
☐ FIRST ☐ SECOND ☐ THIRD
WARNING WITHIN 12 MONTHS
OF THIS DATE

| EMPLOYEE | | | | COUNSELING DATE |
|---|---|---|---|---|
| *Pat Barrow* | | | | 1-11-95 |

| FACILITY | DEPARTMENT | ROOM | SHIFT | WARNING DATE |
|---|---|---|---|---|
| *Lanier* | *prep* | *Warper* | *D1-6* | |

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| *Greg Tilley* | |

**SITUATION IN BRIEF**

Job Duty

**DETAILS**

ON 1-11-95 Pat run 82,000 yds on A Cotton beam.
that was supose to only Have 78,000 yds. Pat has been
talked to About this earlyer, And Knows she is sipose to Check
the yardage Clock.

STATUS
OK
TW

DEFENDANT'S
EXHIBIT
21
P. Gibson

**ACTION TAKEN**

Explained discipline & discharge policy.

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| *Greg Tilley* | |
| DEPARTMENT MANAGER *Ray Scott* | EMPLOYEE *Patricia J. Barrow* |
| | SIGNATURES |

# W E S T P O I N T   S T E V E N S

☐ **COUNSELING REPORT**          ☑ **WARNING REPORT**·

*THIS IS THE
☑FIRST ☐ SECOND ☐ THIRD
WARNING WITHIN 12 MONTHS
OF THIS DATE

| EMPLOYEE | | | | COUNSELING DATE |
|---|---|---|---|---|
| Pat Barrow | | | | 1-11-95 |

| FACILITY | DEPARTMENT | ROOM | SHIFT | WARNING DATE |
|---|---|---|---|---|
| Lanier | Prep | Warper | D1-6 | 2-8-95 |

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| | |

**SITUATION IN BRIEF**

Dust Mask

**DETAILS**

Pat is supose to wear A dust mask on Her job every day for the frist Hour of Her shift. I went by Her job At 8:15 She was not wearing one. I reminded Pat that she had to wear A dust mask the 1st Hr. She told me she was not going to wear one today.

TW

**ACTION TAKEN**

Explained discipline + discharge policy

DEFENDANT'S
EXHIBIT
22
P. Gibson

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| Dug Lilly | |
| DEPARTMENT MANAGER | EMPLOYEE |
| Ray Scott | Patricia Barrow |
| | SIGNATURES |

WP-1097-CS – REV. 10/83
50939

01189

# WESTPOINT STEVENS

☑ **COUNSELING REPORT**          ☐ **WARNING REPORT***

*THIS IS THE*
☐ FIRST ☐ SECOND ☐ THIRD
WARNING WITHIN 12 MONTHS
OF THIS DATE

EMPLOYEE _Pat Barrow_

FACILITY _Lanier_          DEPARTMENT _Prep_          ROOM _Warper_          SHIFT _Dixie_

COUNSELING DATE _7-18-96_

WARNING DATE

SUPERVISOR

SUPERVISOR WITNESSING WARNING

**SITUATION IN BRIEF**

Poor job performance

**DETAILS**

On 7-13-96 Pat run 2 bad beams on #3 warper
that had high selvages. These caused the slasher
to have trouble running. Pat needs to watch her job
closer.

7-25-96

**ACTION TAKEN**

Explained Discipline & Discharge Policy.

DEFENDANT'S
EXHIBIT
23
P. G. b50n

SUPERVISOR _Doug Tilly_

DEPARTMENT MANAGER _Ray Scott_

SUPERVISOR WITNESSING WARNING

EMPLOYEE _Patricia J. Barrow_
SIGNATURES

WP-1097-CS-REV.10/89
250939

**WPH
000105**

01189

# WESTPOINT STEVENS

☐ **COUNSELING REPORT**        ☑ **WARNING REPORT***

**THIS IS THE**
☑ FIRST ☐ SECOND ☐ THIRD
WARNING WITHIN 12 MONTHS
OF THIS DATE

#22621890

EMPLOYEE  Pat Barrow

FACILITY  Lanier          DEPARTMENT  Prep          ROOM  Warpor          SHIFT  D1-6

COUNSELING DATE  7-18-96

WARNING DATE  10-7-96

SUPERVISOR  Greg Tilley          SUPERVISOR WITNESSING WARNING

**SITUATION IN BRIEF**

Job Negligence

**DETAILS**

On 10-5-96 Pat cut the ends out on a beam that had only 80,000 yds on it. The beam should have had 82,000 yds. The doff light was not on, and the clock was not cleared off.



DEFENDANT'S
EXHIBIT
24
P. Gibson

**ACTION TAKEN**

Explained discipline + discharge policy

SUPERVISOR  Greg Tilley

DEPARTMENT MANAGER  Ray Scott

SUPERVISOR WITNESSING WARNING

EMPLOYEE SIGNATURES  Patricia Barrow

WP-1097-CS-REV. 6/89
250939

**WPH**
**000125**

01189

# WESTPOINT STEVENS

☑ **COUNSELING REPORT**          ☐ **WARNING REPORT***

*THIS IS THE
☐FIRST ☐SECOND ☐THIRD
WARNING WITHIN 12 MONTHS
OF THIS DATE

ASSOCIATE  Pat Gibson

COUNSELING DATE  10-14-02

FACILITY  LANier          DEPARTMENT  Prep          ROOM  WAIper          SHIFT  D1-6

WARNING DATE

SUPERVISOR  Grey Tilley

SUPERVISOR WITNESSING WARNING

**SITUATION IN BRIEF**

Bad Conduct.

**DETAILS**

I tryed to talk to Pat About A bad beam she run. She got smart About it And said it was Not Her beam And she did not have time to talk about it that she was trying to start up A waiper, I tryed to show Pat the ticket with Her NAme on it but she just talked smart & hatefull And said it was Not Her beam, There was no need for Pat to Act the way she did.

**ACTION TAKEN**

Explained discipline & discharge policy to Pat.

DEFENDANT'S
EXHIBIT
25
P. Gibson

SUPERVISOR  Grey Tilley          10-14-02          SUPERVISOR WITNESSING WARNING

DEPARTMENT MANAGER  Ray Scott          ASSOCIATE

SIGNATURES

CS-REV. 1/96

WPH
000174

01189

WESTPOINT STEVENS

## SEPARATION NOTICE

FACILITY _Perer_

NAME _Patricia Gibson_   ASSOCIATE NO. _34384_   SOCIAL SECURITY NO.   DATE _1-28-04_

DEPARTMENT _Prep_   OCCUPATION _Winpre opra._   SHIFT _1_   RATE _10.43_   DATE LAST HIRED (CSC) _8-15-75_

FORWARDING ADDRESS   DATE LAST WORKED _1-16-04_

SEPARATION DATE _1-26-04_

SEPARATIONS -- Please check box opposite the reason for separation and explain below.

**VOLUNTARY**

Gave notice of _____ days.
Lacking Active Employment ☐
Securing Other Employment (explain below) ☐
Leaving Locality (explain below) ☐
Transportation ☐
Housing ☐
Family Problems ☐
Health ☐
Pay ☐
Hours ☐
Supervision ☐
Work Conditions ☐
No Report (did not follow-up) ☐
Medical, Pregnancy or Other Leave Expired ☐
Other (explain below) ☐
*No classification could be identified*

**INVOLUNTARY**

Misconduct -- Three written warnings within a 12-month period for offenses less than intolerable (Human Resources Manual -- Section O-1, Part II-A) ☐

**Other Involuntary**

Job Elimination ☐
Temporary Employment Completed ☐
No Work Available -- Leave Expired ☐
No Work Available -- Probationary ☐
Inability to Perform Required Job Duties ☐
Garnishments ☐
Work Restriction Non-Occupational Origin ☐
Other (explain below) ☐

**Intolerable Offenses:**
(Policy Manual, Section O-1, Part II-B)
Intoxicants on Job ☐
Deadly Weapons ☐
Falsifying Records ☐
Dishonesty/Theft ☐
Fighting ☐
Gross Insubordination ☐
Criminal Act Within/Outside Facility ☐
Damage to Property of Company/Others ☐
Dangerous Horseplay ☐
Endangering Life or Health of Self or Others ☐
Unauthorized Work Elsewhere While on Leave ☐
Employment with Direct Competition ☐

**Promiscuous Behavior** ☐
Sexual Misconduct ☐
Refusal To Cooperate in Investigation ☐
Excessive Unexcused Absences ☐
Sleeping on Job ☐
Misconduct Away From Facility ☐
Refusal To Submit to Drug Test ☐
Failure To Get Release of Garnishment ☐
Other (explain below) ☐

**OTHER**
(Include in Separation Rate, not Quit Rate)
Returning to School ☐
Military ☐
Normal Retirement (Age 65) ☐
Delayed Retirement (After Age 65) ☐
Early Retirement (Before Age 65) ☐
Permanent Disability ☐
Workers' Compensation ☐
Death ☐
Transfer to Other Facility ☑
Plant Close ☐
Transfer to Exempt ☐
Other (explain below) ☐

EXPLANATION TO ASSOCIATE

_Temporary Transfer to Center until start up_

_Ray Wynn_   SUPERVISOR   DEPARTMENT MANAGER


DEFENDANT'S EXHIBIT
26
P. Gibson

## SEPARATION CHECKLIST
### TO BE COMPLETED BY THE HUMAN RESOURCES DEPARTMENT FOR ALL TERMINATIONS AND TRANSFERS
(For any item which does not apply, check the Not Applicable blank)

1. Has the appropriate controller been contacted for information on any outstanding cash advances, accounts payable due the Company for any merchandise, etc.?
Yes _____ N/A _____

2. Has Transportation Center been contacted for information on Company car, and air travel and auto rental credit cards and have these been surrendered to the Human Resources Department and returned to Transportation Center?
Yes _____ N/A _____

3. Have other items such as keys, entry cards, manuals and/or other Company properties been surrendered to the Human Resources Department?
Yes _____ N/A _____

4. Does the employee's final paycheck need holding until all of the above items have been checked and cleared?
Yes _____ N/A _____

5. Have "cards" such as Medical Coverage Identification Prescription Drug, Vision, Associate Purchase Card and -- in areas where used -- drug prescription purchase cards been surrendered to the Human Resources Department?
Yes _____ N/A _____

**IMPORTANT:** See the back of this form for applicable statement(s) to be read to the separating employee if he or she is a participant in the Company's group plans for medical care coverage and life insurance and review continuation of medical/dental/vision coverage under COBRA. Also: use form WP-31195-CS for Exit Interview.

REVIEWED BY   ASSOCIATE   PREPARER

_Cauleen E. Ogletree_
HUMAN RESOURCES MANAGER   ASSISTANT MANAGER   MANAGER

QC-31195-SH

PERSONNEL NOTICE

WESTPOINT STEVENS

☑ INITIATED BY COMPANY          ☐ AT REQUEST OF EMPLOYEE

| EMPLOYEE   PATRICIA GIBSON | EMPLOYEE NUMBER  34384 | TYPE OF NOTICE |

| FACILITY  069 CARTER | DEPARTMENT  0013 | ROOM  WINDING & WARPERS | SHIFT  7 |

**3** ◄
1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

| SUPERVISOR  GERRIE HALL | NOTICE DATE  5-15-04 |

EFFECTIVE DATE OF CHANGE    5/17/04

**SITUATION IN BRIEF**

Department, Job, Shift, or Rate Change

**DETAILS**

Present  069 CARTER                    Proposed  068 LANIER

Dept. #  0013                          Dept. No.  0003

Dept. Name                             Dept. Name  WINDING & WARPERS

Shift  7                               Shift  6

Job #                                  Job #  361

Job Title                              Job Title  WARPER OPERATOR

Rate                                   Rate  $10.43

JSD _____    The following to be completed when employee changes job:

DSD _____    The Job Hazard Study for a _____ has

FSD _____    been reviewed with me.

Employee's Signature

DEFENDANT'S EXHIBIT
TC
P. Gibson

**ACTION TAKEN**

Change due to:          Circle One

                        Bid Sheet

                        Displacement

                        Recall

(Other) (explain)  TRANSFERRED BACK TO LANIER MILL

**DISTRIBUTION**

☐ COST DEPT.           ☐ VICE - PRESIDENT
☐ DEPT. FILES          ☐ MANAGER
☐ INDUSTRIAL RELATIONS ☐ ASST. MANAGER
☐ OFFICE MANAGER       ☐ OVERSEER
☐ PAYROLL DEPT.        ☐ PRODUCTION DEPT.
☐ PERSONNEL DEPT.      ☐ SUPPLY ROOM
                       ☐

| RECOMMENDED BY  Calvin E. Oglethee          5/15/04 |
| DEPARTMENT HEAD |
| OTHER |
| SIGNATURE                                   DATE |

WESTPOINT STEVENS

**SEPARATION NOTICE**

FACILITY
069 CARTER MILL    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

NAME
PATRICIA GIBSON

ASSOCIATE NO.
34384

DATE
5-15-04

DEPARTMENT
0013 WINDING & WARPERS

OCCUPATION
361 WARPER OPERATOR

SHIFT
7

RATE
10.43

DATE LAST HIRED (CSD)
8-15-75

FORWARDING ADDRESS

DATE LAST WORKED
5-14-04

SEPARATION DATE
5-16-04

SEPARATIONS — Please check box opposite the reason for separation and explain below.

**VOLUNTARY**
Gave notice of _____ days.
Leaving Active Employment ............................ ☐
Leaving Locality (explain below)* ..................... ☐
Other Employment (explain below)* .................. ☐
Transportation ......................................... ☐
Housing ................................................ ☐
Family Problems ....................................... ☐
Health ................................................. ☐
Pay .................................................... ☐
Hours .................................................. ☐
Supervision ........................................... ☐
Work Conditions ...................................... ☐
No Report (indicate follow-up) ...................... ☐
Medical, Pregnancy or Other Leave Expired .......... ☐
Other (explain below) ................................ ☐
*No dissatisfaction could be identified

**INVOLUNTARY**
Misconduct — Three written warnings within a 12-month period for offenses less than Intolerable (Human Resources Manual — Section O-1, Part III-A) ............ ☐

**Other Involuntary**
Job Elimination ....................................... ☐
Temporary Employment Completed .................... ☐
No Work Available – Leave Expired ................... ☐
No Work Available – Probationary .................... ☐
Inability to Perform Required Job Duties ............. ☐
Garnishments .......................................... ☐
Work Restriction Non-Occupational Origin ........... ☐
Other (explain below) ................................ ☐

**Intolerable Offenses:**
**(Policy Manual, Section O-1, Part III-B)**
Intoxicants on Job .................................... ☐
Deadly Weapons ....................................... ☐
Falsifying Records .................................... ☐
Dishonesty/Theft ...................................... ☐
Fighting ............................................... ☐
Gross Insubordination ................................ ☐
Criminal Act Within/Outside Facility ................. ☐
Damage to Property of Company/Others ............... ☐
Dangerous Horseplay .................................. ☐
Endangering Life or Health of Self or Others ........ ☐
Unauthorized Work Elsewhere While on Leave ........ ☐
Employment with Direct Competition ................. ☐

Promiscuous Behavior ................................ ☐
Sexual Misconduct .................................... ☐
Refusal To Cooperate in Investigation ............... ☐
Excessive Unexcused Absences ....................... ☐
Sleeping on Job ....................................... ☐
Misconduct Away From Facility ....................... ☐
Refusal To Submit to Drug Test ...................... ☐
Failure To Get Release of Garnishment .............. ☐
Other (explain below) ................................ ☐

**OTHER**
**(Include in Separation Rate, not Quit Rate)**
Returning to School ................................... ☐
Military ............................................... ☐
Normal Retirement (Age 65) .......................... ☐
Delayed Retirement (After Age 65) ................... ☐
Early Retirement (Before Age 65) .................... ☐
Permanent Disability .................................. ☐
Workers' Compensation ............................... ☐
Death ................................................. ☐
Transfer to Other Facility ............................ ☑
Plant Close ........................................... ☐
Transfer to Exempt ................................... ☐
Other (explain below) ................................ ☐

EXPLANATION TO ASSOCIATE

TRANSFERRED FROM CARTER TO LANIER MILL

SUPERVISOR                          DEPARTMENT MANAGER

**SEPARATION CHECKLIST**
**TO BE COMPLETED BY THE HUMAN RESOURCES DEPARTMENT FOR ALL TERMINATIONS AND TRANSFERS**
(For any item which does not apply, check the Not Applicable blank)

1. Has the appropriate controller been contacted for information on any outstanding cash advances, accounts payable due the Company for any merchandise, etc.?
Yes _____ N/A ✓

2. Has Transportation Center been contacted for information on Company car, and air travel and auto rental credit cards and have these been surrendered to the Human Resources Department and returned to Transportation Center?
Yes _____ N/A ✓

3. Have other items such as keys, entry cards, manuals and/or other Company properties been surrendered to the Human Resources Department?
Yes _____ N/A ✓

4. Does the employee's final paycheck need holding until all of the above items have been checked and cleared?
Yes _____ N/A ✓

5. Have "cards" such as Medical Coverage Identification Prescription Drug, Vision and Associate Purchase Card been surrendered to the Human Resources Department?
Yes _____ N/A ✓

IMPORTANT: See the back of this form for applicable statement(s) to be read to the separating employee if he or she is a participant in the Company's group plans for medical care coverage and life insurance and review continuation of medical/dental/vision coverage under COBRA. Also: use form WP-31199-CS for Exit Interview.

REVIEWED BY    ASSOCIATE    PREPARER

Calvin E. Ogletree

HUMAN RESOURCES MANAGER    ASSISTANT MANAGER    MANAGER

CC-062503-SN

**PERSONNEL NOTICE**

**West Point Pepperell**

☐ INITIATED BY COMPANY      ☐ AT REQUEST OF EMPLOYEE

| | | | |
|---|---|---|---|
| EMPLOYEE *Pat Barrow* | | EMPLOYEE NUMBER | TYPE OF NOTICE *7* |
| FACILITY *Lanier* DEPARTMENT *Preps* | ROOM *Warper tender* | SHIFT *1* | 1 - EMPLOYEE PROBLEM<br>2 - EMPLOYEE COMPLAINT |
| SUPERVISOR *Ray Scott* | | NOTICE DATE *10-1-93* | 3 - NOTICE OF CHANGE<br>4 - REQUEST FOR CHANGE |
| EFFECTIVE DATE OF CHANGE *10-1-93* | | | 5 - EMPLOYEE REQUEST<br>6 - COMMENDATION<br>7 - MISCELLANEOUS NOTICE |

SITUATION IN BRIEF

*Job Duties*

DETAILS

*On 10-1-93 I went over pats job Duties on the warper each Day she is to check all warper switch to make sure they are set right check beams for being centered on warper check yardage make sure switch is On.*

ACTION TAKEN

*File*

DEFENDANT'S
EXHIBIT
*28*
*E.Gibson*

DISTRIBUTION
☐ COST DEPT.
☐ DEPT. FILES
☐ INDUSTRIAL RELATIONS
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ PERSONNEL DEPT.
☐ VICE-PRESIDENT
☐ MANAGER
☐ ASST. MANAGER
☐ OVERSEER
☐ PRODUCTION DEPT.
☐ SUPPLY ROOM
☐

RECOMMENDED BY *Ray Scott*
DEPARTMENT HEAD
OTHER

SIGNATURE                DATE

WP-1157-CS

00415

**PERSONNEL NOTICE**

☑ INITIATED BY COMPANY    ☐ AT REQUEST OF EMPLOYEE

W E S T P O I N T   S T E V E N S

EMPLOYEE: _Pat Barrow_

EMPLOYEE NUMBER: _34384_

FACILITY: _Lanier_  •  DEPARTMENT: _Prep._  •  ROOM: _Warper_  •  SHIFT: _D1-6_

SUPERVISOR: _Greg Tilley_

NOTICE DATE: _1-2-95_

EFFECTIVE DATE OF CHANGE

**TYPE OF NOTICE**

_7_ ◄ 1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

SITUATION IN BRIEF

_Job Responsibility_

DETAILS

_I talked to Pat about making sure she puts the right amount of yards on every beam she runs. I explained to Pat that it is her responsibility to make sure the yardage clock is set for the right amount of yards for the beam she is running._

ACTION TAKEN

_Placed in Pat's file for a reminder if needed._

DEFENDANT'S EXHIBIT
_21_
_P. Gibson_

**DISTRIBUTION**

☐ COST DEPT.
☐ DEPT. FILES
☐ INDUSTRIAL RELATIONS
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ PERSONNEL DEPT.

☐ VICE - PRESIDENT
☐ MANAGER
☐ ASST. MANAGER
☐ OVERSEER
☐ PRODUCTION DEPT.
☐ SUPPLY ROOM
☐

RECOMMENDED BY: _Greg Tilley_

DEPARTMENT HEAD: _Ray Scott_

OTHER

SIGNATURE                    DATE

WP-1157-CS

0415 - 5

PERSONNEL NOTICE

☑ INITIATED BY COMPANY          ☐ AT REQUEST OF EMPLOYEE

W E S T P O I N T   S T E V E N S

EMPLOYEE
*Pat Barrow*

EMPLOYEE NUMBER
*34384*

TYPE OF NOTICE

FACILITY
*Lanier*

DEPARTMENT
*Prep*

ROOM
*Warper*

SHIFT
*DI-6*

SUPERVISOR
*Greg Tilley*

NOTICE DATE
*3-10-96*

EFFECTIVE DATE OF CHANGE

*7*

1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

SITUATION IN BRIEF

*Unsafe Act*

DETAILS

*On 3-10-96 Pat was wearing headphones listing to A radio. I explained to Pat that we could not wear headphone and listin to A radio on the job.*

DEFENDANT'S
EXHIBIT
*30*
*P. Gibson*

ACTION TAKEN

*Placed in Pats file for A reminder if ever needed.*

DISTRIBUTION

☐ COST DEPT.
☐ DEPT. FILES
☐ INDUSTRIAL RELATIONS
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ PERSONNEL DEPT.

☐ VICE - PRESIDENT
☐ MANAGER
☐ ASST. MANAGER
☐ OVERSEER
☐ PRODUCTION DEPT.
☐ SUPPLY ROOM
☐

RECOMMENDED BY
*Greg Tilley*

DEPARTMENT HEAD
*Ray Lott*

OTHER

SIGNATURE                                   DATE

WP-1157-CS

**PERSONN'   NOTICE**

W E S T P O I N T   S T E V E N S

☑ INITIATED BY COMPANY    ☐ AT REQUEST OF EMPLOYEE

| EMPLOYEE Pat Barron | EMPLOYEE NUMBER 34384 | TYPE OF NOTICE |
|---|---|---|
| FACILITY 048 | DEPARTMENT Prep | SHIFT N-2-9 |
| SUPERVISOR Lyn Sorrell | NOTICE DATE 7/26/96 | |

TYPE OF NOTICE

1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

EFFECTIVE DATE OF CHANGE

**SITUATION IN BRIEF**

Job Performance

**DETAILS**

On 7-26-96 I talked to Pat about paying closer attention to her job. I also talked to her about trying to work at a fast rate of speed. Pat looked at the clock on #2 warper when it stopped, she thought it was ready to doff. It was not. She cut one side of ends out and when going to the other side she realized that she had made a mistake. She cut the beam out 8,000 yds. short.

WPH
000103

**ACTION TAKEN**

Placed in Pat's file to be used as a reminder if needed.

DEFENDANT'S EXHIBIT 31 P. Gibson

(Attach additional sheets as necessary)

| DISTRIBUTION | | RECOMMENDED BY | |
|---|---|---|---|
| ☐ COST DEPT. | ☐ VICE PRESIDENT | | 7/26/96 |
| ☐ DEPT. FILES | ☐ GENERAL MANAGER | DEPARTMENT MANAGER | |
| ☐ INDUSTRIAL RELATIONS | ☐ MANAGER | Ray Scott | 7-26-96 |
| ☐ OFFICE MANAGER | ☐ ASST. MANAGER | EMPLOYEE (if necessary) | |
| ☐ PAYROLL DEPT. | ☐ DEPT. MANAGER | | |
| ☐ HUMAN RESOURCES DEPT. | ☐ PRODUCTION DEPT. | OTHER | |
| | ☐ SUPPLY ROOM | | |
| | ☐ | | |

WP-1157-CS REV 4/96

SIGNATURE            DATES

# PERSONNEL NOTICE

WESTPOINT STEVENS

☑ INITIATED BY COMPANY    ☐ AT REQUEST OF EMPLOYEE

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

| EMPLOYEE | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|
| Pat Barrow | 34384 | 7 |

| FACILITY | DEPARTMENT | SHIFT |
|---|---|---|
| Lanier | Prep | Dite |

| SUPERVISOR | NOTICE DATE |
|---|---|
| Greg Tilley | 10-10-96 |

EFFECTIVE DATE OF CHANGE

- 1 - EMPLOYEE PROBLEM
- 2 - EMPLOYEE COMPLAINT
- 3 - NOTICE OF CHANGE
- 4 - REQUEST FOR CHANGE
- 5 - EMPLOYEE REQUEST
- 6 - COMMENDATION
- 7 - MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

Un-Safe Act

Safety
F3

**DETAILS**

Pat was blowing off A warper And did not have Any safety goggles over the regular glasses.

**WPH
000124**

**CTION TAKEN**

Placed in Pat's File for a reminder if ever needed.

DEFENDANT'S
EXHIBIT
32
P. Gibson

| DISTRIBUTION | | (Attach additional sheets as necessary) |
|---|---|---|
| DEPT. | ☐ VICE PRESIDENT | RECOMMENDED BY    Greg Tilley    10-10-96 |
| FILES | ☐ GENERAL MANAGER | DEPARTMENT MANAGER |
| TRIAL RELATIONS | ☐ MANAGER | Ray Scott    10 10 96 |
| MANAGER | ☐ ASST. MANAGER | EMPLOYEE (if necessary) |
| L DEPT. | ☐ DEPT. MANAGER | |
| RESOURCES DEPT. | ☐ PRODUCTION DEPT. | OTHER |
| | ☐ SUPPLY ROOM | |
| | ☐ | |

EV. 4/96

SIGNATURE                    DATES

# PERSONNEL NOTICE

WESTPOINT STEVENS

☑ INITIATED BY COMPANY    ☐ AT REQUEST OF EMPLOYEE

| EMPLOYEE | | EMPLOYEE NUMBER | TYPE OF NOTICE |
|---|---|---|---|
| Pat Barron | | 34384 | 7 |

| FACILITY | DEPARTMENT | SHIFT |
|---|---|---|
| Lanier | Prep | D1-6 |

| SUPERVISOR | | NOTICE DATE |
|---|---|---|
| Greg Tilley | . | 8-23-97 |

EFFECTIVE DATE OF CHANGE

TYPE OF NOTICE:
1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

Job Duty.

**DETAILS**

I talked to Pat about making sure when she lays the ends in the rake that that are right. Also explained to Pat that the one who lays the ends in the rake is responsible for that beam. And if it is run wrong disciplinary action will be taken.

WPH
000116

**ACTION TAKEN**

Placed in Pats file for a reminder if ever needed.

DEFENDANT'S EXHIBIT 33 P. Gibson

(Attach additional sheets as necessary)

**DISTRIBUTION**
☐ COST DEPT.
☐ DEPT. FILES
☐ INDUSTRIAL RELATIONS
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ HUMAN RESOURCES DEPT.
☐ VICE PRESIDENT
☐ GENERAL MANAGER
☐ MANAGER
☐ ASST. MANAGER
☐ DEPT. MANAGER
☐ PRODUCTION DEPT.
☐ SUPPLY ROOM
☐ ___

| | SIGNATURE | DATES |
|---|---|---|
| RECOMMENDED BY | Greg Tilley | 8-23-97 |
| DEPARTMENT MANAGER | Ray Scott | 8-23-97 |
| EMPLOYEE (if necessary) | | |
| OTHER | | |

WP-1157-CS REV. 4/96

00415

PERSONNEL NOTICE

WESTPOINT STEVENS

☒ INITIATED BY COMPANY  ☐ AT REQUEST OF ASSOCIATE

| ASSOCIATE Pat Gibson | ASSOCIATE NUMBER 34384 | TYPE OF NOTICE |
|---|---|---|
| FACILITY Lanier | DEPARTMENT Prep | SHIFT D1-6 |
| SUPERVISOR Greg Tilley | NOTICE DATE 5-11-99 | |
| EFFECTIVE DATE OF CHANGE | | |

TYPE OF NOTICE

7
1 - ASSOCIATE PROBLEM
2 - ASSOCIATE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - ASSOCIATE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

SITUATION IN BRIEF

Job Duty.

DETAILS

I talked with Pat About checking the yardage clocks on the warpers first thing every morning befor starting the warpers up to make sure they Are on And set right. Also told Pat to keep A check on them during the day.

DEFENDANT'S
EXHIBIT
34
P. Gibson

WPH
000146

ACTION TAKEN

Placed in Pats file for A reminder if ever needed.

(Attach additional sheets as necessary)

DISTRIBUTION
☐ COST DEPT.
☐ DEPT. FILES
☐ INDUSTRIAL RELATIONS
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ HUMAN RESOURCES DEPT.

☐ VICE PRESIDENT
☐ GENERAL MANAGER
☐ MANAGER
☐ ASST. MANAGER
☐ DEPT. MANAGER
☐ PRODUCTION DEPT.
☐ SUPPLY ROOM
☐ ___

| RECOMMENDED BY | Greg Tilley | 5-11-99 |
|---|---|---|
| DEPARTMENT MANAGER | | |
| ASSOCIATE (if necessary) | | |
| OTHER | | |
| | SIGNATURE | DATES |

WP-1157-CS REV 11/97

00415

## PERSONNEL NOTICE

WESTPOINT STEVENS

INITIATED BY COMPANY ☐  AT REQUEST OF ASSOCIATE

| ASSOCIATE Pat Gibson | | ASSOCIATE NUMBER | TYPE OF NOTICE |
|---|---|---|---|
| FACILITY Lanier | DEPARTMENT Prep. | SHIFT 1st | 7  1 - ASSOCIATE PROBLEM |
| SUPERVISOR Greg Tilley | | NOTICE DATE 7-17-03 | 2 - ASSOCIATE COMPLAINT 3 - NOTICE OF CHANGE 4 - REQUEST FOR CHANGE |
| EFFECTIVE DATE OF CHANGE | | | 5 - ASSOCIATE REQUEST 6 - COMMENDATION 7 - MISCELLANEOUS NOTICE |

SITUATION IN BRIEF                Bad beam

DETAILS

Pat filled out the wrong ticket for a beam, she put a 576, 80,000 yds OC 38° on a 580 64,500 yds OC 28° beam. I talked to Pat about this and explained that she has got to watch close about what she is doing to make sure the ticket matches up with with correct beam. I also explained the next time this happens that disciplinary action will be taken.

Patricia Gibson

ACTION TAKEN        File.

CW

DEFENDANT'S EXHIBIT 55 P. Gibson

WPH
000173

(Attach additional sheets as necessary)

| DISTRIBUTION | | RECOMMENDED BY  Greg Tilley | 7-17-03 |
|---|---|---|---|
| ☐ COST DEPT. | ☐ VICE-PRESIDENT | | |
| ☐ DEPT. FILES | ☐ GENERAL MANAGER | DEPARTMENT MANAGER  Will Anderson | 7-17-03 |
| ☐ DIVISION HUMAN RESOURCES | ☐ MANAGER | | |
| ☐ OFFICE MANAGER | ☐ ASST. MANAGER | ASSOCIATE (if necessary) | |
| ☐ PAYROLL DEPT. | ☐ DEPT. MANAGER | | |
| ☐ HUMAN RESOURCES DEPT. | ☐ PRODUCTION DEPT. | | |
| | ☐ SUPPLY ROOM | OTHER | |

## PERSONNEL NOTICE

W E S T P O I N T   S T E V E N S

☑ INITIATED BY COMPANY   ☐ AT REQUEST OF ASSOCIATE

| ASSOCIATE  *Patricia Gibson* | ASSOCIATE NUMBER  34384 | TYPE OF NOTICE |
|---|---|---|
| FACILITY  *Lanier* | DEPARTMENT  *Yarn Prep* | SHIFT  6 |
| SUPERVISOR  *Billy Stewart* | NOTICE DATE  7/27/04 | |
| EFFECTIVE DATE OF CHANGE | | |

TYPE OF NOTICE — 7
1 - ASSOCIATE PROBLEM
2 - ASSOCIATE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - ASSOCIATE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

Off quality section beams

**DETAILS**

I have discussed with Pat the importance of making beams of yarns that will run at the next process (slashing) without problems for the operator. That if a defect does occur to notify me. We will decide at that time what to do

**ACTION TAKEN**

Notify

DEFENDANT'S
EXHIBIT
36
P. Gibson

WPH
000186

(Attach additional sheets as necessary)

**DISTRIBUTION**
☐ COST DEPT.
☐ DEPT. FILES
☐ INDUSTRIAL RELATIONS
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ HUMAN RESOURCES DEPT.

☐ VICE PRESIDENT
☐ GENERAL MANAGER
☐ MANAGER
☐ ASST. MANAGER
☐ DEPT. MANAGER
☐ PRODUCTION DEPT.
☐ SUPT   ROOM
☐

| RECOMMENDED BY  *Billy Stewart* | 7/27/04 |
|---|---|
| DEPARTMENT MANAGER  *Billy Averlyay* | 7-27-04 |
| ASSOCIATE (if necessary)  *Patricia Gibson* | |
| OTHER | |
| SIGNATURE | DATES |

WP-1157 CS REV 11/97

# WESTPOINT STEVENS

☑ **COUNSELING REPORT**    ☐ **WARNING REPORT***

*THIS IS THE
☐FIRST ☐SECOND ☐THIRD
WARNING WITHIN 12 MONTHS
OF THIS DATE

| ASSOCIATE | | | | COUNSELING DATE |
|---|---|---|---|---|
| Patricia Gibson | | | | 8-11-04 |

| FACILITY | DEPARTMENT | ROOM | SHIFT | WARNING DATE |
|---|---|---|---|---|
| Lanier | Yarn Prep | Winder | 6 | |

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| Billy Stewart | Bill Anderson |

**SITUATION IN BRIEF**

Poor Quality

**DETAILS**

Today Pat started up her first beam of style ED 208 and had run 1240 yards when she discovered that she had not pulled all the ends to the front. She had left out 6 ends on the right side

DEFENDANT'S
EXHIBIT
37
P. Gibson

**ACTION TAKEN**

This report has been reviewed with Pat. The disciplinary policy for W.P.S. has been explained to her

Geo

| SUPERVISOR | SUPERVISOR WITNESSING WARNING |
|---|---|
| | Billy Stewart |
| DEPARTMENT MANAGER | ASSOCIATE |
| Bill Anderson | |

SIGNATURES

WP-1097-CS-REV. 1/96

01189

WESTPOINT STEVENS

☑ INITIATED BY COMPANY    ☐ AT REQUEST OF ASSOCIATE    NOTICE

ASSOCIATE    Patricia    Gibson

ASSOCIATE NUMBER    34384

FACILITY    Carter

DEPARTMENT    P&P

SHIFT    9

SUPERVISOR    Clifford    McCants

NOTICE DATE    9-24-04

EFFECTIVE DATE OF CHANGE

TYPE OF NOTICE

1 - ASSOCIATE PROBLEM
2 - ASSOCIATE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - ASSOCIATE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

7

**SITUATION IN BRIEF**

Failure to sign Warper tickets

**DETAILS**

On 9-20-04 Warper Operator #5 failed to sign 5 Warper tickets on a set of ED209.

DEFENDANT'S EXHIBIT
3-8
P Gibson

WPH
000200

**ACTION TAKEN**

Talked with associate and explained the importance of signing all Warper tickets when running Warpers, and failure to do so could result in Disciplinary action being taken

**DISTRIBUTION**

COST DEPT.
DEPT. FILES
DIVISION HUMAN RESOURCES
OFFICE MANAGER
PAYROLL DEPT.
HUMAN RESOURCES DEPT.

☐ VICE-PRESIDENT
☐ GENERAL MANAGER
☐ MANAGER
☐ ASST. MANAGER
☐ DEPT. MANAGER
☐ PRODUCTION DEPT.
☐ SUPPLY ROOM
☐ _____

(Attach additional sheets as necessary)

RECOMMENDED BY    Clifford McCants    9-24-04

DEPARTMENT MANAGER

ASSOCIATE (if necessary)    Patricia G Gibson

OTHER

SIGNATURE    DATES

1157-CS REV 11/99

# WESTPOINT STEVENS

☐ **COUNSELING REPORT**        ☑ **WARNING REPORT***

*THIS IS THE
☑FIRST ☐SECOND ☐THIRD
WARNING WITHIN 12 MONTHS
OF THIS DATE

| ASSOCIATE Patricia Gibson | | | | COUNSELING DATE |
|---|---|---|---|---|
| FACILITY Lanier | DEPARTMENT Prep | ROOM | SHIFT 6 | WARNING DATE 9-30-04 |
| SUPERVISOR Billy Stewart | | SUPERVISOR WITNESSING WARNING | | |

**SITUATION IN BRIEF**

Incorrect number of ends on 4 section beams

**DETAILS**

On Monday 9-27-04 Pat ran 4 section beams of style E 5200 that was each 12 ends short. This yarn was creeled in by the W shift. She said she added the correct ends on the left side but assumed since the ends had already been pulled down on the right side and was ready to be pulled to the front, that it had the correct number of ends.
She has been previously instructed to always count the ends when taking over at the start of her shift as well as new creels throught through out her shift.

**ACTION TAKEN**

**WPH
000203**

DEFENDANT'S
EXHIBIT
39
P. Gibson

| SUPERVISOR Billy Stewart | SUPERVISOR WITNESSING WARNING Bill Anderson |
|---|---|
| DEPARTMENT MANAGER Bill Anderson | ASSOCIATE |
| | SIGNATURES |

WP-1097-CS-REV. 1/96

01189

PERSONNEL NOTICE

WESTPOINT STEVENS

☑ INITIATED BY COMPANY    ☐ AT REQUEST OF ASSOCIATE

| ASSOCIATE | Patricia Gibson | ASSOCIATE NUMBER | 34584 | TYPE OF NOTICE |
|---|---|---|---|---|

Facility _____  DEPARTMENT _Lanier_  SHIFT _Prep_ _6_

SUPERVISOR _Billy Stewart_

EFFECTIVE DATE OF CHANGE

NOTICE DATE _10-5-04_

TYPE OF NOTICE
7
1 - ASSOCIATE PROBLEM
2 - ASSOCIATE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - ASSOCIATE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

SITUATION IN BRIEF

Poor Quality

DETAILS

10-2-04 a complaint was written by the slashing department on poor quality section beams run on the No 2 warper on 9-30-04 The complaint was about ends running in and out. There were 2 section beams being complained about, both AD 180 run from the same creel.

Patricia shares the responsibility of running this warper with Shannon Johnson Today I have again discussed the importance of quality.

ACTION TAKEN

WPH
000202

CW

DEFENDANT'S
EXHIBIT
40
P Gibson

refused to sign

(Attach additional sheets as necessary)

DISTRIBUTION
☐ COST DEPT.
   DEPT. FILES
   DIVISION HUMAN RESOURCES
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ HUMAN RESOURCES DEPT.

☐ VICE-PRESIDENT
☐ GENERAL MANAGER
☐ MANAGER
☐ ASST. MANAGER
☐ DEPT. MANAGER
☐ PRODUCTION DEPT.
☐ SU   ROOM
☐

| RECOMMENDED BY | Billy Stewart | 10-5-04 |
|---|---|---|
| DEPARTMENT MANAGER | | |
| ASSOCIATE (if necessary) | | |
| OTHER | | |
| | SIGNATURE | DATES |

WP-1157-CS REV 11/99

00415

# WESTPOINT STEVENS

☐ **COUNSELING REPORT**          ☑ **WARNING REPORT***

*THIS IS THE
☐FIRST ☑SECOND ☐THIRD
WARNING WITHIN 12 MONTHS
OF THIS DATE

| ASSOCIATE Patricia Gibson | | | | COUNSELING DATE |
|---|---|---|---|---|
| FACILITY Lanier | DEPARTMENT Prep | ROOM Warper | SHIFT 6 | WARNING DATE 10-15-04 |
| SUPERVISOR Billy Stewart | | SUPERVISOR WITNESSING WARNING | | |

**SITUATION IN BRIEF**

Off quality section beams

**DETAILS**

On 10/9/04 Pat ran 3 section beams that were heads short of what the CO200 style required. The style called for 400 ends and she ran only 394. The second row, left side of creel was not pulled to the front and laid in.

**ACTION TAKEN**

Clo

DEFENDANT'S
EXHIBIT
54
P. Gibson

| SUPERVISOR Billy Stewart | SUPERVISOR WITNESSING WARNING Bill Anderson |
|---|---|
| DEPARTMENT MANAGER Bill Anderson | ASSOCIATE REFUSED TO SIGN |
| | SIGNATURES |

WP-1097-CS-REV. 1/96

WPH
000201

01189

# WESTPOINT STEVENS

## FINAL NOTICE

| EMPLOYEE PATRICIA GIBSON | JOB 361 WARPER OPERATOR | DATE 10/19/04 |
|---|---|---|
| FACILITY 068 LANIER MILL | DEPARTMENT 0003 | ROOM WARPERS | SHIFT 6 |

## ☑ LESS THAN INTOLERABLE OFFENSES

Your disciplinary record presently includes the following written warnings for rules violation within the past 12 months.

| | RULE VIOLATED | DATE OF WRITTEN WARNING | 12-MONTH ANNIVERSARY DATE(S) (1) |
|---|---|---|---|
| 1ST WARNING | SECTION O-1 ITEM III. A.1. POOR JOB PERFORMANCE | 9-30-04 | 9-30-05 |
| 2ND WARNING | SECTION O-1 ITEM III. A.1. POOR JOB PERFORMANCE | 10-15-04 | 10-15-05 |

This is to inform you that another violation of an offense considered less than intolerable under the Discipline and Discharge policy before  9-30-05  will result in your discharge. (2)
                    DATE

## ☐ GARNISHMENTS (less than Intolerable Offense)

| | DATE OF WRITTEN COUNSELING/WARNING | ANNIVERSARY DATE (1) |
|---|---|---|
| FIRST GARNISHMENT | | |
| SECOND GARNISHMENT | | |
| THIRD GARNISHMENT | | |

This is to inform you that another violation of the garnishment rules before _____ will result in your discharge. (3)
                                                                      DATE

| EMPLOYEE SIGNATURE *Patricia Gibson* | DATE 10/19/04 |
|---|---|
| IMMEDIATE SUPERVISOR *Billy Joe Stewart* | DATE 10-19-04 |
| PREPARED BY *Calvin E. Ogletree* | DATE 10-19-04 |

HUMAN RESOURCES MANAGER

ORIGINAL - PERSONNEL FILE
COPY 1 - TO EMPLOYEE
COPY 2 - DEPARTMENT FILE

(1) Anniversary date for violation of a rule which is less than Intolerable Offense is calculated from date of oldest written warning within the past 12 months.
(2) The date shown in the blank in this statement should be the anniversary date of the oldest written warning within the past 12 months.
(3) The date shown in the blank in this statement should be the anniversary date of the oldest written counseling/warning within the past 12 months.

WP-1078-CS-REV. 1/96



DEFENDANT'S EXHIBIT
P. Gibson

☑ INITIATED BY COMPANY    ☐ AT REQUEST OF ASSOCIATE

**ASSOCIATE**
PATRICIA GIBSON

**ASSOCIATE NUMBER**
34384

**TYPE OF NOTICE**

1 - ASSOCIATE PROBLEM
2 - ASSOCIATE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - ASSOCIATE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

**FACILITY**
LANIER

**DEPARTMENT**
PREP

**SHIFT**
6

**SUPERVISOR**
JEFF BLACK

**NOTICE DATE**
11-8-04

**EFFECTIVE DATE OF CHANGE**

**SITUATION IN BRIEF**

INCORRECT NUMBER OF ENDS IN SECTION BEAMS

**DETAILS**

PAT RAN 5 BEAMS ON 11-1-04 WITH EACH ONE MISSING 6 ENDS. THE ONLY WAY THIS COULD BE CORRECTED AT SLASHER WAS TO RUN AN EXTRA BEAM IN THIS SET, CREATING 290 ENDS OF WASTE.

DEFENDANT'S EXHIBIT
48
P. Gibson

**ACTION TAKEN**

PAT WAS TALKED TO ABOUT THIS PROBLEM. SHE WAS TOLD IF IT HAPPENS AGAIN, DISCIPLINARY ACTION WILL BE TAKEN, UP TO AND INCLUDING DISCHARGE IF NECESSARY. A COPY OF THIS NOTICE WILL BE PLACED IN PERSONNEL FILE.

(Attach additional sheets as necessary)

**DISTRIBUTION**

☐ COST DEPT.
☐ DEPT. FILES
☐ INDUSTRIAL RELATIONS
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ HUMAN RESOURCES DEPT.

☐ VICE PRESIDENT
☐ GENERAL MANAGER
☐ MANAGER
☐ ASST. MANAGER
☐ DEPT. MANAGER
☐ PRODUCTION DEPT.
☐ SUPPLY ROOM
☐ ___ ___

| | | |
|---|---|---|
| RECOMMENDED BY | Jeff Black | 11-8-04 |
| DEPARTMENT MANAGER | | 11-8-04 |
| ASSOCIATE (if necessary) | | |
| OTHER | | |
| | SIGNATURE | DATES |

WP-1157-CS REV 11/97

00415

# PERSONNEL NOTICE

WESTPOINT STEVENS

☐ INITIATED BY COMPANY   ☐ AT REQUEST OF ASSOCIATE

ASSOCIATE: Patricia Gibson

FACILITY: Lanier          DEPARTMENT: Prep

ASSOCIATE NUMBER: 34384

SHIFT: 6

SUPERVISOR: Billy Stewart

EFFECTIVE DATE OF CHANGE:

NOTICE DATE: 11-22-04

TYPE OF NOTICE:

1 - ASSOCIATE PROBLEM
2 - ASSOCIATE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - ASSOCIATE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

SITUATION IN BRIEF

Section beam quality

DETAILS

When an end breaks while running yarn onto the section beam, every effort should be made by the operator to find the end on the section beam and retie it to the same end that broke in the creel. If it can not be found on the beam then the loose end from the creel will be laid onto the section beam exactly in the spot where the lost end has occured. Then the section beam will be chalked marked at this point. A note should be made on the back of the beam ticket to indicate a lost end and at what yards were on the beam when it occurred.

When a section beam is determined to be full (all the yards on it) from the No. 2 warper, the operator who has determined this will initial the card by the number of yards written on the card.

ACTION TAKEN

DEFENDANT'S
EXHIBIT
45
P. Gibson

WPH
000206

DISTRIBUTION

☐ COST DEPT.
☐ DEPT. FILES
☐ INDUSTRIAL RELATIONS
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ HUMAN RESOURCES DEPT.

☐ VICE PRESIDENT
☐ GENERAL MANAGER
☐ MANAGER
☐ ASST. MANAGER
☐ DEPT. MANAGER
☐ PRODUCTION DEPT.
☐ SUPPLY ROOM
☐

(Attach additional sheets as necessary)

RECOMMENDED BY: Billy Stewart                    11-22-04

DEPARTMENT MANAGER: _____ Anderson           11-22-04

ASSOCIATE (if necessary)

OTHER: Refused to Sign

SIGNATURE                                      DATES

P-1157-CS REV 11/97

PERSONNEL NOTICE

WESTPOINT STEVENS

☐ INITIATED BY COMPANY    ☐ AT REQUEST OF ASSOCIATE

ASSOCIATE
_Patricia Gibson_

| FACILITY | DEPARTMENT | | ASSOCIATE NUMBER | TYPE OF NOTICE |
| --- | --- | --- | --- | --- |

FACILITY
_Lanier_

DEPARTMENT
_Prep_

SHIFT
_6_

SUPERVISOR
_Billy Stewart_

NOTICE DATE
_~~12~~ 10-10-04_

EFFECTIVE DATE OF CHANGE

TYPE OF NOTICE

_7_

1 - ASSOCIATE PROBLEM
2 - ASSOCIATE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - ASSOCIATE REQUEST
6 - COMMENDATION
⑦ MISCELLANEOUS NOTICE

SITUATION IN BRIEF

_Section beam quality_

DETAILS

_Today I have reviewed a complaint with both warper operators. The complaint is basically about poor quality and warp tags not filled out correctly._

ACTION TAKEN

_After reviewing this notice neither operator would sign it._

WPH
000207

_CW_  ✓

DEFENDANT'S
EXHIBIT
4.5
P. Gibson

(Attach additional sheets as necessary)

**DISTRIBUTION**

☐ COST DEPT.
☐ DEPT. FILES
☐ INDUSTRIAL RELATIONS
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ HUMAN RESOURCES DEPT.

☐ VICE PRESIDENT
☐ GENERAL MANAGER
☐ MANAGER
☐ ASST. MANAGER
☐ DEPT. MANAGER
☐ PRODUCTION DEPT.
☐ SUPPLY ROOM
☐ ___

| | RECOMMENDED BY _Billy Stewart_ | _12-10-04_ |
| --- | --- | --- |
| | DEPARTMENT MANAGER _Bill Andersen_ | _12-10-04_ |
| | ASSOCIATE (if necessary) | |
| | OTHER | |

WP-1157-CS REV 11/97

SIGNATURE          DATES

00415

PERSONNEL NOTICE

W E S T P O I N T   S T E V E N S

☑ INITIATED BY COMPANY   ☐ AT REQUEST OF ASSOCIATE

| ASSOCIATE Patricia Gibson | ASSOCIATE NUMBER 34384 | TYPE OF NOTICE |
|---|---|---|

FACILITY _Lanier_   DEPARTMENT _Prp_   SHIFT 6

SUPERVISOR _Billy Stewart_   NOTICE DATE _12-15-04_

EFFECTIVE DATE OF CHANGE

TYPE OF NOTICE: 7

1 - ASSOCIATE PROBLEM
2 - ASSOCIATE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - ASSOCIATE REQUEST
6 - COMMENDATION
⑦ - MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

_Low production_

**DETAILS**

Today we have talked to Pat about her responsibility to make every effort to run all 3 warpers while the other operator is on break. This has come about due to her lack of cooperation to do this. It is a job duty expected of all warper operators on all shifts. We also talked to her about utilizing her time more productively by first get the warpers up and running. The paper work that has to be done can be while the warpers are running as well as general housekeeping.

**ACTION TAKEN**

Associate would not sign this notice

DEFENDANT'S
EXHIBIT
46
P. Gibson

WPH
000209

(Attach additional sheets as necessary)

**DISTRIBUTION**

☐ COST DEPT.
☐ DEPT. FILES
☐ INDUSTRIAL RELATIONS
☐ OFFICE MANAGER
☐ PAYROLL DEPT.
☐ HUMAN RESOURCES DEPT.
☐ VICE PRESIDENT
☐ GENERAL MANAGER
☐ MANAGER
☐ ASST. MANAGER
☐ DEPT. MANAGER
☐ PRODUCTION DEPT.
☐ SUPPLY ROOM
☐ _____

RECOMMENDED BY _Billy Stewart_   _12-15-04_

DEPARTMENT MANAGER _Bill Verdeer_   _12-15-04_

ASSOCIATE (if necessary)

OTHER

SIGNATURE                    DATES

WP-1157-CS REV 11/97                    00415

# Patricia Gibson
# Dx. 47-67

# PERSONNEL NOTICE

WESTPOINT STEVENS

☐ INITIATED BY COMPANY  ☐ AT REQUEST OF ASSOCIATE

| | | |
|---|---|---|
| ASSOCIATE *Patricia Gibson* | | ASSOCIATE NUMBER *34384* |
| FACILITY *Lanier* | DEPARTMENT *Yarn Prep* | SHIFT *6* |
| SUPERVISOR *Billy Stewart* | | NOTICE DATE *2-8-05* |
| EFFECTIVE DATE OF CHANGE | | |

TYPE OF NOTICE

7
- 1 - ASSOCIATE PROBLEM
- 2 - ASSOCIATE COMPLAINT
- 3 - NOTICE OF CHANGE
- 4 - REQUEST FOR CHANGE
- 5 - ASSOCIATE REQUEST
- 6 - COMMENDATION
- ⑦ MISCELLANEOUS NOTICE

**SITUATION IN BRIEF**

*Off quality section beams / low production*

**DETAILS**

*Again today I have talked to Pat about complaints that are continue to have about her off quality section beams. We also have talked about her production needing to be improved. We are expected to run from 3 warpers, 30 beams*

DEFENDANT'S
EXHIBIT
*97*
*P. Gibson*

**ACTION TAKEN**

WPH
000210

*Bill —*
*No more Chances!*

(Attach additional sheets as necessary)

**DISTRIBUTION**

| | |
|---|---|
| ☐ COST DEPT. | ☐ VICE PRESIDENT |
| ☐ DEPT. FILES | ☐ GENERAL MANAGER |
| ☐ INDUSTRIAL RELATIONS | ☐ MANAGER |
| ☐ OFFICE MANAGER | ☐ ASST. MANAGER |
| ☐ PAYROLL DEPT. | ☐ DEPT. MANAGER |
| ☐ HUMAN RESOURCES DEPT. | ☐ PRODUCTION DEPT. |
| | ☐ SUPPLY ROOM |

| | |
|---|---|
| RECOMMENDED BY *Billy Stewart* | *2-8-05* |
| DEPARTMENT MANAGER *Bill Burleson* | *2-8-05* |
| ASSOCIATE (if necessary) *Refused to sign* | *2-8-05* |
| OTHER | |
| SIGNATURE | DATES |

WP-1157-CS REV 11/97

00415

## PERSONNEL NOTICE

WESTPOINT STEVENS

☐ INITIATED BY COMPANY  ☐ AT REQUEST OF ASSOCIATE

| ASSOCIATE Patricia Gibson | ASSOCIATE NUMBER 34384 | TYPE OF NOTICE |
|---|---|---|
| FACILITY Lanier | DEPARTMENT Prep | SHIFT 1 | 1 - ASSOCIATE PROBLEM |
| SUPERVISOR Ronny Warren | | NOTICE DATE 8-2-05 | 2 - ASSOCIATE COMPLAINT |

TYPE OF NOTICE

1 - ASSOCIATE PROBLEM
2 - ASSOCIATE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - ASSOCIATE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

EFFECTIVE DATE OF CHANGE

**SITUATION IN BRIEF**

Poor Quality

**DETAILS**

Pat ran a beam on 7-28-05 that come up 3440 yds short at the Slasher. It was 130 CaLf. Beam # 0875.

Pat understands the seriousness of this problem as well as her situation in that she has 2 active warnings.

If there are any more problems of this nature, she will receive a 3rd written warning and be subject to discharge.

**WPH
000211**

**ACTION TAKEN**

DEFENDANT'S
EXHIBIT
48
P. Gibson

(Attach additional sheets as necessary)

| DISTRIBUTION | | |
|---|---|---|
| ☐ COST DEPT. | ☐ VICE PRESIDENT | RECOMMENDED BY Ronny Warren   8-2-05 |
| ☐ DEPT. FILES | ☐ GENERAL MANAGER | |
| ☐ INDUSTRIAL RELATIONS | ☒ MANAGER | DEPARTMENT MANAGER Bill Anderson   8-2-05 |
| ☐ OFFICE MANAGER | ☐ ASST. MANAGER | ASSOCIATE (if necessary) |
| ☒ PAYROLL DEPT. | ☒ DEPT. MANAGER | |
| ☒ HUMAN RESOURCES DEPT. | ☐ PRODUCTION DEPT. | |
| | ☐ SUPP ROOM | OTHER |
| | ☐ | |

SIGNATURE                    DATES

# WESTPOINT STEVENS

☐ **COUNSELING REPORT**          ☒ **WARNING REPORT***

*THIS IS THE
☐ FIRST ☐ SECOND ☒ THIRD
WARNING WITHIN 12 MONTHS
OF THIS DATE

| ASSOCIATE Patricia Gibson | ASSOCIATE NUMBER 34384 | COUNSELING DATE |
|---|---|---|
| FACILITY Lanier | DEPARTMENT Prep | ROOM Warpers | SHIFT 1 | WARNING DATE 8-26-05 |
| SUPERVISOR Rory Warren | SUPERVISOR WITNESSING WARNING | | | |

**SITUATION IN BRIEF**

Poor Quality— 12 ends short on 3 beams

**DETAILS**

On 8-23-04, Pat ran a CO 333 set on #3 warper. The 3 beams on this set were run 12 ends short making a total of 36 ends short on the set. The 3 beams were verified by the style and the beam numbers being correct by Pat.

Pat is aware that this is her 3rd written warning in 12 months. They are as listed:

9-30-04 — Poor Quality, short ends
10-15-04 — Poor Quality, short ends
8-26-05 — Poor Quality, short ends.

**ACTION TAKEN**

Referred to Personnel Dept.

DEFENDANT'S
EXHIBIT
49
P. Gibson

| SUPERVISOR Rory Warren  8-26-05 | SUPERVISOR WITNESSING WARNING |
|---|---|
| DEPARTMENT MANAGER Bill Overstreet  8.26.05 | ASSOCIATE  REFUSED TO SIGN |
| | SIGNATURES |

CC-062503-C/WR

Tam
Cobra # 1419{

000214 A

WESTPOINT STEVENS
**SEPARATION NOTICE**

FACILITY: Lanier

NAME: Patricia Gibson

| EMPLOYEE NO. | SOCIAL SECURITY NO. | DATE |
|---|---|---|
| 34384 | | 8-26-05 |

DEPARTMENT: Prep

OCCUPATION: Warper operator    SHIFT: 1    RATE: 10.74

DATE LAST HIRED (CSD): 8-15-75

FORWARDING ADDRESS: 403 Fairwood Dr
Valley AL 36854

DATE LAST WORKED: 8-25-05

SEPARATION DATE: 8-26-05

SEPARATIONS — Please check box opposite the reason for separation and explain below.

### VOLUNTARY
Gave notice of _____ days.
Leaving Active Employment
Leaving Locality (explain below)*
Other Employment (explain below)*
Transportation
Housing
Family Problems
Health
Pay
Hours
Supervision
Work Conditions
No Report (indicate follow-up)
Medical, Pregnancy or Other Leave Expired
Other (explain below)
*No dissatisfaction could be identified

### INVOLUNTARY
Misconduct — Three written warnings within a 12-month period for offenses less than intolerable (Personnel Policy Manual — Section O-1, Part III-A) ........... ☒

### Other Involuntary
Job Elimination
Temporary Employment Completed
No Work Available — Leave Expired
No Work Available — Probationary
Inability to Perform Required Job Duties
Garnishments
Work Restriction Non-Occupational Origin
Other (explain below)

### Intolerable Offenses:
### (Policy Manual, Section O-1, Part III-B)
Intoxicants on Job
Deadly Weapons
Falsifying Records
Dishonesty/Theft
Fighting
Gross Insubordination
Criminal Act Within/Outside Facility
Damage to Property of Company/Others
Dangerous Horseplay
Endangering Life or Health of Self or Others
Unauthorized Work Elsewhere While on Leave
Employment with Direct Competition
Promiscuous Behavior

Sexual Misconduct
Refusal To Cooperate in Investigation
Excessive Unexcused Absences
Sleeping on Job
Misconduct Away From Facility
Refusal To Submit to Drug Test
Positive Drug Screen
Failure to Get Release of Garnishment
Conduct Unbecoming A Member of Management
Other (explain below)

### OTHER
(Include in Separation Rate, not Quit Rate)
Returning to School
Military
Normal Retirement (Age 65)
Delayed Retirement (After Age 65)
Early Retirement (Before Age 65)
Permanent Disability
Workers' Compensation
Death
Transfer to Other Facility
Plant Close
Transfer to Exempt
Other (explain below)

EXPLANATION TO EMPLOYEE    *INVOLUNTARY*

THREE WRITTEN WARNING WITHIN A 12-MONTH PERIOD.

DEFENDANT'S
EXHIBIT
50
P. Gibson

_Tony Warner_    SUPERVISOR

_Bill Anderson_    DEPARTMENT MANAGER

### SEPARATION CHECKLIST
**TO BE COMPLETED BY THE HUMAN RESOURCES DEPARTMENT FOR ALL TERMINATIONS AND TRANSFERS**
(For any item which does not apply, check the Not Applicable blank)

1. Has the appropriate controller been contacted for information on any outstanding cash advances, accounts payable due the Company for any merchandise, etc.?
   Yes _____ N/A ✓

2. Has Transportation Center been contacted for information on Company car, and air travel and auto rental credit cards and have these been surrendered to the Human Resources Department and returned to Transportation Center?
   Yes _____ N/A ✓

3. Have other items such as keys, entry cards, manuals and/or other Company properties been surrendered to the Human Resources Department?
   Yes _____ N/A ✓

4. Does the employee's final paycheck need holding until all of the above items have been checked and cleared?
   Yes _____ N/A ✓

5. Have "cards" such as Medical Coverage Identification Card, Employee Purchase Card and — in areas where used — drug prescription purchase cards been surrendered to the Human Resources Department?
   Yes _____ N/A _____

**IMPORTANT:** See the back of this form for applicable statement(s) to be read to the separating employee if he or she is a participant in the Company's group plans for medical care coverage and life insurance and review continuation of medical/dental coverage under COBRA. Also: use form WP-1063-CS for Exit Interview.

EMPLOYEE _____

REVIEWED BY _Calvin E. Naylor_    HUMAN RESOURCES MANAGER

ASSISTANT MANAGER _J. Ha___

PREPARER _____

MANAGER _____

P-1199-CS (REV. 11-98)    892-H

Benefits ended 8/26/05

WPH
000214 B



# W E S T P O I N T   S T E V E N S

# NOTICE

## JOB BID SHEET

FACILITY: 068 LANIER MILL____ DEPARTMENT: PREP_____ DATE: 3/23/05

We have a 214 CLEANER SWEEPER_____ job open on the 1ST___ shift.
Bids to fill this job will be accepted from qualified associates for two (2) days. If you wish to bid on
this job, sign your name and the date in the space provided below. If you have any questions
concerning the duties or qualifications for the job, please see your Supervisor.

Description of job: _____

_____

| NAME | DATE |
|------|------|
| Douglas Gray | 3/24/05 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

DEFENDANT'S
EXHIBIT
S-1
P. Gibson

WP-54861/REV 1-98

DT/REM: 3/28/05____ BY: CEO___

S/B: DOUGLAS GRAY_____

0452 - WPSG

# 1ST SHIFT CLEANER SWEEPER JOB DUTIES

3/23/05

1.  WAX FLOORS.

2.  PAINT.

3.  CLEAN DUCT WORK.

4.  CLEAN WALLS AND WASH LIGHTS ON WALLS.

5.  MOP WALLS DOWN DAILY.

6.  EMPTY TRASH CANS.

7.  CLEAN DUCT WORK PIPES IN CARD ROOM.

8.  SWEEP CAT WALKS OFF IN CARD ROOM.

9.  OPEN DOORS AND SWEEP UP WHEN CLEANING UP CARD ROOM.

10. CLEAN AND WAX CANTEEN FLOORS WHEN NEEDED.

11. CLEAN WINDOWS.

12. KEEP SIDE DOORS AND LOCKER DOORS WASHED OFF AND CLEAN.

13. CLEAN BEAM RACKS.

14. KEEP ENTRANCE RAMP CLEAN.

15. BLOW OUT EXIT HALLWAYS.

16. CLEAN FANS IN TOP OF PLANT.

17. ANY OTHER JOB DUTIES DEEMED NECESSARY BY SUPERVISOR



### WESTPOINT STEVENS

# NOTICE

## JOB BID SHEET

FACILITY: _068 LANIER MILL_    DEPARTMENT: _PREP_    DATE: _9/8/05_

We have a _214  CLEANER  SWEEPER_____ job open on the _1st_____ shift.
Bids to fill this job will be accepted from qualified associates for two (2) days. If you wish to bid on this job, sign your name and the date in the space provided below. If you have any questions concerning the duties or qualifications for the job, please see your Supervisor.

Description of job: _____

_____

| NAME | DATE |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

WP-54861/REV 1-98

DT/REM: _9/14/05_    BY: _CEO_
S/B: _____

0452 - WPSG

# ALABAMA DEPARTMENT OF INDUSTRIAL RELATIONS
## UNEMPLOYMENT COMPENSATION AGENCY
### MONTGOMERY, ALABAMA 36131
# EMPLOYER NOTICE OF DETERMINATION

*422621936*    *122604*    *6001*    *0029404062*

EMPLOYER NO.0029404062

WESTPOINT STEVENS INC
LANIER PLANT
HR DEPT
PO BOX 248
VALLEY AL 36854-0248

| | | |
|---|---|---|
| 1. CLAIMANT'S NAME : | GIBSON/PATRICIA J | 8. DATE MAILED: 09/22/05 |
| 2. SOCIAL SECURITY NO | | 9. LOCAL OFFICE: 6001 |
| 3. BENEFIT YEAR BEGINS: | 12/26/04 | 10. TYPE OF CLAIM: ADDITIONAL |
| 4. EFFECTIVE DATE: | 08/28/05 | 11. MAIL CODE: 9 |
| 5. WEEKLY BENEFIT AMOUNT: | $220.00 | 12. CONTACT LINE: 800-361-4524 |
| 6. MAXIMUM BENEFIT AMOUNT : | $5720.00 | |
| 7. BASE PERIOD: A FOUR QUARTER PERIOD | | |
| BEGINNING QTR/YR 3/03 | | |

A DETERMINATION HAS BEEN MADE ON THIS CLAIM HOLDING THE CLAIMANT ELIGIBLE
FOR BENEFITS.



DEFENDANT'S
EXHIBIT
52
P. Gibson

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

MAY 25 2007

*Daniel J. Somers*

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

WPH
000611

SEE BACK OF THIS NOTICE FOR EXPLANATIONS OF MOST FREQUENT DISQUALIFICATIONS.

**RIGHT TO APPEAL:** This determination becomes final within 15 calendar days from date mailed unless appealed.
All appeals MUST be filed by a letter addressed to the Hearings and Appeals Division, 649 Monroe Street,
Montgomery, Al 36131, or by Fax to 334-242-2084. The appeal must be received within the prescribed time
whether filed by mail or fax. Should the last calendar day for filing an appeal fall on a Saturday, Sunday or
state holiday or other office closing, the period is extended to the next business day.

**NOTE:** THIS NOTICE IS FOR YOUR RECORDS. IF YOU WRITE REGARDING THIS
NOTICE, SHOW CLAIMANT'S SOCIAL SECURITY NUMBER.

403 Fairwood Drive
Valley, AL. 36854
December 30, 2005

EEOC
Birmingham District Office
Ridge Park Place
1130 22nd Street, South
Suite 2000
Birmingham, AL. 35205

Re: Westpoint Stevens, Inc.
Lanier / Carter Mills
P.O. Box 248
Valley, AL. 36854
Phone # 706-645-7223



RECEIVED

JAN 0 4 2006

EEOC

To Whom It May Concern:
I am writing Concerning my separation from my job on August 26, 2005 from Westpoint Stevens, Inc. after 30 yrs.
The reason for my separation given to the unemployment agency wasn't true. I was never given three warnings and the yarn that was coming to me from other areas of the plant I had no control over it.
My supervisor, Billy Joe Steward began harassing me as soon as I came into the Lanier side from the Carter side. It went as far as me not running other people jobs.

Patricia J. Gibson

Patricia J. Gibson



**U.S. Equal Employment Opportunity Commission**
**Birmingham District Office - 130**

Ridge Park Place
1130 22nd Street, South
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105
1-800-669-4000

WESTPOINT STEVENS, INC.

Jan 06, 2006

Patricia J. Gibson
403 Fairwood Drive
Valley, AL   36854

Dear Ms. Gibson:

Your correspondence concerning allegations of employment discrimination by the respondent named above has been reviewed. The information you gave us is not enough to determine how we should handle this case. More information is needed before we can continue. Our experience is that an interview is the best way to obtain the needed information. Please call us as soon as possible.

To arrange an interview, please call me during office hours (listed below).

BECAUSE WE ARE UNABLE TO INVESTIGATE FURTHER WITHOUT AN INTERVIEW, THE CHARGE MAY BE DISMISSED IN 30 DAYS IF WE ARE NOT CONTACTED FOR AN INTERVIEW.

Please contact me as soon as possible because charges of employment discrimination must be processed within the time limits imposed by law. When you call please give your name and mention that you are responding to this request for information.

IF WE HAVE NOT HEARD FROM ANYONE WITHIN 30 DAYS OF THIS LETTER, WE WILL ASSUME THAT THERE WAS NO INTENTION TO FILE A CHARGE OF DISCRIMINATION WITH US.

Sincerely,

Linda-Sue Ross
Investigator Support Asst
(205) 212-2103



# CASE LOG

(Continue on Reverse)

| Charge No. | Respondent | Charging Party |
|---|---|---|
| 420. 2006.0 1200 | West point Stevens | Gibson, Patricia |

| Date | Action | Entered | Reviewed/ |
|---|---|---|---|
| 12-30-05 | Mail enriqed to ISA - No Errs | | |
| 01-06-05 | ISA mailed CP a contact to make | | |
| | certain that she had NO Errs | ISA | |
| 3-6-06 | Called CP to inquire on Contact Letter. Left Message on Answering Machine. | | |
| 3-7-06 | Received call from CP who stated she never received the contact letter | | |

DEFENDANT'S EXHIBIT
55
P. Gibson

EEOC-FORM 131 (5/01)

# U.S. Equal Employment Opportunity Commission

|  |  |
|---|---|
| TIM WILBANKS<br>DIRECTOR OF LABOR RELATIONS<br>WESTPOINT STEVENS<br>P. O. BOX 71<br>WEST POINT, GA 31833 | PERSON FILING CHARGE<br><br>**Gibson Patricia**<br><br>THIS PERSON *(check one or both)*<br>[X] Claims To Be Aggrieved<br>[ ] Is Filing on Behalf of Other(s)<br><br>EEOC CHARGE NO.<br>**420-2006-01200** |

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[ ] Title VII of the Civil Rights Act      [ ] The Americans with Disabilities Act

[X] The Age Discrimination in Employment Act      [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [X] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [ ] Please provide by _____ a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [ ] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by _____ to _____
If you **DO NOT** wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

|  |  |
|---|---|
| **Linda-Sue Ross,**<br>**Investigator Support Asst**<br>*EEOC Representative*<br>Telephone: **(205) 212-2103** | **Birmingham District Office - 420**<br>**Ridge Park Place**<br>**1130 22nd Street, South**<br>**Birmingham, AL 35205** |

Enclosure(s): [ ] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] RACE   [ ] COLOR   [ ] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN   [X] AGE   [ ] DISABILITY   [ ] RETALIATION   [ ] OTHER

**ISSUES:** Discharge

**DATE(S) (on or about): EARLIEST:** 01-04-2006    **LATEST:** 01-04-2006

DEFENDANT'S EXHIBIT 56 P. Gibson

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| **Mar 07, 2006** | **Bernice Williams-Kimbrough,**<br>**District Director** | *Bernice Williams-Kimbrough* |

EEOC FORM 131 (5/01)                    U.S. Equal Employment Opportunity Commission

| | |
|---|---|
| Tim  Wilbanks<br>DIRECTOR OF LABOR RELATIONS<br>WESTPOINT STEVENS<br>P. O. BOX 71<br>West Point,    GA   31833 | PERSON FILING CHARGE<br><br>**Gibson  Patricia**<br><br>THIS PERSON *(check one or both)*<br>[X] Claims To Be Aggrieved<br>[ ] Is Filing on Behalf of Other(s)<br><br>EEOC CHARGE NO.<br>**420-2006-01200** |

## NOTICE OF CHARGE OF DISCRIMINATION
### *(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[ ] Title VII of the Civil Rights Act            [ ] The Americans with Disabilities Act

[X] The Age Discrimination in Employment Act     [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ]  No action is required by you at this time.

2. [ ]  Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X]  Please provide by  **21-APR-06**   a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below.  Your response will be placed in the file and considered as we investigate the charge.  A prompt response to this request will make it easier to conclude our investigation.

4. [ ]  Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below.  Your response will be placed in the file and considered as we investigate the charge.  A prompt response to this request will make it easier to conclude our investigation.

5. [ ]  EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources.  If you would like to participate, please say so on the enclosed form and respond by _____ to
If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above.  Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| | |
|---|---|
| Sandra G. Figgers,<br>Investigator<br>*EEOC Representative*<br>*Telephone:*  **(205) 212-2071** | **Birmingham District Office - 420**<br>**Ridge Park Place**<br>**1130 22nd Street, South**<br>**Birmingham, AL 35205** |

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION
[ ] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN  [X] AGE  [ ] DISABILITY  [ ] RETALIATION  [ ] OTHER

## See enclosed copy of charge of discrimination.

DEFENDANT'S EXHIBIT<br>S-7<br>P. Gibson

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| **Mar 21, 2006** | **Bernice  Williams-Kimbrough,**<br>**District Director** | *Bernice Williams Kimbrough* |

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 420-2006-01200 |

and EEOC

_State or local Agency, if any_

| Name (Indicate Mr., Ms., Mrs.) **Patricia Gibson** | Home Phone No. (Incl Area Code) **(334) 756-9275** | Date of Birth |
|---|---|---|

| Street Address **403 Fairwood Drive,** | City, State and ZIP Code **Valley, AL 36854** |
|---|---|

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name **WESTPOINT STEVENS** | No. Employees, Members **101 - 200** | Phone No. (Include Area Code) |
|---|---|---|

| Street Address **Lanier/Carter Mills, P. O. Box 248** | City, State and ZIP Code **Valley, AL 36854** |
|---|---|

[stamp: RECEIVED MAR 16 2006 EEOC BIRMINGHAM DISTRICT]

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|

| Street Address | City, State and ZIP Code |
|---|---|

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☐ RETALIATION ☒ AGE ☐ DISABILITY ☐ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **08-26-2005**   Latest **01-04-2006**
☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I was hired by the above employer on August 16, 1975. Since my employment began, I have performed on at least five different jobs within the plant. I performed all duties without complaints until I was assigned to work at the Lanier Mills under the supervision of Billy Joe Steward. I would be called to the office by Billy Steward and told that I had made mistakes. He would attempt to get me to sign statements admitting to mistakes that I did not believe I made. He would come and get me to write me up even when I would be working under other supervisors. I do not believe that I was the only employee making mistakes, but I do believe I was the only one being written up for them. One day while performing my duties, Bill Anderson, remarked to me, "Pat, your kids are all grown now and don't you have grand kids, you can move on now." While waking through the plant, Tim Wilbanks, saw me and said, "Pat, you still here?" These statements made me feel as though they believed I was too old to be there. I was given three writeups in the first year that I worked under Billy Joe Steward. I was terminated from my job after thirty years of employment on August 26, 2005. After I was terminated Kelvin Overtree, Safety director, informed me that he would get my papers ready. I believed that he was referring to my retirement papers. I have not been contacted by anyone and every time I have called, I have not been able to speak with anyone who would tell me anything about my retirement benefits.

I believe I have been discriminated against because of my Age, 60, DOB              in violation of the Age Discrimination in Employment Act of 1967, as amended. The write ups were given without cause and I was targeted simply because of my age.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY -- When necessary for State and Local Agency |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **3/15/06** _Date_   *Patricia Gibson* _Charging Party Signature_ | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

DEFENDANT'S EXHIBIT S-8 P. Gibson

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA <br> ☒ EEOC | 420-2006-01200 |
| | | _____ and EEOC |

State or local Agency, if any

| Name (Indicate Mr., Ms., Mrs.) | Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|---|
| Patricia Gibson | (334) 756-9275 | |

Street Address                                    City, State and ZIP Code

403 Fairwood Drive, Valley, AL 36854

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| WESTPOINT STEVENS | 101 - 200 | 706-645-7229 |

Street Address                                    City, State and ZIP Code

Lanier/Carter Mills, P. O. Box 248, Valley, AL 36854

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Patricia Gibson | | 334-756-9275 |

Street Address                                    City, State and ZIP Code

403 Fair Wood Dr. Valley ala. 36854

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN <br> ☐ RETALIATION   ☒ AGE   ☐ DISABILITY   ☐ OTHER (Specify below.) | Earliest: 08-26-2005    Latest: 01-04-2006 <br> ☑ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was hired by the above employer on August 16, 1975. Since my employment began, I have performed on at least five different jobs within the plant. I performed all duties without complaints until I was assigned to work at the Lanier Mills under the supervision of Billy Joe Steward. I would be called to the office by Billy Steward and told that I had made mistakes. He would attempt to get me to sign statements admitting to mistakes that I did not believe I made. He would come and get me to write me up even when I would be working under other supervisors. I do not believe that I was the only employee making mistakes, but I do believe I was the only one being written up for them. One day while performing my duties, Bill Anderson, remarked to me, "Pat, your kids are all grown now and don't you have grand kids, you can move on now." While waking through the plant, Tim Wilbanks, saw me and said, "Pat, you still here?" These statements made me feel as though they believed I was too old to be there. I was given three writeups in the first year that I worked under Billy Joe Steward. I was terminated from my job after thirty years of employment on August 26, 2005. After I was terminated Kelvin Overtree, Safety director, informed me that he would get my papers ready. I believed that he was referring to my retirement papers. I have not been contacted by anyone and every time I have called, I have not been able to speak with anyone who would tell me anything about my retirement benefits.

I believe I have been discriminated against because of my Age, 60, DOB _____, in violation of the Age Discrimination in Employment Act of 1967, as amended. The write ups were given without cause and I was targeted simply because of my age.

**(AMENDED CHARGE-ORIGINAL CHARGE FILED JANUARY 4, 2006)**

RECEIVED MAY - 8 2006
EEOC BIRMINGHAM DISTRICT

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. <br> SIGNATURE OF COMPLAINANT |
| 5-6-06    Patricia Gibson <br> Date    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

DEFENDANT'S EXHIBIT <br> 59 <br> P. Gibson



**U.S. Equal Employment Opportunity Commission**
**Birmingham District Office - 420**

Ridge Park Place
1130 22nd Street, South
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105
1-800-669-4000

Respondent: WESTPOINT STEVENS
EEOC Charge No.: 420-2006-01200
FEPA Charge No.:

May 03, 2006

Gibson  Patricia
403  Fairwood Drive
Valley, AL 36854

Dear  Patricia:

This is with reference to your Charge of Discrimination where in I omitted the Amended Charge Statement. This statement is necessary to show that your charge filed with the EEOC was received in a timely manner.  Please Date and Sign the charges that I have included and return them to me as soon as possible.

[ ]      Title VII of the Civil Rights Act of 1964 (Title VII)

[ X ]    The Age Discrimination in Employment Act (ADEA)

[ ]      The Americans with Disabilities Act (ADA)

[ ]      The Equal Pay Act (EPA)

[Please use the "EEOC Charge No." listed at the top of this letter whenever you call us about this charge. Please notify this office of any change in address or of any prolonged absence from home. Failure to cooperate in this matter may lead to dismissal of the charge.

Sincerely,

Linda-Sue  Ross
Investigator Support Asst
(205) 212-2103

Office Hours: Monday - Friday, 8:00 a.m. - 4:30 p.m.
TDD: 1-800-669-6820
www.eeoc.gov

Enclosure(s)
    Copy of EEOC Form 5, Charge of Discrimination



| **MEMORANDUM** | **RECOMMENDATION FOR CLOSURE** |
|---|---|

**TO:**   BOOKER T. LEWIS                     **CHARGE NO.**   13 0 2006 01200

**FROM:**   ARTHUR SANDERS

**SUBJECT:**   Patricia Gibson                     v.   Westpoint Stevens

*Charging Party*                                         *Respondent*

I recommend dismissal/closure of the subject charge
based on the following:

    ]   No Jurisdiction                              [   ]   Not Reasonable Cause

    [   ]   Failure to State a Claim

    [   ]   Other _____   [   ]   Settlement/Mediation
                 Specify

    ]   Untimely                                   [   ]   Withdrawal without Benefits

    ]   Failure to Cooperate

    ]   Unable to Locate                        [ x ]   Right to Sue (Issued on Request)

    ]   Failure to Accept Full Relief          [   ]   Director must certify that processing will not likely be completed within 180 days of filing (Title VII/ADA).

Specific information in support of recommendation/decision:

By letter dated 6/1/2006, the Charging Party requested the issuance of a Notice of Right to sue. Pursuant

to CFR 1601.28(a)(1), regarding the prompt issuance of a NRTS upon request when more than 180 days have expired from

The filing of the charge, I recommend granting the CP's request for the issuance of a Notice of Right to sue. The Charging

Party filed the subjected charge 3/16/2006 and more than 180 days have expired since filing of the charge.

DEFENDANT'S
EXHIBIT
61
P. Gibson

Decision by/
Recommendation approved by: _____   Date: 7/20/06

*(Signature)*

EEOC Form 291 (10/96)



WESTPOINT HOME

**J. Tim Wilbanks**
Director Labor Relations and Corporate Compliance

March 27, 2006

Ms. Sandra G. Figgers, Investigator
Birmingham District Office
Ridge Park Place – Suite 2000
1130 22nd Street South
Birmingham, AL 35205

     Re:    Patricia Gibson
              EEOC # 420-2006-01200

Dear Ms. Figgers:

    The Company has received the Charge of Discrimination filed by Ms. Gibson. There is however a question concerning whether the Charge was filed within the required 180 day period.

    Ms. Gibson has made several allegations to support her claim of discrimination with the final act being that she was terminated on August 26, 2005. Therefore, the 180-day period expired on February 22, 2006.  The Notice of Charge of Discrimination was filed March 7, 2006, 13 days later.

    Although the Charge indicates the latest date of discrimination occurred on January 4, 2006, there is nothing in "The Particulars Are" section concerning any alleged discriminatory acts after August 26, 2006. In addition Ms. Gibson was no longer an employee on that date.

    The Company believes the Charge should be administratively dismissed for the reasons above. If this is not correct a brief explanation would be appreciated concerning why the Charge is considered timely.

    If it is necessary to file a position statement you can be assured the Company will cooperate fully to resolve the matter. I will wait for your response before proceeding further.

Sincerely,

Tim Wilbanks



DEFENDANT'S
EXHIBIT
62
P. Gibson

7:29 AM
06/06/07

**AIC Operations, Inc.**
## Payroll Summary
### March through August 2006

| | | TOTAL | |
| --- | --- | --- | --- |
| | | Rate | Mar - Aug 06 |
| **Employee Wages, Taxes and Adjustments** | | | |
| Gross Pay | | | |
| Holiday 10 Foundry Utility 2 | | | 215.68 |
| Hourly 10 Foundry Utility 2 | | | 6,187.76 |
| Ovt 10 Foundry Utility 2 | | | 1,801.57 |
| **Total Gross Pay** | | | 8,205.01 |
| | | | |
| Deductions from Gross Pay | | | |
| 42 PreTax Med Premium | | | -384.80 |
| 43 PreTax Dental Premium | | | -20.02 |
| **Total Deductions from Gross Pay** | | | -404.82 |
| | | | |
| **Adjusted Gross Pay** | | | 7,800.19 |
| | | | |
| Taxes Withheld | | | |
| Federal Withholding | | | -530.00 |
| Medicare Employee | | | -113.10 |
| Social Security Employee | | | -483.61 |
| AL - Withholding | | | -268.45 |
| Auburn Occupation | | | -82.03 |
| **Total Taxes Withheld** | | | -1,477.19 |
| | | | |
| **Net Pay** | | | 6,323.00 |
| | | | |
| **Employer Taxes and Contributions** | | | |
| Federal Unemployment | | | 56.00 |
| Medicare Company | | | 113.10 |
| Social Security Company | | | 483.61 |
| AL - Unemployment Company | | | 335.20 |
| AL - Emp. Security Assessment | | | 4.80 |
| **Total Employer Taxes and Contributions** | | | 992.71 |

**WPH**
**000502**


DEFENDANT'S EXHIBIT
6.3
P. Gibson

EMPLOYEE:  Gibson, Patricia
  S.S.#:

EMPLOYER:  First Choice - Opelika
ADDRESS:   128 South 8th Street
CY/ST/ZIP: Opelika      AL  36801

FOR PERIOD:  01/01/2006 TO 12/31/2006

### C H E C K S

| W/E DT. | CHECK DATE | CHECK # | GROSS PAY | FICA W/H | FEDTAX W/H | STATE W/H | LOCAL W/H | SDI W/H | DEDUCTS | MISC. PAY | NET PAY | HOURS REG. | O.T. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/15 | 01/20/2006 | 452396 | 415.76 | 31.81 | 19.84 | 17.19 | 4.16 | .00 | 20.00 | .00 | 322.85 | 40.00 | 7.96 |
| 01/22 | 01/27/2006 | 452448 | 512.00 | 39.16 | 29.87 | 21.41 | 5.12 | .00 | .00 | .00 | 416.44 | 40.00 | 16.00 |
| 01/29 | 02/03/2006 | 452509 | 536.00 | 41.00 | 33.47 | 22.43 | 5.36 | .00 | .00 | .00 | 433.74 | 40.00 | 18.00 |
| 02/05 | 02/10/2006 | 452578 | 440.00 | 33.66 | 22.26 | 18.19 | 4.40 | .00 | .00 | .00 | 361.49 | 40.00 | 10.00 |
| 02/12 | 02/17/2006 | 452645 | 512.00 | 39.16 | 29.87 | 21.41 | 5.12 | .00 | .00 | .00 | 416.44 | 40.00 | 16.00 |
| 02/19 | 02/24/2006 | 452737 | 416.00 | 31.82 | 19.86 | 17.11 | 4.16 | .00 | .00 | .00 | 343.05 | 40.00 | 8.00 |
| 02/26 | 03/03/2006 | 452827 | 512.00 | 39.16 | 29.87 | 21.41 | 5.12 | .00 | .00 | .00 | 416.44 | 40.00 | 16.00 |
| 03/05 | 03/10/2006 | 452920 | 440.00 | 33.66 | 22.26 | 18.19 | 4.40 | .00 | .00 | .00 | 361.49 | 40.00 | 10.00 |
| 03/12 | 03/17/2006 | 453040 | 128.00 | 9.80 | .00 | 4.35 | 1.28 | .00 | .00 | .00 | 112.57 | 16.00 | .00 |
|  |  |  | 3911.76 | 299.23 | 207.30 | 161.60 | 39.12 | .00 | 20.00 | .00 | 3184.51 | 336.00 | 101.98 |

10 pgs



DEFENDANT'S EXHIBIT
6.4
P. Gibson

# Troup County School System
## Cafeteria Plan Election & Enrollment Form

| Employee Name | | | |
|---|---|---|---|
| Patricia J. Gibson | ☒ Female  ☐ Male | ☒ Married  ☐ Single | Birthdate (Mo. Day, Yr.) |

| Address | | | | Hire Date (Mo. Day, Yr.) |
|---|---|---|---|---|
| 403 Fairwood Drive | Dept. 66 | Social Security Number | | 11-17-06 |

| City  State  Zip | Occupation | Effective Date |
|---|---|---|
| Fairfax, AL  36854 | custodian | 1-1-07 |

| | | Annual Earnings |
|---|---|---|
| | | $17,068.80 |

| Paymode | Home Phone | Work Phone | Plan Year End |
|---|---|---|---|
| ☒ Monthly  ☐ Bi-Weekly | 334-756-9275 | 706-845-7556 | 12-31-07 |

| ☒ New Employee or Annual Enrollment | Change Due To: ☐ Marriage ☐ Birth ☐ Death ☐ Divorce ☐ Adoption ☐ Terminated ☐ Name Change ☐ Other | Actively at work? ☒ yes ☐ no | ☐ COBRA ☐ Retiree |
|---|---|---|---|

| ► Jerry Gibson  Primary Beneficiary for Basic & Supplemental Group Life Insurance | husband  Relationship |
|---|---|
| ► Cora Hicks  Contingent Beneficiary for Basic & Supplemental Group Life Insurance | neice  Relationship |

**I ELECT TO RECEIVE THE FOLLOWING COVERAGES UNDER THE CAFETERIA PLAN ON A "PRE-TAX" BASIS:**

I and my employer hereby agree that my cash compensation will be reduced by the amounts set forth below for each pay period during the plan year (or during such portion of the plan year that remains after the date of this agreement). On this or the appropriate form(s), I have enrolled for the below benefits.

| | | Mo. Deduction |
|---|---|---|
| **State Health Benefit Plan** | Must complete SHBP Membership Enrollment Form or Declination Form | $184.40 |
| **Medical Expense Reimbursement-- Flexible Spending Account** (Maximum $5,000 per Year) | | $ |
| **Dependent Care Reimbursement – Flexible Spending Account** (Maximum $5,000 per Year) | | $ |
| **Basic Group Life Insurance - $12,500** | | No Cost |
| **Supplemental Group Life Insurance -** $10,000, $20,000 or $37,500 | Amount Selected $ | $ |
| **Group Dental Insurance** ☐ High Option ☒ Low Option | ☐ Employee ☒ Employee + One ☐ Full Family | $25.80 |
| **Vision Insurance** ☐ Employee | ☐ Employee & One Dependent ☐ Full Family | $ |

### Covered Dependents

| Dental | Vision | Last Name, First Name, Middle Initial | Relationship | Birthdate | Student/Handicap? |
|---|---|---|---|---|---|
| ☐ | ☐ | | | | |
| ☐ | ☐ | | | | |
| ☐ | ☐ | | | | |
| ☐ | ☐ | | | | |
| ☐ | ☐ | | | | |

DEFENDANT'S EXHIBIT 65 P Gibson

**I ELECT TO RECEIVE THE FOLLOWING ADDITIONAL COVERAGES ON AN "AFTER-TAX" BASIS**

Prior to the beginning of each plan year, I will have the opportunity to enroll, cancel or change the following coverages.

| **Dependent Group Life Insurance** | $.27 for $1000 or $1.35 for $5000 covers spouse and all dependents | $1.35 |
|---|---|---|
| **Long-term Disability –** Provides 60% of earnings from the 91st day of disability, continuing to age 65, RBD | | $14.65 |
| **Individual Supplemental Life Insurance** | Contact Houze & Associates, Inc. for rates and application | |

I UNDERSTAND that if my required contributions for the selected benefits are increased or decreased while this agreement remains in effect, my compensation reduction will automatically be adjusted to reflect the change. Prior to the first day of each plan year, I will have the opportunity to change my benefit elections for the following plan year. If I do not complete and submit a new election form prior to a new plan year, I will be treated as having elected to continue my benefit elections then in effect for the new plan year. In addition, I understand changes in the elected deduction and benefits can only be made in the event of a Section 125 qualifying event.

Any person who knowingly and with intent to defraud, submits an application containing materially false, or misleading information, commits a fraudulent act, which is a crime.

Date 12-4-06     Signature Patricia J. Gibson

# TROUP COUNTY SCHOOL SYSTEM

P.O. Box 1228
LaGrange, Georgia 30241
(706) 812-7900
Fax (706) 812-7904

TARYL W. ANDERSON
Director of Personnel

TO:       PATRICIA GIBSON

**WPH
000725**

FROM:     Troup County Board of Education

RE:       Employment Information

Welcome to the Troup County School System. We hope your association with the schools will be a rewarding experience.

Please be aware of the system policies regarding sick leave, drug and alcohol abuse, sexual harassment, and worker's compensation. You will be asked to sign statements that you will respect these policies. Should you find that you are unable to go to work because of illness or an emergency, you must call your supervisor at your earliest opportunity and report your reason for not being at work on a daily basis.

**Paraprofessionals** are required to maintain a valid Paraprofessional Certificate by attending training sessions provided by the school system. Paraprofessionals will receive the Professional Learning Unit (PLU) schedule at the beginning of each school year. Each school has a contact person who is a liaison for the training program.

Questions or information related to **Employee Benefits** should be directed to Pam Crews, Merry Hubbard or Ellen Hubbard in the Payroll Office at the Administrative Services Center (706-812-7900). If you wish to enroll any family member in the State Merit Health Insurance, you must report each individual's social security number and birth date at the time of enrollment. You are solely responsible for obtaining any previous **experience verifications** for payroll purposes. These must be received within 90 days of employment for consideration.

Questions or information regarding **Worker's Compensation** should be directed to Annette Duffee (706-812-7900) at the Administrative Services Center.

Support personnel or non-certified employees are "at will" employees and continued employment is at the will of the Troup County Board of Education.

Location:  FRANKLIN FOREST ELEMENTARY SCHOOL     Position:     CUSTODIAN

Hire Date:  11/17/06     Experience:   10 YEARS APPROVED

Payroll Information: $8.89 AN HOUR, 8 HOURS A DAY, 240 DAYS (12 MONTHS)

$8.89 X 8 X 240 = $17,068.80 ANNUAL SALARY  MONTHLY SALARY = $1,422.40
YOUR DECEMBER CHECK (12/20/06) WILL INCLUDE YOUR MONTHLY SALARY OF $1,422.40, PLUS
THE SUBSTITUTE PAY FROM NOVEMBER 6TH – 16TH, AND YOUR REGULAR DAILY PAY AT $8.89
AN HOUR FOR NOVEMBER 17, 20, 21, 27, 28, 29 AND 30.
BEGINNING AT THE END OF JANUARY 2007 THROUGH JUNE 2007 YOUR MONTHLY SALARY IS $1,422.40.

| | For Office Use Only: | |
|---|---|---|
| | Don Miller | ✓ |
| | BD | N/A |
| | PR | ✓ |
| | 400 | N/A |
| | R | N/A |
| | ID# | |

# TROUP COUNTY SCHOOLS

### Personnel Recommendation Form

Name: _Patricia Gibson_     Location: _FFE_

Position: _Custodian_     Grade: _____ Subject: _____

Beginning Date: _10/16/06_     Comments: _30 day Temporary (after 30 days)_

Funding Source: (Title I, VI-B, Pre-K, Local, Other) _____

---

**Check all that apply:**

_____ New Position (Attach copy of authorization/details)

_✓_ Replacement Position
Replacing : _Eddie Nave_

_✓_ Transfer From: (Name of School) _Operations Center Alternate_
_(30 day probationary period)_
_____ Transfer Within School: (Position/Grade/Subject-Old Assignment)_____

_____ Termination/Resignation  (Attach copy of resignation/documentation)
Last day to work: _____
Personnel notified?  Y_____ N_____       Payroll notified?  Y_____ N_____

---

**Certified:**
I have verified certification with the
Personnel Department and checked
at least two references for the person I
am recommending.
_____ This individual is "Highly Qualified"

Signed:_____

**Non-Certified:**          _one_
I have checked at least ~~two~~ references
for the person I am recommending.
Signed: _M W_
Hours Per Day: _8_
Days Per Year: _240_
Hourly Wage: _____
Previous Experience: _____
(Must be verified in writing before granted)

---

I recommend the above listed person for employment.

_Janet Johnson_     _10-16-06_
Principal/Administrator          Date

Transferring Principal          Date
_M. Whitters_     _10/16/06_

Program Director (If Applicable)     Date          Other          Title     Date

_Daryl W Anders_     _10/18/06_
Director of Personnel          Date

WPH
000727

Revised:  8/23/05

## TROUP COUNTY SCHOOLS

### Personnel Recommendation Form

| For Office Use Only | |
|---|---|
| Don Miller | ✓ |
| BD | ✓ |
| PR | |
| 400 | |
| R | |
| ID# | 37718 |

Name: _Patricia Gibson_    Location: _Operations Center_

Position: _Temporary Custodian_    Grade: _____    Subject: _____

Beginning Date: _9/12/06_    Comments: _Temporary only_

Funding Source: (Title I, VI-B, Pre-K, Local, Other) _____

**Check all that apply:**

_____ New Position (Attach copy of authorization/details)

✓ Replacement Position

Replacing : _Carla Slaughter_

_____ Transfer From: (Name of School) _____

_____ Transfer Within School: (Position/Grade/Subject-Old Assignment)_____

_____ Termination/Resignation  (Attach copy of resignation/documentation)

Last day to work: _____

Personnel notified?  Y_____  N_____        Payroll notified?  Y_____  N _____

**Certified:**

**I have verified certification with the Personnel Department and checked at least two references for the person I am recommending.**

_____ **This individual is "Highly Qualified"**

Signed:_____

**Non-Certified:**

**I have checked at least ~~two~~ *one* references for the person I am recommending.**

Signed: _WW_

Hours Per Day: _8_

Days Per Year: _240_

Hourly Wage: _7.14_

Previous Experience: _10_

(Must be verified in writing before granted)

I recommend the above listed person for employment.

_____    _____
Principal/Administrator                    Date

_Frank O. Gurley_  _9/13/06_    _M. White_  _9/12/06_

Program Director (If Applicable)    Date    Other    Title    Date

_Carol Clark_  _9/14/06_

Director of Personnel    Date

**WPH
000728**

# FIRST ✔ CHOICE
## PERSONNEL, Inc.

---

*"Your First Choice for Personnel Resources"*

## Job Description / Essential Function

**Position Title: Material Handler**

The following are physical requirements pertaining to the job(s) for which you are applying. These bona fide physical requirements are essential functions of the job and are in addition to the skills, certifications, years of experience or other qualifications required to perform the job(s) for which you have applied.

Please be aware that all persons may be required to furnish health condition information and if necessary, submit to an examination by a company-designated physician. This information will be used to determine appropriate job placement. It shall not be used to disqualify an otherwise qualified person who may habe a mental of physical disability.

**These questions pertain only to the essential functions of the job(s) for which you are applying.**

**Can you perform the function or task:**

1. **Withstand varied environments – hot, cold, wet, dusty**      ☑ Yes  ☐ No

2. **Hand grasp, wrist turn, arm extend repetitively during shift**      ☑ Yes  ☐ No

3. **Twist torso from side to side repetitively during shift**      ☑ Yes  ☐ No

4. **Bend knees repetitively during shift**      ☑ Yes  ☐ No

5. **Lift material weighing over 25 lbs repetitively during shift**      ☑ Yes  ☐ No

6. **Wear proper safety equipment – back support, safety glasses, safety goggles, work boots, or gloves**      ☑ Yes  ☐ No

**The following are to be asked only post offer:**

7. **Do you have any condition or have you sustained any injury that would have an effect on your capacity to perform the duties of this position with or without reasonable accommodations?**      ☐ Yes  ☑ No

8. **Do you have or have had any back problems?**      ☐ Yes  ☑ No

9. **Have you had any serious wrist problems including Carpal Tunnel Syndrome?**      ☐ Yes  ☑ No

Signature of Employee *Patricia Jones Gibson*  Date 1-4-06

**Social Security Number**

By completing and signing this form, I am verifying that the employer has already presented a conditional job offer for me.

Signature of Employer *Patricia Jones Gibson*  Date 1-4-06



DEFENDANT'S EXHIBIT
66
P. Gibson

**WPH**
**000528**



WESTPOINT STEVENS



PLAINTIFF'S EXHIBIT
67
R. Gibson

# QUARTER CENTURY CLUB

## Having Completed Continuous Service
## Of a Quarter Century

On the ___15TH___ day of ___AUGUST___, ___2000___,

### PATRICIA J. GIBSON

## Is Duly Recorded As A Member
## Of The
# Quarter Century Club

Signed on this ___19TH___ day of ___JUNE___, ___2001___

_M. L. Fontenot_
M.L. "Chip" Fontenot, President and Chief Operating Officer

_Jon Huston_
General Manager

_Larry L. Bledsoe_
Senior Vice President

_Mike Mansfield_
Plant Manager

CC-051101-QCC